Page 1

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLUMBIA

- - - - - - - - - - - - - - -X

SAUNDRA G. ELION,            :

    Plaintiff           :

    v.                  : Case No. 05-0992(PLF)

                        :

ALPHONSO R. JACKSON,         :

    Defendant           :

- - - - - - - - - - - - - - -X

CONDENSED

DEPOSITION OF MICHAEL STEPHENS

Washington, D.C.

Wednesday, July 19, 2006

Deposition of MICHAEL STEPHENS, called for examination at 9:45 a.m., at the law offices of Robert C. Seldon & Associates, P.C., 1319 F Street, N.W., Suite 305, Washington, D.C., before Gary S. Howard, a notary public in and for the District of Columbia, when were present on behalf of the respective parties:



MGB Reporting, Inc.
Tel:800-245-2528   Fax: 888-983-8016

Page 2

1  APPEARANCES:
2     On behalf of the Plaintiff:
3        ROBERT C. SELDON, Esq.
4        Law Offices of Robert C. Seldon, P.C.
5        1319 F Street, N.W.,
6        Suite 305
7        Washington, D.C. 20004
8
9     On behalf of the Defendant:
10       JOHN C. TRUONG, Esq.
11       United States Department of Justice
12       United States Attorney's Office
13       555 4th Street, N.W.,
14       Washington, D.C. 20530
15       (202-307-0406)
16
17       RICHARD K. JOHNSON, Esq.
18       HUD, Office of Inspector General
19       MAXINE SHARPE WHEATLEY, Esq.
20       HUD, Office of General Counsel
21
22

Page 3

1  Also present:
2     SAUNDRA ELION
3
4            C-O-N-T-E-N-T-S
5  WITNESS                    EXAMINATION
6  Michael Stephens                4
7            E-X-H-I-B-I-T-S
8  NUMBER                     IDENTIFICATION
9  Deposition Exhibit No. 1        52
10 Deposition Exhibit No. 2        61
11 Deposition Exhibit No. 3        84
12 Deposition Exhibit No. 4        102
13
14
15 (Exhibits supplied by Mr. Seldon.)

Page 4

1            P-R-O-C-E-E-D-I-N-G-S
2  Whereupon,
3            MICHAEL STEPHENS
4  was called as a witness and, having been first duly
5  sworn, was examined and testified as follows:
6            EXAMINATION
7  BY MR. SELDON:
8  Q   Mr. Stephens, good morning.
9  A   Good morning.
10 Q   For the record, would you please give us
11 your full name and your present position with the
12 Federal Government?
13 A   Michael Patrick Stephens -- S-t-e-p-h-e-
14 n-s, deputy inspector general, Department of
15 Housing and Urban Development.
16 Q   Mr. Stephens, let me start in a simple
17 place. It often happens that witnesses for the
18 government are needed for trial.
19     And so, typically, for law enforcement
20 people, we ask for home addresses to serve
21 subpoenas.
22     Because you're in law enforcement, I

Page 5

1  prefer not to do that. What we would need to know
2  is, whether you're with HUD, someone else in the
3  government, or outside of the government, the U.S.
4  Attorney's Office could accept service of a trial
5  subpoena for you.
6       They would not be responsible for
7  producing you. They would only act as your agent to
8  accept the subpoena for service.
9       Is that acceptable to everybody?
10      MR. TRUONG: We had this discussion, Mr.
11 Seldon.
12      MR. SELDON: Great.
13      MR. TRUONG: And the U.S. Attorney's
14 Office is willing to accept service on behalf of
15 Mr. Stephens, if he agrees to do so.
16      I don't think that's an issue. Do you
17 want him to answer now?
18      MR. SELDON: No, that's all I want.
19      MR. TRUONG: Okay.
20      MR. SELDON: That's all I want.
21      MR. TRUONG: That's fine.
22 BY MR. SELDON:

Page 22

1  Q  The entity itself, is there any
2  particular way that, standard operating procedure
3  for it to consider reorganizing?
4  A  The assistant inspector generals are
5  responsible for the success of their own
6  organization.
7     And depending on the pressures and the
8  stressors relating to what they need to accomplish,
9  they can propose, and do, changes within an
10 organization to meet whatever goals that need to be
11 met.
12 Q  And if you can just expand upon that.
13 What exactly do you mean by that?
14    MR. TRUONG: Expand on what?
15    MR. SELDON: I'm just not sure what he
16 meant by that. He said --
17    MR. TRUONG: By what?
18    MR. SELDON: His answer, what he said.
19    MR. TRUONG: The whole thing?
20    MR. SELDON: Let me just explain.
21    BY MR. SELDON:
22 Q  I think you said you expect -- or not

Page 23

1  necessarily you expect, but the assistant inspector
2  generals have the responsibility for the success of
3  their own organizations. And then it went on from
4  there.
5     What I was wondering was how does that
6  relate to responsibility for considering, say,
7  budgetary matters?
8  A  Well, the federal budget in the last four
9  or five years has been under terrific strain. Our
10 organization, like many, have had to foment hiring
11 freezes.
12    Because of hiring freezes, you must move
13 people to where the work needs to be done. You
14 don't have an ability to replace people that leave
15 the organization by retirement or transfer to
16 another government job.
17    That's an issue that all federal managers
18 have to deal with, as well as the assistant
19 inspector generals.
20 Q  Okay. And then in terms of responsibility
21 for considering the effects of budget on potential
22 reorganizations, I think to complete the answer, I

Page 24

1  was asking about -- well, maybe I'll go back and
2  try it again.
3     Where, if anywhere, in the process of
4  proposed reorganization are budgetary matters
5  considered as a standard operating procedure?
6  A  I think it's the other way around, with
7  all due respect.
8  Q  Okay.
9  A  And that is, budgetary matters generally
10 require a solution. And one of those solutions
11 might be reorganization.
12 Q  Okay. And then who is responsible, or
13 what entity is responsible for determining, if any,
14 the effect of a proposed reorganization on the
15 budget of OIG?
16 A  Well, the assistant inspector generals
17 have to come up with solutions to meet their
18 requirements placed upon them.
19    And so, they certainly can initiate
20 potential solutions within their organizations to
21 meet that need. And that might include
22 reorganization.

Page 25

1  Q  Okay. And so would that mean then that,
2  in a potential reorganization -- well, let's put it
3  this way.
4     What is the role, then, of the office of
5  management and policy, if any, in considering the
6  budgetary impact of a proposed reorganization?
7     MR. TRUONG: Objection. Foundation.
8     MR. SELDON: I'll rephrase it if you can
9  explain to me -- I'm not quite following the
10 objection.
11    MR. TRUONG: Go ahead and answer the
12 question, to the extent that you understand the
13 question, sir.
14    THE WITNESS: Well, as I understand the
15 question, the office of management and policy
16 really has a very limited role in recommending
17 reorganizations.
18    What they do is they provide me and Mr.
19 Donahue and the senior staff, of which the
20 assistant inspector generals are part of, with the
21 budgetary realities of life.
22    And some of that ends up being how many

Page 26

1  people you can hire, how many people you can
2  backfill.
3      MR. SELDON: Okay.
4      THE WITNESS: And that's the role. They
5  don't come in and say, hey, we think you ought to
6  reorganize this or reorganize that.
7      That's not their role.
8      BY MR. SELDON:
9  Q   Okay. And then they don't -- correct me
10 if I'm wrong. I'm just trying to make it faster.
11     In OMAP, it is not their function, then,
12 to consider the budgetary pros and cons, if you
13 will, of a proposed reorganization?
14 A   No.
15 Q   Okay. Thanks. And again, I'm just trying
16 to move this along.
17     That is essentially the function of the
18 assistant inspector general in the organization
19 that's proposing to reorganize?
20 A   In terms of the issue of reorganization,
21 that's the best I can do to describe it, yes, sir.
22 Q   And is the same true in terms of -- hold

Page 27

1  on one second. Strike that. Let me check my notes.
2      (Pause.)
3      Is that essentially true in terms of the
4  overall desirability or nondesirability of
5  reorganization?
6  A   I don't understand that question.
7  Q   Okay. What we've just gone through in the
8  budgetary world is to try and see if there is
9  another personnel or HR component that gets
10 involved.
11 A   Another what chart?
12 Q   Personnel or human resources component.
13 A   Okay.
14 Q   That gets involved in planning or
15 implementing reorganizations.
16     And I believe we went through on the
17 budgetary matters. And what you testified to was
18 that OMAP has a limited role to play and that this
19 is essentially the role to be played by an
20 assistant inspector general proposing to
21 reorganize.
22     Are you with me so far?

Page 28

1  A   Well, it can come from the top. It can
2  come from Mr. Donahue or myself if we decide that
3  we think things need to be reorganized.
4      That has not happened since we've been
5  there, that I'm aware of, specifically.
6  Q   Okay.
7  A   But it normally is generated by the
8  management of the respective divisions.
9  Q   Okay.
10 A   And brought forward to us for
11 consideration.
12 Q   And all I'm trying to do is close the
13 loop. I think we went through it, specifically that
14 that's true with respect to consideration of
15 budgetary matters.
16 A   If you want to focus on budgetary
17 matters, then that's your option.
18 Q   Okay. And all I wanted to do then was to
19 run through.
20 A   Sure.
21 Q   Is it also true from an HR or human
22 resources perspective in terms of a planned

Page 29

1  reorganization?
2      MR. TRUONG: True, in terms of what? Can
3  you elaborate?
4      MR. SELDON: Sure. I'm trying to find --
5  just to explain what I'm trying to figure out here.
6      THE WITNESS: Sure.
7      MR. TRUONG: I'm confused.
8      MR. SELDON: Okay. We went through what
9  role, if any, the office of management and policy
10 plays from a budgetary perspective in a proposed
11 reorganization.
12     And Mr. Stephens has given us a very
13 clear answer.
14     I'm just trying to find out if, what
15 their role is, or if it's any different from a
16 human resources perspective.
17     That's all.
18     (Pause.)
19     THE WITNESS: The role of the human
20 resources perspective is very limited in a
21 reorganization.
22     MR. SELDON: Okay.

Page 30

1    THE WITNESS: Other than to keep track of
2 what people are assigned. And I think that the
3 potential in reorganizations, of course, the office
4 of human resources writes job descriptions and
5 things of that sort.
6    There may be a circumstance when
7 something changes that requires that. Other than
8 that, I don't know.
9    BY MR. SELDON:
10   Q   And I'll just make it a little clear, if
11 I can.
12   I guess what I'm saying, in terms of
13 proposing to abolish or consolidate a particular
14 entity, is it fair to say that that is also
15 essentially the responsibility either of the
16 assistant inspector general or you or Mr. Donahue
17 above them, as opposed to --
18   A   That's correct.
19   Q   Okay. Fine. There we go. The office of
20 inspector general budget, is that broken down on an
21 office-by-office basis?
22   And by office I mean large offices, the

Page 31

1 office of the inspector general, the office of
2 investigations, the office of audit, office of
3 management and policy, and the office of legal
4 counsel.
5    A   Well, it's submitted to HUD and to
6 Congress as the office of the inspector general.
7 Once it's approved and received, the pie is cut up
8 to the various divisions and those budgets are
9 managed by the assistant inspector generals of
10 those divisions.
11   Q   Okay.
12   A   Mostly operating funds. Salaries and
13 benefits are handled by OMAP.
14   Q   That's what I was going to ask you next.
15 When you say, salaries and benefits are handled by
16 OMAP, what did you mean by that?
17   A   Well, OMAP has the function, among other
18 things, of making sure people get paid. So it's a
19 matter of a function of working with our
20 contractor, which it's the Department of
21 Agriculture that handles our payment.
22   Q   Right. I guess, and let me --

Page 32

1    A   So the inspector generals -- the
2 assistant inspector generals really don't get
3 involved in that, other than timecards and things
4 of that sort.
5    Q   Okay.
6    A   Approving leave and stuff like that,
7 certainly is done by the local managers.
8    Q   Okay. That's been very helpful. So let me
9 try and clarify this again.
10   A   Sure.
11   Q   Is the budget of an office, the office of
12 investigations or, let's say, the office of audit
13 in this case, are they budgeted on an annual basis,
14 a certain amount of functions to pay employee
15 salaries?
16   A   No. That's handled directly out of OMAP.
17 I don't think that the monies for salaries are
18 allotted specifically to the various assistant
19 inspector generals.
20   They have operating funds.
21   Q   But the operating funds, if I understand
22 you, are not used to pay salaries.

Page 33

1    A   No, they're not used to pay salaries or
2 benefits.
3    Q   Okay. They're used for, among other
4 things, lease payments, for example?
5    A   Well, cars, space, printing paper, the
6 normal operating issues related to the field,
7 mostly.
8    Q   Okay. And that's just an example, I take
9 it, to sum it up.
10   A   Yes.
11   Q   Okay. So then in terms of allocating
12 personnel or what are called full-time-equivalents
13 within the office of inspector general, how is that
14 accomplished annually?
15   A   Well, OMB works with our office of budget
16 within OMAP. The assistant inspector generals
17 assist OMAP in putting together a budget that the
18 office of investigations feels that they need.
19   The office of audit, right on down the
20 line, feel that they need, and what their
21 requirements are and what their initiatives are.
22 And we put a package together and we send it

Page 34

1  through HUD to the office of management and budget,
2  like everyone else.
3      And there are negotiations back and forth
4  and then it's sent up to Congress.
5      And then, as time goes by, our budget for
6  the fiscal year is established, in which you can
7  determine what your full-time equivalents can be.
8      And that changes from year to year.
9  Sometimes that changes throughout the year.
10  Q    Okay.
11  A    It depends on the circumstances.
12  Q    Okay. So now, you've been very helpful.
13  Let me go back through the process.
14      There is, I guess, a process in which a
15  budget which includes the number of full-time
16  equivalent or employees for the office of inspector
17  general is sent to the office of management and
18  budget.
19      Is that the idea?
20  A    Yes.
21  Q    And is that broken down by office, for
22  example, office of investigation, office of audit,

Page 35

1  legal counsel, and office of management and policy?
2  A    OMB doesn't tell you what to break it
3  down. They just give you -- for your organization,
4  you can have this many full-time equivalents.
5  Q    Okay.
6  A    And we decide how that's broken up within
7  the organization.
8  Q    Okay. That's very helpful. And does that
9  change during the fiscal year?
10  A    It does, depending on the budget, the
11  stressors. And that normally is what generates a
12  hiring freeze.
13  Q    Okay. That's been very helpful. In this
14  context, and I'm trying to make this quicker for
15  you. But if you need me to explain it more, I will.
16  A    Take your time.
17  Q    What is a hiring ceiling?
18  A    Well, a hiring ceiling --
19  Q    Maybe that's the wrong term. I meant a
20  personnel ceiling. Maybe that's the right term. I
21  don't know.
22  A    Well, I think you're -- I don't want to

Page 36

1  put words in your mouth.
2      I call it an FTE ceiling.
3  Q    Fair enough.
4  A    Which is full-time equivalents. That's
5  really out of the control of agencies. It's
6  primarily set by the department you're in, plus
7  OMB.
8      Now, that doesn't mean that -- you better
9  attempt to stay within that ceiling. Salaries and
10  benefits are about 77 percent of our budget right
11  now. And the average salary of our employees is
12  about $107,000.
13      MR. TRUONG: I'm in the wrong agency.
14      (Laughter.)
15      MR. SELDON: You're not in law
16  enforcement. That drags it up.
17      (Laughter.)
18      BY MR. SELDON:
19  Q    Okay. Got it.
20  A    So the rest is operating expenses.
21  Q    Okay.
22  A    Which, you have to pay people. What's

Page 37

1  left is your operating expenses.
2  Q    And this relates to -- maybe I should go
3  back and maybe take a little more time to go over
4  what the FTE ceiling is.
5      First of all, maybe you could just tell
6  us in your own words, define that first in your own
7  words.
8      What is that?
9  A    Well, an FTE ceiling, to me, is a
10  predesignated, authorized number of employees that
11  an agency can maintain.
12  Q    Okay.
13  A    That's the best I can describe it.
14  Q    That's fair enough. And then, I take it,
15  when you say an agency can maintain -- correct me
16  if I'm wrong -- we also mean divisions, units or
17  other parts of an agency?
18  A    Well, they're a part of it. FTE numbers
19  can be, if you look at them, once again, I look at
20  a pie. There's a budget pie and then there's an FTE
21  pie.
22      You slice it up the best you can

Case 1:05-cv-00992-PLF   Document 20-5   Filed 08/31/2006   Page 7 of 9

11 (Pages 38 to 41)

Page 38

1 according to what you are required to accomplish in
2 respective divisions.
3    Q   Okay.
4    A   Of trying to meet those stressors.
5    Q   That's fair enough. And then, within OIG,
6 are there separate FTE ceilings for the component
7 entities? For example, the office of
8 investigations, the office of audits, OMAP, and the
9 front office of the inspector general and legal
10 counsel, let's say?
11        Are there separate FTE ceilings for each
12 of those?
13   A   There is.
14   Q   And how are those established?
15   A   Well, a lot of it has been historical. In
16 the HUD inspector general's office, we do our best
17 to try to analyze some needs of each assistant
18 inspector general, office of audit, office of
19 investigation, OMAP.
20        Primarily, when I came in 4-1/2 years
21 ago, between the office of audit and
22 investigations, I think it was fairly an even

Page 39

1 match.
2        It varies. It might vary from ten more
3 here, five more there, five less here. A lot of
4 that depends on the movement within those
5 organizations and people retiring, the mobility
6 within the government.
7        So a lot is driven by OMAP saying, this
8 year, based on the budget, based on historical, we
9 feel that the office of audit should have this
10 amount of FTEs, office of investigation have this
11 amount of FTEs.
12        Unless there's a dramatic change, we
13 pretty much take the guidance from the budget
14 office.
15        Now, during times of hiring freeze, you
16 try to target an FTE level. And naturally, that
17 would come in after October. It may come in in
18 January, where your FTE level is defined.
19        And you find yourself over that level
20 simply because your employees are still there. And
21 that normally keys a freeze in hiring.
22        So you could try to attain that new FTE

Page 40

1 level.
2    Q   Okay. And let me work with you here a
3 little bit. You're very helpful and you're getting
4 into another area.
5        Correct me if I'm wrong, and I'm just
6 trying to speed this up. If I'm wrong, it's your
7 testimony that's going to govern. So if I'm wrong,
8 just say so.
9        Is it correct that at the outset of each
10 fiscal year, working through the office of
11 management and policy, the offices within HUD OIG
12 have set for them, or set, FTE ceilings?
13   A   Once more.
14   Q   Sure.
15   A   Once more.
16   Q   Would it be correct to say that at the
17 outset of each fiscal year, working with the office
18 of management and policy, FTE ceilings are set for
19 each of the, at least larger offices, within the
20 office of inspector general?
21   A   That's true.
22   Q   Okay. And then, I think you started to

Page 41

1 say, during the fiscal year, things could happen
2 that might affect the number of people you could
3 have on board or could hire.
4        Is that right or wrong?
5    A   That's right.
6    Q   Okay. And then, is the FTE ceiling then
7 changed during the fiscal year?
8    A   No, it's not necessarily changed. What I
9 was referring to for the point of clarification is
10 what generally causes the stressors is that your
11 anticipated budget comes in a lot lower, and you
12 find that your FTE level that existed the prior
13 year is too high, and you have more people than you
14 can deal with.
15        The percentage for salaries and benefits
16 is so high, you don't have enough operating funds
17 to accomplish what you have to accomplish.
18        Or OMB simply comes up with a new FTE
19 number. And so, you have a surplus of FTEs,
20 according to OMB.
21        I can go on the record and say I've never
22 had a surplus of FTEs. I could always use more

MGB Reporting, Inc.
Tel: 800-245-2528   Fax: 888-983-8016

Page 42

1  people to accomplish what we have to accomplish.
2       But that's the realities of the budget.
3  Q   Sure.
4  A   So if you find out that you may be 25,
5  30, 40 FTEs over, obviously, you have to deal with
6  that.
7       How you deal with that may be a hiring
8  freeze, perhaps seeking early out for OMB, which we
9  attempted to do, get approval for offering early
10 retirements, which we were turned down on, trying
11 to deal with those issues.
12 Q   Okay. And this is very good. And I guess
13 what I'm trying to do is also put it in some kind
14 of chronological order.
15      I think what you said, but, again, it's
16 your testimony that's going to govern, at the
17 outset of a fiscal year, there are FTE levels, FTE
18 ceiling levels, that are set for each of the larger
19 offices in OIG.
20 A   Well, when you say larger offices, the
21 office of audit is given an FTE level.
22      You're not talking field offices here.

Page 43

1  Q   Right. Headquarters.
2  A   Headquarters offices.
3  Q   Right.
4  A   Okay.
5  Q   And each of those is given an FTE level.
6  Is that the idea?
7  A   Correct.
8  Q   And that is the anticipated FTE level for
9  the coming fiscal year?
10 A   Correct.
11 Q   And that, I think you said, is set by, at
12 least in part, working with the office of
13 management and policy.
14 A   Correct.
15 Q   Okay. And now, let's go through the
16 fiscal year. Let's say -- I think you talked about
17 budget stressors, other things, possibly.
18      Is the FTE ceiling level in headquarters
19 then changed as the fiscal year wears on, to, let's
20 say, become lower as these stressors happen?
21 A   That's possible, depending on the year.
22 Q   Okay. Maybe I'll just put it to you then

Page 44

1  since there is no simple answer, in the broadest
2  sense.
3       Does the FTE ceiling level in
4  headquarters organizations, does that change
5  throughout the fiscal year?
6  A   I'm sorry? The last part?
7  Q   Yes. Does that change throughout the
8  fiscal year, the FTE ceiling levels for
9  headquarters OIG offices?
10 A   Well, the FTE level constantly changes.
11 Are you talking about the cap?
12 Q   The ceiling, yes.
13 A   The ceiling?
14 Q   Yes.
15 A   It could change. It could stay stable.
16 Q   If it doesn't change, is there some other
17 change in the ability of OIG headquarters offices
18 to hire up to the ceiling?
19 A   Repeat that.
20 Q   Sure. There's an FTE ceiling level that's
21 set at one time or another. And I think you said,
22 during the fiscal year, it may or may not change.

Page 45

1  A   Okay.
2  Q   Are we together at this point?
3  A   All right.
4  Q   Okay. And if it doesn't change, are the
5  offices in OIG headquarters allowed to hire up to
6  their ceilings?
7       (Pause.)
8  A   Yes.
9  Q   Okay. Now we started to talk about
10 budgetary -- and I don't want to put words in your
11 mouth. I'm just introducing the area.
12      I think you said budgetary stressors, I
13 think is what you called it. Again, I'm focused on,
14 today, at least, we're focused on the budget and
15 the impact on personnel and the number of employees
16 your organization could have or might have.
17      But as you talk about these budgetary
18 stressors, is it all one budget or can we separate
19 out the budgetary stressors on personnel and deal
20 only with those?
21 A   Well, there are issues that cause concern
22 that come up under the responsibility of an

Page 66

1  absolutely, totally critical for the department to
2  get out.
3      Q    Okay. And in these concerns that emanated
4  from the secretary, would it be fair to say that he
5  did not at any time express how the office of audit
6  should be organized to accomplish that mission?
7      A    No, did not.
8      Q    Okay. Or the deputy secretary?
9      A    Did not.
10     Q    Or the CFO.
11     A    Did not.
12     Q    Okay. To your understanding, this
13 memorandum, Stephens Exhibit 2, that you approved,
14 did this give any reasons for seeking your approval
15 of the proposed realignment that had not been given
16 to you by Mr. Heist before?
17     A    To the best of my recollection, what's
18 written here matches up our conversation prior to
19 me receiving this.
20     Q    Okay. So just if I can complete the loop,
21 then.
22          There's nothing -- correct me if I'm

Page 67

1  wrong -- there is nothing then that Mr. Heist
2  communicated to you in support of proposing the
3  realignment, nothing that he told you earlier that
4  was not reflected in the memorandum, Stephens
5  Exhibit 2?
6      A    In reference to the realignment of the
7  division?
8      Q    Yes.
9      A    What should we do with it?
10     Q    What I'm saying is, is there anything he
11 told you before orally in your conversation that is
12 not also in the memorandum that is Stephens Exhibit
13 2?
14     A    Well, let me just review this for a
15 second.
16     Q    Sure.
17          (Pause.)
18     A    There are two issues, I believe that are
19 not included in this memo.
20     Q    What would they have been?
21     A    One is relating to the management of that
22 division, which is called the headquarters audit

Page 68

1  division.
2      Q    Okay.
3      A    He was troubled by that. And he was
4  troubled by some employees that no longer wanted to
5  work under that management.
6      Q    Okay. And what in particular did he
7  communicate to you?
8      A    He indicated that -- let me pause for a
9  minute. Let me think on that.
10          (Pause.)
11          He indicated that he was displeased at
12 the speed of the work, the timeliness of the work
13 product. And that several employees had come to
14 his deputy, Mike Phelps, and was concerned about
15 the environment within that division.
16     Q    Did he say -- I'm sorry. These are the
17 two reasons?
18     A    To the best that I recall, yes.
19     Q    And what you testified was that Mr. Heist
20 had said that employees came to his deputy, Mike
21 Phelps, about the environment in the division.
22          Correct?

Page 69

1      A    Correct.
2      Q    Did Mr. Heist ever say that the employees
3  had come to him?
4      A    I don't recall.
5      Q    That's one of those answers you need to
6  clarify for the Reporter because I don't know if
7  that means you can't remember either way, or you
8  don't recall him doing it.
9          MR. TRUONG: I'm sorry? What's I don't
10 recall that he was saying?
11         MR. SELDON: It's not a clear answer. He
12 could say, I don't recall him doing it, or I don't
13 recall either way.
14         There's no way of knowing what the answer
15 is.
16         MR. TRUONG: Objection. Asked and
17 answered.
18         MR. SELDON: Please go ahead.
19         THE WITNESS: Well, would you repeat your
20 question, and perhaps I can clear it up if you
21 repeat your question.
22         MR. SELDON: Sure.