# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

SAUNDRA ELION,         )
                              )
     Plaintiff,         )
                              )
     v.              )      Civil Action No. 05-0992 (PLF)
                              )
ALPHONSO R. JACKSON,    )
Secretary, U.S. Dept. of Housing    )
and Urban Development,       )
                              )
     Defendant.        )
_____)

## DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

Pursuant to Fed. R. Civ. P. 56 and Local Rules 7(h) and 56.1, Defendant hereby moves for summary judgment.

In support of the said Motion, Defendant refers the Court to the attached Memorandum of Points and Authorities in Support thereof, the Statement of Material Facts Not in Genuine Dispute, and the accompanying exhibits.

Dated: February 26, 2007.        Respectfully Submitted,


                                    /s/  Jeffrey A. Taylor
                              JEFFREY A. TAYLOR, D.C. BAR # 498610
                              United States Attorney


                                  /s/   Rudolph Contreras
                              RUDOLPH CONTRERAS, D.C. BAR #434122
                              Assistant United States Attorney

/s/ John C. Truong
JOHN C. TRUONG, D.C. BAR #465901
Assistant United States Attorney
555 Fourth Street, N.W.
Washington, D.C.  20530
(202) 307-0406

Attorneys for Defendant

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| SAUNDRA ELION, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 05-0992 (PLF) |
| | ) | |
| ALPHONSO R. JACKSON, | ) | |
| Secretary, U.S. Dept. of Housing | ) | |
| and Urban Development, | ) | |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF**
**FEDERAL DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

**I.    Introduction.**

Plaintiff Saundra Elion brings suit against Defendant Department of Housing and Urban Development (HUD) alleging that Defendant discriminated against her because of her race, sex, and age, and in reprisal in violation of Title VII and the Age Discrimination in Employment Act (ADEA), when Defendant disbanded her division and reassigned her to a non-supervisory position in April 2004. Plaintiff's 115-paragraph Amended Complaint advances a panoply of allegations but they are merely "noise" and irrelevant to the underlying issue in this case.

The only issue here is whether Defendant discriminated and retaliated against Plaintiff when – because of a hiring freeze and other work priority – Defendant disbanded the Headquarters Audit Division ("HAD") and reassigned her and other employees of the HAD to other divisions. As shown fully below, Plaintiff cannot establish a prima facie case of

1

discrimination because she cannot show that other similarly situated employees outside of her protected status were treated differently. Furthermore, Plaintiff cannot establish her prima case of retaliation for failure to demonstrate causation. Indeed, there was a 14-month gap between Plaintiff's prior protected activity (her December 2002 EEO complaint) and the alleged discriminatory and retaliatory act (the disbanding of the HAD in April 2004).

In any event, Defendant had legitimate, non-discriminatory reasons for disbanding the HAD and reassigning Plaintiff and other employees to other divisions. Specifically, because of the hiring freeze and the critical need for the Financial Audit Division to complete its financial audit process earlier than previous years, Defendant disbanded the HAD and reassigned its auditors to the Financial Audit Division to help with this financial audit process. As a result of the dissolution of the HAD, Defendant reassigned Plaintiff to become a Special Assistant in the Office of Audits.

For these reasons and those further explained below, the Court should grant summary judgment in Defendant's favor and dismiss this case with prejudice.

## II.    Factual Background.

Plaintiff Saundra Elion, an African-American female over fifty seven years old, was appointed to be the District Inspector General for Audit (DIGA), a GS-15 supervisory auditor position within the Office of Inspector General (OIG) of HUD, in June 1999. A.C. at ¶ 14. She was assigned to the Capital District Office of Audit. Id. In May 2002, Defendant abolished the Capital District Office of Audit and transferred Plaintiff along with all other personnel to the newly-created Headquarters Audit Division (HAD). Amended Complaint ("A.C.") at ¶. 14.

As part of the transfer, Plaintiff became the Director of the HAD, a supervisory GS-15

2

position, on June 30, 2002. A.C. at ¶ 14. She did not suffer any loss of rank, pay, status, or privileges of employment when she became the Director of the HAD. Deposition of Sandra Elion ("Elion I Depo.") at p. 78-80.[1] The HAD was responsible for the execution of audits and the issuance of audit reports for all HUD programs and funds awarded to entities within the Washington Metropolitan Area. A.C. at ¶ 15. These entities included public housing authorities, non-profit organizations, and persons doing business with HUD. Id. The HAD's audits entail reviewing financial transactions and dealings of these entities. A.C. at ¶ 15 n.1. The end result of an audit is an audit report describing the auditee's compliance (or the lack thereof) and any recommendation for action. Id.

In December 2002, Plaintiff filed an administrative discrimination complaint alleging a hostile work environment on the basis of her sex, race, and age, complaining of a diminution of duties and responsibilities, dilution of staff resources, and an undermining of her professional authority. A.C. at ¶ 21. On January 17, 2003, Plaintiff and Mr. Michael Stephens, Deputy Inspector General, had an informal meeting to discuss her allegations. Deposition of Agnes Matthews ("Matthews Depo.") p. 27, 31-32, 37-38; Jan. 17, 2003 Email (Gov. Exh.A). Plaintiff asked that Ms. Agnes Matthew, an ombudsman, accompany her to this meeting for support. Matthews Depo. at 28, 39-40. Mr. Robert Seldon, Plaintiff's attorney, confirmed with Ms. Matthews that Plaintiff agreed to meet with Mr. Stephens. Jan. 16 , 2003 Letter (Gov. Exh. B). The letter required that the meeting be kept confidential. Id.

Thereafter, on January 30, 2003, Plaintiff met with Mr. Stephens (Deputy Inspector

---

[1]    Due to scheduling issues, Ms. Elion was deposed on two separate days – on August 7, 2006, and October 2, 2006. For purposes of this Motion, the August 7th deposition is designated as "Elion I Depo." and the October 2nd deposition is "Elion II Depo."

General), and her two supervisors – Mr. James Heist (Assistant Inspector General for Audit

("AIGA")), and Mr. Michael Phelps ( Deputy AIGA) to address the Plaintiff's concerns. A.C. at

¶ 26; Jan. 17, 2003 Email (Gov. Exh.A). Mr. Stephens engaged in this informal process in lieu

of the formal Alternative Dispute Resolution process to address what he perceived to be a

communications and management issue. Matthews Depo. at 27:13-22; Deposition of Michael

Heist ("Heist Depo.") 47-53; Stephens Depo. at p. 89-95. Plaintiff also believed that Mr.

Stephens thought her complaint was "just a matter of miscommunication, that there was no

deliberate discrimination." Elion II at 79-80. The January 30th meeting was not intended to be a

mediation session, (Matthews Depo. p. 62) but an attempt by management to establish better

relations with the Plaintiff to address her concerns. Stephens Depo. 92-96.

Approximately two months after the meeting, on March 20, 2003, Plaintiff voluntarily

withdrew her December 2002 administrative discrimination complaint. A.C. at ¶ at 27; March

20, 2003 Memo (Gov. Exh.C). In the Memorandum withdrawing her December 2002 EEO

complaint, Plaintiff stated,  "The issues have been resolved to my satisfaction at this time."

March 20, 2003 Memo (Gov. Exh.C).

On April 7, 2004, Mr. Stephens sent out an e-mail to senior executives in the OIG

(including Mr. Heist), informing them that there was a hiring freeze and the OIG had a projected

budget deficit of $6.5 million. Gov. Exh. D; Heist Depo. at 90:9-96:8. Mr. Heist understood

from Mr. Stephens' April 7th email that he could not fill a position unless he had specific

approval from the Deputy Inspector General. Heist Depo. at 95:4-8. On April 12, 2004, Mr.

Heist informed his managers, which included Plaintiff, that the hiring freeze would continue for

the foreseeable future. Elion II Depo. at 8:22-11:15; See also April 12, 2004 Email (Gov.

Exh.E).

        In April 2004, there were only 5 employees in the HAD.  Heist Depo. at 114:1-115:14.

These five employees included Plaintiff (a GS-15 Director), Ms. Donna Hawkins (a GS-14

Assistant Director), and three staff auditors.  Id.  Shortly before Mr. Heist made the proposed

transfer, another staff at the HAD resigned and, therefore, impacted the ratio between managers

and staff.  Heist 115: 6-116:4.  On April 20, 2004, Mr. Heist recommended that the HAD be

disbanded.  See Apr. 20, 2004 Memo (Gov. Exh. F).  He explained that the disbanding of the

HAD made business sense because of workload and resource issues.  See Apr. 20, 2004 Memo.

Specifically, he elaborated that due to the hiring freeze he could not hire more staff for the

Financial Audit Division or the Technical Oversight and Planning Division ("TOP").  Id.  There

was a need to increase the staffing of auditors at the Financial Audit Division because of the new

deadline for submitting the agency's audit report.   Every executive agency is required to

conduct a financial audit each fiscal year.  Under the President's Management Agenda, the

Office of Management and Budget ("OMB") accelerated financial reporting dates for the

executive agencies.  See Dec. 21, 2001 Memo (Gov. Exh.G).[2]  Defendant's financial audit for

Federal Fiscal Year (FY) 2004, conducted by the Financial Audits Division, was due to the

OMB by November 15, 2004.  Id.  Given this accelerated deadline, it made business sense to

---

        [2]        The December 21, 2001 Memorandum is a public document that can be obtained
by visiting the following website:
http://www.whitehouse.gov/omb/financial/year_end_reporting_2001.pdf.  Plaintiff does not
dispute the deadline for the agency's audit report was accelerated to November 15, 2004.  Elion
II Depo. at 159.

        The December 21, 2001 Memorandum was superceded a August 23, 2005
Circular No. A-136 from the OMB.  This public document can be obtained from the following
website: http://www.whitehouse.gov/omb/circulars/a136/a136_rev_2005.pdf.

disband the HAD and move its three auditors to the Financial Audit Division to help with the

continuous financial audit process.  Id.[3]

     To address TOP's staffing needs, Mr. Heist recommended reassigning Ms. Hawkins to

that division.  Id.  Mr. Heist proposed reassigning Plaintiff to become his Special Assistant (i.e.,

to become the Special Assistant to the AIGA).  Id.; see also Apr. 21, 2004 E-mail (Gov. Exh. H).

Mr. Stephens approved Mr. Heist's proposal on April 21, 2004.  See Apr. 20, 2004 at p. 2 (Gov.

Exh. F).  Plaintiff's reassignment to become a Special Assistant did not affect her pay or grade.

Elion I Depo. at 221: 12-223:22.  As a result of the HAD's dissolution, on May 5, 2004,

Plaintiff filed her second EEO complaint alleging discrimination and retaliation.  A.C. at ¶ 43.

## III.     Summary Judgment Standard of Review.

     Summary judgment is appropriate when "the pleadings, depositions, answers to

interrogatories, and admissions on file, together with the affidavits, if any, show that there is no

genuine issue as to any material fact and that the moving party is entitled to a judgment as a

matter of law."  FED. R. CIV. P. 56(c); see also Celotex Corp. v. Catrett, 477 U.S. 317, 322

(1986); Diamond v. Atwood, 43 F.3d 1538, 1540 (D.C. Cir. 1995).

     In ruling on a motion for summary judgment, the court must draw all justifiable

inferences in the nonmoving party's favor and accept the nonmoving party's evidence as true.

See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986).  A nonmoving party, however,

must establish more than "the mere existence of a scintilla of evidence" in support of its position.

Id. at 252.  To prevail on a motion for summary judgment, the moving party must show that the

---

     [3]     To address the Financial Audit Division's staffing needs in prior years, staff from
the field offices would be detailed to the Division to help with the financial process.  See Apr.
20, 2004 Memo (Gov. Exh. F).  The detailing of staff would incur travel and related costs.

nonmoving party "failed to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex, 477 U.S. at 322. By pointing to the absence of evidence proffered by the nonmoving party, a moving party may succeed on summary judgment. See id. The nonmoving party may not rely solely on allegations or conclusory statements. See Greene v. Dalton, 164 F.3d 671, 675 (D.C. Cir. 1999); Harding v. Gray, 9 F.3d 150, 154 (D.C. Cir. 1993). Rather, the nonmoving party must present specific facts that would enable a reasonable jury to find in its favor. See Greene, 164 F.3d at 675. If the evidence "is merely colorable, or is not significantly probative, summary judgment may be granted." Anderson, 477 U.S. at 249-50 (internal citations omitted).

## IV.    **McDonnell-Douglas Analytical Framework.**

In order to survive summary judgment in a Title VII case, a plaintiff must produce some evidence to show that the Agency **intentionally** discriminated against her. Plaintiff may proceed using direct evidence of discrimination or under the now-familiar analysis enunciated in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973), and Texas Dep't of Community Affairs v. Burdine, 450 U.S. 248 (1981). No direct evidence of intentional discrimination or retaliation exists in this case. Accordingly, to prove her case, Plaintiff must meet all the elements of the McDonnell Douglas formula.

Preliminarily, Plaintiff can establish her prima facie case for disparate treatment on the basis of her race by showing that she: (1) belongs to a statutorily-protected group; and (2) she suffered an "adverse employment action" (3) under circumstances giving rise to an inference of discrimination. See Stella v. Mineta, 284 F.3d 135, 144-45 (D.C. Cir. 2002) (citing McDonnell Douglas, 411 U.S. at 802); Harding v. Gray, 9 F.3d 150, 152 (D.C. Cir. 1993).

If Plaintiff succeeds in establishing a prima facie case, the burden shifts to Defendant to articulate a legitimate, non-discriminatory reason for its actions.  See Czekalski v. Peters, - - F.3d. - -, 2007 WL 283443, *2 (D.C. Cir. Feb. 2, 2007) (citing  McDonnell Douglas, 411 U.S. at 802).  Once Defendant has articulated a legitimate, non-discriminatory reason for its actions, the prima facie inference of discrimination drops from the case.  St. Mary's Honor Center v. Hicks, 509 U.S. at 507, 510-11 (1993); Burdine, 450 U.S. at 255.  Plaintiff then must prove that Defendant's proffered reason was not the true reason for its actions and was only a pretext for unlawful discrimination.  Burdine, 450 U.S. at 253; McDonnell Douglas, 411 U.S. at 804; see also St. Mary's Honor Center, 509 U.S. at 507-08; Aka v. Washington Hospital Center, 156 F.3d 1284, 1289 (D.C. Cir. 1998).  In short, "to survive summary judgment the plaintiff must show that a reasonable jury could conclude from all of the evidence that the adverse employment decision was made for discriminatory reason."  Czekalski, 2007 WL 283443, at *2 (internal citation omitted).  The burden of persuasion that discrimination motivated Defendant's actions remains at all times with the plaintiff.  St. Mary's Honor Center, 509 U.S. at 507; Burdine, 450 U.S. at 253.

**V.    Argument**

   **A.    Plaintiff's Discrimination Claims (Counts II, III, and IV) Lack Merit.**

   **1.    Plaintiff Cannot Establish A Prima Facie Case of Discrimination Based On Her Race, Gender, or Age.**

Plaintiff cannot satisfy the third prong of her prima facie case of discrimination.  As discussed above, Plaintiff can establish her prima facie case of discrimination by showing that (1) she belongs to a protected group; (2) she suffered an "adverse employment action" and (3) under circumstances giving rise to an inference of discrimination.  See Stella, 284 F.3d at 144-

45.

In <u>George v. Leavitt</u>, the D.C. Circuit clarified that there are two methods by which a plaintiff can satisfy the third prong of the prima facie case. 407 F.3d 405, 412 (D.C. Cir. 2005). One method is for plaintiff to show that she was treated differently from similarly situated employees who are not part of the protected class. <u>Id</u>. at 412. The second method – in the context of a discharge claim – is to show that the "discharge <u>was not attributable</u> to the two analogous common legitimate reasons for discharge: performance below the employer's legitimate expectations or the elimination of plaintiff's position altogether." <u>Id</u>. at 412 (internal cited omitted) (emphasis added). In <u>Czekalski</u>, the D.C. Circuit noted that reassignment of plaintiff's position is similar to a discriminatory discharge context. 2007 WL 283443, at * 4. Therefore, in this case, under <u>George</u>, to satisfy the third prong of her prima facie case of discrimination, Plaintiff must show that she was treated differently from those outside the protected group or that the asserted of her position as fictitious. Plaintiff cannot carry this burden.

Here, Defendant does not dispute that Plaintiff is able to satisfy the first two prongs of her prima facie case of race discrimination – namely, Plaintiff belongs to a protected group (African-American female over 40 years old) and that she suffered an adverse employment action when Defendant disbanded the HAD and reassigned her to become a Special Assistant, a non-supervisory position. <u>See</u> <u>Czekalski</u>, - - F.3d. - -, 2006 WL 283443, at * 3 (noting that withdrawing an employee's supervisory duties or reassigning the employee with significantly different responsibilities could be considered adverse employment actions).

However, Plaintiff cannot establish the third prong of her prima facie case under the first

method because there is no evidence in the record showing that Defendant treated her differently from similarly situated employees outside of the protected group.  See George, 407 F.3d at 412. As for the second method, although Defendant does not contend that Plaintiff performed below the employer's legitimate expectations, her position was eliminated altogether when Defendant dissolved the HAD  and reassigned its personnel to other divisions.  See George, 407 F.3d at 412.

### a.    Plaintiff Cannot Identify Similarly Situated Individuals Outside Her Protected Group Who Were Treated Differently.

There is no evidence in the record showing that Defendant treated Plaintiff differently from those similarly situated employees outside of the protected group.

To be similarly situated, a plaintiff must show "that all relevant aspects of her employment situation were 'nearly identical'" to those outside the protected class.  See Neuren v. Adducci, Mastriani, Meeks & Schill, 43 F.3d 1507, 1514 (D.C. Cir. 1995); see also William v. Gonzales, 391 F. Supp.2d 52, 59 (D.D.C. 2005) (requiring plaintiff to "point to evidence in the record of another employee whose conduct and conditions of employment was sufficiently 'similarly situated in all material respects to support at least a minimum inference that the difference of treatment may be attributable to discrimination.'"); Child-Pierce v. Utility Workers Union of America, 383 F. Supp.2d 60, 70 (D.D.C. 2005) (requiring a showing that the relevant aspects of the employment situation are nearly identical).  Nurriddin v. Goldin, 382 F. Supp.2d 79, 97 (D.D.C. 2005) (noting that "to be similarly situated, plaintiff must establish that his employment was similar in all relevant regards to those with whom he seeks comparison.").

Here, to establish her prima facie case of discrimination, Plaintiff must show that another GS-15 employee, under the same supervisory chain of command, and outside her protected

10

group, was not involuntarily reassigned to a non-supervisory position.  See Phillips v. Holladay

Prop. Servs., 937 F. Supp. 32, 37 (D.D.C. 1996) (noting that plaintiff and the alleged comparator

"must have dealt with the same supervisor, have been subject to the same standards and have

engaged in the same conduct without such differentiating or mitigating circumstances that would

distinguish their conduct or the employer's treatment of them for it.") aff'd, 1997 U.S. App.

LEXIS 19033 (D.C. Cir. June 19, 1997).  There is no evidence in the record to show that such an

alleged comparator exists.  Therefore, Plaintiff cannot establish the third prong under the first

method.

        In any event, the only other time when Defendant disbanded a division in which Plaintiff

served as a supervisor Defendant reassigned her to an even more prestigious position.

Specifically, in May 2002, Defendant abolished the Capital District and reassigned Plaintiff to

become the Director of the HAD.  A.C. at ¶ 14.  Plaintiff admitted that the Director of the HAD

position gave her more exposure.  Elion I Depo. at 78-80.  Therefore, had Defendant intended to

discriminate against her because of her protected status, Defendant could have reassigned her to

a non-supervisory position in May 2002 when it abolished the Capital District.

        In fact, Plaintiff's Amended Complaint demonstrates that other employees, not in her

protected group, experienced similar treatment – involuntary reassignment to a non-supervisory

position.  Specifically, Plaintiff points out that Mr. Michael Beard (Caucasian male)[4] was

involuntarily reassigned to a non-supervisory position in the OIG Headquarters Office of Audit.

A.C. at ¶ 8.  Prior to this reassignment, Mr. Beard served as the Regional Inspector General for

Audit of HUD Region 6.  Id.  Defendant also involuntarily reassigned Mr. Daniel P. Salas

---

[4]         Declaration of Michael Phelps ("Phelps Decl.") at ¶ 2.

(Hispanic Male)[5] to a non-supervisory position in April 2006.  A.C. at ¶ 9.  Before that, Mr.

Salas worked as a Deputy Assistant Inspector General for Investigations.  <u>Id</u>.

These facts simply show that Defendant will reassign employees – whether or not they

are in the protected group – to meet work-related needs.  Under these facts, Plaintiff cannot show

that she was treated differently because of her protected status.

> **b.     Plaintiff's Position Was Eliminated Because Her Division Was Dissolved.**

Under the second method, Defendant does not contend that Plaintiff's performance fell

short of the employer's expectation; however, she cannot show that her reassignment "was not

attributable  . . . [to the] elimination of the plaintiff's position altogether."  <u>See</u> <u>George</u>, 407 F.3d

at 412.

Here, it cannot be disputed that Plaintiff's reassignment to become a Special Assistant, a

non-supervisory position, was precipitated by the elimination of the HAD.  <u>See</u> Apr. 20, 2004

Memo.  As explained in Mr. Heist's April 20th Memorandum disbanding the HAD, the agency

was under a hiring freeze and the Financial Audit Division needed additional auditors to perform

the financial audit.  <u>Id.</u>  In that vein, Mr. Heist proposed reassigning the HAD's staff auditors to

the Financial Audition Division and, as a consequence, it led to the dissolution of the HAD.

Under these facts, Plaintiff cannot establish a prima facie case of discrimination.

> **2.     Defendant Had Non-Discriminatory, Legitimate Reasons for Disbanding the HAD.**

Defendant had legitimate, non-discriminatory reasons for disbanding the HAD

and reassigning its three auditors to the Financial Audit Division.  "[T]o survive summary

---

[5]        Phelps Decl. at ¶ 2.

judgment the plaintiff must show that a reasonable jury could conclude from all of the evidence that the adverse employment decision was made for a discriminatory reason." Latham v. Snow, 336 F.3d 1085, 1088 (D.C. Cir. 2003). Under this standard, Plaintiff must show that Mr. Heist' proposal to disband the HAD and Mr. Stephens's approval of that proposal was made to intentionally discriminate against her because of her race, gender, and age. There is no evidence in the record to support such a finding.

As a preliminary matter, this Court should "not to act as a super-personnel department that second-guesses an employer's legitimate business decision." Fischbach v. D.C. Dep't of Corr., 86 F.3d 1180, 1183 (D.C.Cir.1996). Mr. Heist explained that the proposal to abolish the HAD had its genesis upon learning that the agency was under a hiring freeze. Heist Depo. 90-91. On April 7, 2004, Mr. Stephens's sent an email to all OIG executives, including Mr. Heist, informing them that the agency had a projected deficit of $6.5 million and it would be under a hiring freeze. See Gov. Exh. D. Mr. Heist understood from this e-mail that he could not hire anyone, without specific justifications and approval from Mr. Stephens. Heist Depo. at 95.

On April 12, 2004, Mr. Heist relayed this information to OIG Regional Inspector Generals for Audit (RIGA). See Gov. Exh. E. Plaintiff also received the e-mail. Elion II at p. 9. In that e-mail, Mr. Heist explained that there were budgetary issues and that "[w]e will continue to be under a hiring freeze for the foreseeable future." Id. As a result of Mr. Stephens's e-mail, Mr. Heist proposed to disband the HAD and reassign its personnel to other divisions to meet workload needs.

Specifically, Mr. Heist's April 20th Memorandum explains that the disbanding of the HAD was "to best address our mission workload and our current and anticipated budget

13

constraints." Apr. 20, 2004 Memo (Gov. Exh.F) . It states, "We are currently under a hiring freeze so I cannot hire more staff in the Financial Audits Division or the Technical Oversight and Planning Division to address staffing needs. Our current year budget has been reduced and we are searching for ways to absorb even greater cuts in FY 2005." Id.

At the same time, Mr. Heist was becoming more concerned about the Department's financial audit. Mr. Heist explained that "[r]ecent changes to the statutory due date for the audit have forced us to begin what is almost a continuous financial audit process, throughout the year, here in the headquarters." Apr. 20, 2004 Memo (Gov. Exh.F). Under the Chief Financial Officers Act of 1990, beginning with the fiscal year ending on September 30, 2004, Defendant and other executive agencies were required to submit their respective financial audit reports to the President by November 15, 2004. See Dec. 21, 2001 Memo (Gov. Exh.G). In fact, Plaintiff knew of this deadline. Elion I Depo. at 209-10. Mr. Stephens explained that it was critical for the agency to complete the financial audit by this deadline. Stephen Depo. at 63:4-66:2. The mission to get the financial audit completed in time came from the Secretary of HUD, the Deputy Secretary of HUD, and the CFO of HUD. Stephens Depo. at 63:4-20.

Given this concern, Mr. Heist further explained that "the continuous audit" that must be done "was too much for the Financial Audit Division without assistance." Id. In previous years, to assist the Financial Audit Division with its work load, the agency had to detail staff from the field offices to the Financial Audit Division. Id. Plaintiff acknowledged that auditors from other parts of the country spent weeks at the HUD headquarters to help with the financial audit process. Elion II at 159. There were costs associated with detailing the staff from the field offices. Id. Mr. Heist was looking for ways to minimize the "TDY travel as much as possible,"

14

(Apr. 20, 2004 Memo) especially because of the projected budget deficit of $6.5 million.  Apr. 7, 2004 E-mail (Gov. Exh. D).

Under these circumstances, Mr. Heist proposed that the three HAD auditors be transferred to the Financial Audit Division.  Apr. 20, 2004 Memo (Gov. Exh.F).  Given this proposed transfer, the only two remaining personnel at the HAD would be Plaintiff and her assistant.[6]  In that vein, to further meet staffing needs, Mr. Heist proposed transferring the Assistant Director of the HAD (Ms. Donna Hawkins) to the TOP.  Id.  He then proposed reassigning Plaintiff to become the Special Assistant in the Office of Audit.  Id.  Mr. Stephens approved Mr. Heist's proposal on April 21, 2004.  Apr. 20, 2004 Memo at 2 (Gov. Exh. F) .

Under these facts, Defendant met its burden of articulating the legitimate, non-discriminatory reasons for disbanding the HAD and reassigning Plaintiff to become the Special Assistant.  At this point, to survive summary judgment, Plaintiff must produce evidence that a reasonable jury could conclude from all of the evidence that Defendant disbanded the HAD and reassigned her for a discriminatory reason.  See Latham, 336 F.3d at 1088.  There is nothing in the record that Plaintiff can rely upon to meet this burden.  Accordingly, the Court should grant summary judgment in Defendant's favor on her discrimination claims and dismiss them with prejudice.

---

[6]     Given this proposed transfer, it did not make sense to retain the HAD. Specifically, in April 2004, the HAD was comprised of only 5 employees – with Plaintiff as its Director, Ms. Donna Hawkins as the Assistant Director, and the three staff auditors.  Heist Depo. at 114:1-116:4.  After the transfer of the three auditors, there was not a reason to keep the HAD with only the two managers  –  Plaintiff and her assistant.  Heist Depo. at 115:6-14.

**B.     Plaintiff's Retaliation Claims (Count I and V) Lack Merit.**

In addition to her discrimination claims, Plaintiff also maintains that Defendant retaliated against her when it disbanded the HAD and reassigned her to the Special Assistant position. A.C. at  Count I and V.  As shown below, Plaintiff cannot show causation to meet her prima facie of discrimination.  Moreover, as explained in Section V.A.2 *supra*, Defendant had legitimate, non-retaliatory for its business decision of disbanding the HAD.

**1.     Plaintiff Cannot Meet Her Prima Facie Case of Retaliation.**

The evaluation of Title VII and ADEA retaliation claims follow the same burden shifting frame-work as discrimination claims.  Holcomb v.Powell, 433 F.3d 889, 901 (D.C. Cir. 2006) (Title II retaliation claims); Forman v. Small, 271 F.3d 285, 298-99 (D.C. Cir. 2001) (ADEA retaliation claims).

To establish a prima facie case of retaliation, the plaintiff must present evidence that (1) she engaged in a protected activity; (2) the employer took some action that "a reasonable employee would have found ... materially adverse" and (3) the adverse action was casually related to the protected activity.  See Burlington N. & Santa Fe Ry. Co. v. White, 126 S.Ct. 2405, 2415 (2006) (quoting Rochon v. Gonzales, 438 F.3d 1211, 1219 (D.C.Cir.2006)). See also Holcomb, 433 F.3d at 901-02; Willingham v. Gonzales, 391 F. Supp.2d 52, 60 (D.D.C. 2005) .

Defendant does not dispute that Plaintiff can meet the first two prongs of her prima facie case.  Specifically, Plaintiff engaged in a protected activity by filing a previous EEO complaint in December 2002 and that she suffered an adverse employment action when Defendant disbanded the HAD and reassigned Plaintiff to become the Special Assistant, a non-supervisory position.  See Czekakski, - - F.3d - -, 2006 WL 283443, at * 3 (noting that withdrawing an

employee's supervisory duties or reassigning the employee with significantly different responsibilities could be considered adverse employment actions). Plaintiff, however, cannot satisfy the causation element – the third prong – because there was a fourteen- month lapse between her first EEO complaint in December 2002 and the alleged retaliatory act (her reassignment) on April 21, 2004.[7]

To establish causation, a plaintiff must pair knowledge with proximity. This Plaintiff is unable to do so. In Willingham, the court observed that "'[c]ourts have not established the maximum time lapse between [a] protected Title VII activity and alleged retaliatory actions.'" 391 F. Supp.2d at 61 (citing Brodetski v. Duffey, 141 F.Supp.2d 35, 43 (D.D.C.2001)). However, the court also noted that "when a court is asked to accept mere temporal proximity between an employer's knowledge of [a] protected activity and an adverse employment action as sufficient evidence of causality, the Supreme Court has cautioned that the temporal proximity must be very close." Id. (citing Clark Cty. Sch. Dist. v. Breeden, 532 U.S. 268, 273, 121 S.Ct. 1508, 149 L.Ed.2d 509 (2001)) (internal quotation marks omitted). The court found that "[i]n two of the cases the Supreme Court cited to support this proposition, the circuit courts rejected delays of less than 4 months as insufficient to establish causation." Id. (citing See Richmond v. ONEOK, Inc., 120 F.3d 205, 209 (10th Cir.1997) (3-month delay insufficient); Hughes v. Derwinski, 967 F.2d 1168, 1174-75 (7th Cir.1992) (4-month delay insufficient)). The court then concluded that it "has often followed a three-month rule to establish causation on the basis of

---

[7]     Subsequent to Plaintiff's December 2002 EEO complaint, she met with Mr. Stephens and her other managers in January 2003 to discuss her grievances. A.C. at ¶ 26. Even assuming that the meeting constituted her "latest" prior protected activity, there was still a thirteen-month gap between the January 2003 meeting and the alleged retaliatory act in April 2004.

temporal proximity alone." <u>Willingham</u>, 391 F. Supp.2d at 61-62 (citing <u>Buggs v. Powell</u>, 293

F.Supp.2d 135, 148 (D.D.C.2003) (a seven month gap was too long); <u>Gustave-Schmidt v. Chao</u>,

360 F.Supp.2d 105, 118-19 (D.D.C.2004) (referring to end of three-month window as "outer

limit" of "temporal requirement in a retaliation case.")).  <u>See also</u> <u>Garrett v. Lujan</u>, 799 F. Supp.

198, 202 (D.D.C. 1992) (eleven months too long); <u>Woods v. Bentsen</u>, 889 F. Supp. 179, 187

(E.D. Pa. 1995) (noting that "Courts generally hold that if at least four months pass after the

protected activity without employer reprisal, no inference of causation is created.").  Ultimately,

in <u>Willingham</u>, the court rejected plaintiff's retaliation claim for failure to establish the temporal

proximity element because of a six-month lapse between plaintiff's EEO activity and

defendant's removal of plaintiff – the alleged retaliatory act.  391 F. Supp.2d at 62.

      In this case, Plaintiff's retaliation claim suffers the same fate as in <u>Willingham</u>.  Indeed,

Plaintiff's reassignment to the Special Assistant position was fourteen months after her prior

EEO complaint in December 2002.  A.C. at ¶ 21 (stating that Plaintiff's prior EEO complaint

was on December 18, 2002).[8]  Given the fourteen- month gap (or at least, a thirteen-month gap),

as a matter of established law, Plaintiff cannot demonstrate causation on the basis of knowledge

and temporal proximity.  <u>See</u> <u>Willingham</u>, 391 F. Supp.2d at 62 (holding that plaintiff could not

establish a prima facie case for her retaliation claim because of a six-month gap between the

EEO activity and the alleged discriminatory conduct).  Accordingly, Plaintiff cannot establish

her prima facie case of retaliation and the Court should grant summary judgment in Defendant's

favor on this claim.

---

    [8]    Defendant does not dispute that Messrs. Stephens (the official approving the
reassignment) and Mr. Heist (the proposing official) knew that Plaintiff filed an EEO complaint
in December 2002.

**2.      Defendant Had Legitimate, Non-Retaliatory Reasons for its Decision.**

As explained in Section V.A.2 *supra*, Defendant disbanded the HAD and reassigned Plaintiff to the Special Assistant position because of budgetary issues and to achieve work related needs.  Specifically, because of the hiring freeze in effect in April 2004 the agency could not hire more staff to assist the Financial Audit Division to complete with its annual financial audit on time.  As a result, Mr. Heist reassigned three staff auditors from the HAD to the Financial Audit Division.  The domino effect was the dissolution of the HAD because, after the transfer of the three auditors, there remained only the two managers in the division – Plaintiff and her assistant (Ms. Hawkins).  Consequently, Mr. Heist reassigned Plaintiff to become the Special Assistant and Ms. Hawkins to TOP to meet the staffing needs in that division.

Under these facts, the Court should grant summary judgment in Defendant's favor on Plaintiff's retaliation claims and dismiss them with prejudice.

**VI.     Conclusion.**

For the reasons and arguments presented above, the Court should grant Defendant's

Motion for Summary Judgment and dismiss this case with prejudice.


Dated: February 26, 2007.                          Respectfully Submitted,


                                    /s/   Jeffrey A. Taylor
                                   JEFFREY A. TAYLOR, D.C. BAR # 498610
                                   United States Attorney

                                    /s/   Rudolph Contreras
                                   RUDOLPH CONTRERAS, D.C. BAR #434122
                                   Assistant United States Attorney

                                    /s/   John C. Truong
                                   JOHN C. TRUONG, D.C. BAR #465901
                                   Assistant United States Attorney
                                   555 Fourth Street, N.W.
                                   Washington, D.C.  20530
                                   (202) 307-0406

                                   Attorneys for Defendant



Of Counsel:
Maxine Sharpe
U.S. Department of Housing and Urban Development
Washington D.C.

Richard Johnson
Office of Inspector General
Washington D.C.

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

SAUNDRA ELION,                          )
                                        )
          Plaintiff,                    )
                                        )
          v.                            )          Civil Action No. 05-0992 (PLF)
                                        )
ALPHONSO R. JACKSON,                    )
Secretary, U.S. Dept. of Housing        )
and Urban Development,                  )
                                        )
          Defendant.                    )
_____ )


## ORDER

      Upon consideration of Defendant's Motion for Summary Judgment, Plaintiff's

Opposition thereto, and the entire record herein, it is this _____ day of _____, 2007,

      ORDERED that Defendant's Motion for Summary Judgment be and is hereby

GRANTED; and it is

      FURTHER ORDERED that the above-captioned case be and is hereby DISMISSED with

prejudice.

      SO ORDERED.


                              _____
                              U.S. District Judge