

```
 1          IN THE UNITED STATES DISTRICT COURT
               FOR THE DISTRICT OF COLUMBIA
 2  _____

 3  SAUNDRA ELION,                    x
                                      :
 4                 Plaintiff,         :
       vs.                            :  Civil Action
 5                                    :  No. 05-0992
    ALPHONSO R. JACKSON, and HUD,     :
 6                                    :
                   Defendant.         x
 7  _____

 8                          Washington, D.C.

 9                          Monday, August 7, 2006

10

11  DEPOSITION OF:

12                     SAUNDRA ELION,

13  a witness, was called for examination by counsel for

14  the defendant in the above-entitled matter,

15  pursuant to Notice and agreement of the parties as

16  to time and date, taken at the United States

17  Department of Justice, 501 Third Street, Northwest,

18  Washington, D.C., convened at approximately 10:10

19  o'clock, a.m., before Catherine B. Crump, a court

20  reporter and Notary Public in and for the District

21  of Columbia, when were present on behalf of the

22  respective parties:
```



**CAROL J. THOMAS STENOTYPE**
**REPORTING SERVICES, INC.**
3162 MUSKET COURT
FAIRFAX, VIRGINIA 22030
(703) 273-9221

```
 1 APPEARANCE OF COUNSEL:

 2       On behalf of the Plaintiff:

 3             SELDON & ASSOCIATES, ESQUIRES

 4             BY:  ROBERT C. SELDON, ESQUIRE

 5             1319 F Street, N.W., Suite 305

 6             Washington, D.C.  20004

 7             (202) 955-6968

 8       On behalf of the Defendant:

 9             UNITED STATES DEPARTMENT OF JUSTICE

10             BY:  JOHN TRUONG, ESQUIRE

11             555 Fourth Street, N.W.

12             Washington, D.C.  20530

13             (202) 307-0406

14 and

15             U.S. DEPARTMENT OF HOUSING AND URBAN

16                 DEVELOPMENT

17             BY:  RICHARD K. JOHNSON, ESQUIRE

18                 MAXINE SHARPE WHEATLEY, ESQUIRE

19             451 7th Street, S.W., Room 8260

20             Washington, D.C.  20410

21             (202) 708-1613

22                         -  0  -
```

1  to come and work for HAD?

2      A.    No, not for HAD, because when he first

3  introduced the idea of abolishing the Capital

4  District, that's when we moved to the Headquarters

5  Audits -- when we moved to Headquarters, the

6  structure would be different for that organization

7  because we would be dealing with high-level

8  officials; therefore, what he had envisioned and

9  what he shared with me was, no, we would not hire

10  entry level, but that we would hire higher-graded

11  auditors who had more experience to put us -- to put

12  that division on par with the other divisions that

13  were at Headquarters.   Therefore, we would be hiring

14  at a minimum Grade 12 level.

15      Q.    I see.   Let's go back.   We'll explore

16  that in a little bit, but something came up.

17      A.    Sure.

18      Q.    What was your position when you were

19  with the Capital District?   What was your title?

20      A.    District Inspector General for Audit.

21      Q.    Okay.   And you became the Director of

22  HAD?

1        A.     Yes.

2        Q.     Was that a promotion or just a lateral
3 transfer?

4        A.     It was lateral.

5        Q.     And your salary, benefits, did it change
6 at all?

7        A.     No.

8        Q.     It was basically just a lateral
9 transfer?

10       A.     Yes.

11       Q.     But isn't it true that you just told me
12 that Mr. Phelps had this vision of making HAD to be
13 on par with other headquarters?

14       A.     Right.

15       Q.     Doesn't that increase your status
16 because now that you are the director of --

17       A.     Increase status in what sense?

18       Q.     In the sense that, you know, now you are
19 the director of the division that is now on par with
20 other divisions that are out there?

21       A.     Other headquarters divisions, yes.

22       Q.     Okay.

1          A.     So did it increase my status in --

2          Q.     In terms of your position, because going

3   from what you had with the Capital District to HAD.

4          A.     See, I'm not really clear when you say

5   status.  What do you mean by status?  It did not

6   increase my grade.  It did not increase my pay.

7   Status in the sense of professional exposure, is

8   that what you're asking?

9          Q.     Yes.  Opportunity, exposure, or what

10  have you.

11         A.     That's kind of a relative term.

12         Q.     In your mind, what do you think?

13         A.     Yes.  It could have increased my

14  exposure.

15         Q.     Okay.

16         A.     Your original question was?

17         Q.     I don't remember.

18                Let's introduce this.

19                        [Elion Exhibit No. 2 was

20                        marked for identification.]

21                BY MR. TRUONG:

22         Q.     Have you seen that E-mail before?

1       A.    The second sentence:   "Recent changes to

2  the statutory due date to audit is almost a

3  continuous financial process."   That due date was

4  posted, has been posted since -- if I'm not

5  mistaken, since the mid to early nineties it had a

6  due date that showed that it was getting earlier and

7  earlier as the years went by.   So this is not

8  something that that was new, that all of a sudden in

9  2004, now the due date of the financial statement

10 audit is brand new.   No.   That's something -- all of

11 the federal agencies knew, have known for years,

12 that it was getting closer and closer to the fiscal

13 year.

14      Q.    Okay.

15      A.    End of the fiscal year.

16      Q.    So the phrase "recent changes to the

17 statutory due date", is that something you take

18 issues with?   Is that what you're saying?

19      A.    Yes.

20      Q.    What part of that sentence?

21      A.    Yes.   They're not recent changes.

22      Q.    Okay.

1       A.    There have been changes.  I mean the due

2 dates have changed, yes.

3       Q.    But the notice of other due date changes

4 were not something recent; it was known for a number

5 of years?

6       A.    [Gestures.]

7       Q.    Okay anything else?

8       A.    That's enough.

9       Q.    So there's nothing else for paragraph

10 four?

11       A.    Nothing that I can identify at this

12 point.

13       Q.    Okay.  What about the next paragraph on

14 page 2?

15       A.    I think you get the gist of what I'm

16 saying with this.  No.  I'm done.

17       Q.    What does that mean?

18       A.    I don't have any other issues I want to

19 bring up.

20       Q.    On paragraph five?

21       A.    Five, six, or seven.

22       Q.    Okay.  So no other issues, what does

1 Headquarters?

2        A.    No.  That is not correct.

3        Q.    That's not correct?

4        A.    No.  That is not correct.

5        Q.    Tell me what this is E-mail about?

6        A.    This E-mail is sent to the managers and

7 OIG senior staff.

8        Q.    Okay.  And this proposed to transfer

9 various employees within HAD to various positions

10 after the realignment?

11       A.    That's correct.

12       Q.    Was your grade level affected in any way

13 after the transfer?

14            MR. SELDON:  She's answered that three

15 times.

16            THE WITNESS:  I have answered, and it's

17 the same.  No, it was not.

18            BY MR. TRUONG:

19       Q.    So what was the only difference between

20 your job as Director of HAD and to the Office of

21 Audits to serve as the Special Assistant?  What was

22 the difference?

1           MR. SELDON:  Difference or differences?

2           BY MR. TRUONG:

3      Q.    Difference or differences?

4      A.    One, it was not a supervisory position.

5  There was far less exposure to entities both within

6  and outside of HUD.  So my professional status, if

7  you will, was certainly different.

8      Q.    Anything else?

9      A.    Those are biggest things I can think of

10 at the moment.

11     Q.    Was it two or three?  No supervisory

12 responsibilities and your status was affected?

13          MR. SELDON:  Less exposure was the

14 second one.

15          MR. TRUONG:  Mr. Seldon, is Ms. Elion

16 testifying or are you testifying?

17          MR. SELDON:  You can't recite back

18 things contrary to what her testimony is.

19          MR. TRUONG:  I'm just asking her what

20 the second one was.

21          BY MR. TRUONG:

22     Q.    What was the first one?  Without

1 lawyer's interrupting each other, what was the first

2 one?

3       A.    I can't recall the order I said them in,

4 John.

5       Q.    It doesn't matter.

6       A.    But the point was that it was

7 non-supervisory.  I was hired to come to HUD as a

8 manager.  That was what I was hired to become, hired

9 into HUD for.

10      Q.    So non-supervisory?

11      A.    I was no longer a manager.

12      Q.    Okay.

13      A.    My professional status --

14      Q.    Okay.

15      A.    -- was definitely diminished, and my

16 exposure to individuals and entities within and

17 outside of HUD has been very -- has been reduced.

18      Q.    Anything else?

19      A.    Nonexistent.

20      Q.    Anything else?

21      A.    That's all I can think of at this

22 moment.