1

ORIGINAL

1          VOLUME II

2    IN THE UNITED STATES DISTRICT COURT
         FOR THE DISTRICT OF COLUMBIA

3    _____

4    SAUNDRA ELION,              x
                                 :
5             Plaintiff,         :
         vs.                     : Civil No. 05-0992
6                                :
     ALPHNSO R. JACKSON and HUD, :
7                                :
              Defendants.        x
8    _____

9                          Monday, October 2, 2006

10                         Washington, D.C.

11   DEPOSITION OF:

12            SAUNDRA ELION,

13   the plaintiff, was called for further examination by

14   counsel for the defendants, pursuant to continuance

15   from Monday, August 7, 2006, Notice and agreement

16   of the parties as to time and date, beginning at

17   approximately 10:24 o'clock, a.m., taken at the U.S.

18   Department of Justice, 510 3rd Street, Northwest,

19   Washington, D.C., before Ronnie C. Palmer, a court

20   reporter and Notary Public in and for the District

21   of Columbia when were present on behalf of the

22   respective parties:



**CAROL J. THOMAS STENOTYPE**
**REPORTING SERVICES, INC.**
3162 MUSKET COURT
FAIRFAX, VIRGINIA 22030
(703) 273-9221

```
 1    APPEARANCE OF COUNSEL:

 2        For the Plaintiff:

 3            SELDON & ASSOCIATES, ESQUIRES

 4            BY:  ROBERT C. SELDON, ESQUIRE

 5            1319 F Street, N.W., Suite 305

 6            Washington, D.C.  20004

 7            202-955-6968

 8        For the Defendants:

 9            U.S. DEPARTMENT OF JUSTICE

10            BY:  JOHN C. TRUONG, ESQUIRE

11                 ASSISTANT U.S. ATTORNEY

12            555 4th Street, Northwest

13            Washington, D.C.  20530

14            202-307-0406

15            U.S. DEPARTMENT OF HOUSING AND URBAN

16                 DEVELOPMENT

17            BY:  RICHARD K. JOHNSON, ESQUIRE

18                 MAXINE SHARPE WHEATLEY, ESQUIRE

19            451 7th Street, S.W., Room 8260

20            Washington, D.C.  20410-4500

21            202-708-1613

22                           -  0  -
```

1    about?

2        A        I don't remember the date of the e-mail

3    from probably Jim Heist and/or Michael Phelps about

4    the hiring freeze.  I don't remember those dates.

5        Q        Let me introduce the next exhibit.  So

6    that we can be sequential on this --

7                MR. SELDON:  When you say introduced, if

8    it is already attached --

9                MR. TRUONG:  It's not.

10                MS. SELIG:  Okay.

11                MR. TRUONG:  This is Exhibit 25.

12                        (Elion Exhibit No. 25 was

13                        marked for identification.)

14                BY MR. TRUONG:

15        Q        For identification purposes, this Exhibit

16    25 is a document Bates number 02848.  Have you seen

17    this e-mail before, Ms. Elion?

18        A        I don't recall this specific e-mail.

19        Q        You don't?

20        A        Yes.  So, I can't say that definitively

21    that I have.

22        Q        This e-mail, Exhibit 25, is from Mr.

1    Heist dated April 12, 2004, and it is to OIG RIGAs

2    R-I-G-A-S.    What does RIGAs stand for?

3        A        Regional Inspector General's Audit.

4        Q        Would you be on the list of RIGAs in

5    April of 2004?

6        A        Most likely.

7        Q        So, is it fair to say that you were one

8    of the recipients of this e-mail?

9        A        As I previously stated, I do not recall

10   this specific e-mail.   I do not recall it.

11       Q        Okay.

12       A        So, there is a possibility that I was on

13   it.   Yes.

14       Q        Let me direct your attention to the third

15   paragraph that begins now for the challenging news.

16       A        Yes.

17       Q        Do you see that?   And the third paragraph

18   reads now for the challenging news.   There is

19   increasing possibility of more reductions as our

20   budget situation for '05 becomes clearer.

21                For that reason, I am holding off any

22   decision on who will take the one FTE hit to get us

1    from 302 to 301.  We will continue to be under a

2    hiring freeze for the foreseeable future, et cetera,

3    et cetera.

4              What I wanted to direct your attention to

5    is the phrase where it begins we will continue to be

6    under a hiring freeze for the foreseeable future.

7              Do you recall talking to Mr. Heist about

8    a hiring freeze?

9        A      No.  I didn't talk to him specifically

10   about a hiring freeze up to this point.

11       Q      I see.  And the subject of the e-mail is

12   called the next conference call.  Do you recall

13   participating in a conference call with the other

14   RIGAs and Mr. Heist to discuss a hiring freeze?

15       A      Off the top of my head, no.

16       Q      Okay.  So, you don't remember whether a

17   conference call ever took place or you don't recall

18   you not participating?

19       A      I'm not sure how to make that distinction

20   between not participating and whether they -- whether

21   they had them.

22       Q      What I'm trying to get at you may have

1    knowledge or you knew there was a conference call to

2    talk about this but for whatever reason you couldn't

3    attend so you couldn't participate?

4                MR. SELDON:   I object.   I don't think

5    that's what she said.   I object to foundation.   You

6    can ask what you want.

7                BY MR. TRUONG:

8       Q        I am asking whether there was a

9    conference call in April of 2004 around April 12,

10   2004, talking about the hiring freeze and whether you

11   were one of the participants of that conference call.

12      A        I may have been.   But just to recall off

13   the top of my head whether I was there on April the

14   whatever, the 15th, I can't say definitively at this

15   time.   Just don't have that instant recall.

16      Q        Okay.   Where Mr. Heist said we will

17   continue to be under a hiring freeze for the

18   foreseeable future, do you have any reason to believe

19   that --

20              (Knock)

21              I am sorry.   Getting back to the question

22   where would Mr. Heist get the information that there

1    say.

2        Q        Let's go back to and I don't think I

3    asked you this question.  Let me ask you this before

4    we move on to your interrogatory responses.

5                What or tell me what do you think

6    Mr. Stevens discriminated or retaliated against you?

7                MR. SELDON:  You mean in addition to

8    interrogatories?

9                MR. TRUONG:  No.  I just want to know --

10                MR. SELDON:  All right.  I will object to

11    that.  The interrogatory answers I will say for the

12    record --

13                MR. TRUONG:  It does not say in her

14    interrogatory Mr. Steven did A, B, C.

15                MR. SELDON:  It does not have to.  She

16    incorporated her affidavit and everything else she

17    said in the EEO process.

18                BY MR. TRUONG:

19        Q        Let me reask the question.  What did

20    Mr. Stevens do to lead you to believe he

21    discriminated or retaliated against you?

22        A        For starters, when I had my initial

1    complaint and I had selected to do ADR, a mediator

2    had been assigned, but he requested a meeting with me

3    to discuss the issues.

4              He at that point knew there was a

5    mediator, but he believed that we could discuss it

6    and we would get -- we could better communicate if I

7    didn't have counsel present.

8              He thought that it was just a matter of

9    miscommunication, that there was no deliberate

10   discrimination, the issues that I had about the

11   hostile work environment.

12             He convinced me to meet with him, and we

13   did that.  Michael Phelps and Jim Heist.  We met, and

14   we identified four things that we were going to do to

15   resolve my issues.

16             And I believed that everything was going

17   to work out except that within a couple of months we

18   were back to the same way of doing business.

19        Q    So, let me understand this correctly.

20   The fact that Mr. Stevens asked you to meet with him

21   without counsel to resolve these issues is that some

22   sort of a discriminatory act against you?

1    statements would be issued like within a month after

2    the close of the fiscal year.

3         Q        So, did the work change or did it not

4    change under Chief Financial Officers Act for HUD

5    Office of Inspector General shortly before the April

6    20th, 2004, memorandum?

7         A        The work did not change.  The timing

8    changed a little bit in that it had to be done a

9    little sooner.

10        Q        Do you know how that work was performed

11   before April 20th, 2004?

12        A        How it was performed?

13        Q        Well, there is a reference here the work

14   performed by detailing staff in the field offices.

15   Is that something you know about one way or the

16   another?

17        A        Yes.  I do know that auditors came from

18   different parts of the country and spent several

19   weeks here --

20        Q        Was --

21        A        -- at Headquarters.

22        Q        To your knowledge, was it difficult to