Page 1

```
 1
 2            UNITED STATES DISTRICT COURT
 3            FOR THE DISTRICT OF COLUMBIA
 4   - - - - - - - - - - - - - - - -X
 5   SAUNDRA G. ELION,               :
 6            Plaintiff              :
 7       v.                          : Case No. 05-0992(PLF)
 8                                   :
 9   ALPHONSO R. JACKSON,            :
10            Defendant              :
11   - - - - - - - - - - - - - - - -X
12                 DEPOSITION OF JAMES HEIST
13                       Washington, D.C.
14                       Monday, July 31, 2006
15            Deposition of JAMES HEIST, called for
16   examination at 9:45 a.m., at the law offices of Robert
17   C. Seldon & Associates, P.C., 1319 F Street, N.W., Suite
18   305, Washington, D.C., before Gary S. Howard, a notary
19   public in and for the District of Columbia, when were
20   present on behalf of the respective parties:
21
22
```

Page 2

| | |
|---|---|
| 1 | APPEARANCES: |
| 2 | On behalf of the Plaintiff: |
| 3 | ROBERT C. SELDON, Esq. |
| 4 | MOLLY BUIE, Esq. |
| 5 | Law Offices of Robert C. Seldon, P.C. |
| 6 | 1319 F Street, N.W., |
| 7 | Suite 305 |
| 8 | Washington, D.C. 20004 |
| 10 | On behalf of the Defendant: |
| 11 | JOHN C. TRUONG, Esq. |
| 12 | United States Department of Justice |
| 13 | United States Attorney's Office |
| 14 | 555 4th Street, N.W., |
| 15 | Washington, D.C. 20530 |
| 16 | (202-307-0406) |
| 17 | RICHARD K. JOHNSON, Esq. |
| 18 | HUD, Office of Inspector General |
| 19 | MAXINE SHARPE WHEATLEY, Esq. |
| 20 | HUD, Office of General Counsel |
| 21 | Also present: |
| 22 | SAUNDRA ELION |

Page 3

C-O-N-T-E-N-T-S

| WITNESS | DIRECT | CROSS | REDIRECT |
|---|---|---|---|
| James Heist | 4 | 174 | 176 |

E-X-H-I-B-I-T-S

| NUMBER | IDENTIFICATION |
|---|---|
| Deposition Exhibit No. 1 | 43 |
| Deposition Exhibit No. 2 | 58 |
| Deposition Exhibit No. 3 | 79 |
| Deposition Exhibit No. 4 | 82 |
| Deposition Exhibit No. 5 | 87 |
| Deposition Exhibit No. 6 | 87 |
| Deposition Exhibit No. 7 | 89 |
| Deposition Exhibit No. 8 | 90 |
| Deposition Exhibit No. 9 | 104 |
| Deposition Exhibit No. 10 | 120 |
| Deposition Exhibit No. 11 | 124 |
| Deposition Exhibit No. 12 | 128 |
| Deposition Exhibit No. 13 | 130 |
| Deposition Exhibit No. 14 | 132 |
| Deposition Exhibit No. 15 | 132 |
| Deposition Exhibit No. 16 | 135 |

(Exhibits supplied by Mr. Seldon.)

Page 4

P-R-O-C-E-E-D-I-N-G-S

Whereupon,

JAMES HEIST

was called as a witness and, having been first duly sworn, was examined and testified as follows:

DIRECT EXAMINATION

BY MR. SELDON:

Q  Mr. Heist, good morning.
A  Good morning.
Q  My name is Bob Seldon. I am the attorney representing Saundra Elion in this case.
   Would you please for the record give us your full name and the present place where you work?
A  My name is James Alan Heist. I work in Washington, D.C., HUD office of inspector general.
Q  And what's your position there?
A  I am the assistant inspector general for audit.
Q  Okay. Mr. Heist, let me tell you, this case may go to trial. If it does, we might need to subpoena you for trial.

Page 5

Because you're in law enforcement, rather than ask you your home address because we'd need, if we had to subpoena you -- I'll give you the option that whether you are still with the government or not, the U.S. attorney's office could accept service of a subpoena for you, although they would not be responsible for producing you. That would be your responsibility.

Is that your preference, sir?

MR. TRUONG:  We talked about this. We take whatever position that we took in the last deposition with Mr. Stephens.

MR. SELDON:  Okay. So the answer is you guys are okay doing that.

MR. TRUONG:  Yes.

THE WITNESS:  Yes.

MR. SELDON:  Okay. The question is, is Mr. Heist?

MR. TRUONG:  We'll cross that bridge when we get there.

MR. SELDON:  No, I'll have to ask him his

Page 46

1  remember anything specific about the ADR
2  memorandum, Heist Exhibit 1, Ms. Elion's first
3  complaint?
4         You've given us the standard practice.
5    A   Right.
6    Q   What I'm wondering was if you remember
7  anything specific that happened in response
8  to --
9    A   That happened?
10   Q   Yes.
11   A   Okay. You said, specific about the -- I
12 was wondering.
13   Q   Okay.
14   A   As far as the process, yes, that I
15 remember.
16   Q   Okay. So let me just be clear. You
17 remember this request coming in, and Ms. Elion's
18 first complaint.
19   A   I remember there being an issue that came
20 in.
21   Q   Okay. So let me --
22   A   I remember the issues. I honestly can't

Page 47

1  remember when or when I would have seen this
2  particular document.
3    Q   Okay.
4    A   But I remember the issues and I remember
5  the process that ensued afterwards.
6    Q   What I'm trying to ask you to specify is,
7  do you remember what action, if any, was taken in
8  HUD OIG in response to Heist Exhibit 1, the
9  memorandum concerning ADR in Ms. Elion's case?
10   A   Well, there was no formal ADR session
11 held. ADR, meaning a mediator?
12   Q   Let me back up one step.
13   A   Right.
14   Q   Do you remember there being a decision
15 made by you or Mr. Stephens or anybody about what
16 to do -- do you remember the decisional process
17 about what to do in response to Heist Exhibit 1?
18   A   What I remember was Mr. Stephens had, I
19 believe somewhere along the line, had asked Sandy
20 whether or not we could convene a meeting to talk
21 through her issues, in hopes of coming to a
22 resolution, and at least getting her issues out on

Page 48

1  the table.
2    Q   Okay. Do you recall any discussions or
3  communications between you and Mr. Stephens on
4  whether or not to agree to ADR in response to Ms.
5  Bradford-Washington's memorandum of December 24th?
6    A   No, I didn't have any conversations with
7  Mr. Stephens about ADR.
8    Q   Okay.
9    A   My --
10       MR. TRUONG: I'm sorry. Mr. Heist, just
11 make sure Mr. Seldon finishes his question before
12 you answer the question.
13       I'm sorry.
14       MR. SELDON: That's fine.
15       BY MR. SELDON:
16   Q   And then I think you said, Mr. Stephens,
17 as you understood, was going to ask Ms. Elion to
18 participate in a meeting.
19   A   (Nods in the affirmative.)
20   Q   You need to say yes or no for the Court
21 Reporter.
22   A   Yes.

Page 49

1    Q   And were you involved in making a
2  recommendation or communicating with Mr. Stephens
3  about that idea?
4    A   Only that I thought it was a reasonable
5  idea.
6    Q   Okay.
7    A   Obviously, this was something that Sandy
8  would have to agree to.
9    Q   Okay.
10   A   But I was not involved in any kind of
11 conversations about whether to do that, versus ADR,
12 or the merits of one versus the other.
13       I don't know that it was ruled out that
14 after we had this meeting, there might be ADR. This
15 was potentially an intermediate first step, in at
16 least trying to get everybody's concerns on the
17 table.
18   Q   Okay. Did you understand the ADR process
19 and how it works in the context of any EEO
20 complaint?
21   A   Yes.
22   Q   I'd like to turn your attention to page 2

Page 50

1  of the Bradford-Washington memorandum.
2      And you see at the very bottom, this a
3  memo that goes to Mr. Donohue, I take it. And is it
4  correct, as you understand it, that the memorandum
5  on the bottom is asking for management's agreement
6  or disagreement to participate in ADR?
7      MR. TRUONG: Objection. The document
8  speaks for itself.
9      MR. SELDON: I'm asking his
10 understanding.
11     THE WITNESS: Yes, that would seem to be
12 what this document is calling for.
13     BY MR. SELDON:
14  Q  And as you understood it.
15  A  There's checkboxes, yes.
16  Q  Okay. So, then, above it, it says to give
17 the answer within ten days.
18     MR. TRUONG: I'm sorry. Did you say there
19 were checkmarks?
20     MR. SELDON: He said there were boxes to
21 check.
22     MR. TRUONG: Okay.

Page 51

1      THE WITNESS: There's a line -- I'm
2  sorry. There's a line that one could put a
3  checkmark.
4      BY MR. SELDON:
5   Q  So above that, it asks for management, I
6  believe, to return a copy of the memo, presumably
7  with checks, within ten days.
8      Do you see that?
9   A  Yes.
10  Q  You see that?
11  A  Yes.
12  Q  And that's what you understand that to
13 mean, I take it.
14  A  Yes.
15  Q  Okay. So was it also your understanding
16 that there would be the meeting with Ms. Elion and
17 if that was unsuccessful, there would be a response
18 on mediation within ten days of December 24th,
19 2002?
20     MR. TRUONG: Objection. Foundation.
21     MR. SELDON: I asked him for his
22 understanding.

Page 52

1      BY MR. SELDON:
2   Q  Did you understand that?
3      MR. TRUONG: Can you ask the question
4  again, Bob?
5      THE WITNESS: Yes.
6      MR. SELDON: Sure.
7      BY MR. SELDON:
8   Q  Mr. Heist, you testified that it was your
9  understanding that if the meeting with Ms. Elion
10 didn't come off as planned, or was unsuccessful,
11 that there could be ADR after that.
12     Was that your testimony?
13  A  That was my belief. I was not in control
14 of the process. As you can see, the letter is
15 addressed to Mr. Donohue.
16  Q  Right.
17  A  So it wouldn't be my decision to make.
18  Q  Okay. And whose would it be?
19  A  It would be Mr. Donohue's. They're asking
20 him.
21  Q  Okay. And in practice, were those
22 decisions made by Mr. Donohue, Mr. Stephens, or

Page 53

1  somebody else?
2   A  Mr. Stephens.
3   Q  Okay. Fair enough. And then let's go
4  through the process.
5      Were you a participant in this meeting
6  process that then ensued? And I won't ask you, I
7  think we all know, a process ensued.
8   A  Yes.
9   Q  What was your role?
10  A  I attended the meeting.
11  Q  Okay. And what transpired at that
12 meeting?
13  A  Well, the meeting was convened by Mr.
14 Stephens. It was an informal discussion where Sandy
15 talked about her issues in connection with the
16 decision to abolish the headquarters audit -- I'm
17 sorry -- the capital district office.
18     And then, the other issues that she had
19 as far as her belief that she was being harassed.
20  Q  Harassed on account of her race, sex and
21 age, I take it.
22     Is that right?

Page 90

1  for a moment.
2   A   I know I did not send this until after
3  Mr. Stephens approved it.
4   Q   Okay. I'd like you to tell me the process
5  in which Heist Exhibit 7, in which you sent that to
6  Mr. Stephens for his approval, process.
7   A   You said the process for sending the
8  memo?
9   Q   Before the memo was sent, I'd like to
10 know how this idea came into being.
11  A   There are a number of factors that had
12 occurred previous to my drafting of this memo.
13  Q   Okay.
14  A   It was early April, Mr. Stephens had sent
15 an e-mail advising -- and even before
16 then -- well --
17  Q   Let's stick with that e-mail.
18  A   Mr. Stephens had sent an e-mail advising
19 of budget constraints that had impacted the office
20 of inspector general.
21     Not just the office of audit, but OIG as
22 a whole, that there was a need to reduce our FTE

Page 91

1  level. As a consequence, there was the imposition
2  of a hiring freeze.
3   Q   When was the last time you saw that e-
4  mail?
5   A   When was the last time I saw the e-mail?
6   Q   In hard copy or electronic copy. Go
7  ahead.
8   A   Probably a couple days ago.
9   Q   Okay.
10  A   The e-mail also -- again, it was dated, I
11 think the 7th of April.
12     MR. SELDON: John, I don't think you guys
13 have given that to us.
14     MR. TRUONG: I will look into it.
15     MR. SELDON: Because, obviously, it's
16 been the subject of three depositions, including
17 today's.
18     MR. TRUONG: As I said, we'll look into
19 it.
20     MR. SELDON: Good enough.
21     THE WITNESS: It was a general e-mail
22 about our budget situation. In addition to calling

Page 92

1  for an FTE hiring freeze -- and I don't recall if
2  the e-mail gave numbers, but there was a need to
3  reduce by the end of the year, there was a target
4  FTE level that the organization needed to get to,
5  and Mr. Stephens had imposed a hiring freeze.
6     BY MR. SELDON:
7   Q   Okay. So let's define a few terms here.
8   A   If you look at my April 20th memo, it
9  says, we are currently under a hiring freeze.
10  Q   Yes, I know what you wrote.
11  A   Right.
12  Q   So why don't we defined first, what is an
13 FTE?
14  A   Full-time equivalent.
15  Q   Does HUD office of audits keep track of
16 those?
17  A   Primarily, it's the office of management
18 and policy that keeps track of the FTE level for
19 the organization.
20  Q   Okay. And exactly, when we say an FTE, is
21 that someone on board, someone who is potentially
22 on board?

Page 93

1   A   It's really a budget term.
2   Q   Meaning what?
3   A   That OIG is authorized a certain full-
4  time equivalent staff level set forth in our
5  budget. And at any given point in time, the
6  organization may be above that level. It may be
7  below that level.
8      It becomes a function of the dollars
9  available as to how much, how many FTEs the
10 organization can afford.
11     It may or may not be equal to the target
12 FTE level that's set forth in the budget.
13  Q   Okay. Let's go back a bit because now
14 you've confused me.
15     I understood you to say that an FTE, a
16 full-time equivalent employee, is a budget term
17 that OIG is authorized a certain level of.
18     Is that right, or no?
19  A   There's an FTE level number that's in the
20 budget.
21  Q   You're talking about the budget as the
22 annual budget?

Page 94

1  A  Yes, the President's budget.
2  Q  Okay. And what I'm also talking now are
3  FTEs as they are kept track of --
4  A  Correct.
5  Q  -- periodically, within the office of
6  inspector general or the office of audit.
7  A  And that's something that the office of
8  management and policy tracks.
9  Q  Okay.
10 A  That, at this point in time, we have this
11 many people on board and based on average salary
12 rates, if those individuals were to be employed for
13 the rest of the year, it would cost us this much.
14 Q  Okay. Is it correct, then, that the FTE
15 level is the authorized level of employees?
16 A  In this context -- well, it could be the
17 authorized. It could be the actual at a given point
18 in time.
19 Q  Okay. Now I think you used another
20 term -- is there anything else it could be?
21 A  No.
22 Q  Okay. A hiring freeze -- what does that

Page 95

1  mean?
2  A  It means -- well, let me see.
3  (Pause.)
4  Q  I don't think it's in there.
5  A  Well, no, no. A hiring freeze to me means
6  that, in this case, Mr. Stephens has directed that
7  we not fill positions unless we have a specific
8  justification that's approved by Mr. Stephens.
9  Q  And then is the FTE level adjusted
10 accordingly, if you know?
11 A  That I can't say.
12 Q  Okay. What's a hiring ceiling, as that
13 term is used in HUD OIG, in the office of audits?
14 A  A hiring ceiling?
15 Q  I'm sorry -- staff ceiling.
16 A  Oh, staff ceiling. That takes the budget
17 FTEs and the budget changes over time, so the
18 budget FTE at any point in time is different,
19 organizationally. Audit has an FTE ceiling.
20 That is the office of audit's portion of
21 OIG's FTE ceiling.
22 Q  And I'm just confused here. How does that

Page 96

1  relate to the staff ceiling?
2  A  They're basically the same.
3  Q  Okay. That's fair enough. So now let's
4  talk about the process -- anything up to, but not
5  including your memorandum of April 20th, 2004,
6  Heist Exhibit 7.
7     Had you talked to Mr. Stephens about a
8  hiring freeze for the office of audit or the office
9  of inspector general?
10 A  Just generally, that there was one.
11 Q  Why did you understand it was imposed, if
12 you had an understanding?
13 A  It was imposed, to my recollection,
14 because, based on the number of people, the number
15 of staff FTEs that we had on board, if we were to
16 have enough money, we would organizationally have
17 to get down to a certain level of FTE by the end of
18 the year.
19 Q  End of the fiscal year, I assume.
20 A  Correct.
21 Q  Okay. And did you discuss with Mr.
22 Stephens the impact on the office of audit?

Page 97

1  A  I don't recall any specific discussions.
2  Q  How did you know whether or not it
3  applied to the office of audit?
4  A  Because of the e-mail that I spoke of.
5  Q  Was that it?
6  A  That's what I recall.
7  Q  Okay. How did this budget freeze, if you
8  know -- hiring freeze -- come to be put in place in
9  the middle of the 2004 fiscal year?
10 A  Just by virtue of -- it's something that
11 the office of management and policy calculates and
12 dictates.
13    I'm not involved in those determinations.
14 Q  So Mr. Stephens never explained it to
15 you?
16 A  Explained what to me?
17 Q  How there was a hiring freeze in place.
18 A  He explained that the budget staff in
19 OMAP had determined that we needed to get to a
20 certain FTE level by the end of the year.
21    And that was the explanation.
22    We periodically had budget meetings

Page 114

1   Q   Did you ever talk to him and give him any
2   others?
3       (Pause.)
4   A   There's one other thing that I just want
5   to make sure is in here.
6       (Pause.)
7       If you read the memo, you could piece it
8   together. But the other thing that was a reality,
9   that at the time I prepared this, the staffing
10  level in the headquarters audit division was three
11  staff auditors.
12      The managers were Sandy and Donna
13  Hawkins. So you had two individuals in a
14  supervisory position that had three staff positions
15  under them.
16  Q   Okay. And when and where did you
17  establish ratios for headquarters audit divisions
18  for supervisory to staff auditors?
19  A   There's no established ratios.
20  Q   Okay. Anything else that's not in this
21  memo -- I'm sorry. Yes.
22      Is there anything else that is not in

Page 115

1   this memo that you communicated to Mr. Stephens as
2   your reasons for conducting the realignment which
3   led to the abolition of the headquarters audit
4   division?
5   A   No, I can't recall anything.
6   Q   And were there any other reasons that you
7   had, whether or not you communicated them to Mr.
8   Stephens?
9   A   One of the -- as I said, there were three
10  -- and I wouldn't -- to me, it's not a reason for
11  abolishing the headquarters audit division, but it
12  led to the fact that there were only three staff auditors.
13      Shortly before I drafted this memo, one
14  of Saundra's staff had decided to resign.
15  Q   Right. Okay. So are you saying, then,
16  that her performance or conduct was related to your
17  reasons for abolishing the headquarters audit
18  division?
19      MR. TRUONG: Objection. Mischaracterizes
20  the Witness' --
21      BY MR. SELDON:
22  Q   Are you saying that?

Page 116

1   A   No.
2   Q   Okay. So how did that relate, then?
3   A   Only from the standpoint that it caused
4   the supervisor-to-staff ratio to be impacted.
5   Q   Okay. And were there any other reasons
6   not expressed in your memorandum of April 20th,
7   2004, Heist Exhibit 7, that contributed to your
8   decision to realign the office of audit and abolish
9   the headquarters audit division?
10  A   Not that I recall.
11  Q   Okay. So take us forward again in the
12  process.
13      The memo goes up to Mr. Stephens' office,
14  I take it. Is that right or wrong, do you recall?
15      (Pause.)
16      Let's put it this way. You then signed
17  the memo on or around April 20th, 2004, I take it.
18  Front page.
19  A   Right.
20  Q   Right? And then, in the process, what do
21  you recall happening next?
22  A   Mr. Stephens approved it.

Page 117

1   Q   Do you recall that you took or arranged
2   the memo to be taken to Mr. Stephens' office?
3   A   No, I don't remember if I handed it to
4   him directly.
5   Q   Okay. Do you recall one way or another
6   if you had any oral communication with Mr. Stephens
7   --
8   A   I mean, we had discussed some of these
9   same, the issues that are in the memo, ahead of
10  time with Mr. Stephens.
11  Q   Okay.
12  A   So he was generally aware that this was
13  coming.
14  Q   I'm just trying to find out the best you
15  know, the process of his approval.
16      MR. TRUONG: Can you clarify that? What
17  do you mean by that?
18      MR. SELDON: Sure. There could have been
19  another meeting on this. There could have been --
20  they could have just come back signed.
21      THE WITNESS: We had conversations going
22  over these very points before I even signed the