Page 1

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLUMBIA

- - - - - - - - - - - - - -X

**CONDENSED**

SAUNDRA G. ELION,                    :

       Plaintiff            :

     v.                           : Case No. 05-0992(PLF)

                            :

ALPHONSO R. JACKSON,                :

       Defendant            :

- - - - - - - - - - - - - -X

DEPOSITION OF MICHAEL STEPHENS

Washington, D.C.

Wednesday, July 19, 2006

Deposition of MICHAEL STEPHENS, called for examination at 9:45 a.m., at the law offices of Robert C. Seldon & Associates, P.C., 1319 F Street, N.W., Suite 305, Washington, D.C., before Gary S. Howard, a notary public in and for the District of Columbia, when were present on behalf of the respective parties:

2 (Pages 2 to 5)

Page 2

| | |
|---|---|
| 1 | APPEARANCES: |
| 2 | On behalf of the Plaintiff: |
| 3 | ROBERT C. SELDON, Esq. |
| 4 | Law Offices of Robert C. Seldon, P.C. |
| 5 | 1319 F Street, N.W., |
| 6 | Suite 305 |
| 7 | Washington, D.C. 20004 |
| 8 | |
| 9 | On behalf of the Defendant: |
| 10 | JOHN C. TRUONG, Esq. |
| 11 | United States Department of Justice |
| 12 | United States Attorney's Office |
| 13 | 555 4th Street, N.W., |
| 14 | Washington, D.C. 20530 |
| 15 | (202-307-0406) |
| 16 | |
| 17 | RICHARD K. JOHNSON, Esq. |
| 18 | HUD, Office of Inspector General |
| 19 | MAXINE SHARPE WHEATLEY, Esq. |
| 20 | HUD, Office of General Counsel |
| 21 | |
| 22 | |

Page 3

1  Also present:
2      SAUNDRA ELION
3
4              C-O-N-T-E-N-T-S
5  WITNESS                    EXAMINATION
6  Michael Stephens                4
7          E-X-H-I-B-I-T-S
8  NUMBER                    IDENTIFICATION
9  Deposition Exhibit No. 1        52
10 Deposition Exhibit No. 2        61
11 Deposition Exhibit No. 3        84
12 Deposition Exhibit No. 4       102
13
14
15  (Exhibits supplied by Mr. Seldon.)
16
17
18
19
20
21
22

Page 4

1              P-R-O-C-E-E-D-I-N-G-S
2  Whereupon,
3              MICHAEL STEPHENS
4  was called as a witness and, having been first duly
5  sworn, was examined and testified as follows:
6              EXAMINATION
7  BY MR. SELDON:
8      Q    Mr. Stephens, good morning.
9      A    Good morning.
10     Q    For the record, would you please give us
11 your full name and your present position with the
12 Federal Government?
13     A    Michael Patrick Stephens -- S-t-e-p-h-e-
14 n-s, deputy inspector general, Department of
15 Housing and Urban Development.
16     Q    Mr. Stephens, let me start in a simple
17 place. It often happens that witnesses for the
18 government are needed for trial.
19          And so, typically, for law enforcement
20 people, we ask for home addresses to serve
21 subpoenas.
22          Because you're in law enforcement, I

Page 5

1  prefer not to do that. What we would need to know
2  is, whether you're with HUD, someone else in the
3  government, or outside of the government, the U.S.
4  Attorney's Office could accept service of a trial
5  subpoena for you.
6          They would not be responsible for
7  producing you. They would only act as your agent to
8  accept the subpoena for service.
9          Is that acceptable to everybody?
10         MR. TRUONG:  We had this discussion, Mr.
11 Seldon.
12         MR. SELDON:  Great.
13         MR. TRUONG:  And the U.S. Attorney's
14 Office is willing to accept service on behalf of
15 Mr. Stephens, if he agrees to do so.
16         I don't think that's an issue.  Do you
17 want him to answer now?
18         MR. SELDON:  No, that's all I want.
19         MR. TRUONG:  Okay.
20         MR. SELDON:  That's all I want.
21         MR. TRUONG:  That's fine.
22         BY MR. SELDON:

Page 62

1 the proposal or possibility of disbanding the
2 headquarters audits division?
3    A    Yes.
4    Q    What was that?
5    A    Well, Jim and I had talked about the
6 problem of dealing with the financial audit
7 division's new timetable, and the priority that
8 we've had to set because of OMB's decision to speed
9 up that timetable, and how he was going to meet
10 that extra burden.
11        And he indicated that he thought that
12 this division, the people in this division could be
13 instrumental in meeting that responsibility.
14    Q    What else, if anything, did Mr. Heist
15 tell you or communicate to you before you got this
16 memorandum, Stephens Exhibit 2, on that subject,
17 the subject being the disbanding of the
18 headquarters audit division and/or moving staff
19 elsewhere in the headquarters office of audit?
20    A    We discussed the workload that existed in
21 that division. And he indicated that the
22 anticipated workload had not been forthcoming, and

Page 63

1 discussed how he would transfer whatever existing
2 workload they had within the office of audit.
3        And it made sense.
4    Q    Okay. Did he give you any other reasons
5 before you got this memo on why he would be
6 proposing to disband the headquarters audit
7 division and move its staff to other functions
8 within the headquarters office of audit?
9    A    The vision, in his opinion, had not been
10 as productive as it could have been.
11    Q    I'm sorry. I thought it said division.
12 The division had not been as productive as it could
13 have been.
14    A    Right. And his major concern, and mine,
15 at the time was the major concern by the secretary
16 of HUD, the deputy secretary of HUD, the CFO of
17 HUD, our office, to meet our responsibilities on
18 the financial audit, which clearly became a major
19 priority because of the problems that we had in the
20 past year, and how we were going to get it done.
21    Q    Okay. Was there anything else that Mr.
22 Heist gave you as a reason before you got this

Page 64

1 memo, the memo being Stephens Exhibit 2?
2    A    No, not to transfer the people to the
3 financial management division. There wasn't really
4 any other reason that he indicated. He felt that
5 they should go to that division to meet their
6 responsibilities.
7    Q    Okay. Was this one or more conversations
8 that you had with Mr. Heist?
9    A    About the realignment?
10    Q    I guess what I should do is go back and
11 say, this communication with Mr. Heist, was it
12 orally or in writing?
13    A    Orally.
14    Q    And was it one conversation or more than
15 one?
16    A    It was one conversation specifically
17 about the realignment.
18    Q    And was it before April 20th?
19    A    I'm sorry -- oh, April 20th is the date
20 on the memo. It was before April 20th, yes. It may
21 have been the same day. It may have been the same
22 day.

Page 65

1        I don't know. Before or on the same
2 date.
3    Q    Did you get any — other than this one
4 communication, did you get anything else in writing
5 from Mr. Heist that concerned this subject?
6    A    Not that I'm aware of.
7    Q    And when you say there was — I think you
8 said that there was a major concern expressed by
9 the secretary, the deputy secretary and the CFO of
10 HUD about needing to fulfill another mission.
11        But put that in your own words. It's not
12 right of me to —
13    A    Well, it's not another mission. It's an
14 annual mission, to report on the financial audit of
15 any department. Ours is with HUD.
16        It's critical for the department to get
17 it done and meet the timetable. It's also critical
18 for the department to cooperate with whomever is
19 doing the audit to accelerate the timetable, to get
20 all parties together to agree of rolling up their
21 sleeves and working hard together.
22        And that particular audit is just

Page 66

1  absolutely, totally critical for the department to
2  get out.
3     Q   Okay. And in these concerns that emanated
4  from the secretary, would it be fair to say that he
5  did not at any time express how the office of audit
6  should be organized to accomplish that mission?
7     A   No, did not.
8     Q   Okay. Or the deputy secretary?
9     A   Did not.
10    Q   Or the CFO.
11    A   Did not.
12    Q   Okay. To your understanding, this
13 memorandum, Stephens Exhibit 2, that you approved,
14 did this give any reasons for seeking your approval
15 of the proposed realignment that had not been given
16 to you by Mr. Heist before?
17    A   To the best of my recollection, what's
18 written here matches up our conversation prior to
19 me receiving this.
20    Q   Okay. So just if I can complete the loop,
21 then.
22       There's nothing -- correct me if I'm

Page 67

1  wrong -- there is nothing then that Mr. Heist
2  communicated to you in support of proposing the
3  realignment, nothing that he told you earlier that
4  was not reflected in the memorandum, Stephens
5  Exhibit 2?
6     A   In reference to the realignment of the
7  division?
8     Q   Yes.
9     A   What should we do with it?
10    Q   What I'm saying is, is there anything he
11 told you before orally in your conversation that is
12 not also in the memorandum that is Stephens Exhibit
13 2?
14    A   Well, let me just review this for a
15 second.
16    Q   Sure.
17       (Pause.)
18    A   There are two issues, I believe that are
19 not included in this memo.
20    Q   What would they have been?
21    A   One is relating to the management of that
22 division, which is called the headquarters audit

Page 68

1  division.
2     Q   Okay.
3     A   He was troubled by that. And he was
4  troubled by some employees that no longer wanted to
5  work under that management.
6     Q   Okay. And what in particular did he
7  communicate to you?
8     A   He indicated that -- let me pause for a
9  minute. Let me think on that.
10       (Pause.)
11       He indicated that he was displeased at
12 the speed of the work, the timeliness of the work
13 product. And that several employees had come to
14 his deputy, Mike Phelps, and was concerned about
15 the environment within that division.
16    Q   Did he say -- I'm sorry. These are the
17 two reasons?
18    A   To the best that I recall, yes.
19    Q   And what you testified was that Mr. Heist
20 had said that employees came to his deputy, Mike
21 Phelps, about the environment in the division.
22       Correct?

Page 69

1     A   Correct.
2     Q   Did Mr. Heist ever say that the employees
3  had come to him?
4     A   I don't recall.
5     Q   That's one of those answers you need to
6  clarify for the Reporter because I don't know if
7  that means you can't remember either way, or you
8  don't recall him doing it.
9        MR. TRUONG: I'm sorry? What's I don't
10 recall that he was saying?
11       MR. SELDON: It's not a clear answer. He
12 could say, I don't recall him doing it, or I don't
13 recall either way.
14       There's no way of knowing what the answer
15 is.
16       MR. TRUONG: Objection. Asked and
17 answered.
18       MR. SELDON: Please go ahead.
19       THE WITNESS: Well, would you repeat your
20 question, and perhaps I can clear it up if you
21 repeat your question.
22       MR. SELDON: Sure.

Page 86

1  around that time, you became aware of this
2  complaint by Ms. Elion?
3      A   Yes.
4      Q   Okay. How did you become aware of it?
5      A   I believe Peggy Matthews.
6      Q   Advised you?
7      A   To the best of my recollection, Peggy
8  did.
9      Q   Okay. And we'll go back on this in a
10 minute.
11         And did you also become aware at some
12 point that Ms. Elion had requested alternative
13 dispute resolution?
14     A   I don't know. I don't have a recollection
15 of that.
16     Q   Okay. So now let's go back to the
17 complaint a little bit.
18         You're aware of the complaint and that it
19 was directed against Mr. Phelps and Mr. Heist. Were
20 you also aware of that?
21     A   I believe Mr. Phelps. I don't recall the
22 details regarding Mr. Heist.

Page 87

1      Q   Okay.
2      A   Primarily, Mr. Phelps.
3      Q   Do you recall after receiving this -- and
4  what I'm going to get into, just so you know, I
5  just want to see what was done in response to this.
6      A   Sure.
7      Q   But the first thing I'm going to ask you
8  is, do you recall discussing this complaint with
9  either of these two gentlemen?
10     A   I don't think I've ever seen this.
11     Q   And this, you need to identify for the
12 record.
13     A   This letter --
14         MR. TRUONG:  What the Witness is
15 referring to is the December 18th, 2002 letter
16 signed by Ms. Doris Carey.
17         MR. SELDON:  Right.
18         MR. TRUONG:  C-a-r-e-y.
19         MR. SELDON:  Okay.
20         THE WITNESS:  I don't think I've ever
21 seen this.
22         MR. SELDON:  Okay. So maybe I should go

Page 88

1  back a little bit, then.
2         BY MR. SELDON:
3      Q   I think you said that you were aware that
4  Ms. Elion had filed a complaint, or an informal
5  complaint. And your recollection was that it was
6  directed against Mr. Phelps, and you weren't sure
7  whether it was directed against Mr. Heist?
8      A   I don't recall whether it was or not.
9      Q   Okay. But the rest of what I've said so
10 far seems accurate?
11     A   Other than referring to this document.
12     Q   Right.
13     A   And I believe it was transmitted orally
14 by Peggy Matthews.
15     Q   Okay. And so, do you recall anything more
16 than you haven't just testified by agreeing with
17 me, anything more that Ms. Matthews told you about
18 the complaint?
19     A   Repeat it.
20     Q   Sure.  You just testified about your
21 knowledge or lack of knowledge about the complaint.
22 And you've testified that you learned about the

Page 89

1  complaint from Ms. Matthews.
2         What I'm trying to find out is if Ms.
3  Matthews told you anything else that you haven't
4  brought out already?
5         (Pause.)
6      A   Well, she advised me that there was
7  conflict between them, and that Ms. Elion felt that
8  she was not being treated fairly.
9         That's the best of my recollection. It
10 goes back a long time ago.
11     Q   Sure. Did you not understand that Ms.
12 Elion was filing an administrative complaint of
13 discrimination?
14     A   I understood that she had come to Peggy
15 Matthews with her concerns. Whether at the time I
16 understood that she had planned to file an EEO
17 complaint, I don't recall.
18     Q   Did you at some point come to understand
19 that she did have a plan to file an EEO complaint?
20     A   Yes.
21     Q   Okay. And now let's switch gears a little
22 bit.

24 (Pages 90 to 93)

Page 90

1      Do you recall discussing either what Ms.
2  Matthews told you or what you learned about Ms.
3  Elion's plan to file an EEO complaint, do you
4  recall discussing it with Mr. Phelps or Mr. Heist?
5      A   Yes.
6      Q   What was the substance of your
7  discussions, to the best you can remember?
8      A   To the best of my recollection, I believe
9  I talked to both of them about what seemed to be
10  the issue, what were the concerns, that there was
11  an employee that was concerned that she was not
12  being treated fairly, and how could we resolve this
13  matter?
14      What could be done to resolve it within
15  the division?
16      Q   Okay.
17      A   I think I stressed better communication.
18  They agreed to do so.
19      Q   Okay. And did you at any time in your
20  discussions with them, did you say to them, or they
21  to you, that Ms. Elion either had filed or planned
22  to file an EEO complaint?

Page 91

1      A   I don't recall. I don't recall. Surely I
2  said that she went to Peggy Matthews with her
3  concern.
4      Q   Okay. I take it, and I'm going to sort of
5  turn this over to you in a minute, that at some
6  point after learning about this from Ms. Matthews,
7  Ms. Elion's complaint, that you had a personal role
8  in trying to see that this was worked out.
9      A   I did.
10      Q   And at that point, when you were working
11  it out, did you understand it to be a complaint
12  involving discrimination?
13      A   I believe the term, hostile work
14  environment, was used.
15      Q   Did you understand that that was based on
16  Ms. Elion's race or sex?
17      A   If I had not seen -- and I do not recall
18  the formal complaint -- I would not have known
19  that.
20      Q   Okay. So now we're on the subject of Ms.
21  Elion's first complaint.
22      What is it that you did? I think you

Page 92

1  said you did attempt to resolve it. If you would
2  tell us what you did.
3      A   As I recall, I met with Ms. Elion and
4  Peggy Matthews, and we had a discussion about her
5  concerns, in which she indicated that there was a
6  lack of definition of what her mission was, and
7  that she felt it was a hostile environment.
8      I told her that I would do what I could
9  to look into the issue and get back to her.
10      Q   Okay. And do you have any recollection of
11  when that meeting occurred?
12      A   I do not, sir.
13      Q   Do you have a recollection --
14      THE WITNESS: Can I have a five-minute
15  break?
16      MR. SELDON: Sure. In fact, we're doing
17  very well. You can never really reassemble in five
18  minute. Let's say ten.
19      THE WITNESS: Ten.
20      MR. SELDON: But we're doing very well.
21      THE COURT REPORTER: We're off the
22  record.

Page 93

1      (Recess.)
2      THE COURT REPORTER: We're back on the
3  record.
4      MR. SELDON: Gary, read the last
5  interchange back to me so I can move forward, if
6  you would, please.
7      THE COURT REPORTER: Surely.
8      (The Court Reporter read the record as
9  requested.)
10      BY MR. SELDON:
11      Q   Okay. I think at last count, with Mr.
12  Truong's help, you had told us what had gone on
13  with the meeting with you and Ms. Matthews and Ms.
14  Elion.
15      And then, did you take some action with
16  respect to Ms. Elion's complaint after that
17  meeting?
18      A   That's correct.
19      Q   What did you do?
20      A   I had a meeting with Mr. Phelps and I
21  believe Mr. Heist. And I asked them or relayed to
22  them the information that was given to me by Peggy

25 (Pages 94 to 97)

Page 94

1  Matthews, and I asked them to meet with Ms. Elion
2  in an attempt to resolve the issues, work on better
3  communication and definition of her mission.
4        And they agreed to do so.
5    Q   And do you recall it coming up in this
6  meeting with either or both of them, the subject
7  that Ms. Elion's complaint either already or would
8  include discrimination allegations?
9    A   No.  To the best of my recollection, no,
10  I did not.
11    Q   And do you recall it concerning Ms.
12  Elion's allegations that there was a hostile work
13  environment?
14    A   Do I recall whether -- repeat it again.
15    Q   Yes. Do you recall whether the fact that
16  Ms. Elion's complaint was a hostile work
17  environment complaint, do you recall that coming up
18  in your meeting with Mr. Phelps and Mr. Heist?
19    A   No.
20    Q   Okay.
21    A   And again, let me clarify. When Peggy
22  Matthews brings an employee in who has some

Page 95

1  concerns, it's obviously with the consent of the
2  employee.
3        And at that point, we discuss issues. And
4  I don't believe that there was any definition by
5  either Peggy or Ms. Elion about the issue of
6  discrimination because of race or the other normal
7  definitions.
8        It was more specifics about relationship
9  problems back in that office. That's what I
10  recall.
11    Q   Okay. And then after the meeting with Mr.
12  Phelps and Heist, did you have some other
13  involvement in trying to work this matter out?
14    A   Yes.
15    Q   What was that?
16    A   I recall another meeting — I could not
17  tell you the timeframe -- in which Ms. Hawkins, Ms.
18  Elion and Peggy Matthews, came into my office.
19  I believe it was at my request, in order to try to
20  determine and clarify and define more concerns that
21  they had.
22    Q   Okay. And I'm sticking again with the

Page 96

1  early '03 timeframe.
2    A   I can't help you out with that, sir. I
3  don't know.
4    Q   Okay.
5    A   I have so many meetings --
6    Q   I understand.
7    A   -- that it's very difficult.
8    Q   I guess what I'm going to do is just go
9  back and if you don't remember, that's fine, but
10  try and refocus you on -- you said you had the
11  meeting with Mr. Phelps and Mr. Heist.
12        And then, specifically, with regard to
13  that meeting, for issues that were raised there, do
14  you specifically remember what, if anything, you
15  did next to resolve that concern?
16        (Pause.)
17    A   I believe I met with Ms. Elion again and
18  asked her how things were going. And I believe she
19  indicated that things seemed to have been going
20  better.
21    Q   Okay.
22        MR. SELDON: Let me just check my notes

Page 97

1  for a second.
2        (Pause.)
3        BY MR. SELDON:
4    Q   What I'm going to do, just to refresh
5  your recollection, if possible, it doesn't mean you
6  have it, I'm just going to show you, I'll give you
7  first a copy of the complaint.
8        Let me see if I've got an unmarked copy.
9        MR. TRUONG: We can share.
10        MR. SELDON: I just want to see if I have
11  an unmarked copy, which I don't.
12        BY MR. SELDON:
13    Q   And I'm really going to draw your
14  attention to paragraph 26.
15        MR. TRUONG: Let me ask you this. You are
16  handing Mr. Stephens the complaint, not the amended
17  complaint.
18        MR. SELDON: Right. It's going to be the
19  same paragraph.
20        MR. TRUONG: Same paragraph? Same facts
21  or allegations?
22        MR. SELDON: Yes. And I'm going to get