Page 1

```
            UNITED STATES DISTRICT COURT
            FOR THE DISTRICT OF COLUMBIA
          - - - - - - - - - - - - - -X
            SAUNDRA G. ELION,           :
                    Plaintiff           :
                 v.                     :
            ALPHONSO R. JACKSON,        :
                    Defendant           :
          - - - - - - - - - - - - - -X
                DEPOSITION OF AGNES MATTHEWS
                      Washington, D.C.
                    Tuesday, April 18, 2006
             Deposition of AGNES MATTHEWS, called for
          examination at 1:45 p.m., at the law offices of Robert
          C. Seldon & Associates, P.C., 1319 F Street, N.W., Suite
          305, Washington, D.C., before Gary S. Howard, a notary
          public in and for the District of Columbia, when were
          present on behalf of the respective parties:
```

Page 2

1  APPEARANCES:
2    On behalf of the Plaintiff:
3      ROBERT C. SELDON, Esq.
4      Law Offices of Robert C. Seldon, P.C.
5      1319 F Street, N.W.,
6      Suite 305
7      Washington, D.C.
8
9    On behalf of the Defendant:
10     JOHN C. TRUONG, Esq.
11     United States Department of Justice
12     United States Attorney's Office
13     555 4th Street, N.W.,
14     Washington, D.C. 20530
15     (202-307-0406)
16
17     RICHARD K. JOHNSON, Esq.
18     HUD, Office of Inspector General
19
20   Also present:
21     SAUNDRA ELION
22

Page 3

1           C-O-N-T-E-N-T-S
2  WITNESS              DIRECT   CROSS
3  Agnes Matthews          1      69
4           E-X-H-I-B-I-T-S
5  NUMBER              IDENTIFICATION
6  Deposition Exhibit No. 1      24
7  Deposition Exhibit No. 2      27
8  Deposition Exhibit No. 3      36
9  Deposition Exhibit No. 4      47
10 Deposition Exhibit No. 5      48
11 Deposition Exhibit No. 6      52
12 Deposition Exhibit No. 7      54
13 Deposition Exhibit No. 8      56
14 Deposition Exhibit No. 9      59
15 Deposition Exhibit No. 10     61
16
17 (Exhibits supplied by Mr. Seldon.)

Page 4

1           P-R-O-C-E-E-D-I-N-G-S
2  Whereupon,
3           AGNES MATTHEWS
4  was called as a witness and, having been first duly
5  sworn, was examined and testified as follows:
6           DIRECT EXAMINATION
7    BY MR. SELDON:
8    Q   Ms. Matthews, good afternoon.
9    A   Good afternoon.
10   Q   For the record, would you please give us
11 your full name and present place of employment?
12   A   Agnes Lorraine Matthews, U.S. Department
13 of Housing and Urban Development, Office of
14 Inspector General.
15   Q   Ms. Matthews --
16     MR. TRUONG: Mr. Seldon, before you go on
17 with your deposition, I just wanted to make a broad
18 objection for the record.
19     The Defendant objections to the Plaintiff
20 calling this Witness for the deposition because
21 this is irrelevant.
22     This Witness had nothing to do with the

Page 25

1   A   It was a part of the informal complaint
2   process that was issued in 2002, through the
3   departmental ADR office.
4   Q   Okay. Is it departmentally through your
5   office or an EEO counselor for the department?
6   A   It was the EEO counselor through the
7   departmental ADR office that it came to me.
8   Q   I see. Ms. Cary, do you know one way or
9   another whether she was serving in an ADR function
10  or as an EEO counselor?
11  A   He was the EEO counselor.
12  Q   In Ms. Elion's first case, I guess.
13  A   Correct.
14  Q   Okay. Now does this come like this in
15  your form to OIG?
16  A   It did come in this form. Attached, or
17  another form in the package, is the departmental
18  letter requesting remedy in the ADR process.
19  Q   Okay. And that advises the complainant of
20  their right to seek ADR.
21      Is that right? I may have a copy of that
22  here, in fact.

Page 26

1       (Pause.)
2       If you don't know, that's fine.
3   A   I do not know.
4   Q   Okay.
5       (Pause.)
6       MR. SELDON: Let's mark as Matthews
7   Exhibit -- let me do this first, if we could. Is
8   this the document that she's talking about? If
9   not, I'm not going to bring it up now. I'll bring
10  it up later.
11      (Pause.)
12      THE WITNESS: No. The EEO counselor
13  issues this.
14      MR. SELDON: Okay. So we'll put this --
15  that's not the form that comes up to you.
16      Okay. So let me put that -- we won't use
17  that now.
18      (Pause.)
19      I'm going to ask to have marked as
20  Matthews Exhibit 2 --
21      THE COURT REPORTER: No. 2.
22      (The document referred to

Page 27

1           was marked for identification
2           as Deposition Exhibit No. 2.)
3       BY MR. SELDON:
4   Q   Ms. Matthews, is this a letter that you
5   remember receiving?
6   A   Yes, it is.
7   Q   Okay. So let's go back a little bit
8   before this letter.
9       Can you recall one way or another whether
10  Ms. Elion had requested ADR or medication in
11  connection with her first EEO complaint?
12  A   I do not recall.
13  Q   Okay. And this letter -- what, if
14  anything, do you recall about Ms. Elion either
15  seeking ADR, OIG deciding whether or not for her to
16  have ADR, or there being some other meeting or
17  conference that would be used as a possible way of
18  resolving Ms. Elion's first EEO complaint?
19  A   I recall having an informal meeting with
20  Mr. Stephens and with Ms. Elion to resolve this
21  matter outside of her participating in the
22  departmental ADR process.

Page 28

1   Q   And the participation in that meeting,
2   how did you come to participate in it?
3   A   Ms. Elion and I had a rapport together.
4   And as an ombudsman, she did ask questions about
5   how the process worked.
6       And she made a personal request that I be
7   present in the meeting with her.
8   Q   Okay. Now I'd like to look at Exhibit 2,
9   if you could, to your deposition.
10      And it says in my letter to you -- do you
11  recall ever writing back to me about this letter?
12  A   No, I do not.
13  Q   Me, neither. And any reason to believe
14  that this letter was inaccurate in any way?
15  A   I have no way to answer that.
16  Q   That's fair. We say originally in this
17  letter -- Ms. Elion has decided to accept the
18  agency's offer that she and Mr. Stephens meet --
19  let's go dot, dot, dot -- before the upcoming
20  mediation session.
21      Was that in fact an offer that was made
22  by the agency?

Page 29

1   MR. TRUONG: Objection.
2   BY MR. SELDON:
3   Q   If you know.
4   MR. TRUONG: Objection. Let the record
5   reflect what is said in the letter, Exhibit 2. So
6   let me read the entire thing.
7   MR. SELDON: You can read it, John, but I
8   don't want it to reflect that. I'm trying to find
9   out if there was an offer of Ms. Elion and Mr.
10  Stephens to meet before the upcoming mediation
11  session.
12  I have a right to ask that question and
13  to say that it's a part of what's written in the
14  letter.
15  MR. TRUONG: That --
16  MR. SELDON: Please don't interrupt.
17  MR. TRUONG: I'm merely objecting to the
18  question because it is an incomplete question. It
19  misrepresents the document.
20  So I want to make sure that the record is
21  clear what the document actually says.
22  MR. SELDON: The document is attached to

Page 30

1   it and I said, dot, dot, dot, which clearly left
2   part of it out.
3   So let me go forward now, Ms. Matthews.
4   MR. TRUONG: Objection. The document
5   speaks for itself.
6   MR. SELDON: Great.
7   BY MR. SELDON:
8   Q   Ms. Elion has decided to accept the
9   agency's offer that she and Mr. Stephens meet --
10  and I'm leaving out part of the letter -- before
11  the upcoming mediation session.
12  My first question is, did HUD OIG make an
13  offer to your knowledge, one way or the other, for
14  Ms. Elion to meet with Mr. Stephens and/or other
15  agency officials before an upcoming mediation
16  session in her original EEO complaint?
17  A   Could you define what you mean by offer?
18  Q   That's a good question. Let's back up one
19  step.
20  Was there consideration given at some
21  point to Ms. Elion meeting with Mr. Stephens and/or
22  other representatives of agency management before a

Page 31

1   mediation session in her original complaint?
2   A   I'm sorry?
3   MR. TRUONG: Can you read back the
4   question, if possible?
5   MR. SELDON: Why is that?
6   MR. TRUONG: Because I don't understand
7   the question.
8   MR. SELDON: Then I'll just phrase it
9   again. I'll do it again.
10  BY MR. SELDON:
11  Q   Do you recall one way or another there
12  being any consideration for Ms. Elion and one or
13  more members of HUD OIG management to meet before a
14  mediation session in her original EEO complaint?
15  A   It's hard for me to answer that. You're
16  saying one or more HUD managers?
17  Q   Uh huh.
18  A   All I recall is the meeting that Ms.
19  Elion and Mr. Stephens agreed to that I was there.
20  And if there were any other meetings before that
21  meeting took place, I don't know.
22  Q   Okay. So let's go back. Was there at

Page 32

1   some point, then, a meeting with Ms. Elion, Mr.
2   Stephens, and you, in which you also attended?
3   A   Yes.
4   Q   Okay. To your recollection, how did that
5   meeting come about?
6   A   I recall there being an effort made with
7   Ms. Elion and through our discussion together to
8   see or explore the possibility of resolving the
9   matter before it entered into the departmental ADR
10  process.
11  Q   And how, if at all, do you recall that
12  effort originating?
13  A   I can't guess. I don't recall exactly how
14  it originated.
15  Q   Okay. Just to run down the possibilities,
16  I take it, then, you don't recall whether it
17  originated either way with Ms. Elion.
18  MR. TRUONG: Objection. Asked and
19  answered.
20  BY MR. SELDON:
21  Q   Please go ahead and answer.
22  A   State your question again.

Page 37

1  Q   And he was at that time the assistant
2  inspector general for management and policy.
3  A   Management and policy, yes.
4  Q   And your direct supervisor.
5  A   Correct.
6  Q   This first e-mail, which I gather is
7  dated January 16th, '03, is from you to him.
8      Can you read this to yourself before I
9  ask you some questions?
10     MR. TRUONG: Take your time reviewing the
11 documents.
12     MR. SELDON: Absolutely. Take as much
13 time as you like.
14     (Pause.)
15     THE WITNESS: Okay. I'm ready for the
16 first one.
17     MR. SELDON: Okay.
18     BY MR. SELDON:
19 Q   The first sentence says — I'll just read
20 it to you —
21     Mr. Stephens will be meeting with Sandy
22 Elion on Friday morning.

Page 38

1      I think we've talked about this before,
2  but I'll ask you if this gives you any further
3  recollection how the meeting came about between Mr.
4  Stephens and Sandy Elion in the middle of January
5  of '03?
6      MR. TRUONG: Objection. Asked and
7  answered.
8      BY MR. SELDON:
9  Q   Okay. Please go ahead and answer.
10 A   All I recall is the conversation with Ms.
11 Elion between herself and I.
12 Q   Okay. The one that you testified to
13 already?
14 A   Correct.
15 Q   Okay. Let's go to the second sentence.
16 She, meaning Ms. Elion, requested that I accompany
17 her to the meeting.
18     Do you have any independent recollection
19 of that occurring?
20 A   Yes, I remember our discussion.
21 Q   What was your discussion, to your
22 recollection?

Page 39

1  A   With Ms. Elion?
2  Q   Yes.
3  A   That I would be there as a support
4  person. And at any time, if the meeting did not --
5  if she wasn't comfortable with the meeting, even at
6  the very beginning, she could just get up and walk
7  out and I would walk out with her.
8  Q   Okay.
9  A   It was totally her decision.
10 Q   Other than this memorandum — I'm
11 sorry -- this e-mail, to Gen. Keho, do you recall
12 having any discussions with him on this subject?
13 A   Mr. Keho?
14 Q   Yes.
15 A   I do not recall.
16 Q   Okay. Do you recall having any
17 discussions with Mr. Stephens on this subject?
18 A   Getting approval from Mr. Stephens to
19 meet with Ms. Elion to see if the matter could be
20 resolved.
21     I don't remember what the words were, but
22 that was the purpose of trying to set up the

Page 40

1  meeting.
2  Q   Okay. Just to clarify, you had a meeting
3  with him about it.
4      But is it fair to say that you don't
5  remember the substance of the meeting, or not?
6  A   I don't remember directly meeting with
7  him. I could have set it up through his secretary.
8  Q   Okay.
9  A   I just can't recall the facts.
10 Q   Okay. We won't pursue that, then. It was
11 understood that I will not participate — that's
12 the first clause in sentence three.
13     You said you would be a support person.
14 Does this have any additional meaning beyond that?
15 A   Support person was to allow Ms. Elion to
16 ask me questions during or after the meeting, as
17 well as if she felt as though someone's voice
18 raised and she was uncomfortable, she would have a
19 witness there and things could stop.
20     And gather information if an agreement is
21 reached in order to prepare or support the
22 preparation of the settlement agreement.

Page 61

1  final interview, which would give her 15 days to
2  file a formal complaint.
3    Q  Okay. And that was because management had
4  declined to participate in ADR?
5    A  It was her issuing this because the EEO
6  process stops until ADR has a decision reached one
7  way or the other.
8      And this is to have the process to start
9  up again.
10    Q  And in this case, the decision -- was it
11  to have ADR or not have ADR?
12    A  It says not to have ADR and for the
13  process to go forward.
14    Q  Okay. So now let me have you turn your
15  attention back to Matthews Exhibit 2.
16      (Pause.)
17      And this -- I think you've testified that
18  this is a letter that I sent to you. And is it fair
19  to say that this concerns Ms. Elion's meeting with
20  Mr. Stephens in her first EEO complaint?
21    A  It does relate to her first EEO complaint
22  and her meeting with Mr. Stephens.

Page 62

1    Q  Did you understand one way or another
2  that that meeting would be treated as part of the
3  mediation process?
4      (Pause.)
5    A  Rephrase that for me, please.
6    Q  Yes. Did you have an understanding one
7  way or the other whether Ms. Elion's meeting with
8  Mr. Stephens in January of 2003, was part of the
9  mediation process?
10    A  It was not part of the mediation process.
11  The department has a formal process. If a
12  settlement was reached, then it would be put into
13  the departmental system. But it was separate from
14  the ADR process.
15    Q  Okay. Was there any guarantee of
16  confidentiality, to your knowledge, about what
17  transpired in that meeting?
18    A  State that again.
19    Q  Yes. Was there any guarantee of
20  confidentiality about what transpired in the
21  meeting?
22    A  In the e-mail, we said that it would be

Page 63

1  held confidential.
2      In your letter, you state that it would
3  remain confidential.
4      But nothing's confidential if the
5  complainant or the aggrieved person decides to
6  share it with others.
7    Q  Okay. Did Mr. Stephens keep everything
8  that was confidential --
9      MR. TRUONG: Objection. Speculation.
10      MR. SELDON: Sorry -- if you know.
11      THE WITNESS: I have no knowledge.
12      BY MR. SELDON:
13    Q  Okay. Now I'd like to ask you a little
14  bit about the ADR process itself.
15      What does on in an ADR session, I take it
16  -- and if you don't know, it's fine.
17    A  Sure.
18    Q  Is confidential. Is that right?
19    A  The departmental ADR session is private.
20  They do not get back with me.
21    Q  About what goes on?
22    A  About what goes on in the meeting.

Page 64

1    Q  Okay. Let's assume that, as a result of
2  one or more ADR sessions, an agreement is reached
3  to resolve an EEO complaint and at the
4  administrative level.
5      Do you know what happens to formalize
6  that resolution, if anything?
7    A  Okay. Now state that one more time for
8  me, please.
9    Q  Sure. Let's work on the assumption that
10  in ADR, an agreement is reached between the
11  complainant and HUD OIG management.
12      MR. TRUONG: Is this within the formal ADR
13  process?
14      MR. SELDON: Yes.
15      BY MR. SELDON:
16    Q  Okay. And then, at the end of that
17  process, there is an agreement.
18      Is something done to codify that
19  agreement, reduce it to writing?
20    A  Yes.
21    Q  What's that?
22    A  That's an ADR process. They share neutral