# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **SAUNDRA G. ELION,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Civ. Action No. 05-0992 (PLF)** |
| | ) | |
| **ALPHONSO R. JACKSON,** | ) | |
| **Secretary Of Housing And** | ) | |
| **Urban Development,** | ) | |
| | ) | |
| **Defendant.** | ) | |
| _____ | ) | |

## MEMORANDUM OF POINTS AND AUTHORITIES
## IN OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

### PRELIMINARY STATEMENT

Saundra G. Elion formerly served as the Director of the Headquarters Audits Division of the HUD Office of Inspector General ("OIG") and as the District Inspector General for Audit for Washington, D.C. She was the only African American woman and one of only three African Americans ever to hold positions at this level in HUD OIG since its creation in 1979, until a second African American woman was appointed well after the Complaint here was filed (Elion Decl., ¶6). In April of 2004, Ms. Elion was stripped of her supervisory duties and reassigned involuntarily to a make-work position as a "special assistant" in a pretextual reorganization that abolished her office, 13 months after her earlier EEO complaint concluded (Id., ¶¶12-13 & Att. 1-4). Like Ms. Elion, Austin Groom, her African American predecessor as District Inspector General for Audit, was fired after he filed an EEO complaint shortly after being reassigned involuntarily as a "special assistant" (Id. ¶29; Groom Dep. at 6, 14-16, 22-23, 33-34 & Exh. 1).

The purported basis for defendants' adverse actions against Ms. Elion was a "new hiring freeze" implemented in April of 2004, one that supposedly necessitated disbanding the Headquarters Audits Division and dividing Ms. Elion's staff between two other divisions (Elion Decl., ¶¶12-13 & Att. 3, 4). This action was taken despite the fact that in Fiscal Year 2004, Ms. Elion's former office was ranked third out of HUD OIG's thirteen operational Regional and Headquarters audit offices (Id., ¶¶34-36 & Att. 5; Beard Decl., ¶¶20-23). The worst performing office, also located in Washington, D.C., was left unaffected by the "reorganization" (Elion Decl., ¶36; Beard Decl., ¶24). Unlike Ms. Elion, the director of that office was white and had never filed an EEO complaint (Elion Decl., ¶36; Beard Decl., ¶16).

Truth be told, OIG's purported "new hiring freeze" did not make the Headquarters Audits Division superfluous or provide any grounds for removing Ms. Elion from supervisory ranks. In the two preceding years, OIG Headquarters audit divisions were never fully staffed up even once (Elion Decl., ¶40 & Att. 6). That was true even though during much of that time OIG management was exhorting the Office of Audit to accelerate its hiring, ostensibly to avoid the possibility that its personnel ceiling would be lowered (Id., ¶44 & Att. 7-9). Moreover, the workload of the two offices that supposedly had "new" needs for Ms. Elion's staff were unchanged for several years, according to the former director of one office (McLeod Dep. at 5-6, 12-15, 76), and White House and OMB Memoranda, Bulletins, and Circulars, which affected the workload of the second office (Elion Decl., ¶45 & Att. 10-13). Ms. Elion's office, by contrast, would have had work for up to 14 auditors had it not been disbanded (Elion Decl., ¶24).

For 33 years until the Headquarters Audits Division was abolished, HUD OIG and its predecessor always had a separate audit office responsible for auditing Headquarters program activities (Elion Decl., ¶39; Phelps Dep. at 14-15; Beard Decl., ¶27). That Division was the first

and only audit office at an equivalent level in HUD OIG ever composed entirely of African Americans (Id, ¶6). According to auditors in OIG Headquarters, Ms. Elion had been targeted for discrimination over a period of years before OIG's campaign culminated in the dissolution of her former Division (Hawkins Aff.; Campbell-Waters Aff.; Bowles Aff.; Bowles Aff.).

HUD's motion for summary judgment addresses none of these issues, with the exception of OIG's supposed "new hiring freeze" (Def. Mot. at 2). The argument that this purported freeze triggered the adverse employment actions visited upon Ms. Elion is belied by OIG's own staffing records, e-mails directing management to accelerate hiring, and White House and OMB directives (Elion Decl., ¶¶33-43 & Att. 5-13). HUD's factual argument is, therefore, ineffectual on summary judgment. E.g., Lathram v. Snow, 336 F.3d 1085, 1088 (D.C. Cir. 2003).

Defendant's other primary argument is unfounded as a matter of fact and erroneous from a legal perspective. According to HUD, Ms. Elion cannot meet her prima facie burden of discrimination "because there is no evidence of record showing that Defendant treated her differently from similarly situated employees outside of the protected group" (Def. Mem. at 9). Even if comparators were required, they were plentiful. But they need not be, because Ms. Elion "alleges that her position was abolished for discriminatory" and retaliatory reasons, so "the fact that she was not replaced by someone not of her protected class is not fatal to her claim." Washington v. Garrett, 10 F.3d 1421, 1433 (9th Cir. 1994); accord e.g., Montana v. First Federal Savings & Loan Ass'n, 869 F.2d 100, 104 (2nd Cir. 1989) ("in a reduction-in-force case or a structural reorganization case," a plaintiff "need not show that he was replaced by" someone not in his protected categories). In point of fact, the sole case on which HUD relies held that differences in treatment among comparators are "not the only way" to establish a prima facie case. George v. Leavitt, 407 F.3d 405, 412 (D.C. Cir. 2005).

In any event, Ms. Elion was the only Director of a Headquarters audit division involuntarily reassigned, not only in the "reorganization" in April of 2004 but ever (Heist Dep. at 141-42; Elion Decl., ¶30). This disparate treatment by itself cements the causal element of Ms. Elion's prima facie case of retaliation without regard to temporal proximity. Stone v. City of Indianapolis Public Utilities Div., 281 F.3d 640, 644 (7th Cir. 2002) (Posner, J.). The fact that the supposed "reorganization" which led to Ms. Elion's involuntary reassignment did not affect an undeniable comparator – namely, the worst performing Headquarters Division Director who was Caucasian and had not engaged in EEO activity – reinforces the factual components of Ms. Elion's prima facie case of retaliation and discrimination, as well (Elion Decl., ¶¶34-36 & Att. 5). E.g., George v. Leavitt, supra, 407 F.3d at 412. Even in the field, the only Regional Inspector General for Audit ever reassigned over his objection was Michael Beard, who was removed from his position and reassigned to a make-work special assistant position after he filed an EEO complaint (Heist Dep. at 67-69, 75, 142-48; Elion Decl., ¶30; Beard Decl., ¶16).

HUD's secondary argument is neither novel nor sound. According to defendant, Ms. Elion "cannot establish her prima facie case of retaliation" because "there was a [13]-month gap between her" original EEO complaint and her involuntary reassignment (Def. Mem. at 1-2). Applying HUD's logic, OIG was free to retaliate against Ms. Elion as long as it waited a few months. It is undoubtedly correct that even without any other evidence, retaliation "may be established by showing that … the employee's protected activity" was followed by "adverse personnel action … shortly after." Mitchell v. Baldridge, 759 F.2d 80, 86 (D.C. Cir. 1985) (emphasis supplied). However: "Consideration of such dates is part of [the] analysis, but not in itself conclusive" and does "not absolve defendant of its responsibility for retaliating." Shirley v. Chrysler First, Inc., 970 F.2d 39, 44 (5th Cir. 1992); accord, Gipson v. Wells Fargo, N.A., 460

F.Supp.2d 15, 25 (D.D.C. 2006) (span of five years between protected activity and adverse action).  Here, there is substantial other evidence of retaliation and discrimination both before and after Ms. Elion's initial EEO complaint including, among other matters, the withdrawal and reduction of work assignments for Ms. Elion's former Division and OIG's reliance on this manufactured lack of work as a basis for disbanding it (Phelps Dep. at 52-57; Heist Dep. at 116-22 & Exh. 10); the higher performance of Ms. Elion's former office than the Headquarters audit division not affected by the alleged reorganization (Elion Decl., ¶¶34-36 & Att. 5); and the termination of Ms. Elion's African American predecessor after he filed an EEO complaint.  E.g. Jones v. WMATA, 946 F. Supp. 1011, 1019 (D.D.C. 1996) (Lamberth, J.).

Correctly formulated, since she is an African American woman who engaged in protected activity and suffered actionable changes in employment when she was 56 years old, Ms. Elion's prima facie case is completed with evidence that she was treated "less favorably" on account of her protected status or activity.  International Brotherhood of Teamsters v. United States, 431 U.S. 324 at 335, n.15 (1977); accord Teneyck v. Omni Shoreham Hotel, 365 F.3d 1139, 1150 (D.C. Cir. 1150).  Comparators are not required, and Ms. Elion "need not demonstrate that she was replaced by a person outside her protected class."  Stella v. Mineta, 284 F.3d 135 at 145, 146 (D.C. Cir. 2002).  "More recently, the D.C. Circuit observed that '[u]sually, proffering 'evidence from which a jury could find that [the employer's] stated reasons ... were pretextual ... will be enough to get a plaintiff's claim to a jury.'"  Kalinoski v. Gutierrez, 435 F.Supp.2d 55, 68 (D.D.C. 2006) (Bates, J.) (quoting George v. Leavitt, supra, 407 F.3d at 413) (citing Aka v. Wash. Hosp. Ctr., 156 F.3d 1284 (D.C. Cir. 1998) (en banc)).  The strength of Ms. Elion's prima facie case, combined with evidence of OIG's discrimination and retaliation and genuine factual disputes about the supposed reasons for its adverse actions, entitles Ms. Elion to proceed to trial.

**STATEMENT OF THE CASE**

**Ms. Elion's Service With HUD OIG**

Ms. Elion was appointed to the position of District Inspector General for Audit of the HUD OIG Capital District in Washington, D.C., in June of 1999 (Elion Decl., ¶7).  In May of 2002, Ms. Elion's former office was abolished and she became the Director of the OIG Headquarters Audits Division in HUD Headquarters (Id., ¶8).  Both positions gave Ms. Elion extensive managerial responsibility and exposure to senior officials in HUD OIG and senior program officials in HUD (Id., ¶9; Beard Decl., ¶¶9-10).  Ms. Elion's grade in both positions was GS-15 (Elion Decl., ¶9).  She has been recognized by HUD OIG for exceptional audit work (Beard Decl., ¶32).

In her original position as District Inspector General for Audit, Ms. Elion was responsible for supervising the execution of internal and external audits[1] and audit reports concerning HUD programs and HUD-related activities within HUD Headquarters and the greater Washington, D.C. area (Elion Decl., ¶10 & Att. 13 at 2-7).  In her subsequent position as Director of the Headquarters Audits Division, Ms. Elion managed the OIG audit division primarily responsible for internal audits and the preparation of audit reports for HUD Headquarters programs and activities (Id., ¶11 & Att. 13 at 7-10).  Ms. Elion was also personally responsible for performing audits and issuing audit reports in more complicated and sensitive areas involving HUD officials (Id., & Att. 13 at 2-10).

When HUD OIG disbanded the Headquarters Audits Division, it reassigned Ms. Elion to a non-supervisory "special assistant" position under the Assistant Inspector General for Audit

---

[1]    Audits entail the review of financial transactions and dealings of entities which receive HUD funds, among them public housing authorities, contractors, and mortgagees, to ascertain whether their dealings with HUD, its programs, and federal funds have complied with federal law and regulation.  The end product of an audit is typically an audit report, which details the auditee's compliance and recommends potential sanctions (Elion Decl., ¶10, n.1).

(Cplt./Answ., ¶¶6, 33).  Although Ms. Elion's grade remains the same, there the similarity to her prior positions ends (Elion Decl., ¶13).  Ms. Elion's work assignments are few and far between, often menial, and not commensurate with her background and experience as a supervisory auditor who was previously engaged in the full range of OIG's audit activities (Id.).  They entail identifying speaking engagements for her supervisor, reviewing a training database, inventorying personnel positions, and serving as a representative at meetings that have little or no relationship to the Office of Audit's activities (Id.).

### Organization Of The OIG Office of Audit

The Office of Audit is the larger OIG unit which included Ms. Elion's two former offices. The operating units of the Office of Audit are divided into Headquarters Divisions that are headed by Division Directors and Regional field offices (formerly District offices), which are headed by Regional Inspectors General for Audits.  All of these office heads serve at Grade 15 (Heist Dep. at 27-29; Elion Decl., ¶3; Beard Decl., ¶10).  All of the incumbents in these positions are accomplished auditors; all are supervisors; and all of their positions are functionally equivalent, as proven by the fact that Ms. Elion was reassigned laterally between these positions in 2002 (Heist Dep. at 27-29; Elion Decl., ¶¶3-4; Beard Decl., ¶¶9-10).  These supervisory auditors are responsible for managing the audit programs of HUD and there are no other managers at their level (Id.).  The program activities they manage are essentially the same, with the only meaningful distinction being that Regional Offices concentrate on field audits and operations and Headquarters Divisions focus on activities at HUD Headquarters (Id.).

The chain of command for all of these supervisory auditors is the same, as well (Elion Decl., ¶5; Beard Decl., ¶11).  All answer first to the Deputy Assistant Inspector General for Audit, in this case Michael Phelps, and second to the Assistant Inspector General for Audit,

James Heist (Phelps Dep. at 3, 10-11; Heist Dep. at 4). The Deputy Inspector General, in this case Michael Stephens, serves as the third line supervisor. He is the chief operating officer for HUD OIG (Stephens Dep. at 4, 11-14; Elion Decl., ¶5; Beard Decl., ¶11).

### Ms. Elion's Initial EEO Complaint

Ms. Elion's primary assignment when she was appointed to head the Capital District was to improve the performance of that office (Elion Decl., ¶14). Her last performance appraisal as District Inspector General for Audit confirmed that she did accomplish this objective successfully (Id. & Att. 14, 15). According to both Assistant Inspector General Heist and Deputy Assistant Inspector General Phelps, "Ms. Elion issued five significant [audit] reports" that were "comprehensive" and "resulted in significant changes in improving HUD's operations" (Id., Att. 15 at 7).

Despite Ms. Elion's success, in May of 2002, Mr. Heist and Mr. Phelps abolished that District Office and reassigned Ms. Elion to the newly created Headquarters Audits Division (Elion Decl., ¶15). This reorganization, limitations on the scope of potential audits, reductions in the number of assigned audits, arbitrary staff reductions, repeated acts that undermined her managerial authority, and being personally assigned staff auditor duties below her position were the most prominent acts that led Ms. Elion to initiate the EEO complaints process for the first time on December 18, 2002 (Elion Decl., ¶16 & Att. 1 at 1-4). Ms. Elion specifically identified Mr. Heist and Mr. Phelps as the management officials responsible for discriminating against her (Id.).[2]

---

[2] The legitimacy of Ms. Elion's allegations is not doubted by defendant, although their veracity is disputed (Heist Dep. at 76-77).

**Deputy Inspector General Stephens Interferes With The EEO Complaints Process**

Employees of HUD, like all members of the federal service, enjoy an absolute right to request Alternative Dispute Resolution ("ADR") in order to avoid the lengthy administrative complaints process (Elion Decl., ¶18 & Att. 16 at 4, 17 at 3; Matthews Dep. at 8-9 & Exh. 8). ADR relies on a "neutral or impartial third party" who is "trained in mediation theory and techniques" (Id., Att. 17 at 3). Ms. Elion requested ADR and, under HUD OIG practice, her request had to be honored (Elion Decl., ¶19; Mathews Dep. at 68-69).

Ms. Elion had "the right to representation throughout the complaint process, including during any ADR process" (Elion Decl., ¶18 & Att 16 at 2-3). Deputy Inspector General Stephens was responsible for arranging ADR in Ms. Elion's case; he refused to let her participate in ADR with counsel present (Heist Dep. at 44-45; Elion Decl., ¶20 & Att. 18 at 8). Specifically, Mr. Stephens notified Ms. Elion that he was prepared to participate personally in a conference with Ms. Elion but only if she attended without counsel (Elion Decl., ¶20; Heist Dep. at 55-56).

Believing that without ADR, Mr. Stephens' offer represented the only means of expediting the resolution of her complaint, Ms. Elion agreed to meet with him without counsel present (Elion Decl., ¶21). Unlike ADR, Ms. Elion's conference did not conclude with a written and enforceable settlement agreement resolving her complaint, but only with Mr. Stephens' verbal assurances (Id., ¶22 & Att. 17 at 7). Ms. Elion withdrew her complaint relying on those assurances that OIG management would change its conduct (Id., Att. 2, 19).

**Defendant's Continued Discrimination And Its Retaliation**

Without a settlement agreement, Mr. Heist and Mr. Phelps returned to the very practices that had been the subjects of Ms. Elion's original complaint shortly after she withdrew it (Elion Decl., ¶24). Staff auditors in Ms. Elion's former Division and in the office responsible for

technical review of its audits witnessed her being discriminated against by OIG management in a wide range of work activities after her original EEO complaint was withdrawn (Hawkins Aff.; Campbell-Waters Aff.; Bowles Aff.; Bonds Aff. Bowles Aff.).  By defendant's own admission, routine staff complaints were elevated to senior management (Phelps Dep. at 114-16).  Work that could have been done by Ms. Elion's division was either not performed, assigned to other offices, or assigned to Ms. Elion's staff who were then detailed to other offices (Phelps Dep. at 52-57; Heist Dep. at 118-21 & Exh. 10).  This so-called absence of workload would then be cited as a basis for abolishing Ms. Elion's new office, the Headquarters Audits Division (Elion Decl., ¶24 & Att. 4).  In truth, in the period after that Division was disbanded, there were enough audits of HUD Headquarters programs alone for 14 auditors (Elion Decl., ¶24).

### The Reasons Given By Defendant For Disbanding The Headquarters Audits Division And Reassigning Ms. Elion To A Non-Supervisory Position Were False

Shortly after he failed in the attempt to extract information from Ms. Elion about the EEO complaint filed by her subordinate, Mr. Stephens approved disbanding the Headquarters Audits Division, relieving Ms. Elion of supervisory duties, and distributing her staff between two offices (Elion Decl., ¶27 & Att. 4).  The reasons for doing so were allegedly set forth in Mr. Heist's Memorandum of April 20, 2004 (Id., ¶28 & Att. 4).  Supposedly, this decision was driven by a "hiring freeze" in the Office of Audit, which necessitated reassigning Headquarters Audits Division staff to two other audit divisions whose workload was allegedly much greater (Id. & Att. 3, 4).  An alleged imbalance between staff and supervisors was also cited (Id., & Att. 3). The sections of this Memorandum which follow demonstrate that the reasons given by defendant were false.  It also shows the many reasons not addressed by defendant which show that disbanding the Headquarters Audits Division was discriminatory and retaliatory.

**Factors Demonstrating That Disbanding The Headquarters Audits Division,
Relieving Ms. Elion of Supervisory Duties, And Reassigning Ms. Elion
Were Discriminatory and Retaliatory**

There are no fewer than eight separate factors which provide affirmative evidence demonstrating that defendant's decision to disband the Headquarters Audits Division was discriminatory and retaliatory. No mention of any is made in defendant's motion for summary judgment. Nonetheless, the motion opens with the disparaging comment that Ms. Elion's allegations are "noise" (Def. Mot. at 1). If that is the case, its sound drowns out defendant's self-serving reasons for taking adverse action against Ms. Elion.

**Defendant's Discriminatory And Retaliatory Treatment Of Ms. Elion's
African American Predecessor And Its Retaliatory Misuse of Involuntary Reassignments**

Ms. Elion served as District Inspector General for Audit for Washington, D.C., until that office was disbanded and she was reassigned as Director of the Headquarters Audits Division (Elion Decl., ¶¶6, 11-12). Her African American predecessor as District Inspector General, Austin Groom, also filed an EEO complaint against Assistant Inspector General Heist and Deputy Assistant Inspector General Phelps (Id., ¶29; Groom Dep. at 6, 17-18, 33-34 & Exh. 1). After he did, the two fired him (Id. at 22-23, 28-29).[3] Besides Ms. Elion, the only other Headquarters Division Director or Regional Inspector General for Audit in the field ever removed from management and reassigned over his objection was Michael Beard (Elion Decl, ¶30; Beard Decl., ¶16). He, like Ms. Elion, was reassigned to a make-work special assistant position after filing an EEO complaint (Heist Dep. at 67-69, 75, 141-48; Beard Decl., ¶¶12-13). The officials responsible for this action were Mr. Heist, Mr. Phelps, and Deputy Inspector General Stephens (Beard Decl., ¶12; Elion Decl., ¶31). Today, Mr. Beard has little work to

---

[3]    By all accounts, and despite defendant's testimony, it appears that Mr. Groom was also reassigned over his objection (Groom Dep. at 6, 14-16, 22-23, 33-34 & Exh. 1).

occupy him as a "special assistant" (Beard Decl., ¶¶13-15; Elion Decl., ¶31). Like Ms. Elion, Mr. Beard is also in his fifties (Beard Decl., ¶13; Elion Decl., ¶2).[4]

Defendant used involuntary reassignment to retaliate against at least one other senior OIG official. Daniel Salas, a Hispanic male, served as the Deputy Assistant Inspector General in the Office of Investigations (Salas Dep. at 8-9). Like Ms. Elion and Mr. Beard, Mr. Salas was also reassigned involuntarily after filing an EEO complaint (Id.). Inspector General Kenneth Donahue reassigned Mr. Salas while Deputy Inspector General Stephens was serving as the chief operating officer for HUD OIG (Id. at 8; Stephens Dep. at 4, 11-14).

<u>Comparative Performance Of The Headquarters Audits Division</u>

Even assuming that a "new hiring freeze" necessitated reassigning auditors from one division to another – which will be disproven in a later section of this Memorandum – defendant still had the choice which office to abolish and which office head to reassign. There were thirteen separate OIG offices that generated audits (Heist Dep. at 123-27). OIG would have no reason to disband a highly productive office and remove its head from a supervisory position if its performance exceeded other offices'.

These thirteen Divisions and Regional Offices were ranked annually by Mr. Phelps (Heist Dep. at 123-25; Beard Decl., ¶¶20-23; Elion Decl., ¶¶33-34). He measured their performance in terms of monetary benefits to HUD, cost disallowance to auditees, and timeliness of production at three audit stages (Elion Decl., ¶¶33-34 & Att. 5; Beard Decl., ¶24). According to Mr. Phelps:

> *Here is rankings for FY 2004. This will find its way into performance ratings.*

(Elion Decl., ¶34 & Att. 5). Ms. Elion's former Office was ranked third for FY 2004, the year the Headquarters Audits Division was disbanded (Id.). Ms. Elion's performance was all the

---

[4]    Mr. Beard also has a case of discrimination and retaliation pending in the judicial District, entitled <u>Beard v. Jackson</u>, Civ. Action No. 06-0756 (GK) (Beard Decl., ¶13).

more remarkable, considering the fact that defendant dissolved the Headquarters Audits Division halfway through FY 2004 (Id., ¶35 & Att. 4).

The worst performing of the thirteen OIG audit offices was, like Ms. Elion's, also located in Washington, D.C. (Elion Decl., ¶36). It, however, was left unaffected by the reorganization that led to the dissolution of the Headquarters Audits Division (Id.). In fact, that Division had not met its performance goals for years (Beard Decl., ¶26). Unlike Ms. Elion, the director of that office was a white male and had never filed an EEO complaint (Elion Decl., ¶36).

### Comparative Treatment Of Ms. Elion And Another Supervisory Headquarters Auditor

Ms. Elion today occupies a "special assistant" position, largely performing tasks that could be assigned to support personnel and junior auditors or that are all but meaningless (Elion Decl., ¶¶13, 37). Her position, in short, is superfluous and defendant should have conducted a reduction-in-force to abolish it. 5 C.F.R. Part 351. But had it done so, Ms. Elion's seniority would have been entitled to displace a more junior supervisory auditor under federal personnel law (Elion Decl., ¶37 & Att. 24). That auditor, unlike Ms. Elion, was a white male who had not filed an EEO complaint (Id.).

### Deviation From HUD OIG Standard Business Practice

The business practices HUD OIG used in conceiving and effecting the reorganization that resulted in disbanding the Headquarters Audits Division departed markedly from OIG's standard practices. Mr. Phelps has been involved in ten or more reorganizations in the Office of Audit (Phelps Dep. at 44). It was OIG's standard business practice for reorganizations to be carried out in consultation with one or both of OIG's servicing personnel offices (Id. at 44-45). Mr. Heist's Memorandum of April 20, 2004, specifically stated that he had "discussed" reorganizing the Headquarters Audits Division with the OIG "Human Resources Division" (Elion Decl., Att. 4 at

2).  In truth, neither of OIG's servicing personnel offices was consulted (Elion Decl., ¶Att. 13 at 11, 20 at 2, & 21 at 1).

<u>Unique Composition Of The Headquarters Audits Division</u>

The Headquarters Audits Division was the first and only audit office at an equivalent level in HUD OIG ever composed entirely of African Americans (Elion Decl., ¶6).  From the time that HUD OIG was created in 1979 until well after the Complaint in this action was filed, Ms. Elion was the only African American woman ever to hold a position as a District or Regional Inspector General or as a Headquarters Division Director (Elion Decl., ¶6).  Beside Ms. Elion and her predecessor, who was also the target of discrimination and retaliation by HUD OIG, there had been only one other African American at this level (<u>Id</u>.).

<u>Defendant's Continued Refusal To Honor Ms. Elion's Rights During The Complaints Process</u>

An earlier section of this Memorandum (at 9) demonstrated that Deputy Inspector General Stephens refused to honor Ms. Elion's right to ADR when her original EEO complaint was proceeding through the agency complaints process (Elion Decl., ¶¶18, 20 & Att 16 at 2-4, 17, 18 at 8; Matthews Dep. at 8-9, 68-69 & Exh. 8; Heist Dep. at 44-45, 55-56).  He refused to do so again when her second complaint, which gave rise to this action, was processed administratively (Elion Decl., Att. 25).

<u>Defendant's Harassment Right Before Abolishing The Headquarters Audits Division</u>

Ms. Elion was harassed by Mr. Stephens over the EEO complaint filed by her African American Assistant Director, Donna Hawkins, who was also relieved of supervisory duties when the Headquarters Audits Division was disbanded three months later (Elion Decl., ¶¶26-27 & Att. 4; Hawkins Aff. at 1).  One incident occurred just before the Headquarters Audits Division was disbanded, when Mr. Stephens instructed Ms. Elion to appear in his office and questioned her in

an aggressive manner in an apparent attempt to obtain information adverse to Ms. Hawkins (Id.). According to Mr. Phelps, who also attended the meeting, Mr. Stephens "was quite visibly upset" when Ms. Elion denied that Ms. Hawkins was having difficulty managing her staff (Phelps Dep. at 105-08). Mr. Stephens raised his voice and pointed his finger at Ms. Elion, and ended the meeting abruptly (Elion Decl., ¶26).

Misalignment Of HUD Offices And Regions

Ms. Elion's original EEO complaint in 2002 contested defendant's need to disband the Washington, D.C. District Office of Audit (Elion Decl., ¶¶15-16 & Att. 1 at 1). According to Mr. Heist, one of the principal reasons to do so was to align the OIG audit offices and divisions with HUD's programmatic offices (Heist Dep. at 60-67).[5] Mr. Heist reversed field when he disbanded the Headquarters Audits Division in April of 2004; it marked the first time in 33 years when OIG's Office of Audit did not align with HUD's program and Headquarters activities (Phelps Dep. at 14-15).

**Defendant's Pretextual Reasons For Disbanding The Headquarters Audits Division**

OIG Headquarters audit divisions were never fully staffed up, not even once during the two years which preceded the supposed "new hiring freeze" of April 2004 that purportedly necessitated reassigning Ms. Elion's staff. It was six auditors below ceiling when the freeze was imposed (Elion Decl., ¶43 & Att. 6 & p.64). There was, in fact, nothing particularly special about HUD OIG's supposed "new hiring freeze" at all (Beard Decl., ¶29). Going back to the late 1980's, according to Mr. Phelps, staffing "ceilings were raised, ceilings were lowered … Changing ceilings, reducing, raising … So it happened all the time" (Phelps Dep. at 45-47). During this entire time, no Headquarters audit division other than Ms. Elion's was ever

---

[5]    Although saving money spent on the D.C. office's lease was the other supposed reason for closing it, there is no reason to believe that this was ever planned or occurred (Heist Dep. at 69-72; & Elion Decl., ¶39, n.2 & Att. 13 at 4-7).

15

disbanded to accommodate a supposed hiring freeze; and other than her, no Division Director in OIG Headquarters, and for that matter no Regional Inspector General in the field, was ever reassigned and removed from management as a result of a hiring freeze (Heist Dep. at 67-69, 75, 141-48; Beard Decl., ¶29).

Technical Oversight And Planning Division

Mr. Heist reassigned Ms. Elion's assistant director to the Technical Oversight and Planning Division, supposedly to help with its "tremendous … workload" (Elion Decl., ¶42, Att. 4 at 2). Yet according to its former Director, the workload of that Division had not changed for several years before the reorganization in April of 2004 (McLeod Dep. at 12-15, 76). Moreover, during the year and a half leading up to the reorganization, that Division was never staffed up fully (Elion Decl., ¶43 & Att. 6; Beard Decl., ¶30).

This was also true even when OIG management was exhorting the Office of Audit to accelerate its hiring, to avoid the possibility that its personnel ceiling would be lowered by OMB (Elion Decl., ¶44, Att. 7-9). In March of 2002, Mr. Phelps himself directed an e-mail to all Headquarters and Regional audit offices, including the Division of Technical Oversight and Planning. He wrote: "We have not been doing a very good job staffing up" (Id., Att. 8) (emphasis supplied). Over the next six months, even without a hiring freeze, these offices would fall even farther below their authorized staff ceilings (Id.). At that time, the Division of Technical Oversight and Planning was two below its authorized ceiling (Id., Att. 6 at 14). It would never be staffed fully even once before the "new hiring freeze" of April 2004 was imposed (Id., at 15-65).

<u>Financial Audits Division</u>

Three of Ms. Elion's staff were supposedly needed for the Financial Audits Division due to alleged "recent changes" in the Chief Financial Officers Act which "forced … almost a continuous financial audit process" (Elion Decl., ¶45 & Att. 4 at 1).  That was simply untrue.  The Chief Financial Officers Act itself had been enacted 14 years earlier in 1990; that was the legislation which required HUD and other executive departments to prepare annual audited financial reports (<u>Id</u>. & Att. 12 at 1).  The "recent changes" that Mr. Heist used to justify reassigning Ms. Elion's staff were actually put in place by OMB in 2002, when it moved the due dates for agencies' financial reports forward over the next three Fiscal Years (<u>Id</u>. & Att. 11A).  In April of 2004, only a single audit, the one for FY 2004, remained to be completed early.  From that point forward, the schedule remained unchanged, which thoroughly belied Mr. Heist's allusion to "a continuous financial audit process" as  a basis for reassigning Ms. Elion's staff to the Financial Audits Division (<u>Id</u>.; Beard Decl., ¶31).

<u>Supervisory To Staff Ratio</u>

Although unmentioned in Mr. Heist's Memorandum, defendant's motion for summary judgment cited "the ratio between managers and staff" as a reason for disbanding the Headquarters Audits Division (Def. Mot. at 5).  This supposed high ratio played no part in that decision.  Mr. Phelps admitted that Headquarters Divisions were "never included ... in terms of looking at" the ratio of supervisors to staff (Phelps Dep. at 63-64).  Mr. Phelps went on to admit that even in the field, these ratios were sometimes used as a basis for adding a supervisor, but never for removing one (<u>Id</u>. at 65-69).  Remarkably, this alleged imbalance existed at the time of the reorganization because the Headquarters Audits Division was kept well below its authorized staff level (Elion Decl., Att. 6 at 64).

On-Going Assignments

Mr. Phelps and Mr. Heist withdrew and reduced work assignments for the Headquarters Audits Division before it was disbanded, beginning a few months after Ms. Elion withdrew her original EEO complaint (Phelps Dep. at 52-57; Heist Dep. at 116-22 & Exh. 10).  Mr. Heist detailed auditors from Ms. Elion's staff to work on audits in HUD Headquarters, but under the supervision of Regional Inspector General for Audit in field offices (Phelps Dep. at 52-57; Elion Decl., ¶24).  Just before Mr. Heist disbanded the Headquarters Audits Division, a Regional audit office proposed that one of its audits involving HUD Headquarters "decision makers and information" be assigned to the Headquarters Audits Division (Beard Decl., ¶33; Heist Dep. at 116-18 & Exh. 10).  Mr. Heist never had the audit performed and he was upset that it had been proposed (Beard Decl., ¶33; Heist Dep. at 121-22).

Even with its work being diluted, in the Fiscal Year of her reassignment, Ms. Elion's Division was the third most productive of the thirteen offices that generated audit reports (Elion Decl., ¶¶33-34 & Att. 5; Beard Decl., ¶¶20-26).  This was so despite the fact that Mr. Heist took no action to increase assignments to the Headquarters Audits Division before disbanding it (Heist Dep. at 111).   Had he simply permitted that Division to perform audits of HUD Headquarters, there would have been work for up to 14 auditors (Elion Decl., ¶24).

**ARGUMENT**

**DEFENDANT'S MOTION FOR SUMMARY JUDGMENT
MUST BE DENIED**

With important refinements courtesy of the D.C. Circuit's recent decision in Czekalski v. Peters, 475 F.3d 360, 364 (D.C. Cir. 2007), the framework for analyzing Mr. Elion 's claims was essentially handed down by the Supreme Court in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802 (1973).   Under it, Ms. Elion can establish a prima facie case of discrimination by demonstrating that she enjoys membership in a protected class who sustained an actionable change in her employment which "gives rise to an inference of discrimination."  Stella v. Mineta, 284 F.3d 135, 145 (D.C. Cir. 2002) (quotation omitted); accord, Teneyck v. Omni Shoreham Hotel, 365 F.3d 1139, 1150 (D.C. Cir. 1150).  Ms. Elion's prima facie case of retaliation turns on the causal relationship between her protected activity and the subsequent action, and can be established by timing or with the same types of evidence that support an inference of discrimination.  E.g., Lathram v. Snow, 336 F.3d 1085, 1094 (D.C. Cir. 2003); Gipson v. Wells Fargo, N.A., supra, 460 F.Supp.2d at 25.

Once any challenges to a plaintiff's prima facie case have been surmounted, an employer's responsive burden is to produce evidence of a "legitimate, nondiscriminatory" or nonretaliatory "reason" for its actions.  Burdine, supra 450 U.S. at 255.  Czekalski refined the McDonnell Douglas analysis once that point is reached:

> As the Supreme Court has explained, once a defendant has proffered such a nondiscriminatory explanation, it has "done everything that would be required of [it] if the plaintiff had properly made out a *prima facie* case."  U.S. Postal Serv. Bd. Of Governors v. Aikens, 460 U.S. 711, 715, 103 S.Ct. 1478, 75 L.Ed.2d 403 (1983).  At that point, "whether the plaintiff really did so is no longer relevant," and the only question is "'whether the defendant intentionally discriminated against the plaintiff.'"  Id. (quoting Texas Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248, 253, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981)); see Morgan v. Fed. Home

Loan Mortgage Corp., 328 F.3d 647, 653-54 (D.C. Cir. 2003); Waterhouse, 298
F.3d at 993 n. 6.

Czekalski v. Peters, 475 F.3d 360, 363 (D.C. Cir. 2007).  At that point, "the focus of proceedings
… will be on whether the jury could infer discrimination" or retaliation.  Aka v. Washington
Hospital Center, 156 F.3d 1284, 1289 (D.C. Cir. 1998) (en banc).

 "Summary judgment is appropriate only if 'there is no genuine issue as to any material
fact and … the moving party is entitled to a judgment as a matter of law.'"  Lathram v. Snow,
supra, 336 F.3d at 1088 (quoting Rule 56, Fed. R. Civ. P.; citing Anderson v. Liberty Lobby, 477
U.S. 242, 244 (1986)).  A district court is "obligated" in "[v]iewing the evidence 'as favorably
to'" a plaintiff "'as reason will permit' … at summary judgment.'"  Aka, supra 156 F.3d 1294-95
(quoting Shager v. Upjohn Co., 913 F.2d 398, 401 (7th Cir. 1990)).  Ms. Elion can defeat
summary judgment with a "prima facie case, combined with sufficient evidence to" create a
genuine issue of material fact that its "asserted justification[s]" for disbanding the Headquarters
Audits Division, relieving her of supervisory duties, and reassigning her to a make-work position
are "false."  Reeves v. Sanderson Plumbing Products, Inc., 530 U.S. 133, 150-51 (2000);
Lathram v. Snow, supra 336 F.3d at 1089 (citing Aka, supra, 156 F.3d at 1290).  This she can do
handily.

I.      **Ms. Elion Has Established Prima Facie Cases of**
        **Discrimination And Retaliation**

A.      **Ms. Elion's Prima Facie Case of Discrimination.**

The burden on Ms. Elion to establish a prima facie case "is not onerous." St. Mary's

Honor Center v. Hicks, 509 U.S. 502, 515 (1993).

> "[A] plaintiff makes out a prima facie case of disparate-treatment discrimination
> 'by establishing that: '(1) she is a member of a protected class; (2) she suffered an
> adverse employment action; and (3) the unfavorable action gives rise to an
> inference of discrimination.'" Stella v. Mineta, 284 F.3d 135, 145 (D.C. Cir.
> 2002) (quoting Brown v. Brody, 199 F.3d 446, 452 (D.C. Cir. 1999)).

George v. Leavitt, 407 F.3d 405, 412 (D.C. Cir. 2005). Any other "factor is not relevant

to the analysis set forth by the Court in Teamsters." Stella v. Mineta, supra, 284 F.3d at 145.

i.      **Ms. Elion's Protected Status:** Ms. Elion is a woman and an African American,

both protected categories under Title VII of the Civil Rights Act of 1964, 42 U.S.C. §2000e-2

(Elion Decl., ¶2). She also enjoys protected status as an African American woman, on the basis

of "sex plus race." Hicks v. Gates Rubber Co., 833 F.2d 1406, 1416 (10th Cir. 1987); Jeffries v.

Harris County Community Action Ass'n, 615 F.2d 1025, 1034 (5th Cir. 1980); Judge v. Marsh,

649 F. Supp. 770, 780 (D.D.C. 1976) (Hogan, J.) ("Thus, the Court concludes that employment

actions directed against black women may violate Title VII."). Ms. Elion was 56 years old when

she was subject to the employment actions that are at issue in this suit, and was also protected

under the Age Discrimination in Employment Act of 1967, 29 U.S.C. §§621-34 (Elion Decl.,

¶2).[6]

---

[6]     The parties' burdens under Title VII and the ADEA are the same. Johnson v. Lehman,
679 F.2d 918, 921-22 (D.C. Cir. 1982).

**ii.    Defendant's Adverse Employment Actions:**    Ms. Elion was subject to two adverse employment actions:  she was stripped of supervisory duties and reassigned to a position with significantly less responsibility, exposure, and opportunity for professional advancement (Elion Decl., ¶¶12-13 & Att. 3-4).

> '[W]ithdrawing an employee's supervisory duties … constitutes an adverse employment action.'" [Stewart v. Ashcroft, 352 F.3d 422, 427 (D.C. Cir. 2004)] see Burke v. Gould, 286 F.3d 513, 522 (D.C. Cir. 2002).    So, too, does "reassignment with significantly different responsibilities."  Forkkio v. Powell, 306 F.3d 1127, 1131 (D.C. Cir. 2002) (quoting Burlington Indus., Inc. v. Ellerth, 524 U.S. 742, 761, 118 S.Ct. 2257, 141 L.Ed.2d 633 (1998)); see Holcomb v. Powell, 433 F.3d 889, 902 (D.C. Cir. 2006).

Czekalski v. Peters, supra, 475 F.3d at 364; accord Faragher v. City of Boca Raton, 524 U.S. 775, 808 (1998).  In cases where there is a dispute:  "Whether a particular reassignment of duties constitutes an adverse action for purposes of Title VII is generally a jury question."  Czekalski, supra, 475 F.3d at 365.

**iii.    Other Evidence Demonstrating Discrimination:**    Ms. Elion's prima facie case is completed with evidence which shows that "the unfavorable action gives rise to an inference of discrimination."  Teneyck v. Omni Shoreham Hotel, supra 365 F.3d at 1150 (quoting Stella v. Mineta, supra, 284 F.3d at 145).  This "formulation is designed to accommodate the wide variety of employment discrimination claims that extend beyond the typical 'failure-to-hire' situations." Id.  For that reason, Ms. Elion "need not demonstrate that she was replaced by a person outside her protected class."  Stella v. Mineta, supra, 284 F.3d at 146.  This is particularly true where, as here, a reorganization results in elimination of a plaintiff's job. E.g., Washington v. Garrett, 10 F.3d 1421, 1433 (9th Cir. 1994); Montana v. First Federal Savings & Loan Ass'n, 869 F.2d 100, 104 (2nd Cir. 1989).

Neither, for that matter, must Ms. Elion's prima facie case rest on differences in treatment from comparators. E.g., George v. Leavitt, supra, 407 F.3d at 412. There is, nonetheless, a substantial body of irrefutable evidence that Ms. Elion was treated differently from similarly situated Division Directors and Regional Audit officials, as well as a wealth of other evidence of discrimination.

When defendant subjected Ms. Elion to twin adverse employment actions, the Headquarters Audits Division was the third highest performing of HUD OIG's thirteen operational audit Divisions and Regional Offices (Elion Decl., ¶¶33-34 & Att. 5; Beard Decl. ¶¶20-23). Ms. Elion's own performance as Division Director was singled out by OIG senior management (Beard Decl., ¶32). By contrast, the "reorganization" which cost Ms. Elion her Division and her job did not affect the worst performing audit office, a Division headed by a white male that was also located in HUD Headquarters (Elion Decl., ¶36 & Att. 4, 5). That Division itself had failed to meet its performance goals for years (Beard Decl., ¶26).

That underperforming Headquarters Division Director is undeniably a comparator to Ms. Elion. He too answered to Mr. Heist and Mr. Phelps, served at the Grade 15, was a supervisory auditor who managed a Headquarters Division, and encumbered a position with the same basic duties and responsibilities as Ms. Elion (Heist Dep. at 4, 27-29; Elion Decl., ¶¶3-5 & Att. 13 at 2-10; Beard Decl., ¶¶9-11; Phelps Dep. at 3, 10-11). E.g., Neuren v. Adduci, Mastriani, Meeks & Schill, 43 F.3d 1507, 1514 (D.C. Cir. 1995) (quoting Pierce v. Commonwealth Life Ins. Co., 40 F.3d 796, 802 (6th Cir. 1994)); Radue v. Kimberly Clark Corp., 219 F.3d 612, 617-18 (7th Cir. 2003). The fact that Ms. Elion and this other Division Director are comparators cannot be disputed on summary judgment. "Whether two employees are similarly situated ordinarily

presents a question of fact for the jury." George v. Leavitt, supra, 407 F.3d at 415; accord, Gipson v. Wells Fargo, N.A., supra, 460 F.Supp.2d at 30.

The record abounds with other evidence of defendant's discrimination, which is discussed at length earlier in this Memorandum (at 11-15). To highlight just a portion, when the Headquarters Audits Division was abolished, there had never been a Director of a Headquarters Audit Division ever reassigned over his or her objection (Heist Dep. at 67-69, 75, 142-48; Beard Decl., ¶16; Elion Decl., ¶30). Singling out the Headquarters Audits Division to be disbanded was particularly suspect for two other reasons. At the time Ms. Elion was reassigned, she had greater entitlement to a supervisory position under federal personnel law than a white male supervisory auditor (Elion Decl., ¶37 & Att. 24; 5 C.F.R. Part 351). Further, the Headquarters Audits Division was the first and only audit office in HUD OIG Headquarters or in the field ever composed entirely of African Americans (Elion Decl., ¶6).

Members of the Headquarters Audits Division and the desk auditor responsible for technical review of Ms. Elion's former office attested to the fact that Ms. Elion was subject to continuing discrimination in a wide range of work activities over a period of years leading up the her removal from a supervisory position (Hawkins Decl; Campbell-Waters Decl.; Bowles Decl.; Bonds Decl.). Their uniform perception provides powerful support for Ms. Elion's "background evidence" of the continuing discrimination, which included withdrawing work assignments for the Headquarters Audits Division (Phelps Dep. at 52-57; Heist Dep. at 116-22 & Exh. 10), detailing auditors from Ms. Elion's staff to work on Headquarters audits under the supervision of field supervisors, and failing to assign Headquarters audits to Ms. Elion's Division (Phelps Dep. at 52-57; Elion Decl., ¶24). United Airlines, Inc. v. Evans, 431 U.S. 553, 559 (1977); accord, Czekalski v. Peters, supra, 475 F.3d at 368.

HUD OIG's strikingly similar treatment of Ms. Elion's African American predecessor as District Inspector General for Audit, who was first reassigned to a "special assistant" position and then fired, is also highly persuasive (Groom Dep. at 6, 14-16, 22-23, 33-34 & Exh. 1). The "evidence of prior discriminatory acts" toward him is "relevant to [OIG's] motive and intent, see Rule 404(b) . . ." Jones v. WMATA, 946 F. Supp. 1011, 1019 (D.D.C. 1996) (citing and quoting Morris v. WMATA, 702 F.2d 1037, 1045 (D.C. Cir. 1983)).[7]

Discrimination can also be proven by "evidence from which a jury could find" adverse action "inconsistent with the … process that [an employer] established." Lathram v. Snow, supra 336 F.3d at 1093; accord Johnson v. Lehman, supra, 679 F.2d at 922. In all ten of its previous reorganizations, HUD OIG's standard business practice called for one or both of its servicing personnel offices to be involved (Phelps Dep. at 44-45). Mr. Heist's Memorandum of April 20, 2004, specifically stated that he had "discussed" reorganizing the Headquarters Audits Division with the OIG "Human Resources Division" (Elion Decl., Att. 4 at 2). But in truth, in this one reorganization alone, neither of OIG's servicing personnel offices was consulted (Elion Decl. ¶38 & Att. 13 at 11, 20 at 2, & 21 at 1).

**B.** **Ms. Elion's Prima Facie Case Of Retaliation.**

**i.** **Protected Activity And Actionable Change in Employment**

Ms. Elion's prima facie case of retaliation turns on the causal relationship between her protected activity and subsequent action. E.g., Mitchell v. Baldridge, supra, 759 F.2d at 86. Ms. Elion engaged in protected EEO activity before the Headquarters Audits Division was disbanded (Elion Decl., ¶16 & Att. 1). The changes in her employment are undoubtedly actionable as retaliatory. Ms. Elion was unquestionably subject to adverse employment actions, for the

---

[7]     As explained in footnote 3, supra, it appears that Mr. Groom was also reassigned involuntarily (Groom Dep. at 6, 14-16, 22-23, 33-34 & Exh. 1).

reasons stated above in Section I.A.ii.  E.g., Czekalski v. Peters, supra, 475 F.3d at 364.  The adverse employment action standard, which applies to claims of discrimination, is higher than the change in employment needed to support a claim of retaliation.  Burlington Northern & Santa Fe R.R. v. White, __ U.S. __.126 S.Ct. 2405 (2006) (In "this context," retaliation is actionable so long as it takes the form of any action that "well might have 'dissuaded a reasonable worker from making or supporting a charge of discrimination.'"  Id. at 2415 (quoting Rochon, 438 F.3d at 1219); Rochon v. Gonzalez, 438 F.3d 1211 (D.C. Cir. 2006)).  A fortiori, being relieved of supervisory duties and reassigned to a make-work position provide actionable bases for Ms. Elion's claim of retaliation.

### ii.     Evidence Demonstrating Retaliation

"Consideration of" the temporal proximity between protected activity and adverse action is "not in itself conclusive" of a causal connection between the two.  Shirley v. Chrysler First, Inc., 970 F.2d 39, 44 (5th Cir. 1992); accord, Gipson v. Wells Fargo, N.A., supra, 460 F.Supp.2d at 25.  It is true that a "causal connection … may be established" with evidence that "adverse personnel action took place shortly after" protected activity.  Mitchell v. Baldridge, supra 759 F.2d at 86 (emphasis supplied).  Temporal proximity, however, is by no means required to infer a causal connection.

The Supreme Court's original decision which articulated the shifting burdens in employment cases, McDonnell Douglas, sounded in discrimination and retaliation.  411 U.S. at 796.  That is why circumstantial evidence that provides a basis for inferring disparate treatment based on protected status also provides grounds for establishing a causal connection between adverse action and protected activity.  E.g., Lathram v. Snow, supra, 338 F.3d at 1094.

For that reason, all of the evidence demonstrating that HUD OIG engaged in discrimination against Ms. Elion discussed in the preceding Section of this Memorandum also supports her prima facie case of retaliation. "Especially relevant" is the comparative treatment of employees who did and did not engage in protected activity. McDonnell Douglas, supra 411 U.S. at 804; accord Cones v. Shalala, 199 F.3d 512, 519 (D.C. Cir. 2000); Barbour v. Merrill, 48 F.3d 1270, 1276-77 (D.C. Cir. 1995). Ms. Elion was the only Director of a Headquarters Audit Division ever reassigned involuntarily and the only one who ever filed an EEO complaint (Heist Dep. at 141-42; Elion Decl., ¶30; Beard Decl., ¶16). Without more, this disparate treatment itself satisfies the causal element of Ms. Elion's prima facie case of retaliation without regard to temporal proximity. Stone v. City of Indianapolis Public Utilities Div., supra, 281 F.3d at 644.

Furthermore, the discharge of Ms. Elion's African American predecessor as District Inspector General for Audit shortly after he filed an EEO complaint is also persuasive evidence of retaliation (Groom Dep. at 6, 14-16, 22-23, 33-34 & Exh. 1). So is the fact that even looking to the field, the only Regional Inspector General for Audit ever involuntarily reassigned was removed from his position after he filed an EEO complaint (Heist Dep. at 67-69, 75, 142-48; Beard Decl., ¶16). HUD OIG's retaliatory treatment of these other managerial auditors is highly probative of its motive and intent, just as is contemplated by Rule 404(b), of the Federal Rules of Evidence. Jones v. WMATA, supra, 946 F. Supp. at 1019) (quoting Morris v. WMATA, supra, 702 F.2d at 1045). Indeed, Rule 404(b) specifically permits evidence of "other . . . wrongs . . . as proof of motive."

In Czekalski the D.C. Circuit explicitly noted "that in Aka v. Washington Hospital Center, we recognized that evidence 'of discriminatory statements or attitudes on the part of the employer' may support a verdict for a Title VII plaintiff." Czekalski v. Peters, supra, 475 F.3d at

369 (quoting <u>Aka</u>, <u>supra</u>, 156 F.3d at 1289)).  Deputy Inspector General Stephens revealed his contempt for Ms. Elion's EEO rights twice.  During her first EEO complaint, Mr. Stephens refused to honor Ms. Elion's unqualified right to participate in ADR with a neutral mediator and her counsel present (Elion Decl., ¶¶17-20 & Att. 16 at 2-4, 17 at 3; Matthews Dep. at 8-9, 68-69 & Exh. 8; Heist Dep. at 55-56).  Mr. Stephens disregarded Ms. Elion's rights for a second time, during the administrative processing of her administrative complaint that gave rise to this action, when he refused to honor her request for ADR (Elion Decl., Att. 25).

Retaliation, like discrimination, can also be proven by "evidence from which a jury could find" adverse action "inconsistent with the … process that [an employer] established."  <u>Lathram v. Snow</u>, <u>supra</u> 336 F.3d at 1093.  "A jury could infer that" when a standard "procedure was not followed," it was due to the fact that an employee "had filed EEOC complaints."  <u>Miller v. Fairchild Indus., Inc.</u>, 885 F.2d 498, 504 (9th Cir. 1989).  Defendant's deviation from its standard business practices that were observed in all ten of its previous reorganizations, specifically of consulting with servicing personnel offices was demonstrated earlier in this Memorandum (at 13-14) (Phelps Dep. at 44-45).  This was the one and only reorganization where that did not occur (Elion Decl. ¶36 & Att. 13 at 11, 20 at 2, & 21 at 1).

In addition, there is at least one significant conflict in the account of the supposed "planning" of the reorganization that cost Ms. Elion her position.  The reorganization was proposed in a Memorandum written by Mr. Heist (Elion Decl., Att. 4).  Mr. Phelps claims to have had no involvement in preparing the Memorandum and has no recollection of knowing about the reorganization before it was approved (Phelps Dep. at 70-73, 79 & Att. 20 at 4).  Mr. Heist claims that he did (Heist Dep. at 98-99).  The contradiction between these officials' "accounts" of the process behind defendant's alleged "decision" to reorganize and its current

version is affirmative evidence of "guilt."  <u>Aka</u>, <u>supra</u> 156 F.3d at 1293, 1295; <u>accord</u>, <u>Reeves</u>, <u>supra</u>, 530 U.S. at 147.

## II.    OIG's Legal Responses To Plaintiff's Prima Facie Cases Are Erroneous.

Defendant does not dispute that Ms. Elion occupies protected categories based on her race, her sex, and her age; that she engaged in protected EEO activity; that she sustained actionable changes in her employment; and that the members of OIG senior management who took that action were aware of her original EEO complaint (Def. Mem. at 8-9, 18).  Defendant does argue, however, that it is immune to plaintiff's claims of retaliation "as a matter of established law," because 13 months[8] elapsed between Ms. Elion's original EEO complaint until the Headquarters Audits Division was disbanded and she was removed from a supervisory position (Def. Mem. at 1-2, 17-18).  Defendant also contends that it has an absolute defense to Ms. Elion's claims of discrimination, supposedly because no comparator was treated differently (Def. Mem. at 8-9).  Defendant's legal arguments are erroneous.

### A.    Temporal Proximity Is Not Required To Prove Retaliation.

The adage "revenge is a dish best served cold" was first coined 225 years ago. http://en.wikipedia.org/wiki/Revenge.  In keeping with the wisdom of this time-tested aphorism: "Title VII and related laws … do not provide a hard and fast rule that adverse employment actions must fall within a specified time frame for a retaliation claim to be actionable."  <u>Gipson v. Wells Fargo, N.A.</u>, <u>supra</u>, 460 F.Supp.2d at 25 (five years between protected activity and retaliatory discharge).  That is why, contrary to defendant's assertion, employers do not have a "get out of jail free card" to retaliate as long as they wait four months (Def. Mem. at 17).

---

[8]    Defendant mistakenly characterizes this as "a 14-moth gap" (<u>Compare</u> Elion Decl. ¶16 Att. 2 <u>with</u> Def. Mot. at 2).  <u>Singletary v. District of Columbia</u>, 351 F.3d 519, 525 (D.C. Cir. 2003).

Courts have "repeatedly acknowledged the need for temporal proximity when serving as the only evidence of causality for retaliation." Gipson v. Wells Fargo, N.A., supra, 460 F.Supp.2d at 29 (emphasis supplied).

> Consideration of such dates is part of our analysis, but not in itself conclusive of our determinations of retaliation [and] … does not absolve defendant of its responsibility for retaliating against the plaintiff for her filing the EEOC claim.

Shirley v. Chrysler First, Inc., supra, 970 F.2d at 44; accord, e.g., Clark v. Pennsylvania, 885 F. Supp. 694, 710 (E.D. Pa. 1995). There is simply no denying that if an employee has filed an EEO complaint, the same evidence that supports an inference of discrimination also supports an inference of retaliation, without regard to close temporal proximity between protected activity and adverse action. E.g., Lathram v. Snow, supra 338 F.3d at 1094.

Defendant itself repeatedly quotes from cases "'when a court is asked to accept mere temporal proximity'" as the sole basis for a prima facie case (Def. Mem. at 17) (emphasis supplied).[9] Defendant nonetheless contends that "as a matter of established law," the time between Ms. Elion's original EEO complaint and defendant's adverse actions means that "Plaintiff cannot demonstrate causation on the basis of knowledge and temporal proximity" (Def. Mot. at 18). Ms. Elion's prima facie case of retaliation does not rest on temporal proximity; but rather on a wide range of other factors (Opp. at 9-15). These include, among others, defendant's unprecedented reassignment of Ms. Elion, the difference in its treatment of Ms. Elion and comparators who did not engage in protected activity, defendant's removal of Ms. Elion from a

---

[9] This very quote which utterly defeats defendant's legal argument is drawn from the case on which defendant principally relies, Willingham v. Gonzales, 391 F.Supp.2d 52, 61 (D.D.C. 2005). As defendant itself argues: "In Willingham, the court observed that "'[c]ourts have not established the maximum time lapse between [a] protected Title VII activity and alleged retaliatory actions.'"(Def. Mem. at 17). The Willingham plaintiff had no evidence of retaliation, such as "evidence of a similarly situated employee who received more favorable treatment," other than time; that is why she unlike Ms. Elion could not meet her prima facie burden. 391 F.Supp.2d at 60.

supervisory position despite the outstanding performance of the Headquarters Audits Division, defendant's refusal to honor Ms. Elion's rights in the administrative EEO process, its resumption of discrimination against Ms. Elion once her original complaint was withdrawn, and defendant's deviation from standard personnel practices in disbanding Ms. Elion's former Division (Id.). This is substantial evidence of retaliation; and with it, Ms. Elion need not rely on timing to establish a prima facie case.  E.g., Lathram, supra, 336 F.3d at 1093; Stone, supra, 281 F.3d at 643; Shirley, supra, 970 F.2d at 44.

      **B.**      **Comparators, Who Are Present In Any Event,**
               **Are Not Needed To Prove Discrimination.**

Both the Supreme Court and the D.C. Circuit have observed on any number of occasions that:

> The McDonnell Douglas framework "was 'never intended to be rigid, mechanized, or ritualistic.  Rather, it is merely a sensible, orderly way to evaluate the evidence in light of common experience as it bears on the critical question of discrimination.'

George v. Leavitt, 407 F.3d 405, 411 (D.C. Cir. 2005) (quoting United States Postal Serv. Bd. of Governors v. Aikens, 460 U.S. 711, 715 (1983); Furnco Contraction Co. v. Waters, 438 U.S. 567, 577 (1978)); Stella v. Mineta, supra, 284 F.3d 145-46.

That is why George explicitly held that different treatment "from similarly situated employees who are not part of the protected class … is not the only way" to establish a prima facie case of discrimination.  George v. Leavitt, supra, 407 F.3d at 412; accord, Czekalski v. Peters, supra, 475 F.3d at 365-66.  A "plaintiff in a Title VII case is not required to show that she was disadvantaged in favor of a person outside of the protected class."  Teneyck v. Omni Shoreham Hotel, supra, 365 F.3d at 1150 (citing Stella v. Mineta, supra, 284 F.3d 146).  Despite

the clarity of these decisions and others, defendant contends that "under <u>George</u> … Plaintiff must show that she was treated differently from those outside the protected group" (Def. Mem. at 8-9).

"This is not a correct statement of the law."  <u>George v. Leavitt</u>, <u>supra</u>, 407 F.3d at 412.  It is also utterly irrelevant in a case involving discrimination in a reorganization.  <u>E.g.</u>, <u>Washington v. Garrett</u>, 10 F.3d 1421, 1433 (9th Cir. 1994); <u>Montana v. First Federal Savings & Loan Ass'n</u>, 869 F.2d 100, 104 (2nd Cir. 1989).  In any event, the record contains many comparators who were treated differently from Ms. Elion.  Therefore, from both factual and legal perspectives, defendant's argument is meritless.

### i.  Many Comparators Were Treated Differently From Ms. Elion

This Memorandum demonstrated earlier (at 7-8) that Headquarters Division Directors and Regional Inspectors General for Audit are all similarly situated to Ms. Elion.  All answer to the same managers, Mr. Heist and Mr. Phelps; serve at Grade 15; are supervisory auditors who manage audit Divisions or offices; and encumber positions with the same basic duties and responsibilities (Heist Dep. at 4, 27-29; Elion Decl., ¶¶3-5 & Att. 13 at 2-10; Beard Decl., ¶¶9-11; Phelps Dep. at 3, 10-11).  All, therefore, are comparators to Ms. Elion.  <u>Neuren v. Adduci, Mastriani, Meeks & Schill</u>, <u>supra</u>, 43 F.3d at 1514; <u>Pierce v. Commonwealth Life Ins. Co.</u>, <u>supra</u>, 40 F.3d at 802; <u>Radue v. Kimberly Clark Corp.</u>, <u>supra</u>, 219 F.3d at 617-18.  Any dispute about this conclusion is "a question of fact for the jury."  <u>George v. Leavitt</u>, <u>supra</u>, 407 F.3d at 415; <u>accord</u>, <u>Gipson v. Wells Fargo, N.A.</u>, <u>supra</u>, 460 F.Supp.2d at 30.

When Ms. Elion's position was abolished and she was relieved of supervisory duties, the Headquarters Audits Division had vastly outperformed another audit Division located in HUD OIG Headquarters.  That Division was headed by a white male who was left unaffected by defendant's reorganization and had not filed an EEO complaint (Elion Decl., ¶¶33-35 & Att. 4,

5; Beard Decl., ¶¶20-23).  Another supervisory white male auditor with less seniority and less

job protection than Ms. Elion who had not filed a complaint was also left untouched (Elion

Decl., ¶37 & Att. 24; 5 C.F.R. Part 351).  Even outside of Headquarters, besides Ms. Elion, the

only member of this comparator group ever reassigned over his or her objection was the only

other Regional Inspector General for Audit who had filed an EEO complaint (Heist Dep. at 67-

69, 75, 142-48; Beard Decl., ¶16).[10]  The short of this matter is that Ms. Elion was treated

disparately from her closest comparator in Headquarters and all ten of the Regional Inspectors

General for Audit in the field.

### ii.    Comparators Are Not Required, In Any Event

The foregoing discussion assumes for the sake of argument that Ms. Elion must point to

comparators to establish a <u>prima</u> <u>facie</u> case of discrimination.  She need not.  <u>George v. Leavitt</u>,

<u>supra</u>, 407 F.3d at 412.  The reason why a plaintiff whose job or division has been eliminated can

succeed without comparing himself to his replacement is simple:  no one does.  Therefore, "in a

reduction-in-force case or a structural reorganization case," a plaintiff "need not show that he

was replaced by" not in his or her protected categories.  <u>Montana v. First Federal Savings &</u>

<u>Loan Ass'n</u>, <u>supra</u>, 869 F.2d at 104; <u>accord</u>, <u>Washington v. Garrett</u>, <u>supra</u>, 10 F.3d at 1433 ("the

fact that she was not replaced by someone not of her protected class is not fatal to her claim.");

<u>McCorstin v. US Steel Corp.</u>, 621 F.2d 749, 754 (5th Cir. 1980).

<u>George v. Leavitt</u> does not speak otherwise.  <u>It is a discharge case</u> and the D.C. Circuit

went to some length to make certain that its holding would not be applied literally, least of all

---

[10]    Defendant correctly notes that Inspector General Donahue and Deputy Inspector General Stephens were responsible for the involuntary reassignment of the Hispanic for an involuntary reassignment in the Office of Investigations (Def. Mem. at 11).  The individual reassigned involuntarily was the Hispanic former Deputy Assistant Inspector General of Investigations, after he too filed an EEO complaint (Salas Dep. at 8-9; Stephens Dep. at 4, 11-14).  Why defendant contends his reassignment supports summary judgment is unfathomable.

outside the context of discharge cases.  407 F.3d at 407, 417.  In identifying the many ways that

a plaintiff can meet the third element of her prima facie burden in a discharge setting – in other

words, that it "gives rise to an inference of discrimination" – George specifically identified

pointing to a comparator as one way among others.  407 F.3d at 412.  However, even where a

discharge is at issue, there are any number of ways to establish the third element.  Czekalski v.

Peters, supra, 475 F.3d at 365-66.  George v. Leavitt itself expressly held as much:

> In the context of a discharge claim … establishing the prima facie case would
> require a showing that the discharge was not attributable to the two analogous
> common legitimate reasons for discharge:  performance below the employer's
> legitimate expectations or the elimination of the plaintiff's position altogether.

407 F.3d at 412.  George most certainly does not hold, as HUD OIG suggests, that establishing a

prima facie case in the context of a reorganization requires pointing to a comparator.  In fact, the

D.C. Circuit specified that "this is not the only way" even in challenging a discharge.  Id.

### III.    As A Matter of Law, Defendant's Alleged Reasons For Their Actions Toward Ms. Elion Provide An Insufficient Basis For Summary Judgment

The Czekalski decision synthesized the impact of the establishment of a prima facie case

on the merits of a case of employment discrimination.  It expressly held that once a prima facie

case has been "properly made out," the focus of the inquiry turns to the merits.  Czekalski v.

Peters, supra, 475 F.3d at 363.  The following Section of this Memorandum demonstrates that

there are many genuine issues of material fact about the reasons advanced by defendant for

abolishing the Headquarters Audits Division.  But there is a predicate issue which precludes even

reaching that inquiry.

Earlier, this Memorandum identified many categories of evidence from which

discrimination and retaliation can be inferred.  They include, but are not limited to, the fact that

Ms. Elion was the only Director of a Headquarters Division ever to be reassigned over her

objection; that even outside of Headquarters, the only Regional Inspector General for Audit ever reassigned over his objection had also filed an EEO complaint and was also in his fifties; and that neither a white male Division Director who Ms. Elion had outperformed or a junior supervisory auditor to whom she had superior job rights was relieved of supervisory duties (Heist Dep. at 67-69, 75, 142-48; Beard Decl., ¶¶12-16; Elion Decl., ¶¶30-31).  This comparative evidence, without doubt, is "[o]ne method" for Ms. Elion to create an inference that the reassignment was the product of discrimination and retaliation.  George v. Leavitt, supra, 407 F.3d at 412; accord, Czekalski v. Peters, supra, 475 F.3d at 365-66.

Like inferences of every nature, this one is mandatory on summary judgment.  St. Mary's Honor Center v. Hicks, 509 U.S. 502, 506 (1993).  Once established, in order to be awarded summary judgment, this inference compelled HUD OIG to "'produc[e] evidence' that the adverse employment actions were taken 'for a legitimate, nondiscriminatory reason.'"  Aka v. Washington Hospital Center, supra 156 F.3d at 1289 (emphasis supplied) (quoting St. Mary's Honor Center v. Hicks, 509 U.S. 502 (1993); Burdine, supra 450 U.S. at 254).  It did not.

The only supposedly factual ground supporting defendant's motion for summary judgment was the alleged need to abolish the Headquarters Audits Division (Def. Mot. at 1-2, 12-19).  Nowhere did defendant even attempt to explain why it selected Ms. Elion to be relieved of supervisory duties instead of one of her comparators, who included the Headquarters Division Director who Ms. Elion out-performed, one of the nine Regional Inspectors General she also bested, or the supervisory auditor with fewer job retention rights (Elion Decl., ¶¶33-35, 37 & Att. 4, 5, 24; 5 C.F.R. Part 351; Beard Decl., ¶¶20-23).  Defendant's failure to respond to this evidence and dispel the inferences of discrimination and retaliation it created demands the denial of summary judgment, because even if a hiring freeze warranted abolishing Ms. Elion's former

Division, defendant has offered no evidence why it selected Ms. Elion for reassignment.

Cosgrove v. Sears, Roebuck & Co., 9 F.3d 1033, 1039 (2nd Cir. 1993).

#### IV.    Summary Judgment Cannot Be Awarded To Defendant Because There Are Many Genuine Issues Of Material Fact

#### A.    All Of Plaintiff's Evidence Must Be Considered At This Stage

When an employer carries its burden, "'the McDonnell Douglas framework – with its presumptions and burdens – disappear[s], and the sole remaining issue [is] discrimination" or retaliation "'vel non.'" Lathram v. Snow, supra 336 F.3d at 1088 (quoting Reeves, supra 530 U.S. at 142-43). At this stage, all of the evidence plaintiff presents must be considered and all of it viewed in the light most favorable to plaintiff.

> The ultimate question, once the employer has met its evidentiary burden, is whether intentional discrimination may be inferred from all the evidence before the trier of fact. This includes '(1) the plaintiff's prima facie case; (2) any evidence the plaintiff presents to attack the employer's proffered explanations for its actions; and (3) any further evidence of discrimination that may be available to the plaintiff (such as independent evidence of discriminatory statements or attitudes on the part of the employer).'

Teneyck v. Omni Shoreham Hotel, supra 365 F.3d at 1151 (quoting Dunaway v. Int'l Bhd. of Teamsters, 310 F.3d 758, 763 (D.C. Cir. 2002); Waterhouse v. Dist. of Columbia, 298 F.3d 989, 993 (D.C. Cir. 2002)).

The D.C. Circuit has stressed the importance of this fundamental principal to ensure that the "'prima facie case is part of the evidence we must consider in addressing'" the propriety of summary judgment. Czekalski v. Peters, supra, 475 F.3d at 365-66 (quoting George v. Leavitt, 407 F.3d at 413). The entire body of evidence must be viewed under the traditional summary judgment standard. Czekalski v. Peters, supra, 475 F.3d at 362-63; George v. Leavitt, 407 F.3d at 410.

**B.    There Are Many Genuine Issues Of Material Fact About
The Reasons Advanced By Defendant For Its Actions.**

Any number of times, in both <u>en</u> <u>banc</u> and panel decisions:

[T]he D.C. Circuit [has] observed that '[u]sually, proffering 'evidence from which a jury could find that [the employer's] stated reasons ... were pretextual ... will be enough to get a plaintiff's claim to a jury.'"

<u>Kalinoski v. Gutierrez</u>, 435 F.Supp.2d 55, 68 (D.D.C. 2006) (Bates, J.) (quoting <u>George v. Leavitt</u>, <u>supra</u>, 407 F.3d at 413; <u>Carpenter v. Federal National Mortgage Ass'n</u>, 165 F.3d 69, 72 (D.C. Cir. 1999)); <u>accord</u>, <u>Aka</u>, <u>supra</u>, 156 F.3d at 1284; <u>Czekalski v. Peters</u>, <u>supra</u>, 475 F.3d at 365-66.  Section III of this Memorandum detailed many genuine issues of fact about HUD OIG's reasons for disbanding the Headquarters Audits Division, relieving Ms. Elion of supervisory duties, and reassigning her to a "special assistant" position where she has little or no work commensurate with her experience, background, and training.  They preclude the award of summary judgment.

The full comparison between defendant's alleged reasons for taking action against Ms. Elion and the actual record is contained earlier in this Memorandum (at 15-18).  Briefly, defendant alleges that a "new hiring freeze" imposed in early April of 2004 necessitated disbanding the Headquarters Audits Division, abolishing Ms. Elion's supervisory position, and reassigning her to a make-work "special assistant" position, and dividing her four staff members between two other offices (Def. Mem. at 13-18; Elion Decl., ¶28 & Att. 3, 4).  Even if this were true – and not a word was – it would still provide no basis for taking action against Ms. Elion, whose former office was ranked third out of HUD OIG's audit offices, when the worst performing audit office and its director left unaffected (Elion Decl., ¶¶33-36 & Att. 5).

In the two years leading up to the supposed "new hiring freeze" in April of 2004, OIG Headquarters audit divisions were never fully staffed up (Elion Decl., ¶43 & Att. 6; Beard Decl.,

¶30).  That was true even though much of that time, OIG management was exhorting the Office of Audit to accelerate hiring and stave off action by OMB to cut its personnel ceiling (Elion Decl., Att. 7-9).  In fact, going back to the late 1980's, personnel ceilings were raised and lowered "all the time" (Phelps Dep. at 45-47; accord, Beard Decl., ¶29).  Never on account of any hiring freeze or change in personnel ceiling was another audit Division Director in OIG Headquarters or Regional Inspector General ever reassigned and removed from management (Heist Dep. at 67-69, 75, 141-48; Beard Decl., ¶29).

The supposed overriding reason for disbanding the Headquarters Audits Division, i.e., that its staff auditors were needed to fill critical vacancies in two other audit Divisions, is also genuinely in dispute (Elion Decl., ¶¶42, 45 & Att. 3).  One of these Divisions, the Technical Oversight and Planning Division, supposedly labored under a "tremendous … workload" (Elion Decl., ¶42 & Att. 4 at 2).  According to its former Director, the workload of that Division had not changed for several years before the reorganization in April of 2004 (McLeod Dep. at 12-15, 76).  In fact, at the time of defendant's "new hiring freeze" in April of 2004, that Division was two auditors below its authorized ceiling (Elion Decl., Att. 6 at 14).  In the previous year and half, it was never staffed fully even once (Id., Att. 7-9; Att. 6 at 14, 15-65).

Three of Ms. Elion's staff were supposedly needed for the Financial Audits Division due to alleged "recent changes" in the Chief Financial Officers Act which "forced … almost a continuous financial audit process" (Elion Decl., ¶45 & Att. 4 at 1).  The Chief Financial Officers Act was enacted in 1990; the passage of that act prompted HUD and other executive departments to prepare annual audited financial reports (Id., & Att. 12 at 1).  The "recent changes" in auditing due dates were put in place by OMB in 2002 (Id., & Att. 11A).  Only a single audit, the one for FY 2004, remained to be completed when Ms. Elion's staff was taken

from her; from that point forward, the schedule would be unchanged (Id.).  There was, in short, no need for Ms. Elion's staff to be reassigned to either of these Divisions in April of 2004.

Defendant cites the supposed disproportionate "ratio between managers and staff" of the Headquarters Audits Division as a basis for disbanding it (Def. Mot. at 5).  Defendant admitted, however, that Headquarters Divisions were "never included ... in terms of looking at" the ratio of supervisors to staff (Phelps Dep. at 63-64).  Even in the field, these ratios were sometimes used as a basis for adding a supervisor, but never for removing one (Id. at 65-69).  In any event, this supposed disproportionate ratio between staff and supervisors existed because the Headquarters Audits Division was staffed at barely half of its personnel ceiling (Elion Decl., Att. 6 at 64).

In the months following the dissolution of the Headquarters Audits Division, there was work for 14 auditors in HUD OIG Headquarters that it could have performed (Elion Decl., ¶¶24).  Rather than leave the Headquarters Audits Division in place and allow it to perform audits within its jurisdiction, defendants withdrew and reduced work assignments for the Headquarters Audits Division shortly after Ms. Elion's original EEO complaint was concluded (Phelps Dep. at 52-57; Heist Dep. at 116-22 & Exh. 10; Elion Decl., ¶24; Beard Decl., ¶33).  This manufactured work shortage was nothing more than an unnecessary pretext to discriminate and retaliate.

Even if there was a reason to disband the Headquarters Audits Division, there was no basis for not reassigning Ms. Elion to replace either of two other white male supervisory auditors in Headquarters.  One was the director of the Headquarters Audit Division whose productivity ranked last among OIG's 13 operational audit divisions (Elion Decl., ¶¶33-35 & Att. 5; Beard Decl., ¶¶20-24).  The second was the white male supervisory auditor who was junior to Ms. Elion and had fewer job retention rights under federal personnel law (Elion Decl., ¶137& Att. 24; 5 C.F.R. Part 351).

For these reasons and the many others identified above, there are genuine issues of material fact about the reasons for disbanding the Headquarters Audits Division, relieving Ms. Elion of her supervisory duties, and reassigning her to a position with precious little to do. Therefore, summary judgment cannot be awarded to defendant.  E.g., Czekalski v. Peters, supra, 475 F.3d at 362-63; George v. Leavitt, 407 F.3d at 410; Lathram v. Snow, supra 336 F.3d at 1088.

## CONCLUSION

For the foregoing reasons, plaintiff respectfully urges the Court to deny defendant's motion for summary judgment.


Respectfully submitted,


_____/s/_____
Robert C. Seldon, Esq.
 D.C. Bar No. 245100


_____/s/_____
Molly E. Buie, Esq.
 D.C. Bar No. 483767
Robert C. Seldon & Associates, P.C.
1319 F Street, N.W.
Suite 305
Washington, D.C.  20004
(202) 955-6968

Counsel for Plaintiff