UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| SAUNDRA G. ELION, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civ. Action No. 05-0992 (PLF) |
| | ) | |
| ALPHONSO R. JACKSON, | ) | |
| Secretary Of Housing And | ) | |
| Urban Development, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

PLAINTIFF'S STATEMENT OF GENUINE ISSUES

Plaintiff to the above action respectfully submits the following Statement of

Genuine Issues, in accordance with LCvR 56.1.

I.    Plaintiff hereby responds to Defendant's Statement of Material Facts, utilizing the

same system of paragraph numbering, as follows:

1.    Plaintiff Saundra Elion, an African-American female over fifty seven years old, was

appointed to be the District Inspector General for Audit (DIGA), a GS-15 supervisory

auditor position within the Office of Inspector General (OIG) of HUD, in June 1999.  A.C.

at ¶ 14.  She was assigned to the Capital District Office of Audit.  Id.

Response:    Plaintiff admits the allegations contained in the foregoing paragraph and,

but way of further answer, states that plaintiff is now 59 years of age (Elion Decl, ¶2).

2.    In May 2002, Defendant abolished the Capital District Office of Audit and transferred

Plaintiff along with all other personnel to the newly-created Headquarters Audit Division

(HAD).  (Compl. at 14).

Response:    Plaintiff admits the allegations contained in the foregoing paragraph except for defendant's incorrect identification of plaintiff's former Division, which was the Headquarters Audits Division (Elion Decl., ¶2),

3.    As part of the transfer, Plaintiff became the Director of the HAD, a supervisory GS-15 position, on June 30, 2002.  A.C. at ¶ 14.

Response:    Plaintiff admits the allegations contained in the foregoing paragraph.

4.    She did not suffer any loss of rank, pay, status, or privileges of employment when she became the Director of the HAD.  Deposition of Sandra Elion ("Elion I Depo.") at p. 78-80.

Objection:    The portion of the record cited by defendant does not support defendant's assertion that the facts recited in this paragraph are undisputed, as required by LCvR 56.1. By way of further answer, plaintiff denies the foregoing paragraph and states that the reorganization of the Capital District Office of Audit her reassignment were among the subjects of Ms. Elion's first administrative complaint of discrimination that she filed on December 18, 2002 (Elion Decl., para. 15-16 & Att. 1 at 1-4); that, insofar as that reorganization and reassignment themselves were concerned, they constituted adverse employment adverse employment actions which actionably affected the terms, conditions, and privileges of plaintiff's emplyment because they caused significant managerial duties of Ms. Elion to be removed, the scope of her work to be reduced, the work assignments for Ms. Elion and her former Division to be reduced, and Ms. Elion's professional exposure and standing to be reduced (Elion Decl., para. 15-16 & Att. 1 at 1-4).  Plaintiff

2

further states that the legitimacy of these allegations is not disputed by defendant (Heist Dep. at 76-77).

5.     On December 18, 2002, Plaintiff filed an administrative discrimination complaint alleging a hostile work environment on the basis of her sex, race, and age, complaining of a diminution of duties and responsibilities, dilution of staff resources, and an undermining of her professional authority.  A.C. at ¶ 21.

Objection:  The portion of the record cited by defendant does not support defendant's assertion that the facts recited in this paragraph are undisputed, as required by LCvR 56.1. By way of further answer, plaintiff denies the foregoing paragraph and states that her original administrative complaint, both in fact and as summarized in the Amended Complaint, was based on discrimination engaged in by defendant and a hostile work environment created by defendant on the grounds of plaintiff's sex, race, and age; and alleged that Assistant Inspector General for Audit James Heist and Deputy Assistant Inspector General for Audit Michael Phelps had restricted plaintiff's ability to fill vacant positions on her staff, including her Assistant Director position; reassigned members of plaintiff's staff, even while there was a vigorous nationwide recruitment effort underway throughout OIG and when no such limitations were imposed on any of Ms. Elion's counterpart Office Directors, all of whom were white males; that she was denied recognition and awards given to every other counterpart Office Director, even though her Division ranked 4th by OIG standards; that defendant was actively undermining and diminishing her authority with subordinates and by managerial procedures not imposed on any of her counterpart white male Division Directors; that that reorganization and

reassignment themselves constituted adverse employment actions and caused significant

managerial duties of Ms. Elion to be removed, the scope of her work to be reduced, the

work assignments for Ms. Elion and her former Division to be reduced, and Ms. Elion's

professional exposure and standing to be reduced  (Elion Decl., para. 15-16 & Att. 1 at 1-

4).  Plaintiff further states that the legitimacy of these allegations is not disputed by

defendant (Heist Dep. at 76-77).

6.      On January 30, 2003, Plaintiff met with Mr. Stephens (Deputy Inspector General), and her

two supervisors – Mr. James Heist (Assistant Inspector General for Audit ("AIGA")), and

Mr. Michael Phelps ( Deputy AIGA) to address the Plaintiff's concerns.  A.C. at ¶ 26; Jan.

17, 2003 Email (Gov. Exh. A).

Response:      Plaintiff denies the allegations in this paragraph and, by way of further

answer, states that the foregoing session was orchestrated by Deputy Inspector General

Michael Stephens to intentionally interfere with Ms. Elion's exercise of her civil rights

and not to address her concerns and allegations, which defendant has admitted were

legitimate allegations of discrimination (Heist Dep. at 76-77).  Ms. Elion had an absolute

right to request Alternative Dispute Resolution ("ADR") during the administrative process

(Elion Decl., ¶18 & Att. 16 at 4, 17 at 3; Matthews Dep. at 8-9 & Exh. 8); ADR relies on a

"neutral or impartial third party" who is "trained in mediation theory and techniques" (Id.,

Att. 17 at 3).  Ms. Elion requested ADR and, under HUD OIG practice, her request had to

be honored (Elion Decl., ¶19; Mathews Dep. at 68-69); Ms. Elion had "the right to

representation throughout the complaint process, including during any ADR process"

(Elion Decl., ¶18 & Att 16 at 2-3); Deputy Inspector General Stephens was responsible for

4

arranging ADR in Ms. Elion's case; Deputy Inspector General Stephens refused to let Ms.

Elion participate in ADR with counsel present (Heist Dep. at 44-45; Elion Decl., ¶20 &

Att. 18 at 8); instead, Mr. Stephens notified Ms. Elion that he was prepared to participate

personally in a conference with Ms. Elion but <u>only</u> if she attended without counsel, a

violation of her civil rights (Elion Decl., ¶¶18, 20, & Att. 16 at 4, 17 at 3; Heist Dep. at 55-

56).

7.     Mr. Stephens engaged in this informal process in lieu of the formal Alternative Dispute

Resolution process to address what he perceived to be a communications and management

issue. Matthews Depo. at 27:13-22; Deposition of Michael Heist ("Heist Depo.") 47-53;

Stephens Depo. at p. 89-95.  Plaintiff also believed that Mr. Stephens thought her

complaint was "just a matter of miscommunication, that there was no deliberate

discrimination."  Elion II at 79-80.

Response:     Plaintiff denies the allegations in this paragraph and, by way of further

answer, states that the foregoing session was orchestrated by Deputy Inspector General

Stephens to intentionally interfere with Ms. Elion's exercise of her civil rights, which he

unlawfully characterized as "just a matter of miscommunication," despite defendant's

admission that Ms. Elion's concerns and allegations were legitimate allegations of

discrimination (Heist Dep. at 76-77).  Ms. Elion had an absolute right to request

Alternative Dispute Resolution ("ADR") during the administrative process (Elion Decl.,

¶18 & Att. 16 at 4, 17 at 3; Matthews Dep. at 8-9 & Exh. 8); ADR relies on a "neutral or

impartial third party" who is "trained in mediation theory and techniques" (<u>Id</u>., Att. 17 at

3).  Ms. Elion requested ADR and, under HUD OIG practice, her request had to be

honored (Elion Decl., ¶19; Mathews Dep. at 68-69); Ms. Elion had "the right to

representation throughout the complaint process, including during any ADR process"

(Elion Decl., ¶18 & Att 16 at 2-3); Deputy Inspector General Stephens was responsible for

arranging ADR in Ms. Elion's case; Deputy Inspector General Stephens refused to let Ms.

Elion participate in ADR with counsel present (Heist Dep. at 44-45; Elion Decl., ¶20 &

Att. 18 at 8); instead, Mr. Stephens notified Ms. Elion that he was prepared to participate

personally in a conference with Ms. Elion but <u>only</u> if she attended without counsel, a

violation of her civil rights (Elion Decl., ¶¶18, 20, & Att. 16 at 4, 17 at 3; Heist Dep. at 55-

56).

8.      The January 30th meeting was not intended to be a mediation session, (Matthews

Depo. p. 62) but an attempt by management to establish better relations with the Plaintiff

to address her concerns.  Stephens Depo. 92-96.

Response:      Plaintiff denies the foregoing  allegations and, by way of further answer,

states that the parties' session on January 30, 2003, was supposed to be a mediation

session that was part of the administrative processing of plaintiff's complaint of

discrimination that was unlawfully curtailed by Mr. Stephens with this intentional

interference with Ms. Elion's exercise of her civil rights, despite defendant's admission

that Ms. Elion's concerns and allegations were legitimate allegations of discrimination

(Heist Dep. at 76-77).  Ms. Elion had an absolute right to request Alternative Dispute

Resolution ("ADR") during the administrative process (Elion Decl., ¶18 & Att. 16 at 4, 17

at 3; Matthews Dep. at 8-9 & Exh. 8); ADR relies on a "neutral or impartial third party"

who is "trained in mediation theory and techniques" (<u>Id</u>., Att. 17 at 3).  Ms. Elion

requested ADR and, under HUD OIG practice, her request had to be honored (Elion Decl., ¶19; Mathews Dep. at 68-69); Ms. Elion had "the right to representation throughout the complaint process, including during any ADR process" (Elion Decl., ¶18 & Att 16 at 2-3); Deputy Inspector General Stephens was responsible for arranging ADR in Ms. Elion's case; Deputy Inspector General Stephens refused to let Ms. Elion participate in ADR with counsel present (Heist Dep. at 44-45; Elion Decl., ¶20 & Att. 18 at 8); instead, Mr. Stephens notified Ms. Elion that he was prepared to participate personally in a conference with Ms. Elion but <u>only</u> if she attended without counsel, a violation of her civil rights (Elion Decl., ¶¶18, 20, & Att. 16 at 4, 17 at 3; Heist Dep. at 55-56).

9.     On March 20, 2003, Plaintiff voluntarily  withdrew her December 2002 administrative discrimination complaint.  A.C. at ¶ at 27; March 20, 2003 Memo (Gov. Exh. C).  In the Memorandum withdrawing her December 2002 EEO complaint, Plaintiff stated,  "The issues have been resolved to my satisfaction at this time."  March 20, 2003 Memo (Gov. Exh. C).

Response:      Plaintiff denies the foregoing allegations, except to admit that it correctly quotes a portion of Ms. Elion's Memorandum of March 20, 2003; and, by way of further answer, states that she was deceived and coerced by Mr. Stephens into surrendering her civil rights despite defendant's admission that Ms. Elion's concerns and allegations were legitimate allegations of discrimination (Heist Dep. at 76-77).  Ms. Elion had an absolute right to request Alternative Dispute Resolution ("ADR") during the administrative process (Elion Decl., ¶18 & Att. 16 at 4, 17 at 3; Matthews Dep. at 8-9 & Exh. 8); ADR relies on a "neutral or impartial third party" who is "trained in mediation theory and techniques" (<u>Id.</u>,

Att. 17 at 3). Ms. Elion requested ADR and, under HUD OIG practice, her request had to be honored (Elion Decl., ¶19; Mathews Dep. at 68-69); Ms. Elion had "the right to representation throughout the complaint process, including during any ADR process" (Elion Decl., ¶18 & Att 16 at 2-3); Deputy Inspector General Stephens was responsible for arranging ADR in Ms. Elion's case; Deputy Inspector General Stephens refused to let Ms. Elion participate in ADR with counsel present (Heist Dep. at 44-45; Elion Decl., ¶20 & Att. 18 at 8); instead, Mr. Stephens notified Ms. Elion that he was prepared to participate personally in a conference with Ms. Elion but only if she attended without counsel, a violation of her civil rights (Elion Decl., ¶¶18, 20, & Att. 16 at 4, 17 at 3; Heist Dep. at 55-56). Coerced and deceived into believing that without ADR, Mr. Stephens' offer represented the only means of expediting the resolution of her complaint, Ms. Elion agreed (Elion Decl., ¶21) and eventually withdrew her complaint rather than proceed farther (Id., Att. 2, 19)

10. On April 7, 2004, Mr. Stephens sent out an e-mail to senior executives in the OIG (including Mr. Heist), informing them that there was a hiring freeze and the OIG had a projected budget deficit of $6.5 million. Gov. Exh. D

Response:    Plaintiff admits that Mr. Stephens dispatched the foregoing e-mail and, by way of further answer, states that its contents were untrue, at least insofar as the Office of Audit was concerned: OIG Headquarters audit divisions were never fully staffed up even once during the two years which preceded the supposed "new hiring freeze" announced in Mr. Stephens e-mail that allegedly necessitated reassigning Ms. Elion's staff (Elion Decl., ¶43 & Att. 6 & p.64); in Headquarters alone, the Office of Audit was six auditors below

8

ceiling when the supposed "freeze" was imposed (id.); there was nothing in this alleged "freeze" that necessitated reorganizing the Office of Audit or reassigning Ms. Elion (Beard Decl., ¶29); going back to the late 1980's, although hiring ceilings were raised and lowered repeatedly  (Phelps Dep. at 45-47), no Headquarters audit Division other than Ms. Elion's was ever disbanded to accommodate a supposed hiring freeze; and other than Ms. Elion, no Division Director in OIG Headquarters, or for that matter Regional Inspector General in the field, was ever reassigned and removed from management as a result of a hiring freeze (Heist Dep. at 67-69, 75, 141-48; Beard Decl., ¶29).

11.    On April 12, 2004, Mr. Heist informed his managers, which included Plaintiff, that the hiring freeze would continue for the foreseeable future.  Elion II Depo. at 8:22-11:15; See also April 12, 2004 Email (Gov. Exh. E).

Response:       Plaintiff denies the foregoing allegations (Beard Decl., ¶28).  By way of further answer, plaintiff states that there was no "hiring freeze" that would "continue:" OIG Headquarters audit divisions were never fully staffed up even once during the two years which preceded the supposed "hiring freeze" announced by Mr. Heist that allegedly necessitated reassigning Ms. Elion's staff (Elion Decl., ¶43 & Att. 6 & p.64); in Headquarters alone, the Office of Audit was six auditors below ceiling when the supposed "new hiring freeze" was imposed (Id.); there was nothing in this alleged "freeze" that necessitated reorganizing the Office of Audit or reassigning Ms. Elion (Beard Decl., ¶29); going back to the late 1980's, although hiring ceilings were raised and lowered repeatedly (Phelps Dep. at 45-47), no Headquarters audit Division other than Ms. Elion's was ever disbanded to accommodate a supposed hiring freeze; and other than Ms. Elion, no

Division Director in OIG Headquarters, or for that matter Regional Inspector General in the field, was ever reassigned and removed from management as a result of a hiring freeze (Heist Dep. at 67-69, 75, 141-48; Beard Decl., ¶29).

12.    In April 2004, there were only 5 employees in the HAD. Heist Depo. at 114:1-115:14. These five employees included Plaintiff (a GS-15 Director), Ms. Donna Hawkins (a GS-14 Assistant Director), and three staff auditors. Id.

Response:      Plaintiff admits that in April 2004, there were five auditors assigned to the Headquarters Audits Division, including Ms. Elion (the GS-15 Director), Ms. Donna Hawkins (the GS-14 Assistant Director), and three staff auditors and, by way of further answer, states that Mr. Stephens, Mr. Heist, and Mr. Phelps had authorized a staff of nine auditors for the Headquarters Audits Division (Elion Decl. Att. 6 at 64); that there was work for 14 auditors in the Headquarters Audits Division (Elion Decl., ¶24); that Mr. Phelps and Mr. Heist withdrew and reduced work assignments for the Headquarters Audits Division before it was disbanded (Phelps Dep. at 52-57; Heist Dep. at 116-22 & Exh. 10); that Mr. Heist detailed auditors from Ms. Elion's staff to work on audits in HUD Headquarters, but under the supervision of Regional Inspector General for Audit in field offices (Phelps Dep. at 52-57; Elion Decl., ¶24); Beard Decl., ¶33; Heist Dep. at 116-18 & Exh. 10); and that Mr. Heist never had an audit that a Regional Inspector General for Audit identified for the Headquarters Audits Division performed and that he was upset that the had been proposed for the Headquarters Audits Division (Beard Decl., ¶33; Heist Dep. at 121-22). 13.

13.    On April 20, 2004, Mr. Heist recommended that the HAD be disbanded. See Apr. 20,

2004 Memo (Gov. Exh. F).

Response:       Plaintiff denies the allegations in this paragraph, except to admit that Mr.

Heist's Memorandum of April 20, 2004, states that he recommended that the Headquarters

Audits Division be disbanded, that Ms. Elion be relieved of supervisory duties, that Ms.

Elion's staff be reassigned to other audit divisions, and that Ms. Elion be reassigned to a

specials assistant position (Elion Decl., Att 4).  By way of further answer, plaintiff states

that its contents were untrue:  the workload of the two offices that supposedly had "new"

needs for Ms. Elion's staff were unchanged, according to the former director of one office

(McLeod Dep. at 12-15, 76); and White House and OMB Memoranda, Bulletins and

Circulars which concerned the other office (Elion Decl., ¶45 & Att. 10-13).  The supposed

high ratio between supervisors and staff in the Headquarters Audits Division was

irrelevant, because Headquarters Divisions were "never included .. in terms of looking at"

the ratio of supervisors to staff (Phelps Dep. at 63-64).  Further reasons for disputing the

allegations in this paragraph are contained below in response to paragraphs 14 through 18,

which are incorporated here by reference.

14.    There was a need to increase the staffing of auditors at the Financial Audit Division

       because of the new deadline for submitting the agency's audit report.   Every executive

       agency is required to conduct a financial audit each fiscal year.  Under the President's

       Management Agenda, the Office of Management and Budget ("OMB") accelerated

       financial reporting dates for the executive agencies.  See Dec. 21, 2001 Memo (Gov. Exh.

       G).[1]

---

[1]        The December 21, 2001 Memorandum is a public document that can be obtained by visiting the following website:

Response:    Plaintiff denies the foregoing allegations and, by way of further answer, states that the Chief Financial Officers Act, the legislation which required HUD and other executive departments to prepare annual audited financial reports, had been enacted 14 years earlier in 1990 (Elion Decl., Att. 12 at 1); and that the "recent changes" that Mr. Heist used to justify reassigning Ms. Elion's staff were put in place by OMB in 2002 and OMB's plan moved the due dates for agencies' financial reports to be moved forward over the next three Fiscal Years (Id. & Att. 11A).  Only a single audit, the one for FY 2004, remained to be completed early (Id. & Att. 11A).  From that point forward, the schedule remained unchanged, which belied Mr. Heist's allusion to "a continuous financial audit process" as  a basis for reassigning Ms. Elion's staff to the Financial Audits Division (Id.; Beard Decl., ¶31).

15.    Defendant's financial audit for Federal Fiscal Year (FY) 2004, conducted by the Financial Audits Division, was due to the OMB by November 15, 2004.  Id.  Plaintiff does not deny that the November 15th deadline existed.  Elion I Depo. at 209-10.

Response:    Plaintiff admits the allegations contained in the foregoing paragraph.

16.    Mr. Heist transferred three staff auditors to the Financial Audit Division, Ms. Donna Hawkins to Technical Oversight and Planning Division, and Plaintiff to become a Special Assistant to the AIGA.  See Apr. 21, 2004 E-mail.

Objection:    The e-mail cited by defendant in support defendant's assertion that the facts

---

http://www.whitehouse.gov/omb/financial/year_end_reporting_2001.pdf.  Plaintiff does not dispute the deadline for the agency's audit report was accelerated to November 15, 2004.  Elion II Depo. at 159.

    The December 21, 2001 Memorandum was superseded an August 23, 2005 Circular No. A-136 from the OMB.  This public document can be obtained from the following website:

recited in this paragraph are undisputed is not part of the record on summary judgment, as required by LCvR 56.1.

17.  Mr. Stephens approved Mr. Heist's proposal on April 21, 2004. <u>See</u> Apr. 20, 2004 at p. 2 (Gov. Exh. F).

Response:      Plaintiff denies the allegations in this paragraph, except to admit that on or about April 21, 2004, Mr. Stephens signed Mr. Heist's Memorandum which recommended that the Headquarters Audits Division be disbanded, that Ms. Elion be relieved of supervisory duties, that Ms. Elion's staff be reassigned to other audit divisions, and that Ms. Elion be reassigned to a specials assistant position (Elion Decl., Att 4).  By way of further answer, plaintiff states that the contents of Mr. Heist's Memorandum of April 20, 2004, were untrue:  the workload of the two offices that supposedly had "new" needs for Ms. Elion's staff were unchanged, according to the former director of one office (McLeod Dep. at 12-15, 76); and White House and OMB Memoranda, Bulletins and Circulars which concerned the other office (Elion Decl., ¶45 & Att. 10-13).  The supposed high ratio between supervisors and staff in the Headquarters Audits Division was irrelevant, because Headquarters Divisions were "never included .. in terms of looking at" the ratio of supervisors to staff (Phelps Dep. at 63-64).  Further reasons for disputing the allegations in this paragraph are contained in response to paragraphs 13 through 17 and 19, which are incorporated here by reference.

18.  Plaintiff's reassignment to become a Special Assistant did not affect her pay or grade. Elion I Depo. at 221: 12-223:22.

---

http://www.whitehouse.gov/omb/circulars/a136/a136_rev_2005.pdf.

Response:    Plaintiff admits the allegations contained in this paragraph and, by way of way of further answer, states that plaintiff's reassignment subjected her to two adverse employment actions because it caused her to be stripped of supervisory duties and assigned to a position with significantly less responsibility, exposure, and opportunity for professional advancement (Elion Decl., ¶¶12-13 & Att. 3-4).

19.    As a result of the HAD's dissolution, on May 5, 2004,  Plaintiff filed her second EEO complaint alleging discrimination and retaliation.  A.C. at ¶ 43.

Objection:  The portion of the record cited by defendant does not support defendant's assertion that the facts recited in this paragraph are undisputed, as required by LCvR 56.1. By way of further answer, plaintiff denies the foregoing paragraph and states that she filed the administrative complaint that preceded this action because defendant discriminated and retaliated against her in disbanding the Headquarters Audits Division, reassigning plaintiff's staff to other Headquarters audit divisions, relieving plaintiff of her supervisory duties, and reassigning plaintiff to a make-work position as a special assistant to the Assistant Inspector General for Audit (Elion ROI & Formal Complaint II).


II.    Plaintiff respectfully submits that the following material facts are genuinely at issue:

Whether plaintiff was subject to discrimination and retaliation by defendant's action on or about April 21, 2004, of disbanding the Headquarters Audits Division, reassigning plaintiff's former staff to two other Headquarters audit divisions, relieving plaintiff of supervisory duties, and reassigning plaintiff to a special assistant position, when:

14

A.  Ms. Elion is an African American woman who is currently 59 years of age; and who, prior to the employment actions that gave rise to this action, had engaged in the administrative discrimination complaints process  (Elion Decl., ¶¶2, 16 & Att. 1).

B.  Ms. Elion was subject to two adverse employment actions as a result of defendant's actions:  she was stripped of supervisory duties and reassigned to a position with significantly less responsibility, exposure, and opportunity for professional advancement (Elion Decl., ¶¶12-13 & Att. 3-4).

C.  When defendant subjected Ms. Elion to twin adverse employment actions, the Headquarters Audits Division was the third highest performing of HUD OIG's thirteen audit Divisions and Regional Offices that generated audit reports (Elion Decl., ¶¶33-34 & Att. 5; Beard Decl. ¶¶20-23).

D.  Ms. Elion's performance as the Director of that Division was singled out for recognition by OIG senior management (Beard Decl., ¶32).

E.  The "reorganization" which cost Ms. Elion her Division and her job did not affect the worst performing audit office, a Division also located in HUD Headquarters that was headed by a white male who had not engaged in protected EEO activity, or the Director of that Division himself (Elion Decl., ¶36 & Att. 4, 5).

F.  That Division  had failed to meet its performance goals for years (Beard Decl., ¶26).

G.  Like Ms. Elion, the Headquarters Division Director of that Division answered to Mr. Heist and Mr. Phelps, served at the Grade 15, was a supervisory auditor who managed a Headquarters Division, and encumbered a position with the same basic duties and responsibilities as Ms. Elion (Heist Dep. at 4, 27-29; Elion Decl., ¶¶3-5 & Att. 13 at 2-10; Beard Decl., ¶¶9-11; Phelps Dep. at 3, 10-11).

H.  Before the Headquarters Audits Division was abolished, there had never been a Director of a Headquarters Audit Division ever reassigned over his or her objection (Heist Dep. at 67-69,

15

75, 142-48; Beard Decl., ¶16; Elion Decl., ¶30).

I.   At the time Ms. Elion was reassigned, she had greater entitlement to a supervisory

position under federal personnel law than a white male supervisory auditor stationed in HUD OIG

Headquarters who had not engaged in protected EEO activity (Elion Decl., ¶37 & Att. 24; 5 C.F.R. Part

351).

J.   The Headquarters Audits Division was the first and only audit office in HUD OIG

Headquarters or in the field composed entirely of African Americans (Elion Decl., ¶6).

K.   Members of the Headquarters Audits Division and the desk auditor responsible for

technical review of Ms. Elion's former office attested to the fact that Ms. Elion was subject to continuing

discrimination in a wide range of work activities over a period of years leading up the her removal from a

supervisory position (Hawkins Decl; Campbell-Waters Decl.; Bowles Decl.; Bonds Decl.).

L.   Their uniform perception was that defendant's continuing discrimination against

plaintiff included withdrawing work assignments for the Headquarters Audits Division, complaint

(Phelps Dep. at 52-57; Heist Dep. at 116-22 & Exh. 10), detailing auditors from Ms. Elion's staff to work

on Headquarters audits under the supervision field supervisors, and failing to assign Headquarters audits

to Ms. Elion's Division (Phelps Dep. at 52-57; Elion Decl., ¶24).

M.   Plaintiff  formerly served as the Director of the Headquarters Audits Division and as

the District Inspector General for Audit for Washington, D.C.  She was the only African American

woman and one of only three African Americans ever to hold positions at this level in HUD OIG since its

creation in 1979, until another was appointed well after the Complaint here was filed (Elion Decl., ¶6).

N.   Austin Groom, Ms. Elion's African American predecessor as District Inspector

General for Audit, was fired after he filed an EEO complaint shortly after his involuntary reassignment to

16

a "special assistant" position (Id. ¶29; Groom Dep. at 6, 14-16, 22-23, 33-34 & Exh. 1).

O.  For 33 years until the Headquarters Audits Division was abolished, HUD OIG and its predecessor always had a separate division responsible for auditing Headquarters program activities (Elion Decl., ¶39; Phelps Dep. at 14-15; Beard Decl., ¶27).

P.  In the field, the only Regional Inspector General for Audit ever reassigned over his objection was removed from his position after he filed an EEO complaint; ;he was in his mid 50's when this occurred (Heist Dep. at 67-69, 75, 142-48; Beard Decl., ¶¶13, 16).

Q.  During Ms. Elion's first EEO complaint, Mr. Stephens refused to honor Ms. Elion's unqualified right to participate in Alternative Dispute Resolution with a neutral mediator and her counsel present (Elion Decl., ¶¶17-18 & Att. 16 at 2-4, 17 at 3; Matthews Dep. at 8-9, 68-69 & Exh. 8).

R.  During Ms. Elion's irst EEO complaint, Mr. Stephens notified Ms. Elion that he would participate personally in a conference without a mediator but only if she attended without counsel (Elion Cplt., ¶20; Heist Dep. at 55-56).

S.  Mr. Stephens disregarded Ms. Elion's rights during the administrative processing of her administrative complaint that gave rise to this action, when he refused to honor her request for ADR (Elion Decl., Att. 25).

T.  Defendant deviated from its standard business practices that were observed in all ten of its previous reorganizations, specifically of consulting with servicing personnel offices, in conducting its "reorganization" in April of 2004 (Phelps Dep. at 44-45; Elion Decl. ¶36 & Att. 13 at 11, 20 at 2, & 21 at 1).

Q.  Defendant's "reorganization" in April of 2004  was only one where that did not occur Phelps Dep. at 44-45; Elion Decl. ¶36 & Att. 13 at 11, 20 at 2, & 21 at 1).

R.  Defendant's "reorganization" was proposed in a Memorandum written by Mr. Heist on or about April 20, 2004(Elion Decl., Att. 4).  Mr. Phelps claims to have had no involvement in preparing the Memorandum and has no recollection of knowing about the reorganization before it was approved (Phelps Dep. at 70-73, 79 & Att. 20 at 4).  Mr. Heist claims that he did (Heist Dep. at 98-99).

S.  In the two years leading up to the supposed "new hiring freeze" in April of 2004, OIG Headquarters audit divisions were never fully staffed (Elion Decl., ¶43 & Att. 6; Beard Decl., ¶30).

T.  Much of that time, OIG management was instructing the Office of Audit to accelerate hiring and stave off action by OMB to cut its personnel ceiling (Elion Decl., Att. 7-9).

U.  Going back to the late 1980's, the Office of Audit personnel "ceilings were raised" and "lowered … all the time" (Phelps Dep. at 45-47; accord, Beard Decl., ¶29).

V.  Never on account of any hiring freeze or change in personnel ceiling was another audit Division Director in OIG Headquarters or Regional Inspector General reassigned and removed from management (Heist Dep. at 67-69, 75, 141-48; Beard Decl., ¶29).

W.  Headquarters Audits Division its staff auditors were not needed to fill critical vacancies in two other audit Divisions, is also genuinely in dispute (Elion Decl., ¶¶42, 45 & Att. 3).

X.  The workload of the Technical Oversight and Planning Division had not changed for a number of years (McLeod Dep. at 12-15, 76).

Y.  At the time of defendant's "new hiring freeze" in April of 2004, that Division was two auditors below its authorized ceiling (Elion Decl., Att. 6 at 14).

Z.  In the previous year and half, that Division was never staffed fully (Elion Decl. Att. 7-9; Att. 6 at 14, 15-65).  (Id., at 14-65).

AA.  Headquarters Audits Division staff were not needed for the Financial Audits

18

Division due to alleged "recent changes" in the Chief Financial Officers Act which "forced … almost a continuous financial audit process" (Elion Decl., ¶45 & Att. 4 at 1).

BB. The Chief Financial Officers Act was enacted in 1990; the passage of that act prompted HUD and other executive departments to prepare annual audited financial reports (Elion Decl., & Att. 12 at 1).

CC.  The alleged "recent changes" in auditing due dates were put in place by OMB in 2002 (Elion Decl., & Att. 11A).

DD.  Only a single audit, the one for FY 2004, remained to be completed when Ms. Elion's staff was taken from her; from that point forward, the schedule would be unchanged (Elion Decl., & Att. 11A).

EE.  There was no disproportionate "ratio between managers and staff" of the Headquarters Audits Division that warranted disbanding it: Headquarters Divisions were "never included ... in terms of looking at" the ratio of supervisors to staff (Phelps Dep. at 63-64).

FF.  Even in the field, these ratios were sometimes used as a basis for adding a supervisor, but never for removing one (Phelps Dep. at 65-69).

GG.  When the supposed "new hiring freeze" was imposed, the Headquarters Audits Division had a personnel ceiling of 9 auditors but only five were assigned there (Elion Decl., Att. 6 at 64).  In the months following the dissolution of the Headquarters Audits Division, there was work for 14 auditors in HUD OIG Headquarters that it could have performed (Elion Decl., ¶¶24).

HH.  Defendant withdrew and reduced work assignments for the Headquarters Audits Division shortly after Ms. Elion's original EEO complaint was concluded (Phelps Dep. at 52-57; Heist Dep. at 116-22 & Exh. 10; Elion Decl., ¶24; Beard Decl., ¶33).

II.  In her original position as District Inspector General for Audit, Ms. Elion was responsible for supervising the execution of internal and external audits[1] and audit reports concerning HUD programs and HUD-related activities within HUD Headquarters and the greater Washington, D.C., area (Elion Decl., ¶10 & Att. 13 at 2-7).

JJ.  In her subsequent position as Director of the Headquarters Audits Division, Ms. Elion managed the OIG audit division primarily responsible for internal audits and the preparation of audit reports for HUD Headquarters programs and activities (Id., ¶11 & Att. 13 at 7-10).

KK.  Ms. Elion was also personally responsible for performing audits and issuing audit reports in more complicated and sensitive areas involving HUD officials (Id., & Att. 13 at 2-10).

LL.  When HUD OIG disbanded the Headquarters Audits Division, it reassigned Ms. Elion to a non-supervisory "special assistant" position under the Assistant Inspector General for Audit (Cplt./Answ., ¶¶6, 33).

MM.  Ms. Elion's work assignments as a "special assistant" are few and far between, often menial, and not commensurate with her background and experience as a supervisory auditor who was previously engaged in the full range of OIG's audit activities (Elion Decl., ¶13).

NN.  The Office of Audit is the larger OIG unit which included Ms. Elion's two former offices.  The operating units of the Office of Audit are divided into Headquarters Divisions that are headed by Division Directors; and Regional field offices (formerly, District offices), which are headed by

---

[1]    Audits entail the review of financial transactions and dealings of entities which receive HUD funds, among them public housing authorities, contractors, and mortgagees, to ascertain whether their dealings with HUD, its programs, and federal funds, have complied with federal law and regulation.  The end product of an audit is typically an audit report, which details the auditee's compliance and recommends whether sanctions should be sought, either by recovery of public funds, debarment, or other civil or administrative penalty.  OIG investigations, by contrast, focus on potential criminal violations and prosecutions (Elion Decl., ¶10, n.1).

Regional Inspectors General for Audits.  All of these office heads serve at Grade 15 (Heist Dep. at 27-29; Elion Decl., ¶3; Beard Decl., ¶10).

OO.  All of the incumbents in these positions are accomplished auditors; all are supervisors; and all of their positions are functionally equivalent (Heist Dep. at 27-29; Elion Decl., ¶¶3-4; Beard Decl., ¶¶9-10).  These supervisory auditors are responsible for managing the audit programs of HUD and there are no other managers at their level (Id.).  The program activities they manage are essentially the same, with the only meaningful distinction being that Regional Offices concentrate on field audits and operations and Headquarters Divisions focus on activities at HUD Headquarters (Id.).

PP.  The chain of command for all of these supervisory auditors is the same (Elion Decl., ¶5; Beard Decl., ¶11).  All answer in the first instance to the Deputy Assistant Inspector General for Audit, in this case Michael Phelps; and their second line supervisor is the Assistant Inspector General for Audit, James Heist (Phelps Dep. at 3, 10-11; Heist Dep. at 4).  The Deputy Inspector General, in this case Michael Stephens, serves as third line supervisor; he is the chief operating officer for HUD OIG (Stephens Dep. at 4, 11-14; Elion Decl., ¶5; Beard Decl., ¶11).

QQ.  Ms. Elion's primary assignment when she was appointed to head the Capital District audit function was to improve the performance of that office (Elion Decl., ¶14).  Her last performance appraisals as District Inspector General for Audit confirmed that she did (Id. & Att. 14, 15).  According to both Assistant Inspector General Heist and Deputy Assistant Inspector General Phelps, "Ms. Elion issued five significant [audit] reports" that were "comprehensive" and "that resulted in significant changes in improving HUD's operations" (Id., Att. 15 at 7).

RR.  Despite Ms. Elion's success, in May of 2002, Mr. Heist and Mr. Phelps abolished that District Office and reassigned Ms. Elion to the newly created Headquarters Audits Division (Elion

21

Decl., ¶15).

SS.  This reorganization, limitations on the scope of potential audits, reductions in the number of assigned audits, arbitrary staff reductions, repeated acts that undermined her managerial authority, and being personally assigned staff auditor duties were the most prominent acts that led Ms. Elion to initiate the EEO complaints process for the first time on December 18, 2002 (Elion Decl., ¶16 & Att. 1 at 1-4).

TT.  Ms. Elion specifically identified Mr. Heist and Mr. Phelps as the management officials responsible for discriminating against her (Elion Decl., ¶16 & Att. 1 at 1-4).

UU.  Without a settlement agreement, Mr. Heist and Mr. Phelps returned to the very practices that had been the subjects of Ms. Elion's original complaint shortly after she withdrew it (Elion Decl., ¶24).  Routine staff complaints were elevated to senior management (Phelps Dep. at 114-16). Work that could have been done by Ms. Elion's division was either not performed, assigned to other offices, or assigned to Ms. Elion's staff who were then detailed to other offices (Phelps Dep. at 52-57; Heist Dep. at 118-21 & Exh. 10).

VV.  Defendant has admitted that Ms. Elion's complaint leveled legitimate allegations of discrimination (Heist Dep. at 76-77).

WW.  .  Just before the Headquarters Audits Division was disbanded, Mr. Stephens instructed Ms. Elion to appear in his office and questioned her in an aggressive manner in an apparent attempt to obtain information adverse to Donna  Hawkins, Ms. Elion's subordinate manager who herself had recently filed an EEO complaint based on race (African American) and sex (Elion Decl., ¶¶26-27 & Att. 4; Hawkins Aff. at 1).  Mr. Stephens "was quite visibly upset" when Ms. Elion denied that Ms. Hawkins was having difficulty managing her staff (Phelps Dep. at 105-08).  Mr. Stephens raised his

22

voice and pointed his finger at Ms. Elion, and ended the meeting abruptly (Elion Decl., ¶26).

XX.   Defendant involuntarily reassigned Daniel Salas, a Hispanic male, who formerly served as the Deputy Assistant Inspector General in the Office of Investigations after he filed an EEO complaint (Salas Dep. at 8-9).   Inspector General Kenneth Donahue himself reassigned Mr. Salas (Id. at 8).   Deputy Inspector General Stephens was also involved in Mr. Salas' reassignment (Stephens Dep. at 4, 11-14).

YY.   The thirteen OIG Divisions and Regional Offices that generated audit reports were ranked each Fiscal Year by Mr. Phelps (Heist Dep. at 123-25; Beard Decl., ¶¶20-23; Elion Decl., ¶¶33-34).   He measured their performance in terms of monetary benefits to HUD, cost disallowance to auditees, and timeliness of production at three previously determined audit stages (Elion Decl., ¶¶33-34 & Att. 5; Beard Decl., ¶24).   Ms. Elion's former Office was ranked third for FY 2004, the year the Headquarters Audits Division was disbanded (Elion Decl., ¶34 & Att. 5).   Defendant dissolved the Headquarters Audits Division halfway through FY 2004 (Id., ¶35 & Att. 4).

ZZ.   Ms. Elion's original EEO complaint in 2002 contested defendant's need to disband the Washington, D.C. District Office of audits and replace it with the Headquarters Audits Division (Elion Decl., ¶¶15-16 & Att. 1 at 1).

AAA.   According to Mr. Heist, one of the principal reasons to disband the Washington,
D.C. District Office of audits and replace it with the Headquarters Audits Division was to align the OIG
audit offices and divisions with HUD's programmatic offices (Heist Dep. at 60-67).   When Mr. Heist
disbanded the Headquarters Audits Division in April of 2004; it marked the first time in 33 years when
OIG's Office of Audit did not align with HUD's program and Headquarters activities (Phelps Dep. at 14-
15).

Respectfully submitted,


_____/s/_____
Robert C. Seldon, Esq.
 D.C. Bar No. 245100


_____/s/_____
Molly E. Buie, Esq.
 D.C. Bar No. 483767
Robert C. Seldon & Associates, P.C.
1319 F Street, N.W.
Suite 305
Washington, D.C.  20004
(202) 955-6968

Counsel for Plaintiff