UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| SAUNDRA G. ELION, | ) |
| Plaintiff, | ) ) ) |
| v. | ) Civ. Action No. 05-0992 (PLF) ) |
| ALPHONSO R. JACKSON,<br> Secretary Of Housing And<br> Urban Development, | ) ) ) ) |
| Defendant. | ) ) ) |

## DECLARATION OF SAUNDRA G. ELION

I, Saundra G. Elion, being first duly sworn, do hereby depose and state as follows:

1.) My name is Saundra G. Elion. I am the plaintiff in this action and make this Declaration in support of my Opposition to defendant's Motion for Summary Judgment.

2.) Until the actions that gave rise to this suit, I served as the Director of the Headquarters Audits Division of the HUD Office of Inspector General ("OIG") and as the District Inspector General for Audit for Washington, D.C. I am an African American woman and am now 59 years of age.

3.) The Office of Audit is the larger OIG unit which included my two former offices. The operating units of the Office of Audit are divided into Headquarters Divisions that are headed by Division Directors; and Regional offices, which are headed by Regional Inspectors General for Audit. All of these office heads serve at Grade 15. All of the incumbents in these positions are accomplished auditors; all are supervisors; and all of their positions are functionally equivalent, as proven by the fact that I was reassigned laterally between these positions.

1

4.) These supervisory auditors are responsible for managing the audit programs of HUD and there are no other managers in HUD OIG at their level. The program activities they manage are essentially the same, with the only meaningful distinction being that Regional offices concentrate on field audits and operations and Headquarters Divisions focus on activities at HUD Headquarters.

5.) The chain of command for all of these supervisory auditors is the same, as well. All answer in the first instance to the Deputy Assistant Inspector General for Audit, in this case Michael Phelps; and their second line supervisor is the Assistant Inspector General for Audit, James Heist. The chain of command reaches to the Deputy Inspector General, in this case Michael Stephens, who serves as the chief operating officer for HUD OIG and to whom all HUD OIG Offices answer (Id.).

6.) I was the only African American woman in HUD OIG to hold positions as the Director of a Headquarters audit Division or as a Regional or District Inspector General since OIG's since its creation in 1979, until well after the Complaint here was filed, and one of only four African Americans in total to hold such a position. The Headquarters Audits Division was the first and only audit office at an equivalent level in HUD OIG ever composed entirely of African Americans.

7.) I was appointed to the position of District Inspector General for Audit of the HUD OIG Capital District in Washington, D.C., in June of 1999.

8.) In 2002, my former office was abolished and I became the Director of the OIG Headquarters Audits Division in HUD Headquarters.

9.) Both positions gave me extensive managerial responsibility and exposure to senior officials in HUD OIG and senior program officials in HUD. My grade in both positions was GS-15.

10.) In my earlier position as District Inspector General for Audit, I was responsible for supervising the execution of internal and external audits[1] and audit reports concerning HUD programs and HUD-related activities within HUD Headquarters and the greater Washington, D.C., area.

11.) In my subsequent position as Director of the Headquarters Audits Division, I managed the OIG audit division primarily responsible for internal audits and the preparation of audit reports for HUD Headquarters programs and activities. I was also personally responsible for performing audits and issuing audit reports in more complicated and sensitive areas involving HUD officials.

12.) On April 20, 2004, defendant executed a Memorandum which disbanded my former Division, the Headquarters Audits Division, reassigned my staff to two other Headquarters audit divisions, relieved me of supervisory duties, and reassigned me to a non-supervisory position as a "special assistant" to the Assistant Inspector General for Audit. The Memorandum set forth a series of reasons which supposedly, but did not, justify the foregoing actions and made reference to an e-mail earlier that month from the Deputy Inspector General that supposedly instituted a "new hiring freeze."

---

[1] Audits entail the review of financial transactions and dealings of entities which receive HUD funds, among them public housing authorities, contractors, and mortgagees, to ascertain whether their dealings with HUD, its programs, and federal funds, have complied with federal law and regulation. The end product of an audit is typically an audit report, which details the auditee's compliance and recommends whether sanctions should be sought, either by recovery of public funds, debarment, or other civil or administrative penalty. OIG investigations, by contrast, focus on potential criminal violations and prosecutions.

3

13.)	Although my grade as a non-supervisory "special assistant" to the Assistant Inspector General for Audit remains the same as when I was Director of the Headquarters Audits Division, the two positions are not similar in any other respect.  My work assignments are few and far between, often menial, and are not commensurate with my background and experience as a supervisory auditor who was previously engaged in the full range of OIG's audit activities.  They entail identifying speaking engagements for my supervisor, reviewing a training database, inventorying personnel positions, and serving as a representative at meetings that have little or no relationship to the Office of Audit's activities.

14.)	My primary assignment when I was appointed to head the Capital District audit function was to improve the performance of the office.  My last performance appraisal as District Inspector General for Audit confirmed that I did (Id., Att. 14, 15).  According to both Assistant Inspector General Heist and Deputy Assistant Inspector General Phelps, I "issued five significant [audit] reports" that were "comprehensive" and "that resulted in significant changes in improving HUD's operations."

15.)	Despite my success, in May of 2002, Mr. Heist and Mr. Phelps abolished the Capital District Office and reassigned me to the newly created Headquarters Audits Division.

16.)	This reorganization, limitations on the scope of potential audits, reductions in the number of assigned audits, arbitrary staff reductions, repeated acts that undermined my managerial authority, and being personally assigned staff auditor duties were the most prominent acts that led me to initiate the EEO complaints process for the first time on December 18, 2002.

17.)	My complaint specifically identified Mr. Heist and Mr. Phelps as the management officials responsible for discriminating against me.  The legitimacy of my allegations has never been doubted by defendant.

18.) It is my understanding that employees of HUD OIG, like all members of the federal service, enjoy an absolute right to request Alternative Dispute Resolution ("ADR") in order to avoid the lengthy administrative complaints process; to obtain the appointment of a neutral or impartial third party who is trained in mediation theory and techniques to conduct ADR, and to be represented by counsel in ADR and throughout the administrative complaints process.

19.) I requested ADR during processing of my original complaint and it is my understanding that, under HUD OIG practice, my request had to be honored by the agency.

20.) Deputy Inspector General Stephens was responsible for arranging ADR in my case. He refused to let me participate in ADR with counsel present. Instead, Mr. Stephens notified me through the OIG ombudsman that he was prepared to participate personally in a conference with me but only if I attended without counsel.

21.) Believing that without ADR, Mr. Stephens' offer represented the only means of expediting the resolution of my complaint, I agreed to his terms.

22.) Had my original complaint proceeded to ADR, the complaint processes would not have concluded without a written and enforceable settlement agreement resolving my complaint. Instead, it ended with nothing but Mr. Stephens' verbal assurances.

23.) However, rather than proceed farther, I withdrew my request for ADR and my first complaint after my meeting with Mr. Stephens. Mr. Stephens refused to engage in ADR again, when my second complaint, which gave rise to this action, was processed administratively.

24.) Without a settlement agreement, after a brief period, Mr. Heist and Mr. Phelps returned to the very practices that had been the subjects of my original complaint. For example,

routine staff complaints were elevated to senior management. Work that could have been done by my division was either not performed, assigned to other offices, or assigned to my staff who were then detailed to other offices. The so-called absence of workload would later be cited as a basis for abolishing the Headquarters Audits Division. In truth, after the Headquarters Audits Division was disbanded, there were enough audits of HUD Headquarters programs alone to keep 14 auditors busy.

25.) Members of my staff who were interviewed during the investigation of my administrative complaint witnessed me being discriminated against by OIG management in a wide range of work activities after my original EEO complaint was withdrawn (Hawkins Decl.; Campbell-Waters Decl. Bowles Decl. Staff members in the division responsible for technical review of my former office did, as well (Bonds Decl.; Bowles Decl.).

26.) I was also harassed by Mr. Stephens over the EEO complaint filed by my African American Assistant Director, Donna Hawkins, who was also relieved of supervisory duties when the Headquarters Audits Division was disbanded. One incident occurred just before the Headquarters Audits Division was disbanded, when Mr. Stephens instructed me to appear in his office and questioned me in an aggressive manner in an apparent attempt to obtain information adverse to Ms. Hawkins. Mr. Stephens was visibly upset when I denied that Ms. Hawkins was having difficulty managing my staff. Mr. Stephens raised his voice, pointed his finger at me, and ended the meeting abruptly.

27.) On April 20, 2004, shortly after he failed in the attempt to extract information from me about my Assistant Director's EEO complaint, Mr. Stephens approved disbanding the Headquarters Audits Division, relieving me of supervisory duties, and distributing my staff between two offices.

28.) The reasons for doing so were allegedly set forth in Mr. Heist's Memorandum of April 20, 2004. Supposedly, this decision was driven by a "hiring freeze" in the Office of Audit, which necessitated reassigning Headquarters Audits Division staff to two other audit divisions whose workload was allegedly much greater. An alleged imbalance between staff and supervisors was also cited. These reasons were false and there were many reasons not cited by defendant for not disbanding the Headquarters Audits Division and taking action against me.

29.) I served as District Inspector General for Audit for Washington, D.C., until that office was disbanded and I was reassigned as Director of the Headquarters Audits Division. My African American predecessor as District Inspector General, Austin Groom, also filed an EEO complaint against Assistant Inspector General Heist and Deputy Assistant Inspector General Phelps. After he did, they two fired him.

30.) I have confirmed during the investigation of my administrative complaint and discovery in this action that the only other Headquarters Division Director or Regional Inspector General for Audit in the field ever removed from management and reassigned over his objection was Michael Beard. He, like me, was reassigned to a make-work special assistant position after filing an EEO complaint.

31.) The officials responsible for this action toward Mr. Beard were Mr. Heist, Mr. Phelps, and Deputy Inspector General Stephens. Today, Mr. Beard has little work to occupy him as a "special assistant" and is seated next to me. Like me, Mr. Beard is also in his fifties.

32.) I have confirmed during the investigation of my administrative complaint and discovery in this action that on at least one other occasion, defendant has used involuntary reassignment to retaliate against another senior OIG official. Daniel Salas, a Hispanic male,

7

served as the Deputy Assistant Inspector General in the Office of Investigations. Like me and Mr. Beard, Mr. Salas was also reassigned involuntarily after filing an EEO complaint.

33.) Even assuming that a "new hiring freeze" necessitated the reassignment of auditors from one division to another, HUD OIG management still had the choice of which office to abolish. There were thirteen separate offices in OIG Headquarters and in Regions that generated audit reports. Productivity was always measured and rewarded by HUD OIG senior management and there would be no reason to disband my office, if it was highly productive, and relieve me of supervisory duties if performance exceeded other offices'.

34.) These thirteen Divisions and Regional Offices were ranked each Fiscal Year by Mr. Phelps. He measured their performance in terms of monetary benefits to HUD, cost disallowance to auditees, and timeliness of production at three previously determined audit stages. According to Mr. Phelps, these rankings would be factored into office heads' performance ratings. My former Office was ranked third out of thirteen offices for FY 2004, the year the Headquarters Audits Division was disbanded.

35.) My performance was all the more remarkable, considering the fact that defendant dissolved the Headquarters Audits Division halfway through FY 2004.

36.) The worst performing of the thirteen OIG audit offices was also located in Washington, D.C. It was left unaffected by the reorganization that led to the dissolution of the Headquarters Audits Division. Unlike me, the director of that office was a white male and had never filed an EEO complaint.

37.) I presently encumber a "special assistant" position, largely performing tasks that could be assigned to support personnel and junior auditors or that are all but meaningless. My position is superfluous and defendant should have conducted a reduction-in-force to abolish it. 5

C.F.R. Part 351. Had it done so, my seniority would have given me "bump and retreat" rights that would have permitted me to displace another supervisory auditor,. That auditor was a white male who had not filed an EEO complaint.

38.) I have confirmed during the investigation of my administrative complaint and discovery in this action that the business practices HUD OIG used in conceiving and effecting the reorganization that resulted in disbanding the Headquarters Audits Division departed from OIG's standard routine practices. The Office of Audit has conducted ten or more reorganizations since Mr. Phelps became Deputy Assistant Inspector General in the Office of Audit. It was OIG's standard business practice for reorganizations to be carried out in consultation with one or both of OIG's servicing personnel offices, either its contracting personnel department the Bureau of Public Debt or its in-house Human Resources Division. Neither servicing personnel office was consulted.

39.) My original EEO complaint in 2002 contested the need to disband the Washington, D.C. District Office of audits and replace it with the Headquarters Audits Division. According to Mr. Heist, one of the principal reasons to do so was to align the OIG audit offices and divisions with HUD's programmatic offices.[2] Mr. Heist reversed field when he disbanded the Headquarters Audits Division in April of 2004; it marked the first time in 33 years that OIG's Office of Audit did not have an audit office primarily devoted to Headquarters activities.

40.) OIG Headquarters audit divisions were <u>never</u> fully staffed up even once during the two years which preceded the supposed "new hiring freeze" of April 2004 that necessitated reassigning my staff; it was six auditors below ceiling when the freeze was imposed.

---

[2] Although saving money spent on the D.C. office's lease was the other supposed reason for closing it, I requested and have reviewed discovery responses in this action concerning any such savings. There are no documents or other reasons to believe that this was ever planned or occurred.

9

41.) There was nothing particularly special about HUD OIG's supposed "new hiring freeze" at all. Going back to the late 1980's, staffing ceilings were repeatedly raised and lowered. During this entire time, the only Division Director in OIG Headquarters, or for that matter Regional Inspector General in the field, ever reassigned and removed from management as a result of a hiring freeze was me.

42.) Defendant reassigned my assistant director to the Technical Oversight and Planning Division, supposedly to help with its "tremendous … workload." During discovery, I learned that the former Director of that division testified that the workload of that Division had not changed.

43.) During the year and a half leading up to the reorganization of April of 2004, that Division was never staffed up fully.

44.) This was also true when OIG management was instructing the Office of Audit to accelerate its hiring, to avoid the possibility that our personnel ceiling would be cut by OMB.

45.) Three of my staff were supposedly needed for the Financial Audits Division due to alleged "recent changes" in the Chief Financial Officers Act which "forced … almost a continuous financial audit process." The Chief Financial Officers Act itself had been enacted 14 years earlier in 1990; that was the legislation which required HUD and other executive departments to prepare annual audited financial reports. The "recent changes" that Mr. Heist used to justify reassigning my staff were put in place by OMB in 2002. OMB's plan moved the due dates for agencies' financial reports to be moved forward over the next three Fiscal Years. Only a single audit, the one for FY 2004, remained to be completed early. From that point forward, the schedule remained unchanged.

46.)    During the disclosure and discovery processes in this action, the investigation of my formal administrative complaint at the agency level, and my work as a senior manager in the HUD OIG Office of Audit, I had or gained access to the documents, which accompany this Declaration and my Opposition to defendant's Motion for Summary Judgment.  These documents, each of which is a true and correct copy of what it purports to be, are as follows:

a.)    Attachment 1 is a true and correct copy of the EEO counselor's report of counseling in my original administrative complaint, with my informal complaint attached.

b.)    Attachment 2 is a true and correct copy of my Memorandum of March 20, 2003, withdrawing my original EEO complaint.

c.)    Attachment 3 is a true and correct copy of the e-mail from Deputy Inspector General Stephens of April 4, 2004, which supposedly instituted a "new hiring freeze" in HUD OIG.

d.)    Attachment 4 is a true and correct copy of the Memorandum from Mr. Heist approved by Mr. Stephens dated April 20, 2004, which approved the actions that are the subject of this suit and contained the supposed reasons underlying those actions.

e.)    Attachment 5 is a true and correct copy of the e-mail dated January 7, 2005, from Deputy Assistant Inspector General Phelps and the attached rankings of the Headquarters audit divisions and Regional offices of audit for Fiscal Year 2004.

f.)    Attachment 6 is a true and correct copy of documents obtain during discovery showing staffing and staff ceilings in the Office of Audits between May 5, 2002, and April 4, 2004.

g.) Attachment 7 is a true and correct copy of an e-mail from the Director of the HUD OIG Office of Management and Planning dated April 2, 2003, concerning the need to increase hiring efforts in the Office of Audit.

h.) Attachment 8 is a true and correct copy of an e-mail from Deputy Assistant Inspector General Michael Phelps dated November 8, 2002, concerning the need to increase hiring efforts in the Office of Audit.

i.) Attachment 9 is a true and correct copy of the an e-mail from Deputy Inspector General Michael Stephens dated February 4, 2003, concerning the need to increase hiring efforts in the OIG.

j.) Attachment 10 is a true and correct copy of OMB Bulletin No. 01-09 dated September 25, 2001, concerning requirements it established for agencies to produce audited financial reports in accordance with the Chief Financial Officers Act of 1990.

k.) Attachment 11 is a true and correct copy of OMB Circular A-26 dated December 21, 2004, concerning requirements it established for agencies to produce audited financial reports in accordance with the Chief Financial Officers Act of 1990.

l.) Attachment 11A is a true and correct copy of a Memorandum from OMB dated December 6, 2002, concerning requirements it established for agencies to produce audited financial reports in accordance with the Chief Financial Officers Act of 1990.

m.) Attachment 12 is a true and correct copy of a publication by OMB concerning requirements it established for agencies to produce audited financial reports in accordance with the Chief Financial Officers Act of 1990.

n.) Attachment 13 is a true and correct copy of an extract from Defendant's Reponses to Plaintiff's First Interrogatories and Requests for Production of Documents.

o.) Attachment 14 is a true and correct copy of my performance review for the period ending January 31, 2001.

p.) Attachment 15 is a true and correct copy of my performance review for the period ending January 31, 2002.

q.) Attachment 16 is a true and correct copy of EEOC Management Directive 110 Chapter 3.

r.) Attachment 17 is a true and correct copy of the Appendix to EEOC Management Directive 110 concerning Alternative Dispute Resolution.

s.) Attachment 18 is a true and correct copy of HUD OIG Manual Chapter 1099 concerning processing of administrative EEO complaints.

t.) Attachment 19 is a true and correct copy of the e-mail from the HUD OIG ombudsman dated March 6, 2003, canceling ADR in my original administrative EEO complaint.

u.) Attachment 20 is a true and correct copy of a letter from my counsel, Robert C. Seldon, Esq., to AUSA John Truong dated March 14, 2006, which clarified and asked for clarification of certain of defendant's discovery responses and asked for additional responses.

v.) Attachment 21 is a true and correct copy of the letter to my counsel, Robert C. Seldon, Esq., from AUSA John Truong dated March 18, 2006, which conveyed certain of defendant's responses to Attachment 20.

w.) Attachment 22 is a true and correct copy of the affidavit given by Deputy Assistant Inspector General for Audit Michael Phelps during the investigation of my administrative EEO complaint.

x.) Attachment 23 is a true and correct copy of the affidavit given by Assistant Inspector General for Audit James Heist during the investigation of my administrative EEO complaint.

y.) Attachment 24 is a true and correct copy of supplemental discovery responses by defendant dated May 4, 2006, which conveyed additional information from defendant in response to Attachment 20.

z.) Attachment 25 is a true and correct copy of the e-mail dated June 6, 2004, which notified me formally that HUD OIG was refusing to engage in ADR in my second administrative complaint.

I hereby declare under penalty of perjury that the foregoing is true and correct, to the best of my knowledge, information, and belief.

_____
Saundra G. Elion
Executed on April \_\_\_, 2007.