UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| SAUNDRA G. ELION,<br><br>　　Plaintiff,<br><br>　　　　v.<br><br>ALPHONSO R. JACKSON,<br>　Secretary Of Housing And<br>　Urban Development,<br><br>　　Defendant. | )<br>)<br>)<br>)<br>)<br>)　Civ. Action No. 05-0992<br>)　(PLF)<br>)<br>)<br>)<br>)<br>)<br>) |

**DECLARATION OF D. MICHAEL BEARD**

　　I, D. Michael Beard, being first duly sworn, do hereby depose and state as follows:

　　1.) My name is D. Michael Beard. I am a Certified Public Accountant who was appointed to the position of Regional Inspector General for Audit ("RIG) for the Office of Inspector General ("OIG") of the Department of Housing and Urban Development Region VI, headquartered in Ft. Worth, Texas, at the Grade 15 level in October of 1992.

　　2.) In that position, I was the supervisory official responsible for all audits and audit reports produced by HUD OIG Region VI, among them, audits of public housing authorities, nonprofit organizations, and persons doing business with HUD. Five states were included within the jurisdiction of OIG Region VI, specifically Texas, Louisiana, New Mexico, Oklahoma, and Arkansas. HUD audit activities

in these states, and in other jurisdictions on an as assigned basis, were performed by auditors under my supervision or me personally.

3.) As RIG for Region VI, I supervised thirty professional staff members in five field offices. My last first line supervisor in that position was Deputy Assistant Inspector General for Audit, Michael Phelps; my second line supervisor was Assistant Inspector General for Audit James Heist; and my third line supervisor was Deputy Inspector General Michael Stephens.

4.) I am also a licensed Certified Public Accountant and Certified Fraud Examiner. I hold a Master's Degree in Accounting. In 1999, I was named the HUD OIG Audit Manager of the Year. As RIG, I received positive performance appraisals and numerous performance awards, including an Award for Excellence from the President's Council on Integrity and Efficiency. In total, I have over 30 years of private and government accounting and auditing experience.

5.) In 2004 I was the "senior" RIG, having served in that position longer than any other serving RIG in HUD OIG.

6.) I was first employed by HUD OIG in 1989. Since that time, I personally authored over 70 significant audit reports that identified approximately $200 million in potential savings to the government. These audits have been featured in numerous national newspapers and periodicals; one was featured in a book about the Clinton administration; and another was the subject of two national TV news programs.

7.) I also served as an expert witness for the United States in civil actions and criminal prosecutions, appeared as a key witness for

HUD at five Congressional hearings, and supervised and been responsible for the production of countless final audit reports in Region VI.

8.) While serving as the Regional Inspector General for Audit for Region VI, I received an Award for Excellence from the President's Council on Integrity and Efficiency, Audit Manager of the Year and a Special Recognition Award from the HUD Inspector General, an OIG Special Team Award, and 12 Superior Accomplishment Awards.

9.) My work as RIG for Region VI repeatedly brought me into close professional contact with the other RIG's in the HUD OIG Office of Audit around the country, as well as with audit Division Directors in HUD OIG Headquarters in Washington, D.C.  Based on my extensive experience, all of us who headed offices and divisions that generated audit reports were performing jobs which, at their core, were the same.  The differences were in geographical location and areas of emphasis.  But for this, we were all capable of performing one another's jobs.

10.) The operating units of the Office of Audit are divided into Headquarters Divisions that are headed by Division Directors; and Regional field offices (formerly, District offices), which are headed by RIG's for Audit.  All of these officials are Grade 15's.  All of the incumbents in these positions are accomplished auditors; all are supervisors; and all of their positions are functionally equivalent, as proven by the fact that Ms. Elion was reassigned laterally between these positions.  There are no other managers at this level or with this level of responsibility in the HUD OIG Office of Audit.

11.) The chain of command for all of these supervisory auditors is the same, as well. Like me, the line of supervision ran from the Deputy Assistant Inspector General for Audit, to the Assistant Inspector General for Audit, and then to the Deputy Inspector General

12.) I served as RIG of Region VI until January 10, 2005, when I was removed from that position involuntarily by Deputy Inspector General Stephens, Assistant Inspector General for Audit Heist, and Deputy Assistant Inspector General for Audit Phelps. In addition to removing me as RIG of Region VI, these members of senior OIG management relieved me of all supervisory duties, reassigned me involuntarily and over my objection to the position of Special Assistant to Deputy Assistant Inspector General for Audit, and relocated me involuntarily from Texas to Washington, D.C. At the time, I was ordered to report immediately to Washington, D.C., or face removal from the Federal Service.

13.) After being removed as RIG for Region VI, I initiated suit in Beard v. Jackson, Civ. Action No. 06-0756 (GK), which is now pending in this District. Among other matters, I alleged that the actions in removing me as RIG for Region VI, relieving me of supervisory duties, and reassigning me involuntarily as a "special assistant" to the Deputy Assistant Inspector General for Audit constituted retaliation for my prior protected EEO activity and discrimination on account of my age, which at the time was 55 years of age.

14.) After arriving at Headquarters in Washington, D.C., I became better acquainted with the plaintiff in this action, Saundra Elion. Prior to my relocation, I had known Ms. Elion through work since 1999

when she became the District Inspector General for the Capitol District. I conferred with her on audits and issues of common interest. We were friends during this time both in and out of the workplace.

15.) Once I arrived at OIG Headquarters, I was stationed in a cubicle immediately outside of Ms. Elion's office. Through my daily interactions and discussions with Ms. Elion I learned that she, too, had filed an EEO complaint and settled it through the ADR process with Mr. Stephens. I learned that Ms. Elion's experience was similar to mine, in that after her EEO complaint was settled and while she was in her 50's, she was removed from her previous supervisory position and reassigned to a new non-supervisory position.

16.) During discovery in my case and the investigation of my EEO complaint, HUD OIG records were compiled and I learned that Ms. Elion and I were the only two individuals who, as heads of Regions and HQ Divisions, were involuntarily relieved of supervisory duties and subjected to involuntary reassignments. We were also the only two such individuals who previously filed EEO complaints.

17.) In the position to which I was reassigned, "special assistant" to the Deputy Assistant Inspector General, I do not have any supervisory responsibilities. I have a minimal workload and few assignments, none equal to my education and experience.

18.) Through my discussions with Ms. Elion, and my physical proximity to her in the office, I know that she too does not have any supervisory responsibilities in her position as "special assistant."

19.) I also know that she has been given a minimal workload as well, which did not fully use her background, education, or experience as a senior and highly regarded supervisory auditor.

20.) I am familiar with the OIG Office of Audit's system to measure performance of Regions and Headquarters Offices based upon my thirteen years of experience as a RIG.  I am also familiar with the new performance rating system through my participation in conference calls, emails, and the 2003 Manager's Conference, when the new system was introduced.

21.) During the performance evaluation at the end of that following performance year, HUD OIG senior managers announced that Headquarters would rank audit Regions and Divisions based on the achievement of pre-determined performance goals.

22.) As the RIG for Region VI, I was the recipient of a ranking sheet that was distributed by senior OIG management.  Ranking sheets were circulated at the end of each quarter, and sometimes monthly. Each Region and Division was ranked among the thirteen Regions and Divisions that generated audits on each performance measure.  The sheets were quite detailed and presented a clear and accurate picture of the work being done by each Region and Division.  The ratings were also used in annual appraisals.

23.) In FY 2004, the year that Ms. Elion's division was eliminated, Ms. Elion's Division was ranked third out of thirteen operational Regions and Divisions.

24.) In FY 2004, the year that Ms. Elion's division was eliminated, Information Systems Audit Division, one of the other two

6

Headquarters divisions, ranked thirteenth out of thirteen divisions and regions. The Director of that Division, like all RIG's and Division Directors, is a senior supervisory auditor. Although the work of that Division focuses on particular audit subjects, all RIG's and audit Division Directors, including Ms. Elion, would be perfectly qualified to head that Division.

25.) In November 2004, Inspector General Donohue spoke to all the investigators and auditors and said that return on investment, one of the six goals, was important to him and that he intended to reward the region that ranked number one by giving monetary awards to each auditor and investigator in the winning region.

26.) The Information Systems Audit Division failed to meet any of its six goals in FY 2004; whereas Ms. Elion's division exceeded five of her six performance measures. The Information Systems Audit Division Director was neither reassigned nor realigned. I am also aware, because of discovery and disclosure in my EEO case, that the Information Systems Division did not meet all audit standards in its 2005 Management Assessment Review done by the Office of Management and Policy. It was the only division so noted during the period 2002-2005.

27.) Until Ms. Elion's division was abolished in April 2004, there were three Divisions in OIG Headquarters that generated audit reports. Since I arrived at HUD OIG in 1989, there has always been a Headquarters Audit Division or a counterpart division in Washington, D.C., with primary responsibility for auditing HUD Headquarters programs and activities. All of the Regions and Divisions were

7

staffed and headed by auditors, all of whom had the same qualifications as Ms. Elion and they all reported to the same supervisors in 2004.

28.) Ms. Elion has shared an email with me that she gained through discovery. The email provides as one of the justifications for the elimination of Ms. Elion's Division a hiring freeze because of a report from the Office of Management and Policy. That particular email was not shared with me as a RIG and I was not aware we were under a freeze at that time.

29.) Another reason justifying the elimination of Ms. Elion's division was that the Office of Audit's hiring ceiling was supposedly frozen. In my experience, this was nothing new or unusual and certainly did not justify abolishing an entire Headquarters Division. Hiring ceilings repeatedly fluctuated since I became a RIG in 1992, and there had been hiring freezes and rushes as the FTE level and anticipated rate of resignations fluctuated during the year. At no time did OIG senior management ever consider abolishing a Division in response.

30.) During this time when OIG was implementing efforts to meet full staffing ceilings, according to the monthly staffing charts that were circulated among the OIG managers, the Technical Oversight and Planning Division ("TOP"), a division Mr. Heist created in 2002, failed to meet the staffing ceiling during most, if not all of this time period. Ms. Elion's resources were allegedly needed for this division.

31.) Another reason that was given for eliminating Ms. Elion's Division was the supposed need to meet new government-wide audit deadlines. The Government Accountability Office merely moved up the date government agencies were expected to publish their Financial Statements; there was only one reporting date left to be moved up when the Headquarters Audits Division was eliminated, the one for FY 2004. (At all times, the Fiscal Year ended on September 30th). As a result of the new publishing dates, I, like other RIG's, was required to provide auditors to the Financial Audits Division earlier in the year to meet these earlier dates. HUD OIG had no difficulty staffing these audits. The earlier dates did not increase the audit work, just the timing and nature of the audit testing. The Financial Audits Division always relied on the Field Offices to supplement the staffing for the Audit and each RIG was told how many auditors were needed and when. Further, the Financial Audits Division would ask for volunteers from the field to participate in the financial statement audit. Volunteers were always available as participating auditors received credit towards their CPA accreditation. After Ms. Elion's Division was abolished, I did not see any change in the numbers of auditors being assigned from the Regional Offices to help meet the deadlines of the financial statement audit.

32.) Each year numerous audits were conducted by the HUD OIG Office of Audit, so as a result only the best audits were common knowledge amongst the RIGs. In two different years, Ms. Elion received recognition for two significant audits she issued. Her reputation among the field auditors was excellent.

33.) In 1999-2000 Ms. Elion's staff assisted and collaborated on the Community Builder audits. In February 2004, I suggested to Mr. Heist that Ms. Elion's Division do an audit of a contract concerning HUD headquarters personnel and a consultant in New Orleans. Mr. Heist acted upset by my suggestion at the time, and he rejected my suggestion of Ms. Elion's staff doing the audit.

34.) Although Ms. Elion's division was abolished, audit reports of HUD programs and activities must still be performed at Headquarters. In order to accomplish this work, without the Headquarters Audits Division, OIG now brings in field auditors to the Washington, D.C. Headquarters.

35.) In my opinion Ms. Elion was the best Audit Manager the Headquarters division had since I came to HUD OIG in 1989. Each of her predecessors had not published significant audits or created an effective audit organization. She came into a known dysfunctional division, and turned it into one of the best producing

I hereby declare under penalty of perjury that the foregoing is true and correct, to the best of my knowledge, information, and belief.

_____
D. Michael Beard
Executed on April 12, 2007.