## AFFIDAVIT

Location: Washington, DC

I Donna M. Hawkins, solemnly swear to the truth of the following statement which is in response to questions posed by Tondalaya Carroll, Equal Employment Opportunity (EEO) Investigator, Southwind, and provides information pertaining to the formal complaint of discrimination, filed against the U.S. Department of Housing and Urban Development on June 23, 2004, by Saundra Elion, Case No. IG-04-04. The following claims have been accepted for investigation:

*Whether Ms. Elion was subjected to discrimination and continuous harassment because of her race ( African-American), sex (female) , age (56) and in reprisal when the Deputy Inspector General, Assistant Inspector General for Audit and the Deputy Assistant Inspector General for Audit, Office of Inspector General (OIG), Office of Audit, Washington, DC.*

*1. Subjected her to a hostile work environment since December 2002 through April 2004.*

*2. On April 21, 2004, reassigned her from the position of Director of the Headquarters Audits Division of OIG to a non-supervisory position with significantly less responsibility, career exposure and opportunity for advancement.*

*3. On August 30, 2004, she learned that she was not considered for the position of Director, GS-15, Supervisory, Technical Oversight and Planning Division, OIG Headquarters.*

Q1. Please state the name of the agency for which you work, the organizational unit to which you are assigned and the address of your duty station.

> U.S. Department of Housing and Urban Development
> Office of Inspector General – Technical Oversight and Planning Division (TOP)
> 451 7th Street S.W., Room
> Washington, DC 20410

Q2. How long have you held your current position?

> Headquarters Audits Division (HAD) was arbitrarily disbanded on April 21, 2004 and in retaliation against me for filing a discrimination complaint, and I was demoted to my current position as a Desk Officer for TOP. I have held this position for approximately nine months.

Q3. Please state your race.

> African American

Initial *[signature]*

Exhibit *ES*

Page 1 of 13

Q4. Please state your gender.

    Female

Q5. Please state your age (date of birth).

    I am 42 years old and was born on September 28, 1962.

Q6. Have you previously participated in the EEO process? If so, when and in what way?

    Yes. In January 2004, I filed a discrimination complaint against Michael R. Phelps, Deputy Assistant Inspector General for Audit, based on sex and race. During this time I was the Assistant Director for HAD, Phelps was my second line supervisor and Saundra Elion was first level supervisor.

Q7. Were you aware Complainant had participated in the EEO process? If so, when and how did you become aware?

    Yes. I have worked with Saundra Elion since 1999 when she was District Inspector General for the Capital District through her tenure as Director of HAD which was arbitrarily disbanded on April 21, 2004. In my position as a Senior Auditor and an Assistant Director, I either witnessed, heard and/or was told directly of discriminatory acts against Ms. Elion beginning in 2001 to the present.

Q8. Please identify your first and second level supervisors by name and title.

    First level supervisor – Sandra LaPorte from May 3 to October 22, 2004(retired). As of 10/23/04, Brenda Patterson became my new first level supervisor.

Second level supervisor – Stanley McLeod from May 3 to January 9, 2005 (retired). As of January 10, 2005, Robert Gwin was appointed by James Heist as the Director of TOP thus becoming my new second level supervisor.

Q9. What is your organizational relationship to Complainant?

From 1999 to May 2002, I worked as a Senior Auditor for Ms. Elion while she was District Inspector General for Capital District. In May of 2002, Ms. Elion became the Director of HAD and I worked as a Senior Auditor in this division until I was promoted in March 2003 to the Assistant Director, and remained in this position until April 21, 2004. On April 21, 2004, OIG Management arbitrarily and maliciously disbanded HAD. At the present time, Ms. Elion and I both work for the Office of Inspector but in different offices.

1. Subjected to hostile work environment from December 2002 to April 2004.

Initial _[signature]_                              Page 2 of 12

Q10. Ms. Elion contends she was subjected to a hostile work environment from December 2002 to April 2004. Did she ever bring to your attention concerns of a hostile work environment? If so, what were her concerns? Were you aware of any actions taken with regards to her concerns?

Yes, Ms. Elion brought to my attention her concerns that she was working in a hostile work environment. In my positions as Senior Auditor and Assistant Director, I either witness, heard and/or was told directly of discriminatory acts against Ms. Elion beginning in 2002.

To show her willingness to work with Management, Ms. Elion met with Stephen, Heist and Phelps in attempt to informally resolve her EEO complaint she filed in December 2002. After that session, she was positive that the proposed action outlined in the ADR session would resolve the hostile work environment. Therefore, she withdrew her complaint. However, it did not take Phelps and Heist long to resort to their old ways of unnecessarily reviewing and questioning her work and not providing a clear mandate or adequate staffing. It appears that OIG Management deliberately denied Ms. Elion legal representation at that meeting so they would not be bound by their proposed resolutions and they could continue to put her in a position where her productivity and effectiveness would decline.

The following is a list of discriminatory acts that Ms. Elion was subjected to as the Director of the Capital District and HAD:

- In May 2002, Heist abolished the Capital District Office of Audit and created Headquarters Audits Division, despite the fact that the Capital District had a clear area of responsibility and audit universe developed in the Washington Metropolitan Area. According to Heist, HAD was supposed to cover only Headquarters programs but its mission had not been clearly defined nor had any research been performed to determine whether enough work existed to sustain a group of auditors whose sole purpose was Headquarter Programs. The reason that Heist offered for abolishing the Capital District was to align the OIG with HUD's regional offices, reduce costs and move the audit staff closer to it clients. The rumor on the OIG grapevine was that all of the audit staff including Ms. Elion was going to report to Stan Mcleod, Director of TOP. More importantly, if Heist wanted HAD to be productive and effective, he would have assured that the 2002 and subsequent Annual Audit Plans would have identified and included audits for HAD. I attended the July 17-18, 2002 Managers Meeting to represent Ms. Elion. I raised our concerns with the Director of TOP regarding the lack of audits for HAD. He had suggested one audit for HAD during the meeting. When I returned to the office, I sent an email to him regarding audits for HAD. Mcleod informed that my supervisor, Saundra Elion should talk with Mike Phelps about my and Ms. Elion' concerns.

- On September 6, 2002, Phelps directed Ms. Elion to exclude me, the Auditor in Charge, from a conference call with Robert Gwin, Manager for Region 8, to discuss his concerns regarding two Congressionally requested OTAG and ITAG reviews that I was overseeing and managing on a daily basis. Ms. Elion was aware of all of the issues but may not have known the finer details. Phelps viewed Gwin as the expert although neither he nor his staff had performed any of the audit tests or evaluated the two auditees. Later, Gwin told Ms. Elion that I was too aggressive but did not provide any specific details.

- From September 6 through 27, 2002, Region 8 held up the issuance of HAD's Congressionally requested audit reports, because Phelps supported the Region 8 AIC and Manager claimed that they had to re-write the reports to bring them into compliance with other reports before issuing. The suggested changes were not substantive or significant re-writes to the report as Phelps had claimed. Region 8 report template was grammatically incorrect, included inaccurate statement and parts of it did not apply to our audit. We found inconsistencies in the use of report template by several other offices reports. I was also told that the Report Consultants that OIG hired to teach a training course on report writing in July 2004 used excerpts from Region 8's OTAG/ITAG report as an example of a report needing extensive clarification.

- In August 2003, Phelps transferred Dave Gleason, the only white male and most senior auditor out of HAD. In October 2003 Phelps replaced Gleason with Edward Bowles, an inexperienced African American who had not conducted audits in more than 10 years. Previously, Phelps had labeled Bowles a poor performer. Phelps was fully aware that this exchange of personnel was not equitable and thus productivity for HAD would decrease.

- Two of the other three Headquarters Audit Divisions were managed by white male Directors and at least one GS-15 Assistant Directors and TOP had two GS-15 Assistant Directors. Each staff consisted of a least 8 auditors that were GS-13 and 14 senior auditors. Phelps restricted HAD's Assistant Director to a GS-14. In February 2004, Ms. Elion received written comments regarding the Travel and Purchase Card survey report from TOP. These comments were written in a very negative tone, over-zealous, unnecessary, and were intended to be demeaning. James Heist, Assistant Inspector General for Audit, endorsed. Heist stated "I have reviewed TOP's comment and concur".

After reading and reviewing these comments numerous times, I wondered whether I worked for the same organization and was a member of the team. This process is supposed to be collaborative and improve the quality of the products we issue. However, the comments were intended to embarrass and humiliate HAD. During a meeting on 3/4/04, I told McLeod that the content and tone of his comments questioned my ability to perform my job and were offensive to me. McLeod immediately apologized. The very next morning, 3/5/04, Heist and

Initial _/s/_    Page 4 of 12

McLeod met with Ms. Elion regarding the unresolved matters from the previous day's meeting. During this meeting, Heist stated that he could see where the comments would be offensive for the Auditor in Charge (AIC). Ms. Elion informed Heist that she was also offended by the tone. Heist agreed that the comments were offensive for everyone and he too apologized.

- When HAD was disbanded in April 2004, the two audit assignments that were in progress were reassigned to the Information System Division. The Director of this division is a white male. When HAD was responsible for the assignments, Phelps insisted that Ms. Elion adhere to established timelines, write and submit justifications for any deviations and include all draft reports in Auto Audit. Although the audit work had been completed over five months ago, several re-writes were done - only one was in Auto Audit, however, only one report had been issued in December 2004. The Information System Division did not have to comply with the same requirements that were imposed on HAD.

Q11. To your knowledge, does the Agency have a policy regarding raising concerns of harassment/hostile work environment? If so, what is your understanding of the policy?

> Yes, HUD, the Agency, has policies regarding raising concerns of harassment/hostile work environment. Specifically, I am familiar with HUD's Unlawful Harassment Policy and Procedures for Filing a Harassment Complaint in which the OIG failed to comply with at times. According to the policy, (an) "employee who believes she has experienced harassment in the workplace should immediately bring the matter to the attention of their supervisor, the Discrimination Complaint Manager in their organization or Equal Employment Opportunity Counselor. If the matter is brought to the attention of a supervisor or the Discrimination Complaint Manager, the alleged harassment should be investigated immediately."
>
> The Inspector General has notices, at least two, that were issued to staff stating a zero tolerance for discrimination in the workplace. In addition to notices, the OIG issued Human Resource Manual Policy Issuance 752.1, Disciplinary and Adverse Actions. Appendix II includes a Table of Penalties which specifies adverse actions for Discrimination, harassment and retaliation covered by Title VII, Age Discrimination in Employment Act and Rehabilitation Act.

Q12. To the best of your knowledge, has the policy been communicated to all employees? If yes, how?

> Yes, all of the OIG notices were communicated to all employees but implementation of these policies is a different matter. In direct contrast, the OIG has not communicated all of HUD's policies regarding harassment/hostile work environment. Specifically, HUD's Unlawful Harassment Policy and Procedures for Filing a Harassment Complaint has not been communicated to all OIG

Initial _____     Page 5 of 13

employees. I only found out about this policy in August of 2004 after I had filed a complaint of discrimination. Because the OIG is an independent organization within HUD, this does not mean that OIG employees should not be provided with all the Federal Government policies and procedures. OIG is not exempt from Federal laws, policies and procedures.

Q13. Ms. Elion contends the reorganization was used as a form of retaliation against her. Do you believe that the reorganization was a form of retaliation against Ms. Elion? Please state specific reason for your answer.

Yes, I believe the arbitrary and malicious reorganization was a form of retaliation against Ms. Elion and her race, sex, age and reprisal were all factors. Had Ms. Elion been a younger white manager and member of the "good old boys club" the retaliation would not have occurred.

James Heist and Michael Stephens (Deputy Inspector General) decided that HAD would be disbanded. OIG Management neither solicited input nor had any discussion with Ms. Elion, the Division Director, regarding disbanding HAD. Ms. Elion who was the Director of HAD was told by Heist only one hour before her staff was informed of the disbandment.

Ms. Elion and I were the only two female African American Managers in OIG who were in the Headquarters Office of Audit that were adversely affected demoted from supervisory positions as a form of retaliation when management disbanded HAD.

Management could not use performance or productivity issues as reasons for the disbandment of HAD. Therefore, in a memorandum to Michael Stephens, dated 4/20/04, Jim Heist states the following as the reasons for disbanding HAD: (1) the work load centralized in HUD Headquarters program areas did not materialize to the extent anticipated and (2) current and future budget constraints.

On 4/2/04, Edward Kim (staff auditor in HAD) turned in his resignation letter and Ms. Elion took the letter to Phelps. Ms. Elion reported to me that Phelps showed little concern about Kim's planned resignation and that Phelps stated that Kim "could resign today and not wait until the 16th." On the next working date, Monday, 4/5/04, Phelps had completely changed his views on Kim's resignation, elevated the matter to Michael Stephens, and Stephens summoned Ms. Elion to his office for questioning regarding the staff's opinion about me. Management was content with not affording either Ms. Elion or I an opportunity to address the issues raised by the HAD staff. Also, Stephens told Ms. Elion that he planned to have the OIG Ombudman review her office to address the staffs concerns.

I believe that the disbanding of HAD was reprisal in for my and Ms. Elion's inquiries regarding the parameters of the Ombudsman review of HAD's operations and raising concerns regarding the continuous meetings between HAD

Initial _____   Page 6 of 13

staff and OIG senior managers. It appears that the managers were taking actions based on these meetings with HAD staff. These meeting took place without Ms. Elion or my or knowledge. I also believe that Mike Stephen was still annoyed when he questioned Ms. Elion and I on 12/2/03 about the hostile work environment that Mike Phelps had created for me. I did not discuss my specific concerns with Stephens and referred him to my attorney.

In direct contrast to the very questionable circumstances under which HAD was disbanded, approximately 43 days later, Heist sent an email to the Directors and Regional Inspectors General for Audit (RIGA) to solicits their input regarding under-performing offices. They were specifically asked to provide recommendations, detail action plans and timelines regarding how to make each office successful, transferring of staff and office closings. Heist allowed the other Directors and RIGAs 11 day to make recommendations on their offices' fate, however, he did not provide the only two African American female managers in the entire Office of Audit Headquarters organization an opportunity to provide any input to the future of HAD. Despite all of managements attempts to undermine, discredit, demean and humiliate Ms. Elion, HAD was one of the most productive offices and ranked 4th out of 13, although it had the smallest audit staff in the entire Office of Audit during FY 2003.

Q14. Was Ms. Elion's race a factor in reorganization/abolishment of her position?

    See answer to Q13

Q15. Was her gender a factor?

    See answer to Q13

Q16. Was her age a factor?

    See answer to Q13

Q17. Was the reorganization/abolishment of Ms. Elion's position an act of reprisal for her filing an EEO complaint?

    See answer to Q13

Q18. Ms. Elion contends that during the period June 2001 and October 2002, her ability to hire replacement staff was hindered by a reduction in staffing and reassignment of existing staff to 2 month detail. Ms. Elion also contends that, during this same period, there was a nationwide recruitment campaign in place. Was Ms. Elion hindered from hiring replacement staff during this period in question? If so, what were the reasons?

Yes, I believe Ms. Elion was hindered from hiring replacement staff during the period of June 2001 to October 2002 because of her race, sex, age and reprisal.

I was primarily responsible for assisting Ms. Elion with organizing, planning and implementing the recruitment strategy for the Capital District and HAD. In this capacity, Ms. Elion and I would discuss hiring, staffing levels, reassignments, performance level and termination of employment. During the period in question, OIG Office of Audit staffing levels were down, so all divisions and regional offices except Capital District and HAD were allowed to hire even if it meant exceeding their ceiling. Ms. Elion was not allowed to hire replacement staff for the following reasons:

- Joan Hobbs (June 2001) Assistant Director Capital District, transferred to the Housing Fraud Initiative in OIG Los Angeles Office. Based on discussions with Ms. Elion, I believe Phelps cancelled the job announcement after she held interviews because he said he wanted to bring the Capital District in line with other districts of similar sizes. Phelps' actions reduced the number of Assistant Directors from two to one.

- Cindy Nelson and Martin Irizarry transferred to OIG Financial Audits Division and Warner Taylor and Steve Wolannin resigned. These staffing changes occurred between July and November 2001. Although Phelps said Ms. Elion could fill one of the vacancies, the position was never advertised. Phelps also assisted with transferring both Cindy and Martin and made the decision not to fill any of the vacant positions.

- Joe Richardson, Assistant Director in the Capital District, retired in January 2002. The vacancy notice for this position was announced in December 2001. However, Phelps cancelled this announcement in early January 2002. To my knowledge Phelps never told Ms. Elion about this cancellation. Eventually, Phelps told Ms. Elion that she could announce all her vacancies once the office moved from the Capital District location to Headquarters and that the grade structure would be higher.

- Latesha Campbell, Administrative Officer, was removed in May 2002 and reassigned to work for Phelps after HAD was created. Phelps informed Ms. Elion that the Bureau of Public Debt said that because her staff was so small she was not allowed to have two support staff.

- Kilah White transferred to OIG Atlanta Office for personal reason and Jacquline Jimmerson resigned to take a position with Department of Education during October 2002. Again, Phelps did not allow Ms. Elion to fill these vacancies.

Initial _____    Page ___ of 13

Ms. Elion informed me that Phelps arbitrarily reduced HADs' staffing ceiling to 9, which included the secretary, 7 auditors and her. Phelps publicly announced this to Ms. Elion in a staff meeting held on 7/1/02 with other OIG Managers across the country. Ms. Elion had to work for a year as both the Director and Assistant Director of HAD. Phelps would not allow her to hire an Assistant or delegate some of her audit administrative duties to any of her Senior Auditors.

In June of 2003 HAD staff consisted of five auditors. James Heist assigned two of HAD limited audit resources to assist Region 7 in conducting an audit of the Office of Federal Housing Oversight, a Headquarters function. The two entities involve in this audit were Fannie Mae and Freddie Mac. I had previously worked for Freddie Mac so I had more knowledge and experience of Freddie's operation than the Auditor in Charge from Region 7. The Managers assigned this Headquarters audit to Region7 in a deliberate attempt to demean, humiliate and to cast doubt on Ms. Elion abilities.

Management monitored staffing levels very closely, so they were fully aware of how the reduction in staff would impact Ms. Elion performance and productivity. Ms. Elion was continually subjected to disparate treatment by Management because she was older, female, African American. Management was trying to reduce her overall productivity, effectiveness, and accomplishments by reducing her staffing resources. I also believe this was in retribution for Ms. Elion's stepping "outside of the box" and not complying with all of management's directives that would have negatively impacted her staff. Management would not have shown such disrespect to a white male manager.

Q19. Was Ms. Elion's race a factor in not being allowed to hire replacement staff?

   See answer to Q 18

Q20. Was her gender a factor?

   See answer to Q 18

Q21. Was her age a factor?
   See answer to Q 18

Q22. Was not being allowed to hire replacement staff an act of reprisal for her filing an EEO complaint?

   See answer to Q 18


Q23. Ms. Elion contends that although the Headquarters Audit Division ranked 4th, she did not receive recognition or any awards or bonuses for accomplishments of the Headquarters Audits Division under her leadership. She further states other managers

Initial _____                                                    Page 1 of 13

received not only recognition but also monetary awards. Was Ms. Elion's race a factor in her not receiving awards and bonuses?

> Yes, I believe race, sex, age and reprisal were factors in Ms. Elion not receiving awards and bonuses from about 2002 to the present. Ms. Elion made Ms. Elion made significant accomplishments, despite Heist's, Phelps and Stephens' (management) deliberate depletion and eroding of HAD staffing resources and constantly undermining her ability and authority in the Capital District and HAD. Ms. Elion, the only female African American Director for OIG, consistently perform audit work at a high level and produced top quality audits which had a significant impact on HUD's operations. Management reluctantly acknowledged the quality and significance of Ms. Elion audit results on a number of her assignments but never included her in monetary awards given to other Directors with Fewer accomplishments.

> In 2003, HAD under Ms. Elion's leadership was ranked number 3 out of the 11 OIG Audit Offices/ Divisions for completing audits reports in the prescribe number of calendar days and 4th overall in achieving performance goals. HUD's Office of Fair Housing and Equal Opportunity invited Ms. Elion to speak twice (2000 and 2002) at their National Training Conference because of the significant impact her audit reports had on their programs. The Secretary of HUD removed the Director of the Office of Healthy Homes and Lead Hazard Control, and the Deputy Assistant Secretary for Office of Public and Indian Housing from their positions and lessened the duties and responsibilities of the Deputy Chief Financial Officer because of the results of audit reports issued by Ms. Elion. The HUD Training Academy review conducted by Ms. Elion resulted in another Director being removed from her position and a referral to investigation. Had Ms. Elion been a white manager she would not only had received monetary awards and bonuses for these efforts but and would have been Audit Manager of the Year. I also believe management was retaliating against Ms. Elion because she constantly produced top quality audit results while stepping "outside of the box" and did not comply with all of managements' directives that would have impacted her staff negatively because of disparate treatment.

Q25. Was her gender a factor?

> See answer to Q24

Q26. Was her age a factor?

> See answer to Q24

Q27. Was Ms. Elion not receiving awards and bonuses an act of reprisal for her filing an EEO complaint?

> See answer to Q24

Initial _____                              Page 10 of 13

Q28. Ms. Elion contends that management directed her to take action against you when she did not consider it appropriate. She contends this incident is a form of retaliation. Was Ms. Elion's race a factor in management directing her to take disciplinary action against you?

Ms. Elion (African American) **was not** directed to take action against me, however, management (Michael Phelps and James Heist) tried to force her to take disciplinary actions against Pamela Collins (white female with 25 years of Federal Service), the Division's Secretary, for leave and alcohol abuse.

Yes, I believe Ms. Elion race was a primary factor in management's directing her to take disciplinary actions against Ms. Collins. Management was aware of Ms. Collins leave problem prior to Ms. Elion accepting employment with HUD's OIG. However, during August 2002, it was widely known that Ms. Collins was having a hard time dealing with the death of her husband and the suicidal death of his twin brother and a fellow co-worker. She was also having problems adjusting to changes in her work environment specifically, moving back to Headquarters.

Ms. Elion had no proof of Heist's allegation that Ms. Collins abused alcohol, so she sought guidance from OIG Human Resources and the Bureau of Public Debt on the best way to deal with this matter. In regards to both matters of abuse alleged by Phelps and Heist, Ms. Elion exercised prudent judgment by counseling Ms. Collins concerning her leave and not discussing the alleged alcohol abuse without substantive proof. Had Ms. Elion acted as directed by management regarding the alleged alcohol abuse, she would have been opening herself and the OIG for a possible discrimination complaint or law suit. Phelps was angry and informed Ms. Elion that she had not acted as he had directed her. Neither Phelps nor Heist would have required a white manager to take disciplinary action against an employee without considering extenuating circumstances and not having substantive proof of the alleged abuse.

Q29. Was her gender a factor?

Yes, I believe gender and age were factors in management's directing Ms. Elion to take disciplinary action against Ms. Collins. Ms. Elion was the only female and African American Director in the Headquarters Office of Audit and older than the other three other Division Directors, who are white males. Phelps and Heist are also white males and belong to the "good old boys club" so they would not have undermined the white male Directors authority when dealing with and making decisions regarding disciplinary actions of their staff. Because Ms. Elion is female and African American, the managers felt that she was suppose to act as directed by her white male management chain without questioning their facts or decisions.

Q30. Was her age a factor?

See answer to Q 29.

Q31. Was management directing Ms. Elion's to take disciplinary action against you an act of reprisal for her filing an EEO complaint?

Yes, I believe management retaliated against Ms. Elion for not following management directive to take disciplinary action against Ms. Collins for alleged alcohol abuse.

Q32. Would like to add anything else regarding this claim?

Yes. Prior to James Heist's and Michael Stephens' disbanding of HAD in April 2004, management was aware that the Director of Technical Oversight and Planning (TOP) Division would be retiring as of December 31, 2004. In August 2004, Heist announced that he was transferring Robert Gwin, a white male who lived in the Washington Metropolitan area before taking the position of Regional Inspector General for Audit in Denver, to replace the retiring TOP Director. Heist did not open this position for competition. Ms. Elion is qualified for this position. She has 37 years of operational and financial auditing experience. She was the Manager of DOD Audit Planning and Technical Support Directorate for two years. She also served as Manager for five years over DOD Financial Statement Audit which included two years over the Consolidated Financial Statement. Heist did not consider restoring Ms. Elion to her supervisory status after arbitrarily disbanding HAD and demoting her from a supervisory position. Management had achieved their goal of eliminating Ms. Elion from a supervisory position, destroying her career and discrediting her reputation and contributions. They were not inclined to restore Ms. Elion to another supervisory position, despite her excellent credentials.

2. Reassignment to non-supervisory position

Q33. Ms. Elion contends that on April 21, 2004, she was reassigned to the position of Special Assistant, Office of Inspector General without supervisory responsibility. Was Ms. Elion's race a factor in her reassignment?

Yes, I believe race, sex, age and reprisal were factors in the arbitrary and malicious demotion and reassignment of Ms. Elion to a previously non-existent position as Special Assistant to James Heist, Assistant Inspector General for Audit. In 1999, Austin Groom, an African American male, was removed from a Headquarters audit mangers position, reassigned as Michael Phelps' Special Assistant and assigned to work on an audit that was supervised by a lower graded auditor. I do not know of a white manager male or female who was stripped of his duties and responsibilities and placed in a non-supervisory position. Ms. Elion is very intelligent, highly motivated and has maintained high level of performance



within the OIG and she is highly regarded by HUD Program Offices and Senior Management Officials as well as in the community. This assignment of Ms. Elion as a non-supervisory Special Assistant is management's deliberate attempt to retaliate against her by destroying her career, discrediting, embarrassing and humiliating her for filing an EEO complaint.

Q34. Was her gender a factor?

See answer to Q 33

Q35. Was her age a factor?

See answer to Q 33

Q36. Was Ms. Elion's reassignment an act of reprisal for her filing an EEO complaint?

See answer to Q 33

Q37. Would like to add anything else regarding this claim?

I have read this statement consisting of  13  pages, and I have made all the necessary changes, additions or corrections and I have signed or initialed every page.

I hereby declare under penalty of perjury that the foregoing statement is true, correct and complete to the best of my knowledge and belief.

Signature: _____

Date: January 24, 2005

Subscribed and sworn to before me this 31 day of January 2005

_____

EEO Investigator, Southwind

Or

_____

Notary Public

My commission expires:_____

Initial _____    Page 13 of 13