# AFFIDAVIT

Location: Washington, DC

I, Janet P. Bonds, solemnly swear to the truth of the following statement which is in response to questions posed by Tondalaya Carroll, Equal Employment Opportunity (EEO) Investigator, Southwind, and provides information pertaining to the formal complaint of discrimination, filed against the U.S. Department of Housing and Urban Development on June 23, 2004, by Saundra Elion, Case No. IG-04-04. The following claims have been accepted for investigation:

*Whether Ms Elion was subjected to discrimination and continuous harassment because of her race (African-American), sex (female), age (56) and in reprisal, when the Deputy Inspector General, Assistant Inspector General for Audit and the Deputy Assistant Inspector General for Audit, Office of Inspector General (OIG), Office of Audit, Washington, DC.*

1. *Subjected her to a hostile work environment since December 2002 through April 2004.*

2. *On April 21, 2004, reassigned her from the position of Director of the Headquarters Audits Division of OIG to a non-supervisory position with significantly less responsibility, career exposure and opportunity for advancement.*

3. *On August 30, 2004, she learned that she was not considered for the position of the Director, GS-15 Supervisory, Technical Oversight and Planning Division, OIG Headquarters*

Q   Please state your full name.

A   Janet P. Bonds

Q   Please state your title and grade.

A   Senior Auditor GS- 511-14

Exhibit F.6

Initials *JPB*

1   Q   Please state the name of the agency for which you work, the organizational
2   unit to which you are assigned, and the address of your duty station.
3   A   Technical Oversight and Planning Division (TOP), Office of Audit, Office of
4   the Inspector General, U.S. Department of Housing and Urban Development, 451
5   Seventh Street, SW, Washington, DC.
6   Q   How long have you held your current position?
7   A   TOP (formerly Planning and Research) since 1998.
8   Q   Please state your race.
9   A   African-American.
10  Q   Please state your gender.
11  A   Female.
12  Q   Please state your age (date of birth).
13  A   August 8, 1949.
14  Q   Have you previously participated in the EEO process?
15  A   Yes.
16  Q   Were you aware Complainant had participated in the EEO process?
17  A   Yes.
18  Q   Please identify your first and second level supervisors by name and title.
19  A   My first-line supervisor is Brenda Patterson, Assistant Director, TOP. My
20  second-line supervisor is Stanly McLeod, Director, TOP.
21  Q   What is your organizational relationship to Complainant?
22  A   Worked under the same organizational umbrella but different offices.

Initials *JPB*

1

**1.   Subjected to hostile work environment from December 2002 to April 2004**

Q    Ms. Elion contends she was subjected to a hostile work environment from December 2002 to April 2004. Did she ever bring to your attention concerns of a hostile work environment? If so, what were her concerns? Were you aware of any actions taken with regards to her concerns?

A    Through my association with Ms. Elion and Donna Hawkins, her former assistant, I was familiar with what was going on between Ms. Elion and management [Michael Phelps, James Heist and Michael Stephens]. I was aware that management, specifically Mr. Phelps, was meeting with Ms. Elion's staff secretly to discuss issues regarding her office. Several members of Ms. Elion's staff were arbitrarily transferred to other offices after complaining to Mr. Phelps. In one incident, a Hispanic male auditor assigned to Ms. Elion's group got into a verbal altercation with Ms. Elion's assistant, Joe Richardson. They were arguing over an assignment. Mr. Martin Irizarry went to Mr. Phelps and complained. As a result, Mr. Irizarry was transferred to the Financial Audit Division. The second incident involved management's decision to transfer an experienced auditor out of Ms. Elion's Division and to replace him with a much less experienced auditor. Specifically, Mr. Phelps reassigned James (Dave) Gleason, a White male with about 30 years' auditing experience and who worked for Ms. Elion since her arrival at HUD-OIG, to the TOP Division. To replace Mr. Gleason, Mr. Phelps assigned Edward Bowles, an African American male, to Ms. Elion's group. The transfer was a

1  problem for Mr. Bowles, a GS-14, because it was involuntary. Mr. Bowles personally
2  told me that he was not in agreement with the transfer and had not conducted
3  audits since he was a GS-12. Mr. Bowles stated that he needed training to be
4  brought up to speed. I believe the transfer was detrimental to Ms. Elion because she
5  had to give up an experienced auditor for one with much less experience. The
6  transfer had a negative impact on her ability to meet her reporting goals. I believe
7  Mr. Bowles was transferred in as a retaliatory move. Mr. Phelps made the decision
8  for the transfer. The transfer took place despite Ms. Elion's objections. Mr. Bowles
9  filed an EEO case as a result of the transfer and an incident that he perceived as a
10 threat against him by Mr. Phelps. Mr. Bowles left HUD OIG shortly after the
11 transfer, resulting in further depletion of Ms. Elion's staff. Another incident
12 involved comments from TOP staff on a survey memorandum report prepared by
13 Ms. Elion's staff. Ms. Hawkins brought to my attention several comments the TOP
14 staff made regarding the survey report that she felt were demeaning to both her and
15 Ms. Elion. The comments gave the impression that Ms. Hawkins and Ms. Elion
16 were not familiar with OIG policy or audit standards. Ms. Hawkins was also upset
17 that Mr. Heist, AIG for Audit, had forwarded the comments to her and Ms. Elion in
18 an email along with a statement that he was in agreement with the comments. After
19 reviewing the comments, I agreed that the comments were negative and demeaning.
20 I have reviewed comments prepared by TOP staff on reports prepared by other
21 regions; therefore, I noticed right away the difference in the tone of the comments.
22 Ms. Hawkins advised me that she discussed how she felt about the comments in a

1  meeting with Mr. McLeod, Director, TOP. She advised me that Mr. McLeod agreed
2  that the comments had a negative tone and apologized to her for the tone.
3  Q     To your knowledge, does the Agency have a policy regarding raising
4  concerns of harassment/hostile work environment?  If so, what is your
5  understanding of that policy?
6  A     The Inspector General (IG) has issued at least two memorandums to staff
7  stating that there is zero tolerance for acts of discrimination in the workplace.
8  Q     To the best of your knowledge, has the policy been communicated to all
9  employees? If yes, how?
10 A     Other than the memos from the IG, I am not aware of any other
11 communication with staff regarding the policy.
12 Q     Ms. Elion contends the reorganization was used as a form of retaliation
13 against her. Do you believe that the reorganization was a form of retaliation against
14 Ms. Elion? Please state specific reasons for your answer.
15 A     Yes, I do. I question Management's hasty decision to reorganize, the fact that
16 it involved **ONLY** Ms. Elion's Division, and the way the reorganization was justified
17 and announced to the affected staff. Ms. Elion was only given only several hours'
18 notice before the reorganization took place. Just before it was announced, Ms.
19 Hawkins filed an EEO complaint against Mr. Phelps. In addition, a staff member
20 (Asian male) threatened to resign. Ms. Elion took the resignation letter to Mr.
21 Phelps to seek his guidance on handling the situation. When Mr. Phelps was first
22 made aware of the resignation, he led Ms. Elion to believe that he did not seem to be



1  interested in whether the individual stayed with the organization or not. However, a
2  few days later Mr. Phelps began to blame Ms. Elion and Ms. Hawkins for the
3  individual's decision to resign. Mr. Phelps brought the resignation to the attention
4  of the Deputy Inspector General of OIG, Mike Stephens. Mr. Stephens and Mr.
5  Phelps decided to give the Asian male a transfer to another group in lieu of his
6  resignation, even though he requested the same transfer previously and was denied.
7  I felt this was the impetus for the reorganization, along with a meeting between Mr.
8  Stephens and Ms. Elion that I learned about though Ms. Hawkins. Mr. Stephens
9  apparently told Ms. Elion that there were a lot of problems in her division. Mr.
10 Stephens indicated that he planned to order an Ombudsman to review personnel
11 issues (dispute resolution) within Ms. Elion's Division before the issues escalated.
12 Ms. Hawkins, concerned about the action, sent an email to Ms. Elion inquiring about
13 the Ombudsman review. Ms. Elion forwarded the email to Mr. Phelps and Mr.
14 Heist to inform them of Ms. Hawkins' concerns. Management became upset by the
15 email and questions and, shortly after, informed Ms. Elion that her division would
16 be disbanded. A poor workload was the reason management cited for the
17 disbandment, according to an April 20, 2004 memorandum signed by Mr. Heist, and
18 approved by Mr. Stephens. I did not accept Mr. Heist's justification as credible.
19 Other fellow employees in OIG share my opinion. The program offices and key
20 officials responsible for administering HUD's $31 billion budget are located at HUD
21 Headquarters. In its Fiscal Year 2004 budget justification, the OIG identified the
22 following Headquarters activities as "some of our more critical audit areas": Strategic

1 Management of Human Capital in HUD's Business Operations, Grants Management,
2 Administration of Low-Income Housing Assistance, and Implementation of Federal
3 Activities Conversion Reform. If the budget justification is accurate, why did Mr.
4 Heist state that HAD's workload had not materialized? In disbanding HAD abruptly
5 for the reasons cited in his memorandum, Mr. Heist needlessly cast doubt on the
6 OIG's credibility because the budget justification indicated that there was more than
7 enough headquarters' oriented work. I continue to believe the OIG managers'
8 decision to reorganize, or abolish, Ms. Elion's Division was very questionable. I
9 think it was done in anger because Ms. Elion questioned their authority.

10

11 I believe race was a factor in the reorganization. Normally, before the OIG makes a
12 drastic move such as a change in organization, there is usually research, analysis,
13 and a great deal of discussion. In this case, none of this was done. Neither Ms. Elion
14 nor Ms. Hawkins was consulted before the managers made the decision to abolish
15 Ms. Elion's office. The managers' handling of the reorganization did not give the
16 perception of a well thought out plan. A few months after the reorganization, Mr.
17 Heist sent a letter to all of the regions regarding cost cutting measures. He asked the
18 regions to determine which sub-offices could be eliminated or combined to save
19 costs. I believe that if management were truly interested in increasing the workload
20 or making other changes in Ms. Elion's Division, the decision to disband should
21 have been handled in this manner. Management gave the other regions an
22 opportunity to defend their reasons for continued operation. In Ms. Elion's situation,

Initials [signature]

1    management never gave her an opportunity to respond. I also believe age may have
2    been a factor because Ms. Elion is eligible for retirement. By disbanding her division
3    and making her a Special Assistant to the AIG for Audit with no supervisory
4    responsibility, management's motive could have been to encourage her to retire.
5    Q    Ms. Elion contends that during the period June 2001 and October 2002, her
6    ability to hire replacement staff was hindered by a reduction in staffing and
7    reassignment of existing staff to 2-month details. Ms. Elion also contends that,
8    during this same period, there was a nationwide recruitment campaign in place.
9    Was Ms. Elion hindered from hiring replacement staff during the period in
10   question? If so, what were the reasons?
11   A. Every year, the OIG conducts a financial audit of HUD that requires
12   reassignment of some personnel from other divisions and regions to assist the
13   Financial Audit division. Mr. Phelps and Mr. Heist arbitrarily pick which divisions
14   and regions would detail staff to assist in conducting the financial audit. For the
15   year in question, I believe several of Ms. Elion's staff were chosen to participant. As
16   a result, there was a reduction in staff and, even with the reduction, Ms. Elion still
17   had to meet her goals. In another incident, when Ms. Elion's assistant retired she
18   was not allowed to replace him. She had to be both the director and the assistant for
19   about a year before management permitted her to hire an assistant. During the same
20   period, other divisions and regions were allowed to hire staff.
21

Initials

1    Q    Ms. Elion contends that although the Headquarters Audit Division ranked
2    4th, she did not receive recognition or any awards or bonuses for the
3    accomplishments of the Headquarters Audits Division under her leadership. She
4    further states other managers received not only recognition but also monetary
5    awards. Was Ms. Elion's race a factor in her not receiving awards and bonuses?
6    A    Yes, I believe race was a factor in Ms. Elion not receiving performance
7    awards and bonuses from about 2002 to the present. During this period, Mr. Phelps
8    and Mr. Heist assumed leadership roles in the organization. As a senior auditor
9    assigned to TOP, I monitored three to four regions during the period Ms. Elion's
10   region existed. Also, during this period, I was asked by Mr. Phelps, through my
11   supervisor, to prepare written justifications for the regional and division directors
12   selected for awards. Therefore, I knew who would receive the awards and who
13   would not. If you look at TOP's 2003 analysis of the performance measurements for
14   the Office of Audit's divisions and regions, Ms. Elion was #3 out of a total of 11
15   regions/divisions in meeting the calendar day goal for completing audit reports;
16   however, she did not receive an award. Another performance measure is the
17   number of staff days used to complete audits and issue reports. Although Ms.
18   Elion's division ranked #4, she did not get an award. I noted that Regional and
19   Divisional managers who used significantly more calendar days and staff days to
20   complete audits than Ms. Elion received awards. Since Ms. Elion consistently
21   performed at a high level, I concluded that she was not given awards because of her
22   age, race, and sex, and for reprisal. During the period covered by the analysis, there

Initials _____

1   was a White female director in Region #4; however, Ms. Elion was the only female

2   and African American manager in Audit's headquarters office. As I indicated in

3   my previous affidavit for Ms. Hawkins' EEO case, I believe that in any organization,

4   other than HUD OIG, Ms. Hawkins and Elion would have been praised and rewarded

5   for their consistently high performance level. Instead, OIG managers have humiliated

6   and disrespected them and attempted to destroy their careers and reputations simply

7   because Ms. Hawkins exercised her right to file an EEO complaint. Ms. Elion

8   respected Ms. Hawkins' right to file; the OIG managers apparently did not. I should

9   note that an EEO complaint is the only effective means for an OIG employee to seek

10  redress when he or she believe they are a victim of discrimination, as OIG employees

11  are prohibited from joining the HUD Employees' Union.

12

13

14  2.    Reassigned to non-supervisory position

15  Q     Ms. Elion contends that on April 21, 2004, she was reassigned to the position

16  of Special Assistant, Office of Inspector General without supervisory responsibility.

17  Was Ms. Elion's race a factor in her reassignment?

18  A     Yes. I am aware that, in 1999, Office of Audit managers removed Austin

19  Groom, an African American male from a management position, reassigned him as

20  a special assistant to Mr. Phelps, and assigned him to an audit in which he was

21  supervised by lower-graded staff. Ms. Elion received somewhat similar treatment as

22  Mr. Groom. In essence, the managers treated the only two African American

Initials *[signature]*

Page 10 of 12

1  managers at Audit's headquarters office in a demeaning manner. I know of no other
2  White male or female manager whose duties and responsibilities have been taken
3  away from him or her, or who was moved to a non-supervisory position. Clearly,
4  Ms. Elion is keenly intelligent, highly motivated, and a proven high performer. If
5  sex wasn't a factor in Ms. Elion's reassignment, then I think race and reprisal is. The
6  circumstances surrounding the abolishment of Ms. Elion's division remain
7  questionable.
8
9  **3. Not considering Ms. Elion for the position of director, TOP.**
10  At the end of December 2003, it was common knowledge among staff that the TOP
11  director was retiring at the end of 2004. Sometime around September 2004, or early
12  October 2004, I started hearing rumors that management had already designated
13  Bob Gwin, the Regional Inspector General for the Denver Region and a white male,
14  as the replacement. This meant management had no intentions of competing the
15  job. In late October, early November and mid-December, Mr. Gwin made trips to
16  Headquarters to sit in on meetings and learn the ropes of the division. Management
17  used the same process when another TOP manager, Dave Derrecola, retired. In
18  January 2004, Roger Niesen became his replacement. Mr. Nieson, a white male,
19  previously held the position of Regional Inspector General for the Kansas City
20  Region.
21
22  I have nothing more to add to my statement.
23

Initials

1

2   I have read this statement consisting of /2 pages, and I have made all the

3   necessary changes, additions or corrections, and I have signed or initialed every

4   page.

5   I hereby declare under penalty of perjury that the foregoing statement is true,

6   correct, and complete to the best of my knowledge and belief.

7   Signature: *Janet P. Bond*

8   Date: 12/13/04

9   Subscribed and sworn to before me this 21st day of December 2004.

10  *Tindya O Canatt*

11  EEO Investigator, Southwind

12  Or

13  _____

14  Notary Public

15  My commission expires: _____

16

Initials *JPB*