Page 1

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLUMBIA

- - - - - - - - - - - - - - -X

SAUNDRA G. ELION,                    :

             Plaintiff          :

        v.                       : Case No. 05-0992(PLF)

                                 :

ALPHONSO R. JACKSON,                 :

             Defendant          :

- - - - - - - - - - - - - - -X

DEPOSITION OF JAMES HEIST

Washington, D.C.

Monday, July 31, 2006

Deposition of JAMES HEIST, called for

examination at 9:45 a.m., at the law offices of Robert

C. Seldon & Associates, P.C., 1319 F Street, N.W., Suite

305, Washington, D.C., before Gary S. Howard, a notary

public in and for the District of Columbia, when were

present on behalf of the respective parties:

1            P-R-O-C-E-E-D-I-N-G-S

2    Whereupon,

3                    JAMES HEIST

4    was called as a witness and, having been first duly

5    sworn, was examined and testified as follows:

6                    DIRECT EXAMINATION

7            BY MR. SELDON:

8        Q    Mr. Heist, good morning.

9        A    Good morning.

10       Q    My name is Bob Seldon. I am the attorney

11   representing Saundra Elion in this case.

12            Would you please for the record give us

13   your full name and the present place where you

14   work?

15       A    My name is James Alan Heist. I work in

16   Washington, D.C., HUD office of inspector general.

17       Q    And what's your position there?

18       A    I am the assistant inspector general for

19   audit.

20       Q    Okay. Mr. Heist, let me tell you, this

21   case may go to trial. If it does, we might need to

22   subpoena you for trial.

1      Q     Are there criminal sanctions that can

2   result from an audit by the office of audit?

3      A     Well, not directly. If, during the course

4   of an audit, something potentially criminal is

5   uncovered, our internal operating procedures

6   require that that matter be turned over to our

7   office of investigations, who has the law

8   enforcement authority and the authority to

9   investigate criminal matters.

10           The auditors may or may not provide

11   support to the office of investigation. But the

12   criminal case itself would be under the

13   responsibility of the office of investigation.

14      Q     Okay. I think you said, as assistant

15   inspector general for audit, you were responsible

16   for managing the regional and field offices, as

17   well as the headquarters divisions in the office of

18   audit.

19           Is that right?

20      A     Yes.

21      Q     Okay. Are those individuals -- let me ask

22   you this.

9a8ddda2-25f7-11db-b7ae-0003b3005cf9

1           The regional offices of audit, what is

2      the title of the person who heads those up?

3           A      Regional inspector general for audit.

4           Q      And an individual who heads up an audit

5      division in headquarters that reports to you, is

6      there also a title that they have?

7           A      Division director. Director of X-

8      division, director of Y-division.

9           Q      And are these individuals all at grade

10     15?

11          A      Yes.

12          Q      And in your organizational chart or in

13     terms of your managerial hierarchy, are they all at

14     the same level?

15          A      Yes.

16          Q      Is there anyone else in your organization

17     who is at that same level as these eight -- and I

18     realize that the number of regional offices changes

19     a bit periodically -- but eight regional directors

20     and three division directors?

21          A      Could you clarify what you mean by level?

22          Q      I mean with not only the same grade, but

1    the same level of responsibility and authority.

2        A    If you say level, grade level and level

3    of authority and responsibility, those are our

4    operating components.

5        Q    Okay. All right.

6        A    Yes.

7        Q    You said that you were responsible for

8    managing those regions and divisions.  And you've

9    given us the subject matter.

10        What I'd like to ask you to turn your

11    attention to is what do you mean by managing?  And

12    by this, I'd like to turn your attention to budget

13    or staffing, that sort of thing, and ask you to

14    focus on the duties and responsibilities that you

15    personally discharge over those entities.

16        A    Well, personally, I am mostly involved in

17    overseeing the audits and how the audits themselves

18    are carried out, as opposed to the administrative

19    operations, by and large, under the responsibility

20    of my deputy.

21        Q    Okay. And until recently, I take it --

22        A    That's not exclusive.

1    Q    Okay.

2    A    But I do remember the issues.

3    Q    Okay.

4    A    Generally.

5    Q    And if we look at the informal complaint

6    counseling summary, one of the issues, I believe,

7    was abolishing the capital district office.

8         Right?

9         MR. TRUONG:  Where are you reading that,

10   Bob?

11        MR. SELDON:  Go to the informal, and go

12   about -- it should be somewhere like around there

13   (indicating).

14        THE WITNESS:  Sure.

15        MR. SELDON:  Okay.

16        BY MR. SELDON:

17   Q    Do you recall that as an issue that Mr.

18   Elion raised in the EEO complaint process?

19   A    Yes, generally.

20   Q    Okay. What I'd like to do now is ask you,

21   is there a standard operating procedure as far as

22   you know it, that the office of inspector general

1    follows when it receives a request for alternative

2    dispute resolution, or a memorandum concerning

3    alternative dispute resolution like Heist Exhibit

4    1?

5        A    Those generally get funnelled to Mr.

6    Stephens.

7        Q    Okay. And then --

8        A    Then --

9        Q    I'm sorry -- then, if anything?

10       A    Well, depending on what Mr. Stephens

11   concludes as to whether or not ADR will be useful,

12   ultimately, he makes the call as to whether or not

13   we would participate in ADR.

14       Q    Okay.  And do you recall --

15       A    I mean, he would ask for my input.

16       Q    Okay.

17       A    We would discuss it.

18       Q    And that's the basic standard practice?

19       A    (Nods in the affirmative.)

20       Q    You need to say yes or no.

21       A    Yes.

22       Q    Okay. So now what I'll ask you is, do you

Page 55

1    I have no recollection of any process that ensued

2    after that.

3         Q      Neither do I.

4         A      As far as --

5         Q      I was just checking with you. In this

6    meeting, was anyone else a participant?

7         A      Michael Phelps.

8         Q      Anyone else?

9         A      Saundra Elion.

10        Q      Anyone else?

11        A      And me.

12        Q      Okay. And to your recollection, was there

13   another meeting?  And I'm not saying there is.

14               Was there another meeting that you

15   participated in as part of this process which began

16   with this first meeting?

17        A      No meeting that I recall, no.

18        Q      Okay. I don't, either. I just wanted to

19   make sure.

20               Do you recall one way or another whether

21   Ms. Elion was represented by counsel when she was

22   participating in the first EEO process?

9a8ddda2-25f7-11db-b7ae-0003b3005cf9

Page 56

1    A    She was not.

2    Q    You recall that she was not.

3    A    Correct.

4    Q    Do you believe that to have been true at
5    all times?

6    A    At that meeting?

7    Q    Yes.

8    A    Yes.

9    Q    Oh, sorry. There was not an attorney
10   present with Ms. Elion at the meeting, I take it.

11   A    Correct.

12   Q    And why was that, if you know?

13   A    It was my understanding that that was
14   what had been proposed by Mr. Stephens.

15   Q    Okay.

16   A    And agreed to by Ms. Elion.

17   Q    And then previously in the EEO process,
18   do you recall one way or another whether Ms. Elion
19   had an attorney?

20   A    At the time, I had no knowledge one way
21   or another.

22   Q    Okay. That's fair enough.  Do you recall

9a8ddda2-25f7-11db-b7ae-0003b3005cf9

Page 60

1    her mission.

2         Q    Okay.

3         A    I do recall having conversations about

4    that with her.

5              I don't know the timing because they

6    weren't structured, formal meetings.

7         Q    Okay.

8         A    And there was other interaction I know

9    concerning the bullet there, producing more timely

10   products.

11             I know that that issue had been

12   communicated in her performance appraisals.

13        Q    Okay.

14        A    But I don't recall a specific meeting

15   convened to go over this list of things, if that's

16   what you're asking.

17        Q    Yes. That was it exactly. Okay. So now we

18   go back to the complaints process, the first

19   complaint.

20             And I'm not saying that that document,

21   Heist Exhibit 2, was involved in that. But I think

22   we did agree, one of the issues that Ms. Elion

9a8ddda2-25f7-11db-b7ae-0003b3005cf9

1    raised was the abolition of the capital district

2    office which she previously headed.

3            Right?

4    A     Correct.

5    Q     And in responses to discovery -- and

6    again, I'm just going to make this real clear --

7    I'm here to summarize it for you to speed it up.

8    People often expand on discovery responses in

9    depositions and it's not the end of the world.

10           But as I've read it so far, the decision

11   to abolish the capital district was a decision made

12   by you and the previous inspector general, Mr.

13   Williams.

14   A     The acting inspector general, Mr.

15   Williams.

16   Q     Is that right?

17   A     Yes.

18   Q     Okay. And can you briefly summarize for

19   us what your reasons were for doing that?

20   A     Right. Actually, there were a few

21   reasons.

22   Q     Why don't you list them for us first?

Page 62

1        A        Okay.

2                MR. TRUONG:  Before you answer --

3        objection. Relevance.

4                MR. SELDON:  Well, once again, John, if

5        you want to stipulate that Ms. Elion's earlier

6        complaint had a reasonable basis, we can go beyond

7        this. But if not, I have to explore it with him.

8                Which way do you want to do it?

9                (Pause.)

10               BY MR. SELDON:

11       Q        Let's go ahead, Mr. Heist. List the

12       reasons for us, please.

13       A        Okay. Bear with me. This will take some

14       time to describe.

15       Q        Right.

16       A        It was my determination based on the

17       sorts of assignments that -- well, let me --

18       forgive me. I'm trying to figure the best way to

19       construct the list, and maybe to help lay a little

20       bit of foundation.

21               HUD, as far as I can remember, had, and

22       has, ten regional offices. Now, if we can agree

Page 63

1    that, substantively, from my perspective, they were

2    always regional offices, there were times when they

3    went by different names.

4              There was a period of time when HUD

5    didn't use the term, region.

6         Q    Right.

7         A    But essentially, in my way of thinking,

8    they were ten regions.

9         Q    And one of them had been the capital

10   district.

11             Is that the idea?

12        A    No.

13        Q    Okay.

14        A    No. That's getting to my point.

15        Q    Okay.

16        A    HUD OIG -- and again, much of this

17   predates my assumption of the position of the

18   assistant inspector general for audit.

19             And I can't recall exactly when, but a

20   previous administration had made a decision to

21   establish a capital district office.

22        Q    Right.

1      A      Now, it was called a capital district. In

2  essence, it was, as far as alignment was concerned,

3  organizationally concerned, was equivalent to an

4  OIG regional office.

5      Q      Okay.

6      A      As far as there was an assistant

7  inspector general for audit, there was a special

8  agent in charge on the investigative side.

9      Q      Okay.

10      A      That decision predates Sandy's assumption

11  of that position.

12      Q      Correct. And is my assumption also

13  correct that at the time the consideration was

14  given to abolishing the capital district office,

15  that that area or region had now become part of

16  Philadelphia?

17      A      Which is where -- that's correct. But

18  HUD's regional office that encompassed the

19  geographic territory of the capital, of the OIG

20  capital district office had never changed.

21      Q      Okay.

22      A      HUD's regional office had throughout this

Page 65

1    entire time period been headquartered in

2    Philadelphia and included the Washington, D.C.

3    metropolitan area.

4         Q    Correct.

5         A    HUD maintains and, as far as I remember,

6    had always maintained, a field office in

7    Washington, D.C. that reported to Philadelphia.

8         Q    Okay.

9         A    The organizational alignment of OIG did

10   not align with HUD's organizational structure,

11   meaning that we did not -- we had a region within

12   an area that HUD did not have a region.

13        Q    Okay.

14        A    At that time, the office of investigation

15   had decided to abolish, disband, whatever you want

16   to call it, their capital district office.

17             And they put that under the jurisdiction

18   of their mid-Atlantic -- their office in

19   Philadelphia.

20        Q    And is that Region 3?

21        A    That's Region 3.

22        Q    And is Philadelphia --

Page 66

1       A       I think some of those -- I'm sorry?

2       Q       Was Philadelphia the headquarters of

3  Region 3?

4       A       Yes.

5       Q       Okay.

6       A       The workload of the office of audit as it

7  related to the capital district was different, in

8  my judgment, in one key way, in that, because of

9  the proximity and because the headquarters audit,

10  the capital district office, was located in

11  Washington, D.C., that office did a number of

12  assignments at HUD headquarters.

13           And a number of those assignments were

14  what I would term, reactive in nature, where,

15  because of something that came up, a complaint, a

16  request, the capital district office was given the

17  assignment to do those sorts of activities, mostly

18  because of the proximity to headquarters.

19       Q       Okay.  Well, let me go back to the

20  alignment thing for a minute, if we could.

21           Is it your testimony, then, that one of

22  the reasons to abolish the capital district office,

1    which was one of the subjects of Ms. Elion's first

2    complaint, was to align responsibility for the

3    Washington, D.C. area with the way main HUD had the

4    main HUD's regions as well?

5         A    That's correct.

6         Q    Okay. And is that basically -- I'm sorry.

7

8              And that was the way, when you abolished

9    the capital district office, that was then the way,

10   in other words, aligning with main HUD, that the

11   regional offices of inspector general were

12   organized as well.

13        A    Correct.

14        Q    Okay. And then the regional audit offices

15   were in the headquarters in the field regions.

16             Right?

17        A    I'm sorry?  Say that again.

18        Q    The regional offices of audit were also

19   headquartered where the regional offices were

20   headquartered.

21             Right?

22        A    At that time, yes.

Page 68

1        Q      And then, afterward, did you move -- were

2   you responsible for moving the HUD audit function,

3   the headquarters of the HUD audit function in

4   Region 9, from San Francisco to Los Angeles?

5        A      Yes.

6        Q      And isn't it true that at the time you

7   did that, that San Francisco was the headquarters

8   of Region 9?

9        A      Yes.

10       Q      And who was responsible for that?

11       A      Who was responsible for?

12       Q      For moving the headquarters of the audit

13  function in Region 9 from San Francisco to Los

14  Angeles?

15       A      It was a recommendation that I made.

16       Q      To whom?

17       A      Now --

18              (Pause.)

19              I can't -- I know we put a paper together

20  that described the basis for that. And we did not

21  re-align the regional structure --

22       Q      Of course not.

1    A    -- of Region 9. We simply moved the

2  headquarters from San Francisco to Los Angeles.

3    Q    The headquarters of the inspector general

4  function?  The audit function?  Or the full HUD

5  function?

6    A    The headquarters -- that decision, as far

7  as I was concerned, the scope of that was moving

8  the headquarters of the audit function from San

9  Francisco to Los Angeles.

10    Q    Okay.  Was one of the reasons to abolish

11  the capital district when Ms. Elion was in charge

12  of it, also to save money on rent of office space?

13    A    That was one of my arguments for doing

14  that.

15    Q    Right.

16    A    Now, the extent to which those rent

17  savings can be achieved, and the timing of those,

18  is contingent upon a number of factors that I don't

19  have control over.

20    Q    Like relinquishing the lease, I assume.

21    A    Right.

22    Q    Did that happen --

9a8ddda2-25f7-11db-b7ae-0003b3005cf9

Page 70

1        A       And --

2        Q       I'm sorry.

3                MR. TRUONG:  Just let the Witness finish

4        the answer.

5                MR. SELDON:  I will.

6                THE WITNESS:  And the ability to

7        consolidate space.

8                The office space was shared by the office

9        of investigation and the office of audit. The

10       investigation office had already decided to move

11       the administration of their responsibilities to

12       Philadelphia.

13               BY MR. SELDON:

14       Q       So then they weren't taking more space in

15       the former capital district, the office of

16       investigation, I take it.

17       A       They weren't taking more space?

18       Q       In other words --

19       A       I really don't know.

20       Q       Okay. What about --

21       A       Well --

22       Q       I'm going to ask the question now. What

9a8ddda2-25f7-11db-b7ae-0003b3005cf9

Page 71

1    about relinquishing the lease that the capital

2    district had had for its auditors?

3            Was that, to your knowledge, the lease

4    relinquished, or in some way given back to the

5    landlord?

6        A    To my knowledge, it was released. I don't

7    know exactly when.

8        Q    Well, do you recall, was it released in

9    the same year that the capital district was

10   abolished?

11       A    I don't know.

12       Q    How about the next year?  Do you recall

13   either way?

14       A    I --

15           MR. TRUONG:  Objection. Asked and

16   answered.

17           BY MR. SELDON:

18       Q    Do you recall either way?

19       A    No.

20       Q    And then, do you recall in the year that

21   the capital district was abolished, whether the HUD

22   investigative office, the HUD office of

1    investigations, moved into any of the space that

2    had been relinquished by the auditors in the

3    capital district?

4        A    I don't recall or would I have any

5    knowledge of when and to what extent they moved

6    into that space.

7        Q    Okay.

8        MR. SELDON:  John, I'll ask you this.

9    We're going to go to another subject area.

10       Would you like to take a break?

11       MR. TRUONG:  Yes. Why don't we do that?

12       THE WITNESS:  You wanted a list of

13   reasons.

14       MR. SELDON:  Sure.

15       THE WITNESS:  Can we --

16       MR. TRUONG:  Yes, to complete the record.

17       MR. SELDON:  Might as well.

18       THE WITNESS:  Well, I think I had touched

19   on the nature of the workload, as I saw it, of the

20   capital district, was, to a great extent, work that

21   was done in headquarters.

22       MR. SELDON:  Okay.

9a8ddda2-25f7-11db-b7ae-0003b3005cf9

Page 75

1    division to primarily be was a special projects

2    unit that would be available, would be a resource

3    to perform audit work based on requests.

4              MR. SELDON:  Okay.

5              BY MR. SELDON:

6        Q    When the decision was made to abolish the

7    capital district, were there any regional inspector

8    generals for audit who were African-American?

9        A    At the time, yes.  Al Malloy.

10       Q    Okay. Anyone else?

11       A    No.

12       Q    Any who were black women?

13       A    No.

14       Q    Any who were women?

15       A    Mimi Lee was the -- let me make sure I

16   have my timeframes straightened out.

17              (Pause.)

18              Well, Mimi Lee was Asian-American.

19       Q    Correct.

20       A    Or is Asian-American.

21       Q    And at the time, she was a regional

22   inspector general for audit.

9a8ddda2-25f7-11db-b7ae-0003b3005cf9

1        A      Right.   And subsequent to that, Joan

2   Hobbs is the current regional inspector general for

3   audit of Region 9.

4              MR. JOHNSON:   I believe also one of those

5   managers --

6              THE WITNESS:   I was getting to that. And

7   Nancy Cooper.

8              MR. SELDON:   Okay.

9              THE WITNESS:   I was trying to remember

10  the dates and trying to relate it to that

11  timeframe.

12             MR. SELDON:   Okay.

13             THE WITNESS:   But, yes, Nancy Cooper in

14  Region 4.

15             MR. SELDON:   And then we'll finish this

16  up.

17             BY MR. SELDON:

18       Q      Did you have any reason to doubt Ms.

19  Elion's sincerity in bringing her first EEO

20  complaint?

21             MR. TRUONG:   Objection. Foundation.

22             MR. SELDON:   I said, did he have any

9a8ddda2-25f7-11db-b7ae-0003b3005cf9

1    reason to doubt her sincerity?

2              THE WITNESS:  No.

3              MR. SELDON:  Okay. Let's take that break

4    now.

5              MR. TRUONG:  Okay.

6              THE COURT REPORTER:  We're off the

7    record.

8              (Recess.)

9              THE COURT REPORTER:  We're back on the

10   record.

11             MR. SELDON:  Let's change gears. I think

12   what I'm going to do, just so you know, because

13   it's short, is just go through the second complaint

14   process, and then we'll get into the immediate

15   thing.

16             It's a little out of order, though.

17             (Pause.)

18             BY MR. SELDON:

19   Q    Mr. Heist, I take it you know that Ms.

20   Elion for a second time utilized the EEO complaints

21   process.

22   A    Yes.

1      A      Had what?  The two assignments?

2      Q      That they only had two assignments.

3      A      I don't know.

4      Q      What steps, if any, had you taken prior

5    to proposing the abolishing of the headquarters

6    audit division to see that they had more ongoing

7    assignments?

8      A      I don't recall.

9      Q      That's one of those answers you need to

10   clarify.

11           You mean to say that you don't recall

12   any?  Is that correct?

13     A      I don't recall there being any additional

14   assignments beyond those two.

15     Q      Okay. And I guess I was saying, do you

16   recall any efforts that you took that the

17   headquarters audit division would have more than

18   those two ongoing assignments before you proposed

19   their abolishment?

20           MR. TRUONG:  Objection. Foundation.  Go

21   ahead and answer the question.

22           THE WITNESS:  I don't remember how I came

9a8ddda2-25f7-11db-b7ae-0003b3005cf9

Page 116

1       A       No.

2       Q       Okay. So how did that relate, then?

3       A       Only from the standpoint that it caused

4    the supervisor-to-staff ratio to be impacted.

5       Q       Okay. And were there any other reasons

6    not expressed in your memorandum of April 20th,

7    2004, Heist Exhibit 7, that contributed to your

8    decision to realign the office of audit and abolish

9    the headquarters audit division?

10      A       Not that I recall.

11      Q       Okay. So take us forward again in the

12   process.

13              The memo goes up to Mr. Stephens' office,

14   I take it. Is that right or wrong, do you recall?

15              (Pause.)

16              Let's put it this way. You then signed

17   the memo on or around April 20th, 2004, I take it.

18   Front page.

19      A       Right.

20      Q       Right?  And then, in the process, what do

21   you recall happening next?

22      A       Mr. Stephens approved it.

9a8ddda2-25f7-11db-b7ae-0003b3005cf9

1    Q    Do you recall that you took or arranged

2    the memo to be taken to Mr. Stephens' office?

3    A    No, I don't remember if I handed it to

4    him directly.

5    Q    Okay.  Do you recall one way or another

6    if you had any oral communication with Mr. Stephens

7    --

8    A    I mean, we had discussed some of these

9    same, the issues that are in the memo, ahead of

10   time with Mr. Stephens.

11   Q    Okay.

12   A    So he was generally aware that this was

13   coming.

14   Q    I'm just trying to find out the best you

15   know, the process of his approval.

16        MR. TRUONG:  Can you clarify that?  What

17   do you mean by that?

18        MR. SELDON:  Sure. There could have been

19   another meeting on this. There could have been --

20   they could have just come back signed.

21        THE WITNESS:  We had conversations going

22   over these very points before I even signed the

9a8ddda2-25f7-11db-b7ae-0003b3005cf9

1    memo.

2          BY MR. SELDON:

3      Q    Right. But I'm saying -- we're now going

4    forward.

5          Once you signed it.

6      A    Once he signed it?

7      Q    Once you signed the memo and sent it up

8    to Mr. Stephens for his approval.

9      A    Right.

10     Q    Did you also speak with him about it or

11   was there anything --

12     A    I don't recall. I do know that there were

13   conversations before I sent the memo up, after I

14   had signed it.

15     Q    Okay.  That's perfectly fair. That's

16   perfectly fair.

17         Let me just stick this one that we had

18   mismarked back where it belongs.

19         (Pause.)

20         MR. SELDON:  I'm going to ask to be

21   marked as Heist Exhibit 10 -- that's what we're up

22   to?

9a8ddda2-25f7-11db-b7ae-0003b3005cf9

Page 119

1              THE COURT REPORTER:  Yes. Ten.

2                   (The document referred to

3                     was marked for identification

4                     as Deposition Exhibit No. 10.)

5              BY MR. SELDON:

6         Q    I'm going to ask you, do you recognize

7    this document, and starting with the top part?

8              Do you recognize this format as an e-mail

9    to you?

10        A    Yes.

11        Q    Dated on or about April 18th, 2004.

12        A    It's February 18th.

13        Q    So you are watching.  With a copy to Mr.

14   Phelps?

15        A    And Stan McLeod and William Nixon.

16        Q    And to you three gentlemen in your

17   capacities with the HUD office of inspector

18   general, I take it.

19        A    Yes.

20        Q    And the gentleman who sent it is Mr.

21   Michael Beard, who at that time was the regional

22   inspector general for audit for Region 6, I

9a8ddda2-25f7-11db-b7ae-0003b3005cf9

1    believe.

2         A     Yes.

3         Q     And he sent you a proposal for an audit,

4    I take it of Tulane contracts with HUD.

5         A     That's what this e-mail says.

6         Q     This is the format you recognize, is it

7    not?

8         A     I recognize it as what it says.

9         Q     Do you recognize the format?

10             MR. TRUONG:  Are you asking about the

11    format of the e-mail?

12             MR. SELDON:  To and from.

13             MR. TRUONG:  Well, why don't we stipulate

14    to the fact that it says to Mr. Heist and cc:

15    Michael Phelps, McLeod --

16             MR. SELDON:  I'm asking him if he

17    recognizes it.

18             MR. TRUONG:  That he actually sees this

19    format right in front of him?

20             MR. SELDON:  Does he know this format?

21             MR. TRUONG:  The format of the e-mail?

22    The physical -- the to line and the cc: line and

Page 121

1    everything?

2            MR. SELDON:  Precisely.  Let me ask

3    him. Have you seen this format before, Mr. Heist?

4            THE WITNESS:  Yes. It looks like our e-

5    mails.

6            MR. SELDON:  Okay.

7            BY MR. SELDON:

8        Q    So we're talking here about an audit of

9    Tulane contracts with HUD in HANO.

10           Do you know what that is?

11       A    It's a proposed approach for an audit.

12       Q    When it says Tulane, what does that mean?

13       A    It's my recollection that that was one

14   area that Mr. Beard and his staff were looking at

15   in some work they were doing, some audit work that

16   they were doing at HANO.

17       Q    Okay. And what's that?

18       A    Housing Authority of New Orleans.

19       Q    Okay. Do you know one way or another

20   whether this proposed audit was ever assigned to

21   the headquarters audit division?

22       A    It's my recollection that it wasn't done

9a8ddda2-25f7-11db-b7ae-0003b3005cf9

1    at all.

2        Q     Can you tell us, was there a reason for

3    that?

4        A     I don't recall the specifics.

5        Q     Do you have any recollection of

6    discussing this proposed audit with Mr. Phelps?

7        A     Not with Mr. Phelps.

8        Q     Mr. McLeod?

9              (Pause.)

10       A     It's possible, but I don't recall the

11   specifics.

12       Q     Mr. Beard?

13       A     I had either discussed it with Mr. Beard

14   or Mr. Nixon. I recall some conversations.

15       Q     And do you recall the substance of those

16   conversations?

17       A     I recall there being some conversations.

18   What I recall is that, for various reasons, I

19   decided not to do the work, not to do the audit.

20       Q     Okay. Was that because it wasn't

21   important?

22       A     I don't recall the specific reason.

9a8ddda2-25f7-11db-b7ae-0003b3005cf9

Page 123

1          Q      Okay. Let me ask you to look at a

2      document we'll mark as -- are we up to 11?

3                  THE COURT REPORTER:  This is 11.

4                      (The document referred to

5                       was marked for identification

6                       as Deposition Exhibit No. 11.)

7                  MR. TRUONG:  Before we go on to Exhibit

8      11, Mr. Seldon, I was noting that the fax date on

9      top of document Exhibit No. 10, dated July 27,

10     2006, are there additional documents that you may

11     have that we don't have, that you haven't produced

12     in response to our document request?

13                 MR. SELDON:  I've certainly answered your

14     document request fully, if that's the question.

15                 MR. TRUONG:  So I'm just saying, I'm

16     asking you under Rule 26, you have a continuing

17     obligation to produce documents.

18                 MR. SELDON:  Of any documents that I

19     would use to --

20                 MR. TRUONG:  Not would use, but

21     responsive to our document request.

22                 MR. SELDON:  On that one.

9a8ddda2-25f7-11db-b7ae-0003b3005cf9

1        MR. TRUONG:  Yes.

2        MR. SELDON:  I don't know of any.

3        MR. TRUONG:  Okay.

4        MR. SELDON:  But I do intend to go

5    through other documents. And it's also clear that

6    things come out in discovery, especially when

7    impeachment information is needed.

8        MR. TRUONG:  I just want to make sure

9    that we have all your --

10        MR. SELDON:  Well, why didn't you give

11    that to me.

12        MR. TRUONG:  I'm sorry?

13        MR. SELDON:  Why didn't you give that to

14    me?

15        MR. TRUONG:  I don't know that it was

16    called for.

17        MR. SELDON:  It was.

18        BY MR. SELDON:

19    Q    Now, let's talk about Heist Exhibit 11.

20    What's this?

21        (Pause.)

22    A    It's an e-mail that Michael Phelps sent,

1    it looks like to the regs, about rankings for FY

2    '04?

3         Q     And was that part of his job, to prepare

4    rankings?

5         A     That was something he did. He did

6    that -- part of his responsibility was to do the

7    ratings for the regs and this was something that he

8    had put together as part of that.

9         Q     Okay. So now let's look at the actual

10   ratings, which are the second page of Heist Exhibit

11   11, I believe.

12            (Pause.)

13            Are these the rankings?

14        A     This is a ranking that Mr. Phelps

15   prepared.

16        Q     Okay. That's what the second page is?

17        A     Yes.

18        Q     Okay. Now I think we can understand, this

19   goes by regions or divisions. And I think we know

20   that the numerical ones are the region numbers.

21            Is that right?

22            MR. TRUONG:  Are you talking about the

Page 126

1    mes send at nef send si quarter?

2            MR. SELDON:  Under A. Not all the way to

3    the left, under column A.

4            THE WITNESS:  Right. Correct.

5            BY MR. SELDON:

6    Q      And what is GAA?

7    A      That's the organization code for the

8    information systems audit division.

9    Q      GAH?

10   A      That was, at the time, the organizational

11   code for the headquarters audit division.

12   Q      And GAF?

13   A      That was the organizational code for the

14   financial audits division.

15   Q      Where is technical oversight and planning

16   included in here, if anywhere?

17   A      They're not.

18   Q      And is that because they're not at the

19   division level, or what?

20   A      They're not what I would call an

21   operating division.

22   Q      Okay.

9a8ddda2-25f7-11db-b7ae-0003b3005cf9

1    A    They don't generate audit reports.

2    Q    Okay. Got it.

3         MR. SELDON:  Please mark this as the next

4    exhibit.

5         THE COURT REPORTER:  This will be 12.

6              (The document referred to

7               was marked for identification

8               as Deposition Exhibit No. 12.)

9         BY MR. SELDON:

10   Q    Can you identify this document?

11        (Pause.)

12   A    It's an e-mail from Mike Phelps, it

13   appears, to the regs.

14   Q    Okay. And this is dated March 15th, 2002.

15        Right?

16   A    Correct.

17   Q    And it says, subject, staffing. Right?

18   A    Correct.

19   Q    And it contains a discussion of being

20   below ceiling, I guess.

21   A    Correct.

22   Q    This is what Mr. Phelps, part of his job

1    Region 6 or something?

2         A     Yes.

3         Q     Okay.

4         A     There's a separate office.

5         Q     Is there a head of that office, from the

6    audit perspective?

7         A     Yes.

8         Q     What is the title of that person?

9         A     Director.

10        Q     Are there any other supervisors, audit

11   supervisors, in that office?

12        A     No.

13        Q     How many staff auditors are in that

14   office?

15        A     Currently, there's four.

16        Q     Has that always been true?

17        A     Yes.

18        Q     Okay. I think we know that Ms. Elion was

19   given -- would you call it a directed reassignment?

20   Is that fair?  Or is that not a term you would use,

21   when the headquarters audit division was abolished?

22        A     A reassignment, a directed reassignment.

9a8ddda2-25f7-11db-b7ae-0003b3005cf9

1    Q    Okay. Since you have been assistant

2    inspector general for audit, have there been any

3    other headquarters division directors who were

4    given directed reassignments?

5    A    Headquarters division directors who were

6    given directed reassignments?

7    Q    Other than Ms. Elion.

8        (Pause.)

9    A    No, not that I can recall.

10    Q    What about in that same period of time,

11    have there been regional assistant inspector

12    generals for audit who have been given directed

13    reassignments?

14    A    Yes.

15    Q    Who would that be?

16    A    Roger Neason.

17    Q    Okay. Let's go down the list first, and

18    then I'll ask the question.

19    A    Robert Gwin.

20    Q    Right.

21    A    Just a point of clarification. When you

22    say, directed reassignment, you're not restricting

9a8ddda2-25f7-11db-b7ae-0003b3005cf9

1    that to reassignments that involve the change in

2    geographic duty station?

3         Q     I guess what I'm talking about, people

4    who are taken out of jobs -- assistant regional

5    inspector generals for audit who are taken out of

6    such jobs without their concurrence or over their

7    objection.

8         A     Well, when you say, over their objection,

9    neither of -- none of these -- if you're talking

10   about a change from one position to another one, a

11   third would be Mimi Lee.

12        Q     Okay.

13        A     But that was not under their objection.

14   They didn't object to the reassignment.

15        Q     Okay. And this is good information. But

16   when we take a written transcript and we say, they,

17   or a third, it's unclear.

18             So what I'm going to do is I'm going to

19   give you the question again, and then I'll let you

20   clarify this so that there's no misunderstanding.

21             In the period in which you have been

22   assistant inspector general for audit, have there

Page 144

1    been regional inspector generals for audit who have

2    been reassigned out of such positions involuntarily

3    by direction of management and/or over their

4    objection?

5         A    And/or over their objection?

6         Q    Yes.

7         A    Mimi Lee.

8         Q    Okay.

9         A    Was directed.

10        Q    So that's one.

11        A    I don't recall her objecting.

12        Q    Okay. Michael Beard, I take it, is one?

13        A    Yes.

14        Q    Okay. So Mimi Lee and Michael Beard. Is

15   that the list we should we working with?

16        A    Well, I guess we've excluded Robert Gwin

17   and Roger Neason.

18             I was just thinking reassignments in

19   general.

20        Q    Yes.

21        A    I apologize.

22        Q    That's okay. That's why I said, we went

9a8ddda2-25f7-11db-b7ae-0003b3005cf9

Page 145

1    back to clarify it.

2         A    Michael Beard had a directed

3    reassignment.

4         Q    Okay.

5         A    When you say, object, what does that

6    entail?

7         Q    I suppose it could be anyone who filed a

8    grievance, anyone who filed an EEO complaint, or

9    someone who took some other sort of action.

10            MR. TRUONG:  So, as a consequence of the

11   reassignment, they filed something, or when the

12   decision was being made?

13            MR. SELDON:  Either one.

14            THE WITNESS:  Well, both Mimi Lee and

15   Michael Beard accepted the directed reassignment.

16            BY MR. SELDON:

17        Q    Right. Rather than be fired, basically,

18   or retired, I take it.

19            MR. TRUONG:  Objection. Foundation.

20            BY MR. SELDON:

21        Q    Is that right or wrong?

22        A    Well, there were consequences that could

9a8ddda2-25f7-11db-b7ae-0003b3005cf9

Page 146

1    have been taken had they not accepted the

2    reassignment.

3        Q    In those two circumstances.

4        A    Correct.

5        Q    Okay. So Beard, I take it, we know,

6    before his reassignment, had engaged in some sort

7    of EEO activity?

8        A    Yes.

9        Q    And Mimi Lee, I think, had not.

10       A    Correct.

11       Q    And when Mimi Lee was given a directed

12   reassignment, did that happen as a consequence of

13   the movement of the Region 9 location for the

14   office of audit?

15           MR. TRUONG:  Objection. Foundation.

16           MR. SELDON:  He did it. I think he knows.

17

18           BY MR. SELDON:

19       Q    Go ahead.

20       A    My recollection was we created a

21   temporary position deputy, RIGA, and transferred

22   her to that position.

1      Q    Okay. So this is more complicated than I

2   thought. So we need to go back.

3         Before this reassignment, what was Ms.

4   Lee's position?

5      A    The was the regional inspector general

6   for audit.

7      Q    In Region 9?

8      A    In Region 9.

9      Q    And stationed, where?

10     A    In San Francisco.

11     Q    Okay. And then you said that you created

12   another position for her?

13     A    We moved the headquarters of the regional

14   office for Region 9 from San Francisco to Los

15   Angeles.

16     Q    Correct.

17     A    As a consequence of that, her position

18   would move -- she would be expected to move along

19   with the position.

20     Q    From San Francisco to Los Angeles.

21     A    Correct.

22     Q    Okay.

9a8ddda2-25f7-11db-b7ae-0003b3005cf9

Page 148

1    A    Subsequent to that, she didn't -- it's my

2  understanding that she did not want to relocate

3  from San Francisco, and subsequently agreed to a

4  position as deputy rig.

5        That was a temporary position.

6    Q    That was also in San Francisco. Is that

7  the case?

8    A    Yes.

9    Q    And when you say temporary, how long did

10 it last?

11   A    I don't recall the dates.

12   Q    Okay. I guess temporary, not a permanent

13 position.

14   A    Correct.

15   Q    Okay. So I take it that we know that Ms.

16 Elion had named you or identified you as a

17 responsible management official in her original EEO

18 complaint -- if you know.

19   A    Correct.

20   Q    And had Mr. Beard?

21        MR. TRUONG:  Objection. Foundation.

22        BY MR. SELDON:

9a8ddda2-25f7-11db-b7ae-0003b3005cf9

FROM : VICTOR H. ELION              FAX NO. : 703 7196619              Jul. 27 2006 04:01PM P2

| | | |
|---|---|---|
| **D Beard/FTW/HUDOIG**<br>Sent by: D Beard<br><br>02/18/2004 02:07 PM | To<br>cc<br><br>bcc<br>Subject | James Heist/WHQ/HUDOIG@HUDOIG<br>Michael Phelps/WHQ/HUDOIG@HUDOIG, Stanley<br>McLeod/WHQ/HUDOIG@HUDOIG, William<br>Nixon/FTW/HUDOIG@HUDOIG<br><br>Tulane Audit |

Below is Mr. Nixon's proposed approach for an audit of the Tulane contracts with HUD & HANO. (You asked that we send this sometime ago.)

The most important thing to note is he believes this is better done in DC.

Mike

----- Forwarded by D Beard/FTW/HUDOIG on 02/18/04 12:54 PM -----



| **William Nixon**<br>02/10/04 09:23 AM | To:  dbeard@hudoig.gov@HUDOIG<br>cc:<br>Subject:  Tulane Audit |
|---|---|

Mr. Beard,

Here is an audit approach for Tulane.

The audit objective will be to determine if Tulane performed in compliance with its agreements with HUD and HANO during the period 2000 through the present. The compliance will include both eligibility of expenditures and eligibility of activities. We would use data-mining where appropriate, but it will be typical audit procedures of going through invoices and deliverables. I just narrowed the scope to 2000 because of the difficulty getting information and overwhelming the people performing the audit. We could go back to February 1996 if we desire - this would add about 500 hours for each year.

At this point, I would not pursue the amount HANO paid. HANO is settling with Tulane on many of the payments using our Moten costs to negotiate. I had told HANO officials that our recommendations were closed (based upon Mr. Liu's request) and they should get the best deal, but they should include a statement in the agreement that it would not preclude fraud. I think it will be tough to get payment back on the HANO part - which leaves



DEPOSITION
EXHIBIT
#10
Heist   1/2/06

HUD. But, we would still need to look and review the payments to determine duplication of expenditures, efforts, etc. I have included some information on the HANO payments below.

I don't know all the specifics about HUD payments but do know it was a poor procurement as reported in our 1996 report. Best we can determine, HUD has given Tulane a $12 million grant over the 7/8 years. I have included "reports" that we obtained about the Campus of Affiliates.

[attachment "Tulane CAP.pdf" deleted by D Beard/FTW/HUDOIG]

I am unaware of the reviews or what HUD requires. Unfortunately, most of the money maybe gone. It was a bad procurement and we pointed out.

I would recommend that HQ auditors perform the audit. Most of the decision makers and information is in HQ. I would be willing to provide background information and other guidance as needed. Also, I do not have the staff to undertake - I have lost 2 people and have another on part-time over the last year and half. This effort with two people would take:

60 days to plan - includes setting up AA, audit program, initial contacts, notification letters, reviewing reports, understanding the procurement, etc.

50 days of on-site planning - Initial entrance conference(s) - locating and evaluating files and records - initial assessment of controls (possibility of fraud), determination of use of CAATTs, revising and finalizing the procedures and audit program.

40-120 days per a year to review invoices, deliverables, payments, discuss with officials, evaluate controls, determinations of fraud indicators - make appropriate referrals, locate and interview participants and providers, etc.

Let me know if you need additional information.

WWN.