**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| SAUNDRA ELION, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 05-0992 (PLF) |
| | ) | |
| ALPHONSO R. JACKSON, | ) | |
| Secretary of the | ) | |
| U.S. Dept. of Housing and | ) | |
| Urban Development, | ) | |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |

**DEFENDANT'S REPLY IN SUPPORT OF
MOTION FOR SUMMARY JUDGMENT**

**I.      INTRODUCTION**

Plaintiff's Opposition attempts to cloud the water with irrelevant arguments, conclusory

statements of alleged discrimination and retaliation, and mischaracterizations of the record.  The

only issue in this case is: Whether Defendant discriminated or retaliated against Plaintiff when

Defendant transferred three auditors to the Financial Audits Division to meet work load needs –

leaving Plaintiff's Division with only herself and her assistant – and, as a result, Defendant

disbanded Plaintiff's Division (the Headquarters Audits Division ("HAD")).  In short, the

dissolution of the HAD led to Plaintiff's reassignment to a non-supervisory position.

Therefore, stripped away Plaintiff's rhetoric and innuendo, the undisputed facts show that

Plaintiff cannot establish her prima facie case of discrimination based on her race, gender, or age

because she cannot point to a similarly situated employee – outside of the protected group – who

received better treatment.  Furthermore, Plaintiff cannot establish the causal element of her

prima facie case of retaliation because there was a 16-month gap between Plaintiff's initial EEO

complaint (December 18, 2002) and the alleged discriminatory conduct (the disbandment of the

HAD on April 20, 2004).[1]

Assuming *arguendo* that Plaintiff could establish her prima facie case of discrimination

and retaliation, Defendant had legitimate, non-discriminatory and non-retaliatory reasons for

disbanding the HAD, which resulted in Plaintiff's reassignment to a non-supervisory position.

As explained in Defendant's Motion and elaborated below, HAD had five employees, including

Plaintiff, her assistant, and three auditors.  Due to workload needs and a hiring freeze, Defendant

transferred the three auditors to the Financial Audits Division to meet an accelerated deadline for

submitting the agency's  financial audit to the Office of Management and Budget ("OMB").  As

a result, there were only two employees left at the HAD – Plaintiff and her assistant (Ms. Donna

Hawkins).  Another division, the Technical Oversight and Planning Division ("TOP"), also

needed additional staff.  To meet that need, Defendant transferred Ms. Hawkins to the TOP.  In

the end, it made business sense to disband the HAD and reassign Plaintiff because she was the

only employee left in the HAD.  Plaintiff's new position did not affect her grade, salary or

benefits.  Under these undisputed facts, the Court should grant Defendant's Motion for Summary

Judgment and dismiss the Amended Complaint with prejudice.

**II.    ARGUMENT**.

---

[1]    It appears that the parties' opening briefs miscalculated the temporal gap between
Plaintiff's initial EEO complaint and the alleged retaliatory act. Defendant's Motion for
Summary Judgment miscalculated the gap as a "14-month gap."  Def. Mot. at 17-18.  Plaintiff
appears to calculate it as a 13-month gap.  See Opp. at 29.  In fact, it is actually a 16-month gap.

**A.     ADR Issue**

Plaintiff devotes much ink to the alternative dispute resolution ("ADR") process at the administrative level.  This is nothing but a tempest in a teapot.  Specifically, Plaintiff maintains that Mr. Michael Stephens interfered with the agency's ADR process by insisting that he would only engage in mediation with her, but only if she attended without counsel.  See Opp. at 9, 14, and 28; see also A.C. at ¶ 3, 4, 5, 23-26.  This argument is a red herring and unsupported by Plaintiff's own documents.  In fact, her own attorney, Mr. Robert Seldon, agreed to allow Plaintiff to meet with Mr. Stephens without his (Seldon's) presence.  See Gov. Exh. B.

Plaintiff requested to engage in ADR to resolve her first administrative discrimination complaint (filed in December 2002).  ADR is a formal process within the Department's Equal Employment Opportunity Process, in which a neutral mediator and counsel represent the parties in a formal mediation.  See Dkt. Nos. 37-26 to 37-28.[2]

On January 17, 2003, Mr. Stephens and Plaintiff had an informal meeting to attempt to resolve Plaintiff's December 2002 EEO claims, outside the agency's ADR process.  Matthews Depo. at p. 27:13-22, 31-32.  Prior to the meeting, Plaintiff asked Ms. Agnes Matthews, the Agency Equal Employment Manager, to attend the meeting to support her.  Matthews Depo. 28:1-7, 39:3-7; 40:13-22.

---

[2]     Plaintiff failed to label her exhibits.  For the Court's convenience, Defendant shall refer to Plaintiff's exhibits by citing the ECF docket number.  For instance, Plaintiff's Opposition is assigned as Docket No. 37 on the Docket Report and therefore, docket number "37-26" refers to the twenty-sixth document attached to Plaintiff's Opposition.  Although Plaintiff's declaration assigns each exhibit with an "Attachment" number, it is neither useful or convenient to rely on the designation.  For instance, according to Plaintiff's declaration, docket number "37-26" is "Attachment 10."  See Pl. Decl. at ¶46(j).  However, Plaintiff fails to mark that exhibit with the designated "Attachment 10."  For the sake of consistency, Defendant will reference the ECF numbering.

Furthermore, prior to the meeting, Plaintiff also consulted with her attorney, Mr. Robert Seldon, who *affirmatively* agreed to allow Plaintiff to meet with Mr. Stephens informally. Gov. Exh. B (Jan. 16, 2003 Letter from Seldon to Matthews). Mr. Seldon's January 16th letter specifically stated, "Ms. Elion has decided to accept the agency's offer that she and Mr. Stephens meet privately, one-on-one, **before the upcoming mediation session**." Gov. Exh. B (emphasis added). This letter clearly demonstrates that Plaintiff and her counsel understood that the meeting was outside the agency's formal ADR process. Plaintiff and Mr. Stephens then met on January 17, 2003.

Thereafter, Plaintiff and Mr. Stephens had a second informal meeting on January 30, 2003, which included her first and second line supervisors, Messrs. James Phelps and Michael Heist, respectively. A.C. at ¶ 26. The January 30th meeting was not intended to be a mediation session, (Matthews Depo. p. 62) but an attempt by management to establish better relations with Plaintiff to address her concerns. Stephens Depo. 92-96; Def. Mot. at 4. Subsequent to the meeting, in March 2003, Plaintiff withdrew her December 2002 administrative complaint stating that, "The issues have been resolved to my satisfaction at this time." <u>See</u> March 20, 2003 Memo (Gov. Exh. C).

There is no evidence that Plaintiff or her counsel, Mr. Seldon, objected to these two informal meetings in January 2003, or considered them to be an interference with Plaintiff's right to the agency's formal ADR process. Had Plaintiff or her counsel believed that these informal meetings interfered with the formal ADR process, they could have objected. But they did not and in fact Plaintiff agreed (with counsel's full knowledge) to meet with Mr. Stephens without the presence of counsel. <u>See</u> Gov. Exh. B.

Under these facts, Plaintiff cannot now claim that Mr. Stephens somehow would not meet with her to informally resolve her claims unless it was done outside of her counsel's presence.

In short, it is a gross misrepresentation of the facts for Plaintiff to argue that she considered Mr. Stephens's request for informal meetings to be an interference with the agency's ADR process and a denial of her civil rights. Finally, the ADR issue is not relevant to Plaintiff's underlying claims here. In fact, Plaintiff neither claims that her rights under Title VII or the ADEA were violated nor seeks redress under those statutes pertaining to the ADR issue. Plaintiff appears to raise this issue to distract the Court from her meritless claims.

**B.    Plaintiff's Discrimination Claims Are Legally and Factually Infirm.**

**1.    Plaintiff Has Not Made a Prima Facie Case For Her Race, Sex, and Age Discrimination Claims (Counts II, III, IV).**

As explained in Defendant's Motion, a plaintiff makes out a prima facie case of disparate-treatment discrimination by establishing that: (1) she is a member of a protected class; (2) she suffered an adverse employment action; and (3) the unfavorable action gives rise to an inference of discrimination. George v. Leavitt, 407 F.3d 405, 412 (D.C. Cir. 2005). Although it is not the only way, one way a plaintiff can satisfy the third prong of this test is by demonstrating that she was treated differently from similarly-situated employees who are not part of the protected class. Id.; Def. Mot. at 8-10.

Here, Plaintiff has not pointed to an alleged comparator, outside the protected group, whom Defendant treated differently. Plaintiff conclusorily and broadly states that she was "treated differently from similarly situated Division Directors and Regional Audit Oficials." See Opp. at 23, 33. Plaintiff, however, specifies neither the division nor the director. Furthermore, Plaintiff also fails to identify any particular region or its official. More importantly, she fails to

explain how she was similarly situated to these unidentified "Division Directors" or "Regional Audit Officials."

Without evidence of a comparator, Plaintiff attempts to homogenize the Office of Audits by claiming that all of the positions within the Office of Audits are, *inter alia*, functionally equivalent. See Opp. at 7. This is an inaccurate description of the Office of Audits. Based on this inaccurate description, Plaintiff appears to compare herself to a "white male" division director located in HUD Headquarters. See Opp. at 23. Plaintiff, however, fails to identify this particular "white male" and how his duties and position were similarly situated to Plaintiff. "[I]n this Circuit, the showing of similarity is demanding. She must show a near identity of circumstances between her situation and that of the person to whom she compares herself." Coles v. Perry, 271 F. Supp. 2d 157, 163 (D.D.C. 2003) (citing Neuren v. Adduci, Mastriani, Meeks & Schill, 43 F.3d 1507, 1514 (D.C. Cir. 1995)). Without pointing to any evidence in the record, as Plaintiff must do in a summary judgment context, she has not shown that she was similarly situated to an employee outside her protected class but was treated differently.[3]

---

[3]    Based on Plaintiff's conclusory description of this unidentified "white male" who heads a division "located in HUD Headquarters," (see Opp. at 23), Defendant *surmises* that she was referring to the Director of the Information Systems Audit Division (ISAD). Even assuming that she was referring to the Director of ISAD, Plaintiff was not similarly situated to this employee.

The ISAD Director in 2004 was a Caucasian male, but he is not a proper comparator. The functions and characteristics of the HAD (Plaintiff's former division) and the ISAD are vastly different. The ISAD's focus is solely on the information systems of the Department, which has a large number of propriety software programs, and requires auditors with expertise in computer software programs. Heist Decl. at ¶ 7 (Reply Gov. Exh.A). The Directors and many of their auditors are certified information systems auditors. Id. Plaintiff is not a certified information systems auditor. Id. The ISAD also generally ranged in size from 17 to 20 auditors, while the HAD had 2 supervisors and 3 staff auditors in April 2004. The ISAD audit of the Department's information systems is required to complete the Department's annual financial

**2.    Defendant Had Legitimate, Non-Discriminatory Reasons for Disbanding the HAD and Reassigning Plaintiff.**

Even assuming that Plaintiff could establish her prima facie case of discrimination, as explained in Defendant's Motion,  Defendant had legitimate, non-discriminatory reasons for disbanding the HAD.  Def. Mot. at 12-15.  Plaintiff attempts to challenge Defendant's reasons for disbanding the HAD by raising eight red-herring arguments.  See Opp. at 11-15.  Each is discussed herein.

**a.    Alleged Discriminatory and Retaliatory Treatment of Plaintiff's Predecessors and Misuse of Reassignment.**

Plaintiff points to three other individuals who were involuntarily reassigned from their positions and claims that their reassignments somehow constituted discrimination and retaliation against her.  See Opp. at 11-12, 24.  Plaintiff's argument is untenable for three reasons.

First, it appears that Plaintiff attempts to argue a "pattern or practice" of discrimination or retaliation.  This argument is legally infirm.  This is an individual disparate treatment case, which focuses on alleged discriminatory acts against a single individual.  See, eg., Taylor v. District of Columbia, 205 F.R.D. 43, 46 n.3 (D.D.C. 2002).  Plaintiff has not made a "pattern or practice" claim here.  Even assuming that Plaintiff has made such a claim, her claim fails

_____

statement audit.  Id.  The ISAD also does the statutorily required annual Federal Information Security Management Act audit.  It is currently headed by an Asian female.  Heist Decl. at ¶7 .

Under these facts, the ISAD and the HAD were not "functionally equivalent," as Plaintiff maintains.  Rather, these two offices performed markedly different functions.  Accordingly, under the law, Plaintiff was not similarly situated to the "white male" director of ISAD.  See Neuren v. Adducci, Mastriani, Meeks & Schill, 43 F.3d 1507, 1514 (D.C. Cir. 1995) (noting that to be similarly situated, a plaintiff must show "that all relevant aspects of her employment situation were 'nearly identical'" to those outside the protected class).

because she has not provided any statistical evidence to show that discriminatory or retaliatory practices were Defendant's "standard operating procedures."  Id. at 46.  Without more, Plaintiff cannot rely on the treatment of some other employees as evidence of discrimination or retaliation against her.

Second, pointing to Defendant's treatment of other employees is not relevant to the underlying issue in this case – that is whether Defendant discriminated or retaliated against her when it reassigned three auditors to meet workload needs and thereby led to the dissolution of the HAD.  Furthermore, Plaintiff's factual iteration is anachronistic.  For instance, citing Mr. Austin Groom's deposition, Plaintiff insinuates that Defendant involuntarily reassigned him due to his EEO activity.  See Opp. at 11, 27.  This is inaccurate.  Mr. Phelps reassigned Mr. Groom to become his Special Assistant in 1999 *two years prior* to Mr. Groom's EEO complaint, filed in May 2001.  Phelps Decl. at ¶ 6.  Therefore, Mr. Groom's reassignment is not evidence of retaliation.

Plaintiff also points to Mr. Michael Beard's reassignment.  See Opp. at 11.  Mr. Beard's reassignment took place in January 2005, almost thirteen months *after* the disbanding of the HAD that led to Plaintiff's reassignment.  Heist Decl. at ¶ 10 (Reply Gov. Exh.A).  Furthermore, Mr. Beard's previous EEO activity took place in 2002, three years prior to his reassignment in 2005, thus dispelling any inference of retaliation.  Id.  Plaintiff finally points to Mr. Daniel Salas and his reassignment.  See Opp. at 12.  This example also does not support Plaintiff's case.  Specifically, neither Messers. Phelps nor Heist (Plaintiff's former first and second line supervisors) played a role in Mr. Salas's reassignment.  Heist Decl. at ¶ 11.  In fact, Plaintiff even concedes that the Inspector General himself reassigned Mr. Salas.  See Opp. at 12.

8

Furthermore, Mr. Salas was a Senior Executive Service ("SES") employee in the Office of

Investigation.  Heist Decl. at ¶ 11.  Unlike Mr. Salas, Plaintiff's HAD was in the Office of Audit

and she was a GS-15 employee at the time.  Id.  In short, evidence of Defendant's treatment of

other employees does nothing to suggest pretext in Defendant's reasons for disbanding the HAD

that led to the Plaintiff's reassignment.

### b.    Comparative Performance of the HAD.

Plaintiff asserts that the HAD was ranked third in FY 2004 when it was disbanded while

other divisions with lower rankings were not affected by the reorganization.  See Opp. at 12, 35,

37.  Plaintiff's argument misses the point for two reasons.

First, the dissolution of the HAD was not part of an agency-wide reorganization where

other divisions were also affected.  As explained in Defendant's Motion, the dissolution of the

HAD was a collateral result of the reassignment of three auditors from the HAD to the Financial

Audit Division to help meet the November 15 audit deadline.  Def. Mot. at 13-15.  After the

transfer of the three auditors, the HAD was left with two employees – Plaintiff and her assistant

(Donna Hawkins).  Because the TOP needed additional staff, Mr. Heist reassigned Ms. Hawkins

to that division.  See Apr. 20, 2004 Memo (Gov. Exh. F).  With that reassignment, it made no

sense to keep the HAD with only Plaintiff.  As a consequence, Mr. Heist proposed disbanding

the HAD and Mr. Stephens approved that decision.

Second, the HAD's ranking is a red-herring.   Indeed, neither the HAD's ranking nor any

other division's ranking  was a factor in Mr. Heist's decision to transfer the three auditors, which

eventually led to the disbandment of the HAD.  See Apr. 20. 2004 Memo (Gov. Exh. F).  The

HAD was not disbanded due to performance issues, rather it was disbanded as a result of

resource allocations made to meet agency needs in a situation where the agency was under a

hiring freeze  Thus, the HAD's ranking was irrelevant. Furthermore, it is misleading for Plaintiff

to argue that her organization – the HAD – was ranked third in FY 2004.  See Opp. at 12.  In

fact, at the time of the HAD's dissolution, it was ranked tenth out of thirteen offices.  Phelps

Decl. at ¶ 2 (Exh. 1) (Reply Gov. Exh. B).[4]

        **c.**        **Comparative Treatment of Plaintiff and Another Supervisory Auditor**

Plaintiff argues that her current position is superfluous and that Defendant should have

conducted a reduction-in-force ("RIF").  See Opp. at 13.  She further maintains that had

Defendant conducted a RIF, she would have been entitled to displace a more junior supervisory

auditor.  Id.  As an initial matter, Defendant was not required to conduct a RIF and neither

Plaintiff nor the Court should "second-guess an employer's personnel decision."  Marshall v.

Federal Express Corp., 130 F.3d 1095, 1100 (D.C. Cir. 1997) (citing Fischbach v. District of

Columbia Dep't of Corrections, 86 F.3d 1180, 1183 (D.C. Cir. 1996)).

Furthermore, Plaintiff's argument is just that – an argument, and not a statement of fact

that refutes Defendant's reasons.  In fact, Plaintiff's argument merely debates the proper course

of action taken by the agency when confronted with a projected $6.5 million shortfall in the

operating budget.  See Stephens Apr. 7, 2004 E-mail (noting that the projected budget deficit for

2005 was over $6.5 million) (Gov. Exh. D).  In that same e-mail, Mr. Stephens indicated that the

---

       [4]        "Exhibit 1" to the Phelps Declaration is a spreadsheet showing the rankings of all thirteen offices in March 2004.  Plelps Decl. at ¶ 11.  On the spreadsheet, the HAD is identified as "GAH" and it was assigned a "4" .  Phelps Decl. at ¶ 11 (Exh. 1 – far hand right column).  The office with the highest number is considered the most successful office.  Therefore, in Phelps's Exhibit 1, Region 8 had a "10" and therefore, was the highest ranking office.  Id.  The HAD had a "4" and thus ranked tenth out of thirteen offices.

agency would impose a hiring freeze to avoid the possibility of a RIF.  <u>Id</u>.

### d.      Deviation From Agency Standard Business Practice.

Citing the record out of context, Plaintiff asserts that neither Mr. Phelps nor Mr. Heist consulted with the agency's servicing personnel offices, although it was a standard operating procedure in reorganizations.  <u>See</u> Opp. at 13-14, 25.  The record and deposition testimony show otherwise.

Specifically, in his April 20, 2004 Memorandum, Mr. Heist stated that he consulted with the Human Resources Division to ensure the realignment could be accomplished without adversely affecting any employee's grade or benefits.  <u>See</u> Gov. Exh. F at p. 2.  Mr. Heist also testified in his deposition that "we had to involve HR and BPD to the extent of identifying position descriptions and those logistical issues that we had to resolve before we could implement this.  That was something Mike Phelps would have handled in his role . . . in carrying out the administrative responsibilities of the office."  Heist Depo. 99:7-16 (Reply Gov. Exh. C). Mr. Phelps also testified that his standard practice was to consult with HR in carrying out a reorganization.  Phelps Depo. at 45:13-14 (Reply Gov. Exh. D).  Plaintiff, however, ignored these two witnesses' deposition testimony in arguing that Defendant deviated from its standard business practice.  Plaintiff is simply wrong.

### e.      Unique Composition of the HAD.

Plaintiff  argues that the HAD was composed of only African American employees and its dissolution somehow constituted discrimination against her.  <u>See</u> Opp. at 14.  This assertion is legally untenable.

The number of minorities in an organization says nothing about why decisions are made. Antonio v. The Sygma Network, Inc., 458 F.3d 1177, 1184 (10th Cir. 2006). "Employment statistics have little bearing on the specific intentions of the employer in making a particular decision . . . and will rarely suffice to rebut an employer's legitimate, nondiscriminatory reasons for a particular adverse employment action." Id. (internal marks omitted).

In this case, it was happenstance that on April 21, 2004, everyone assigned to the HAD was African American. Just two weeks earlier, an Asian male, Edward Kim left the HAD, due to harassment from Ms. Hawkins (Plaintiff's assistant). Phelps Depo. at p. 98-101 (Reply Gov. Exh.D). Plaintiff merely insinuates discrimination but has not offered any evidence to make the connection between the composition of the HAD and the decision to realign the auditors in the HAD to meet workload needs.[5]

### f.     Defendant's Refusal to Honor Plaintiff's ADR Request.

The ADR issue has been addressed above. See Section II(A), *supra*. In the end, Plaintiff has not shown the relevance of the ADR issue to the dissolution of the HAD for business reasons.

---

[5]     In any event, Mr. Heist has elevated African Americans into senior management positions in the Office of Audit and the Office of Audit has regularly recruited black auditors. Mr. Heist selected an African American female for a GS-15 supervisory position in the Technical Oversight and Planning Division (TOP) in October 2004, and promoted her to be the Director of TOP on January 8, 2006. Heist Decl. at ¶9 (Reply Gov. Exh. A). Additionally, Mr. Heist recently selected an African American to head the Financial Audit Division, meaning that minorities now fill all the division director positions in the Office of Audit. Id. Plaintiff conveniently ignores all of these facts.

**g.      Defendant's Alleged Harassment Before Disbanding the HAD.**

Plaintiff argues that, immediately prior to the disbandment of the HAD, Mr. Stephens harassed her in April 2004 when he questioned her about Ms. Donna Hawkins' management style because he received complaints about her (Hawkins) management style.  See Opp. at 14-15. Mischaracterizing Mr. Phelps's deposition testimony, Plaintiff maintains that Mr. Stephens "was quite visibly upset" when Ms. Elion denied that Ms. Hawkins was having difficulty managing her staff.  See Opp. at 15.

In fact, when considered in full context, Mr. Phelps testified that Mr. Stephens was upset because of the possibility that OIG had "managers that are treating employees in such a way that they would resign their job as the only way out."  Phelps Depo. at 107:17-22 and 108:1-22. Shortly before Mr. Stephens's meeting with Plaintiff about her assistant, Mr. Edward Kim (another employee under Ms. Hawkins's supervision) resigned because of the way he (Mr. Kim) "was being treated by Ms. Hawkins and Ms. Elion."  Phelps Depo. at 99:2-16 (Reply Gov. Exh. D).

In any event, Mr. Stephens's reaction does not show any animus towards the Plaintiff's race, sex, age, or the EEO process.  It merely shows that Mr. Stephens was rightly concerned about an organization where an employee was so desperate to escape a manager he had to resign. Id.  Without more, Plaintiff has not established a nexus between Mr. Stephens's reaction at that meeting to Mr. Heist's decision to reassign the three auditors and to disband the HAD.

**h.      Misalignment of HUD Offices and Regions.**

Finally, Plaintiff attempts to "second-guess" the agency's management decision by arguing that the disbanding of the HAD marked the first time in 33 years that the Office of Audit

did not align with HUD's program and Headquarters activities.  <u>See</u> Opp. at 15.  Plaintiff is wrong.

The April 20th Memorandum disbanding the HAD explained that the staff within the HAD was being realigned "to best address our mission workload and our current and anticipated budget constraints."  Gov. Exh. F.  Mr. Heist explained in the Memorandum that, "We are currently under a hiring freeze so I cannot hire more staff in the Financial Audits Division or the Technical Oversight and Planning Division to address staffing needs."  <u>Id</u>.  He pointed out that it was necessary to reassign the staff within HAD to meet staffing needs.  These are reasonable objective reasons to disband the HAD and to "align" the offices to meet Defendant's programtic needs – to help the Financial Audit Division meet its November 15 deadline.

**3.    Defendant's Proffered Reasons Are Not Pretext.**

Plaintiff attempts to challenge Defendant's proffered reasons as pretextual with four arguments: (1) the TOP did not need additional staffing; (2) the Financial Audits Division did not have a continuous financial audit process; (3) supervisor to staff ratio was not a factor in the decision to disband the HAD; and (4) there was sufficient work for the HAD to occupy fourteen auditors and, therefore, it should not have been disbanded.  <u>See</u> Opp. at 15-18.  Plaintiff fails to point to any document in the record to support each of these four reasons.  Rather, Plaintiff's Opposition merely relies upon her own self-serving, vague and conclusory declaration.  Each of these reasons is discussed below.

**a.    Technical Oversight and Planning Division (TOP)**

One of the reasons cited in Mr. Heist's April 20th Memorandum for disbanding the HAD was the need to reassign Ms. Hawkins to the TOP to address its tremendous workload.  <u>See</u> Apr.

14

20, 2004 Memorandum (Gov. Exh. F). Plaintiff, however, disputes this reason arguing that the

TOP's workload had not changed in years. See Opp. at 16.[6] This argument misses the point.

Mr. Heist's reassignment of Ms. Hawkins to the TOP was to address the personnel

shortage in that division while the agency was under hiring freeze. Plaintiff's Opposition even

admits that the TOP was never fully staffed. See Opp. at 15. The stress from personnel shortage

clearly meant that the current workload became more onerous for the TOP because it was short

staffed. In fact, the staffing report between April 2004 and October 2004 shows that the Office

of Audit lost seventeen auditors. Phelps Decl. at ¶ 4 (Exh. 2 to Phelps Decl). But, it could only

hire three people from outside the organization during this period. Id. Two were assigned to the

TOP and the division had "to obtain permission from the front office for these hires due to the

hiring freeze." Id. . In short, Mr. Heist had a legitimate reason to reassign Ms. Hawkins

(Assistant Director of the HAD) to the TOP to address workload needs and a staffing shortage.

### b.    Financial Audits Division

One of the primary reasons cited by Mr. Heist for transferring the three auditors from the

HAD to the Financial Audits Division was to help that division with its November 15, 2004

deadline. See Gov. Exh. F; see also Def. Mot. at 12-15. Mr. Heist also stated that the work was

"a continuous financial audit process." Id. (Gov. Exh. F). Plaintiff, however, disputes there was

a continuous financial audit process and argues that the schedule remained unchanged after

2004. See Opp. at 17, 38, 39.

---

[6]    Citing to the deposition of Stanley McLeod, Plaintiff argues that the workload of
the TOP had not changed in years. See Opp. at 16. The fact that the workload had not changed
does not mean that the workload is not "tremendous" given the fact the TOP was constantly
understaffed. See Apr. 20. 2004 Memorandum (explaining that the "workload is tremendous and
it is difficult for the current staff to keep up in a timely manner.").

As an initial matter, Plaintiff admits that in 2004 the agency's annual financial audit was due to OMB on November 15 ( 45 days after the close of the fiscal year), earlier than previous years . See Plaintiff's SOF # BB, CC; Beard Decl. at ¶ 31 (attached to Plaintiff's Opp.). FY 2004 audit was the first year for the accelerated due date. See Beard Decl. at ¶ 31. Plaintiff also concedes that in previous years and including 2004, to meet its audit deadlines, the Financial Audit Division relied upon auditors detailed from other regions around the country. See Beard Decl. at ¶ 31.

For subsequent years after 2004, the Financial Audits Division was required to submit its audited financial statement of the agency to the OMB by November 15 – 45 days after the fiscal year that ends on September 30. See Dkt. No. 37-20 (at p. 2). Therefore, Plaintiff is incorrect to the extent she argues that the "schedule remain unchanged" from previous years because 2004 was the only year with a November 15 deadline. See Opp. at 16. Specifically, on December 21, 2004, the OMB issued Circular A-136 requiring all executive agencies to submit its audited financial statements "no later than 45 days after the end of the fiscal year." See Circular A-136, at ¶ 4(c) (Dkt. No. 37-20). The OMB also indicated that "[t]he Circular makes this 45-day deadline a **permanent annual requirement for all executive agencies regardless of fiscal year**." Id. (emphasis added). As a result, work on the financial audit had to occur earlier in the year in order to be complete 45 days after the close of the fiscal year. Beard Decl. at ¶ 31.

Under Circular A-136, Mr. Heist was correct in explaining that this new deadline forced the Financial Audits Division to have "a continuous financial audit process." More importantly, given the hiring freeze in place in April 2004, Mr. Heist could not hire additional auditors to help the Financial Audits Division meet the new deadline. Therefore, he decided to transfer the three

16

HAD auditors to the Financial Audits Division to help meet the deadline for 2004 and in subsequent years.

### c.     Supervisor to Staff Ratio.

Mr. Heist's April 20th Memorandum did not rely upon the "supervisor to staff ratio" as a factor in disbanding the HAD.  Plaintiff, however, manufactures this argument out of whole cloth.  See Opp. at 17, 39.  Plaintiff cites Defendant's Motion out of context and mischaracterizes Defendant's assertion to argue that "defendant's motion for summary judgment cited 'the ratio between managers and staff' as a reason for disbanding the [HAD]."  Id. at 17 (citing Def. Mot. at 5).

> In actuality, Defendant's Motion states:
>
> In April 2004, there were only 5 employees in the HAD.  Heist Depo. at
> 114:1-115:14.  These five employees included Plaintiff (a GS-15 Director), Ms.
> Donna Hawkins (a GS-14 Assistant Director), and three staff auditors.  Id.
> Shortly before Mr. Heist made the proposed transfer, another staff at the HAD
> resigned and, therefore, **impacted the ratio between managers and staff.**  Heist
> 115: 6-116:4.  On April 20, 2004, Mr. Heist recommended that the HAD be
> disbanded.  See Apr. 20, 2004 Memo (Gov. Exh. F).  He explained that the
> disbanding of the HAD made business sense because of workload and resource
> issues.  See Apr. 20, 2004 Memo.

Def. Mot. at 5 (emphasis added).  Nowhere in Defendant's Motion does it mention that the ratio of supervisor to staff played a role in Mr. Heist's decision to transfer the three auditors to the Financial Audits Division, which precipitated the dissolution of the HAD.

### d.     On-Going Assignments

Finally, Plaintiff argues that there was enough work at the HAD to occupy 14 auditors and that somehow this fact undermines Mr. Heist's justifications for disbanding the HAD.  See Opp. at 17, 39.

As an initial matter, Plaintiff fails to point to any evidence in the record – except to her own self-serving declaration – showing that there was enough work to occupy 14 auditors. In fact, Plaintiff's own declaration fails to explain the type of work and the volume of work that existed in April 2004 to occupy 14 auditors. See Elion Decl. at ¶ 24. Moreover, whether there was work at HAD for 14 auditors is irrelevant.

In short, Plaintiff has not pointed to any evidence in the record to show that Mr. Heist's justifications in his April 20th Memorandum were pretext, including his explanations for (1) transferring the three auditors to the Financial Audits Division to meet a new deadline; (2) transferring Ms. Hawkins (Assistant Director of the HAD) to the TOP to address the staff shortage; and (3) disbanding the HAD because Plaintiff would be the only employee left after the transfer.

### C.  Plaintiff's Retaliation Claims Lack Merit (Counts I and V)

#### 1.  Plaintiff Cannot Establish Her Prima Facie Case of Retaliation.

As explained in Defendant's Motion, Plaintiff cannot establish her prima facie case of retaliation for failure to meet the causal element because of a sixteen-month lapse between her first EEO complaint (December 2002) and the alleged adverse employment action – the disbanding of the HAD (April 2004). Def. Mot. at 16-18. Plaintiff, however, argues that her prima facie case of retaliation does not rest on temporal proximity, but rather on a wide range of factors. See Opp. at 30. According to Plaintiff, these other factors demonstrate disparate treatment and are thus sufficient to establish the causal relationship between the protected activity and the adverse employment action. Id. at 30-31.

In support of that proposition, Plaintiff cites Gipson v. Wells Fargo, N.A., 460 F. Supp.2d

15, 29 (D.D.C. 2006). Gipson, however, does not support Plaintiff's assertion. In Gipson, Magistrate Judge Facciola found that Plaintiff established the causal element of her prima facie case of retaliation by pointing to direct evidence of retaliation. Id. at 25. Specifically, Magistrate Judge Facciola noted that, for the first retaliation claim (non-selection), plaintiff produced direct evidence showing that the selecting official – during an interview – indicated that he could not see how plaintiff could work for him after she filed a complaint against him. Id. at 25. For the second retaliation claim (termination), Magistrate Judge Facciola noted that, in additional to mere temporal proximity, plaintiff received disparate treatment compared to similarly situated employees and that the company violated its own procedures. Id.[7]

Unlike Gipson, in this case, Plaintiff has not produced any direct evidence of retaliation. Furthermore, as discussed above, she has not produced any evidence showing that she was similarly situated to any appropriate comparator and was subjected to disparate treatment. See Section II(B)(1), supra. Moreover, she has not shown that the agency deviated from its business procedures when it disbanded the HAD. See Section II(B)(2)(d), supra. Contrary to Plaintiff's argument, Mr. Heist consulted with HR to ensure that the reassignments did not affect anyone's grade. See Apr. 20, 2004 Memorandum (Gov. Exh. F). Without direct evidence of retaliation,

---

[7]     Citing Stone v. City of Indianapolis Public Util., 281 F.3d 640, 644 (7th Cir. 2002), Plaintiff also argues that evidence of disparate treatment alone is sufficient to satisfy the causal element of her prima facie case. See Opp. at at 27. Plaintiff appears to misconstrue the ruling in Stone. In Stone, Judge Posner opined that one of the methods that a plaintiff could use to establish her prima facie case of retaliation is to "present direct evidence" of retaliation. Id. at 644. Without "direct evidence" of retaliation, a plaintiff must go through the burden shifting analysis articulated in McDonnell Douglas. Id. Here, as discussed above, since Plaintiff has not presented "direct evidence" of retaliation she must rely on circumstantial evidence. As noted, when a plaintiff relies upon that factor as circumstantial evidence the temporal proximity between the protected activity and the alleged material adverse employment action must be close. See infra.

Plaintiff must rely upon circumstantial evidence.  See Kalinoski v. Gutierez, 435 F. Supp.2d 35,

70 (D.D.C. 2006).

The temporal proximity must be very close when a plaintiff relies on that factor as

circumstantial evidence of retaliation.  Id.; see also Def. Mot. at 17-18 (citing cases).  Here,

Plaintiff does not dispute that there was a 16-month lapse between her December 2002 EEO

complaint and the dissolution of the HAD in April 2002.  Under these facts, the 16-month gap is

too wide to permit an inference of causality.  See Willingham v. Gonzales, 391 F. Supp.2d 52, 60

(D.D.C. 2005) (six month lapse was too long); Buggs v. Powell, 293 F. Supp.2d 135, 149

(D.D.C. 2003) (seven month gap was to long).  Therefore, under the law and the facts here,

Plaintiff cannot establish her prima facie case of retaliation.

**2.      Defendant Had Legitimate, Non-retaliatory Reasons for
          Disbanding the HAD.**

Even assuming that Plaintiff could meet her prima facie case of retaliation, Defendant

had legitimate, non-retaliatory reasons for disbanding the HAD and reassigning Plaintiff to a

non-supervisory position.  As discussed above and in Defendant's Motion, Defendant disbanded

the HAD and reassigned Plaintiff to the Special Assistant position because of budgetary issues

and to achieve work related needs.  Specifically, because of the hiring freeze in effect in April

2004 the agency could not hire more staff to assist the Financial Audit Division to complete its

annual financial audit on time.  As a result, Mr. Heist reassigned three staff auditors from the

HAD to the Financial Audit Division.  The domino effect was the dissolution of the HAD

because, after the transfer of the three auditors, there remained only the two managers in the

division – Plaintiff and her assistant (Ms. Hawkins).  Consequently, Mr. Heist transferred Ms.

Hawkins to TOP to meet the staffing needs in that division and reassigned Plaintiff to become

his Special Assistant.

These facts provide an alternative basis for the rejection of Plaintiff's retaliation claim, with

respect to disbanding the HAD.

## III.    CONCLUSION.

    For the reasons presented above and those in Defendant's Motion for Summary

Judgment, the Court should grant Defendant's Motion for Summary Judgment and dismiss this

case with prejudice.


Dated: May 8, 2007.                          Respectfully Submitted,


    /s/  Jeffrey A. Taylor
JEFFREY A. TAYLOR, D.C. BAR # 498610
United States Attorney

    /s/   Rudolph Contreras
RUDOLPH CONTRERAS, D.C. BAR #434122
Assistant United States Attorney

    /s/   John C. Truong
JOHN C. TRUONG, D.C. BAR #465901
Assistant United States Attorney
555 Fourth Street, N.W.
Washington, D.C.  20530
(202) 307-0406

Attorneys for Defendant



Of Counsel:

Maxine Sharpe
U.S. Department of Housing and Urban Development
Washington D.C.

Richard Johnson
Office of Inspector General
Washington D.C.