# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

SAUNDRA ELION,         )
         )
    Plaintiff,         )
         )
    v.         )      Civil Action No. 05-0992 (PLF)
         )
ALPHONSO R. JACKSON,         )
    Secretary of the         )
    U.S. Dept. of Housing and         )
    Urban Development,         )
         )
    Defendant.         )
         )

## DECLARATION OF JAMES HEIST

I, JAMES HEIST, hereby declare under the penalty of perjury, pursuant to 28 U.S.C. § 1746, that the following facts are true and correct based on my personal knowledge and I can competently testify to the facts stated herein.

1. I am currently employed as the Assistant Inspector General for Audit (AIGA) for the Office of Audit, within the Office of Inspector General (OIG), U.S. Department of Housing and Urban Development (HUD or "the Department"). I am a Caucasian male.

2. I have been the AIGA since March 2001 and have been employed by the HUD Office of Inspector General for 19 years. I was the Plaintiff's second line supervisor from March 2001 until April 2004, when I became her immediate supervisor.

3. In April 2004, I was told that OIG was under a hiring freeze and there was a projected shortfall in the next fiscal year of 6.5 million dollars. At the same time, I was becoming more concerned about the Department's financial audit. The OIG is required to conduct a financial audit of the Department every fiscal year. The due date for the financial audit was moved up to November 15, 45 days after the close of the fiscal year. Previously, the audits were not due until January 31 of the following calendar year, or later.

4. In April 2004, I recommended, and Deputy IG Stephens approved, disbanding HAD and, as a consequence the Plaintiff became my Special Assistant. My reasons for recommending disbanding HAD were stated in my memorandum, dated April 20, 2004. Race, sex, and age were not factors in my decision, nor did I disband HAD to retaliate



GOVERNMENT EXHIBIT
Reply A

against the Plaintiff. I ensured no HAD employee would suffer a reduction in pay or grade as a consequence of the reorganization.

5. If HAD had not been disbanded in April 2004, I would still have detailed the three staff auditors of HAD to assist in the Financial Audit to meet the November 15 deadline, leaving HAD with only the Plaintiff and her assistant (Donna Hawkins). We were on a faster timeline than in previous years and I did not want to fail to meet the November 15 deadline. Even after transferring the three HAD staff auditors to the Financial Audits Division, we still had to detail additional auditors from the field offices and authorized the auditors to work overtime to meet the deadline. One consequence from the accelerated due date was that the work load was spread more evenly over the year. We had to begin work on some tasks earlier. Under the previous years' deadlines, we had a greater spike in work after the end of the fiscal year. The November 15 deadline forced us to start the work earlier and keep the work going throughout the year.

6. At the time I disbanded HAD, I was aware that the Inspector General was creating the Inspections and Evaluations Division (IED). While that organization is outside the Office of Audit, it conducts internal reviews of HUD programs and operations. Using IED and Office of Audit headquarters and field offices, OIG remains capable of performing all of the functions previously performed by HAD. IED is currently headed by a Caucasian female special agent in the grade of SES.

7. The functions and characteristics of HAD and the Information Systems Audit Division (ISAD) are vastly different. The ISAD's primary focus is on the information systems of the Department, which has a large number of propriety software programs, and requires auditors with expertise in computer software programs. The Director and many of the auditors are certified information systems auditors. The Plaintiff is not a certified information systems auditor. The ISAD also generally ranged in size from 17 to 20 auditors, while the HAD had 2 supervisors and 3 staff auditors when it was disbanded. The ISAD is also an essential division, unlike HAD. The ISAD audit of the Department's information systems is required to complete the Department's annual financial statement audit, an audit that is statutorily required. ISAD also performs the statutorily required annual Federal Information Security Management Act audit. HAD was not responsible for any recurring statutorily-required audits. While ISAD may have failed to meet some goals we followed in the past, these goals were found to be unsuitable for this Division because of the nature of its work. I consider ISAD to be a high-performing division. The relative performance of ISAD and HAD played no role in my decision to disband HAD. ISAD is currently managed by an Asian Female GS-15 director and an African American female is the Assistant Director, also a GS-15 supervisory position.

8. For that matter, every division at the headquarters level, except HAD, is unique and not comparable to the field offices. Only HAD's workload would be similar to that of a field office, in the sense that it performed typical performance audits. The Technical Oversight and Planning Division (TOP) is a support division providing audit reviews, but conducting no audits of its own. The Financial Audits Division conducts the statutorily

2 _JMK 5/7/07_

i

required annual financial audit of the Department. The annual financial audit is one of the most important functions performed by our organization. The annual financial audit is a comprehensive and unique audit, unlike internal and external performance audits conducted within a region or HAD. The Director of the Financial Audits Division, the Assistant Director, and all the GS-14 senior auditors in the division are certified public accountants. The Plaintiff is not a certified public accountant. The function of ISAD was discussed above, and again, this is a unique division focusing on the Department's information systems and providing information system audit support for the annual financial audit.

9. Currently every division director in the Office of Audit is a minority in some respect. I was responsible for selecting all of them. I selected an African American female for a GS-15 supervisory position in the Technical Oversight and Planning Division (TOP) in October 2004. The Plaintiff did not apply for this position. I then promoted the African American female to be the Director of TOP in January 2006. I recently selected an African American male to lead the Financial Audits Division. I also selected an Asian female to be the director of the Information Systems Audit Division. As a result, minorities now fill all the division director positions in the Office of Audit. I also selected an African American male as the Regional Inspector General for Audit in Region 2 in January 2005, to replace a retiring African American male. There are four supervisory GS-15 assistant director positions in the Office of Audit, two are filled by females, one of them an African American. During my tenure, there have been three female Regional Inspectors General for Audit (RIGAs). They were Nancy Cooper, Mimi Lee, and Joan Hobbs. There have been numerous female assistant RIGAs. The Inspector General from 1993 to 2001 was a female; and the Assistant Inspector General for Audit immediately before I assumed the post was a female.

10. In addition to the Plaintiff, I know of the following supervisory auditors who were involuntarily reassigned within the Office of Audit. I directed Mimi Lee (Asian female), the RIGA for Region 9, who had no prior EEO activity, to move her office from San Francisco to Los Angeles. Rather than accept the reassignment, she took another position of equal pay and grade in San Francisco. Mr. Beard was involuntarily reassigned in January 2005. His last protected EEO activity had occurred in November 2002, more than two years earlier. He was reassigned because he refused to accept the new management style that centralized more control in Headquarters.

11. I am not personally aware of EEO activity by Mr. Salas, and neither I nor Mr. Phelps had any role to play in Mr. Salas' reassignment. Mr. Salas was an SES employee within the Office of Investigations, not the Office of Audit.

12. HAD never had exclusive authority and responsibility for conducting internal audits within Headquarters. I am aware of many occasions where we would use auditors from the field to conduct audit work at Headquarters of a Departmental program or activity. One example is the audit of HUD's Office of Multifamily Housing Assistance Restructuring's Oversight of the Section 514 Program Activities conducted by Region 8. Others examples are the audit of HUD's Administration of Section 3 of the HUD Act of

1968 (Region 7), the audit of HUD's Oversight of the Empowerment Zone Program (Region 5), the Government Performance and Results Act audit (Region 6), the audit of HUD's Asset Control Area Program (Region 2), and a review of HUD's resource allocation processes (Region 3).

13. During my tenure as Assistant Inspector General for Audit, we consolidated the management of two regions (Regions 8 and 10) when the number of personnel in those regions did not justify maintaining a supervisory GS-15 auditor (RIGA) in those regions. The Region 8 and 10 offices are now managed by GS-14 supervisory auditors, who report to the RIGAs (GS-15s) in Region 7 and 9.

I declare under the penalty of perjury that the foregoing is true and correct, to the best of my knowledge and belief.

Date: 5/7/07

JAMES HEIST
Assistant Inspector General for Audit