Page 1

RECEIVED

2006 JUN -9 P 1:13

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLUMBIA

- - - - - - - - - - - - - - -X

SAUNDRA G. ELION,                  :

      Plaintiff           :

    v.                            :

                                  :

ALPHONSO R. JACKSON,               :

      Defendant           :

- - - - - - - - - - - - - - -X

CONDENSED

DEPOSITION OF MICHAEL PHELPS

Washington, D.C.

Wednesday, May 31, 2006

Deposition of MICHAEL PHELPS, called for examination at 1:10 p.m., at the law offices of Robert C. Seldon & Associates, P.C., 1319 F Street, N.W., Suite 305, Washington, D.C., before Gary S. Howard, a notary public in and for the District of Columbia, when were present on behalf of the respective parties:



GOVERNMENT EXHIBIT
Reply O

MGB Reporting, Inc.
Tel:800-245-2528 Fax: 888-983-8016

Page 42

1  office -- the regional office was in San Francisco
2  and we were moving it to L.A.
3      Q   Correct.
4      A   You call that a reorganization.
5      Q   Let me see if I understand this. You were
6  moving a regional inspector general audit office
7  from San Francisco to L.A.
8          Is that right?
9      A   Yes.
10     Q   When was that? 2002? 2003? Does that
11 seem about right?
12         If not, you should feel free --
13     A   Probably in that timeframe.
14     Q   It's my understanding, but you correct me
15 if I'm wrong, that the headquarters for the HUD
16 region in California is in San Francisco.
17         Is that also your understanding?
18     A   Correct.
19     Q   And it's that way today, too?
20     A   It was when I left.
21     Q   And was it when this reorganization was
22 undertaken?

Page 43

1      A   Yes.
2      Q   Okay. So if we call reorganizations,
3  could be abolishing an office --
4          MR. TRUONG: Is that a statement or a
5  question?
6          MR. SELDON: No. I'm just going to give
7  some examples of what we could include in there.
8          Abolishing an office. Some sort of
9  geographical reorganization, if you catch my drift.
10
11         An office might be opened or closed, for
12 example. A reassignment of functions. Does that
13 make sense as a possible reason for reorganization?
14     A   Could be.
15     Q   Okay. Why don't you then tell me, what
16 are the possible ways that you see a reorganization
17 coming about, or came about, when you were DAIGA?
18     A   Closing an office.
19     Q   Okay.
20     A   Opening an office.
21     Q   Okay.
22     A   Moving the location of the regional

Page 44

1  manager.
2      Q   Okay. Anything else?
3      A   Consolidating regional offices.
4      Q   Okay.
5      A   Moving functions from one office to
6  another office.
7      Q   Okay.
8      A   That's the best I can think of.
9      Q   So keeping those examples in mind, I'll
10 ask you again -- does it still seem right that
11 somewhere between five or more, but less than ten,
12 times as DAIGA, you were involved in a
13 reorganization?
14     A   Probably closer to ten.
15     Q   Okay.
16     A   Maybe a little more.
17     Q   Fair enough. And your role in these
18 reorganizations would customarily be what?
19     A   It could be a very varied role, from
20 making the recommendation that it be done, to
21 implementing what I was told was being done.
22     Q   Okay. And in carrying out these ten or

Page 45

1  more reorganizations, was it customary for one of
2  the HR divisions or the other that worked with OIG
3  to be involved?
4      A   Yes.
5      Q   Which one or ones?
6      A   I'm sorry?
7      Q   Which one or ones, or was it both?
8      A   Both.
9      Q   On a routine basis?
10     A   Yes.
11     Q   Standard business practice. Is that
12 right?
13     A   To the best of my knowledge. Let me say
14 it was for me.
15     Q   What about to the best of your knowledge?
16     A   To the best of my knowledge, it was.
17     Q   Okay. That's fair.
18         (Pause.)
19         Good. Making good progress.
20         (Pause.)
21         At some point in the last few years, were
22 there hiring ceilings or staffing ceilings or

Page 70

1  as Deposition Exhibit No. 2.)
2  BY MR. SELDON:
3  Q  Is this a document you're familiar with?
4  A  Yes, it is.
5  Q  Just for the record, then, I'll say, this
6  is a memorandum dated April 20th, 2004, from Mr.
7  Heist to Mr. Stephens. And the subject is: Proposal
8  For Realignment of the Office of Audit.
9      Now this does seek Mr. Stephens' approval
10 for a realignment in the office of audit, which, as
11 it states here, would involve disbanding the
12 headquarters audit division and moving staff to
13 other mission-critical functions within
14 headquarters' office of audit.
15     What involvement, if any, did you have in
16 preparing this memorandum?
17 A  None.
18 Q  What involvement, if any, did you have in
19 the consideration or proposal or implementation of
20 the actions discussed in this memorandum before
21 they were taken?
22     MR. TRUONG: Objection to the form of the

Page 71

1  question, and foundation.
2      MR. SELDON: I think I said, what action,
3  if any.
4      MR. TRUONG: Answer the question to the
5  best of your ability.
6      MR. SELDON: Let's make it simpler. I see
7  you were struggling.
8      BY MR. SELDON:
9  Q  Did you have any -- there are certain
10 actions that are discussed in this memorandum,
11 Phelps Exhibit 2, okay.
12     Are you with me there?
13 A  Yes, sir.
14     MR. TRUONG: Do you want to point those
15 out?
16     MR. SELDON: I actually had just read
17 them a moment ago -- realignment involved
18 disbanding the headquarters audit division and
19 moving staff to other mission-critical functions.
20     Right?
21     MR. TRUONG: Okay.
22     MR. SELDON: In the first paragraph,

Page 72

1  okay?
2      MR. TRUONG: Okay.
3      BY MR. SELDON:
4  Q  What I wanted to know was, what
5  involvement, if any, did you have in considering
6  this proposed realignment before it was
7  implemented?
8  A  Before it was implemented?
9  Q  Before it was approved.
10 A  Before it was approved.
11     (Pause.)
12     I can't recall. I can't recall whether
13 Mr. Heist discussed this with me before he sent it
14 up to Mr. Stephens or after Mr. Stephens had
15 approved it.
16 Q  Do you recall one way or the other Mr.
17 Heist soliciting your input or thoughts into this
18 realignment before he sought Mr. Stephens'
19 approval?
20     MR. TRUONG: He just told you.
21     MR. SELDON: No. It's a different
22 question.

Page 73

1      THE WITNESS: I do not remember what the
2  timing was when Mr. Heist discussed it with me.
3      MR. SELDON: Okay.
4      BY MR. SELDON:
5  Q  I take it at some point you were involved
6  or became knowledgeable about this.
7      Right?
8  A  Yes.
9  Q  Okay. Hang on one second.
10     (Pause.)
11     What I'm going to do is I'm going to just
12 give you a copy of your affidavit that you gave at
13 the EEO -- I'm sorry -- investigative process of
14 Ms. Elion's complaint.
15     I'm just going to draw your attention to
16 a part of it and just ask if this in any way
17 refreshes your recollection.
18     I'm showing you page 4, and there's a
19 question beginning on line 10. And the answer on 12
20 is: Although I had no direct involvement in the
21 reorganization, I understand the ongoing workload,
22 et cetera.

Page 74

1  MR. TRUONG: Why don't we mark this as an
2  exhibit since we have extra copies?
3  MR. SELDON: Because I've got to pay a
4  half-buck a page for each one of these, and it's my
5  money. And we're not going to use it.
6  I'm just using it to refresh his
7  recollection.
8  MR. TRUONG: Okay. What line?
9  MR. SELDON: It was the question that was
10 posed --
11 MR. TRUONG: Line.
12 MR. SELDON: Right. Only now I don't
13 remember what page I was on.
14 MR. TRUONG: 4 of 7.
15 MR. SELDON: Thank you. The question was
16 posed on line 10. And the answer that I summarized
17 was on line 12.
18 THE WITNESS: Were the functions of
19 headquarters audit division transitioned to another
20 office or division?
21 BY MR. SELDON:
22 Q  And your answer was: Although I had no

Page 75

1  direct involvement in the reorganization -- I've
2  been asking you questions, trying to elicit your
3  recollection on what involvement, if any, you had
4  in this reorganization or realignment that involved
5  Ms. Elion.
6  A  And my point is the timing of this. Yes,
7  my answer here is that my understanding was that
8  things were transferred to the information systems
9  audit group.
10 I know that to be a fact.
11 Q  Correct.
12 A  Did I know -- did Mr. Heist discuss with
13 me that he was going to propose abolishment and we
14 would shift these two audits in question to IS
15 audit, I can't remember the timing of that.
16 Q  That's fine. That's what the function of
17 trying to refresh someone's recollection is, to see
18 if they can do.
19 So was responsible for, until its being
20 disbanded, responsible for the assignment of audits
21 within Ms. Elion's former division, the
22 headquarters office of audit?

Page 76

1  (Pause.)
2  A  The only way I can answer that is, the
3  ultimate decision as to whether or not an audit is
4  assigned to an office is Mr. Heist's.
5  Now there could be times when Mr. Heist
6  would make that assignment directly.
7  Q  Okay.
8  A  There could be times when he would tell
9  me to make the assignment.
10 Most often, the way assignments get made
11 is at a biannual managers planning meeting where we
12 sit around and talk about audits that are coming
13 up, and timing of them, and make assignments that
14 way.
15 Now, I can't say that he was responsible,
16 I was responsible, I did, he did.
17 Q  Audits are also self-generated by each
18 office. Is that right?
19 A  External audits.
20 Q  Okay.
21 A  Could be proposed.
22 Q  I'm sorry?

Page 77

1  MR. TRUONG: Wait.
2  MR. SELDON: I'm just asking for a sign.
3  Do you want to take a break?
4  MR. TRUONG: No. Just let him finish his
5  answer. Go ahead and finish the answer.
6  THE WITNESS: External audits could be
7  proposed by a field office and a decision be made
8  by Mr. Heist as to whether or not it would be done.
9  BY MR. SELDON:
10 Q  Is that also true of a headquarters
11 office as well?
12 A  A headquarters office, yes, would be able
13 to make proposals as to what they're going to do.
14 Q  Okay.
15 A  No one, at least for the last couple of
16 years, could start an audit without headquarters'
17 approval.
18 MR. TRUONG: Why don't we take a break?
19 MR. SELDON: Sure. We're doing very, very
20 well. We're not going to have any trouble.
21 So let's take ten.
22 MR. TRUONG: Yes.

Page 78

1  (Recess.)
2  THE COURT REPORTER: We're back on the
3  record.
4  MR. SELDON: I'm going to ask to have
5  marked as Phelps Exhibit 3, this e-mail.
6  THE COURT REPORTER: No. 3.
7  (The document referred to
8  was marked for identification
9  as Deposition Exhibit No. 3.)
10 BY MR. SELDON:
11 Q  Mr. Phelps, this is an e-mail from Mr.
12 Heist to a number of officials in OIG, the day
13 after his memorandum to Mr. Stephens -- that was
14 Phelps Exhibit 2 -- alerting or advising particular
15 people of that realignment and the disbanding of
16 the headquarters office of audit.
17    Do you recall seeing his e-mail at or
18 about the time it came out?
19 A  Yes.
20 Q  Do you recall whether you knew about the
21 realignment and the disbanding of that office
22 before this e-mail came out?

Page 79

1  A  Yes.
2  Q  Okay. So now I'm going to ask you to
3  think again. And if you still don't know or if I
4  haven't asked it exactly right before, I'm just
5  going to say once again, Phelps Exhibit 2 is the
6  memorandum that Mr. Heist sent to Mr. Stephens on
7  April 20th.
8     And Phelps Exhibit 3 is the day later,
9  the e-mail that Mr. Heist circulated about this
10 realignment.
11    And I think you said that you knew about
12 this realignment before the e-mail came out.
13 A  Yes, before the e-mail.
14 Q  Okay. Does it help you at all to figure
15 out when you first learned about this, to know that
16 you knew about it when the e-mail came out on the
17 21st, but that you're not sure what you knew on the
18 20th?
19 A  No, it really doesn't.
20 Q  Okay. That's fair enough.
21 A  I just don't know whether it was the 19th
22 or the 20th, or the morning of the 21st.

Page 80

1  Q  Okay. And no recollection either way,
2  seeing Phelps Exhibit 2, before Mr. Stephens signed
3  it, or before Mr. Heist signed it?
4     Any recollection?
5  A  No.
6  Q  Okay. That's fair enough. Before her
7  previous office, the office headquarters office of
8  audits was abolished, Ms. Elion was the head of the
9  capital district office.
10    Do you recall that?
11 A  Yes.
12 Q  And at one point, I take it that there
13 was no longer to be a capital district office.
14    Is that right?
15 A  Yes.
16 Q  Were you involved in that?
17 A  Yes.
18 Q  How so?
19 A  Discussions with Mr. Heist about
20 abolishing that office.
21 Q  And what did you understand were the
22 reasons for abolishing that office?

Page 81

1  A  The primary rationale was that the
2  majority of the work that was performed by that
3  office was work that we considered to be
4  headquarters-related in terms of either centralized
5  programs that were run directly out of
6  headquarters, as opposed to out of one of HUD's
7  field offices, or issues impacting only
8  headquarters, not field offices.
9     So the workload -- and I think the number
10 we felt was about 75 percent of the work -- fell
11 into this realm, as opposed to a traditional audit
12 workload from the field where you might go out and
13 audit a housing authority or audit a mortgage
14 company.
15 Q  75 percent was headquarters-related
16 audits of the former capital district.
17    Is that right?
18 A  Yes.
19 Q  Okay. And 25 percent was more field work.
20 In other words, audits that arose from HUD
21 activities in Washington, D.C. and the surrounding
22 area.

Page 98

1  April of 2004, Mr. Stephen instructed Ms. Elion to
2  appear in his office, et cetera, et cetera.
3       And in the Defendant's answer, they do
4  admit that there was a meeting around that date,
5  and the rest of it is essentially denied.
6       Paragraph 32, John.
7       MR. TRUONG: 32. Okay.
8       BY MR. SELDON:
9   Q  Is that a meeting -- ready?
10      MR. TRUONG: Yes.
11      BY MR. SELDON:
12  Q  Is that a meeting that you participated
13  in?
14  A  Yes, I was there.
15  Q  Okay. How did you come to participate in
16  that meeting?
17  A  Mr. Stephens -- in my recollection, Mr.
18  Stephens set the meeting up. The reason that the
19  meeting was set up was because I went to Mr.
20  Stephens with information about Edward Kim
21  resigning.
22  Q  So you went to Mr. Stephens with that

Page 99

1  information.
2  A  Yes.
3  Q  And what did you tell him?
4  A  I told him that Ed Kim had submitted his
5  letter of resignation because of the way that he
6  was being treated by Ms. Hawkins and Ms. Elion. And
7  he couldn't work under those conditions any more.
8  Q  And what were those conditions in
9  particular?
10 A  The complaint that he made to me was that
11 he was not being treated in a professional manner,
12 that he was being yelled at by Ms. Hawkins, that he
13 was being held accountable for things that he had
14 no control over.
15 Q  Is that the sum and substance of it?
16 A  Pretty much, as I recall.
17 Q  Did you discuss that complaint with Ms.
18 Elion?
19 A  Did I discuss the complaint?
20 Q  Mr. Kim's complaint, or his grievance, if
21 you will.
22 A  Ms. Elion came to me with, as I recall,

Page 100

1  with the letter of resignation from Mr. Kim.
2  Q  Okay.
3  A  Asking me about he wants to resign
4  effective, whenever.
5  Q  Okay.
6  A  What should she do?
7  Q  What did you tell her?
8  A  I said, he could resign today if he
9  wants. We can't make somebody work. If they want to
10 resign, they resign.
11      If he wants to do it today or next week
12 or whenever, we have nothing to say about that.
13 Q  So you didn't say to Ms. Elion -- see if
14 you can talk him out of it or get any more detail?
15 A  I don't recall. I don't recall.
16 Q  What made you bring this to Mr. Stephens'
17 attention?
18 A  I believe it was later that day that Mr.
19 Kim asked for a meeting with me to discuss his
20 resignation.
21 Q  Okay. And did you meet with him?
22 A  Yes.

Page 101

1  Q  And what did he tell you?
2  A  That's when he told me that he couldn't
3  work under those conditions any more. He wasn't
4  being treated professionally. He was being held
5  accountable for things beyond his control. He was
6  being blamed for everything that went wrong.
7       And he didn't want to work under those
8  conditions any more.
9  Q  Is that the first time in your managerial
10 carer you heard complaints like that from an
11 employee?
12 A  No. I heard them on numerous occasions.
13 Q  Can you think of any other occasion when
14 you brought a complaint of that nature to the
15 attention of the deputy inspector general?
16 A  I am pretty sure that there was an
17 occasion when another member of Ms. Elion's staff
18 came to me basically under the same scenario.
19 Q  Which staff member?
20 A  Martin Iriczary.
21      MR. TRUONG: Can you spell the last name,
22 sir?

Page 106

1  A   There was mention of another person who
2  Mr. Kim had told me, Sharon Brown, also on Ms.
3  Elion's staff, that she had similar issues with the
4  way she was being treated.
5       And I passed that on to Mr. Stephens.
6  Q   And so, what did Mr. Stephens, to the
7  best of your recollection, say at this particular
8  meeting?
9  A   He asked Ms. Elion what she knew about
10 it, what her feelings were, why this could be
11 happening, was there a problem with Ms. Hawkins,
12 the way she dealt with staff.
13      MR. TRUONG: Bob, I mistakenly wrote down
14 the names, Kim Marn and Sharon Brown on the copy
15 that Mister --
16      MR. SELDON: We're just using it for
17 reference. We're not going to make it an exhibit.
18      MR. TRUONG: I just wrote down those
19 names and I don't know if you have an extra copy, a
20 clean copy, that Mr. Phelps can use.
21      MR. SELDON: Sure. The complaint? Sure.
22      (Pause.)

Page 107

1  Go ahead.
2       BY MR. SELDON:
3  Q   And Ms. Elion, did she answer Mr.
4  Stephens' questions?
5  A   Yes. She said that she wasn't aware of
6  it, that there was this sort of problem going on
7  with Ms. Hawkins.
8       She was aware that, obviously, Mr. Kim
9  submitted his resignation and what his reasons, the
10 reasons he had given her.
11 Q   At the meeting, was Ms. Elion respectful?
12 A   Was Ms. Elion respectful?
13 Q   Yes.
14 A   Yes.
15 Q   Did she raise her voice at any point?
16 A   I don't think so, no.
17 Q   Did anybody?
18 A   Well, Mr. Stephens was quite visibly
19 upset. Did he raise his voice above a normal
20 conversational tone?
21      Yes.
22 Q   Did you observe what he was upset about

Page 108

1  or what made him upset?
2  A   The possibility that we have managers
3  that are treating employees in such a way that they
4  would resign their job as the only way out.
5  Q   Did you observe or have a reason to
6  conclude at that meeting that Mr. Stephens was of
7  the belief that Ms. Hawkins was at fault in Mr.
8  Kim's resignation?
9       MR. TRUONG: Objection to the form of the
10 question.
11      BY MR. SELDON:
12 Q   Can you answer that one, or not?
13 A   Do you want to repeat it?
14 Q   Did you observe or have reason to believe
15 at that meeting that Mr. Stephens had concluded
16 that Ms. Hawkins was at fault in Mr. Kim's
17 resignation?
18 A   No. I don't think he reached a
19 conclusion because one of the things that he said
20 he was going to do was have our ombudsman program
21 take a look at the situation and try to get to the
22 bottom of what was going on.

Page 109

1  Q   So he didn't fault, I take it, Ms.
2  Hawkins, in anything you observed?
3  A   Not that I observed. As I said, I recall
4  him asking Ms. Elion -- is Ms. Hawkins doing this?
5  Is this going on?
6       What's the story?
7       I didn't take it as a conclusion that he
8  had concluded that she was at fault for having done
9  it?
10 Q   And did he later say to you, or did you
11 later find out that Mr. Stephens believed that Ms.
12 Elion was at fault?
13 A   Well, no. No. He did not say to me, she's
14 at fault.
15      I don't know. I don't know what his
16 conclusions were. He did not state to me.
17 Q   Okay. That's fair. I think you testified
18 already that you were not responsible except in the
19 event that Mr. Heist was absent. It would not be
20 your responsibility to give assignments to Ms.
21 Elion in her current role as special assistant to
22 Mr. Heist.