## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| SAUNDRA ELION,            ) | |
|                    ) | |
|       Plaintiff,          ) | |
|                    ) | |
|        v.              ) | Civil Action No. 05-0992 (PLF) |
|                    ) | |
| ALPHONSO R. JACKSON,    ) | |
|      Secretary of the        ) | |
|      U.S. Dept. of Housing and   ) | |
|      Urban Development,     ) | |
|                    ) | |
|       Defendant.         ) | |
| _____ ) | |

### Defendant's Response to Plaintiff's Statement of Genuine Issues.

Pursuant to Local Rules 7(h) and 56.1, Defendant responds to Plaintiff's Statement of

Material Facts in Genuine Dispute, using the same numbering system, as follows:

A.      Ms. Elion is an African American woman who is currently 59 years of age; and who,

prior to the employment actions that gave rise to this action, had engaged in the administrative

discrimination complaints process.

RESPONSE:  Defendant accepts this as true.


B.       Ms. Elion was subject to two adverse employment actions as a result of defendant's

actions: she was stripped of supervisory duties and reassigned to a position with significantly

less

responsibility, exposure, and opportunity for professional advancement.

RESPONSE: This statement is a legal conclusion.  "Legal conclusions cloaked as facts are not

sufficient to create a genuine issue of material fact." Colbert v. Chao, 2001 WL 710114, * 7

(D.D.C. June 19, 2001).

C.      When defendant subjected Ms. Elion to twin adverse employment actions, the

Headquarters Audits Division was the third highest performing of HUD OIG's thirteen audit

Divisions and Regional Offices that generated audit reports.

RESPONSE:  This statement is not a material fact in that it does not "affect the outcome of the

case under governing law." Nails v. England, 311 F. Supp.2d 116, 121 (D.D.C. 2004).  A

division's ranking was not a factor in Mr. Heist's decision to reallocate staffing resources and to

disband the HAD.  Apr. 20, 2004 Memo (Gov. Exh. F).


D.      Ms. Elion's performance as the Director of that Division was singled out for

recognition by OIG senior management.

RESPONSE:  This statement is not a material fact in that it does not "affect the outcome of the

case under governing law." Nails v. England, 311 F. Supp.2d 116, 121 (D.D.C. 2004).

Performance as not a factor in Mr. Heist's decision to disband the HAD.  See Apr. 20. 2004

Memo (Gov. Exh F).


E.      The "reorganization" which cost Ms. Elion her Division and her job did not affect the

worst performing audit office, a Division also located in HUD Headquarters that was headed by

a white male who had not engaged in protected EEO activity, or the Director of that Division

himself.

RESPONSE:  See Response to D.

2

F.      That Division had failed to meet its performance goals for years.

RESPONSE:  This statement is not a material fact in that it does not "affect the outcome of the case under governing law."  Nails v. England, 311 F. Supp.2d 116, 121 (D.D.C. 2004).  A division's performance was not a factor in Mr. Heist's decision to disband the HAD.  Gov. Exh. F.


G.      Like Ms. Elion, the Headquarters Division Director of that Division answered to Mr. Heist and Mr. Phelps, served at the Grade 15, was a supervisory auditor who managed a Headquarters Division, and encumbered a position with the same basic duties and responsibilities as Ms. Elion.

RESPONSE: Assuming Plaintiff is referring to the Director of the Information Systems Audit Division (ISAD), Defendant admits the Director of ISAD answered to Mr. Heist and Mr. Phelps, served at the Grade 15, and was a supervisory auditor who managed a Headquarters Division. However, the ISAD Director did not have the same basic duties and responsibilities as Plaintiff. The functions and characteristics of the HAD (Plaintiff's former division) and the ISAD are vastly different.  The ISAD's focus is solely on the information systems of the Department, which has a large number of propriety software programs, and requires auditors with expertise in computer software programs.  Heist Decl. at ¶ 7 (Reply Gov. Exh.A).  The Directors and many of their auditors are certified information systems auditors.  Id.  Plaintiff is not a certified information systems auditor.  Id.  The ISAD also generally ranged in size from 17 to 20 auditors, while the HAD had 2 supervisors and 3 staff auditors at the time when it was disbanded.  The ISAD audit of the Department's information systems is required to complete the Department's

annual financial statement audit.  Id.  The ISAD also does the statutorily required FISMA audit.
It is currently headed by an Asian female.  Heist Decl. at ¶7 .  Under these facts, the ISAD and
the HAD were not "functionally equivalent," as Plaintiff maintains.  Rather, these two offices
performed markedly different functions. Heist Decl. at ¶ 7 (Reply Gov. Exh. A).  Moreover,
because of its specialized function and significantly larger size, ISAD could not be disbanded the
same way the HAD was.  Thus, the two divisions are not similarly situated.

H.    Before the Headquarters Audits Division was abolished, there had never been a
Director of a Headquarters Audit Division ever reassigned over his or her objection.

RESPONSE:  This statement is not a material fact in that it does not "affect the outcome of the
case under governing law."  Nails v. England, 311 F. Supp.2d 116, 121 (D.D.C. 2004).  Seniority
is not a factor in Mr. Heist's decision to disband the HAD.  Gov. Exh. F.

I.    At the time Ms. Elion was reassigned, she had greater entitlement to a supervisory
position under federal personnel law than a white male supervisory auditor stationed in HUD
OIG Headquarters who had not engaged in protected EEO activity.

RESPONSE:  This statement is not a material fact in that it does not "affect the outcome of the
case under governing law."  Nails v. England, 311 F. Supp.2d 116, 121 (D.D.C. 2004).

J.    The Headquarters Audits Division was the first and only audit office in HUD OIG
Headquarters or in the field composed entirely of African Americans.

RESPONSE:  This statement is not a material fact in that it does not "affect the outcome of the

case under governing law." <u>Nails v. England</u>, 311 F. Supp.2d 116, 121 (D.D.C. 2004).

This statement is also factually incorrect. Two weeks prior the dissolution of the HAD, the

division also included an Asian male (Edward Kim), who resigned because of harassment from

Plaintiff and her assistant. Phelps. Depo. at 98-101 (Reply Gov. Exh. D).

K.      Members of the Headquarters Audits Division and the desk auditor responsible for

technical review of Ms. Elion's former office attested to the fact that Ms. Elion was subject to

continuing discrimination in a wide range of work activities over a period of years leading up to

her removal from a supervisory position.

RESPONSE: This is a statement of law. "Legal conclusions cloaked as facts are not sufficient

to create a genuine issue of material fact." <u>Colbert v. Chao</u>, 2001 WL 710114, * 7 (D.D.C. June

19, 2001).


L.      Their uniform perception was that defendant's continuing discrimination against

plaintiff included withdrawing work assignments for the Headquarters Audits Division,

complaint, detailing auditors from Ms. Elion's staff to work on Headquarters audits under the

supervision field supervisors, and failing to assign Headquarters audits to Ms. Elion's Division.

RESPONSE: Defendant denies that the cited record supports the assertions made by Plaintiff or

that she was subjected to discrimination or retaliation by any Agency actions. Furthermore, this

is a statement of law. "Legal conclusions cloaked as facts are not sufficient to create a genuine

issue of material fact." <u>Colbert v. Chao</u>, 2001 WL 710114, * 7 (D.D.C. June 19, 2001).


M.      Plaintiff formerly served as the Director of the Headquarters Audits Division and as

the District Inspector General for Audit for Washington, D.C.  She was the only African American woman and one of only three African Americans ever to hold positions at this level in HUD OIG since its creation in 1979, until another was appointed well after the Complaint here was filed.

RESPONSE:   This statement is not a material fact in that it does not "affect the outcome of the case under governing law."  Nails v. England, 311 F. Supp.2d 116, 121 (D.D.C. 2004).

Defendant denies that the Plaintiff was the only African American woman to hold this type of position.  An African American female was a supervisory GS-15 auditor as the Assistant Director in TOP beginning in October 2004, and she became the Director of TOP on January 8, 2006.  There is also an African American GS-15 supervisory auditor in ISAD.   Heist Decl. ¶ 7, 9 (Reply Gov. Exh. A).

The Defendant also denies that the Plaintiff was the only woman to hold these types of positions.  HUD OIG was headed by a female Inspector General from 1993 until June 2001.  The Office of Audit was lead by a female for years immediately before Mr. Heist became the AIGA. Since Mr. Heist became AIGA, there have been three female Regional Inspector General for Audit.  Heist Decl. ¶¶ 7, 9.  There are currently two female Directors of Divisions, TOP and ISAD and two female Assistant Directors, who are GS-15 supervisory auditors.  Id.

N.       Austin Groom, Ms. Elion' s African American predecessor as District Inspector General for Audit, was fired after he filed an EEO complaint shortly after his involuntary reassignment to a "special assistant" position.

RESPONSE:  This statement is not a material fact in that it does not "affect the outcome of the case under governing law."  Nails v. England, 311 F. Supp.2d 116, 121 (D.D.C. 2004).

Mr. Groom was placed on a Performance Improvement Plan in May 2001, and that same month he filed an EEO complaint regarding that action. Phelps Decl. ¶ 6(Reply Gov. Exh. B). Mr. Groom testified at his deposition that he did not believe his removal in February 2002 was racial discrimination. Groom Depo. at 29:6-21 (Reply Gov. Exh. E).

O.     For 33 years until the Headquarters Audits Division was abolished, HUD OIG and its predecessor always had a separate division responsible for auditing Headquarters program activities.

RESPONSE: This statement is not a material fact in that it does not "affect the outcome of the case under governing law." Nails v. England, 311 F. Supp.2d 116, 121 (D.D.C. 2004).

P.     In the field, the only Regional Inspector General for Audit ever reassigned over his objection was removed from his position after he filed an EEO complaint; he was in his mid 50's when this occurred.

RESPONSE: This statement is not a material fact in that it does not "affect the outcome of the case under governing law." Nails v. England, 311 F. Supp.2d 116, 121 (D.D.C. 2004).

he Office of Audit has reassigned three supervisory auditors over their objections. They are Mimi Lee, the District Inspector General for Audit for Region 10 (no prior EEO activity); Austin Groom, the District Inspector General for Audit for the Capital Region, (no prior EEO activity); and D. Michael Beard, the Regional Inspector General for Audit for Region VI, (prior EEO activity). Heist Decl. a ¶ 10; Phelps Decl. at ¶5. The Office of Audit also reassigned at least two nonsupervisory auditors over their objections. They are Edward Bowles, from TOP to

HAD, (no prior EEO activity), Dave Gleason, from HAD to TOP, (no prior EEO activity).

Phelps Decl. ¶ 5.


Q. During Ms. Elion's first EEO complaint, Mr. Stephens refused to honor Ms. Elion's

unqualified right to participate in Alternative Dispute Resolution with a neutral mediator and her

counsel present.

RESPONSE:  This statement is not a material fact in that it does not "affect the outcome of the

case under governing law."  <u>Nails v. England</u>, 311 F. Supp.2d 116, 121 (D.D.C. 2004).

Plaintiff's counsel explicitly agreed to allow Mr. Stephens and Plaintiff to meet to resolve

her issues "before the upcoming mediation session."  Gov. Exh. B.  This letter clearly indicates

that Plaintiff (with counsel's knowledge) was meeting Mr. Stephens without the presence of her

counsel.


R.      During Ms. Elion's first EEO complaint, Mr. Stephens notified Ms. Elion that he would

participate personally in a conference without a mediator but only if she attended without

counsel.

RESPONSE:  This statement is not a material fact in that it does not "affect the outcome of the

case under governing law."  <u>Nails v. England</u>, 311 F. Supp.2d 116, 121 (D.D.C. 2004); <u>see also</u>

Defendant's Response to Q above.


S.      Mr. Stephens disregarded Ms. Elion's rights during the administrative processing of

her administrative complaint that gave rise to this action, when he refused to honor her request

8

for ADR.

RESPONSE:  This statement is not a material fact in that it does not "affect the outcome of the case under governing law."  <u>Nails v. England</u>, 311 F. Supp.2d 116, 121 (D.D.C. 2004).


T.      Defendant deviated from its standard business practices that were observed in all ten of its previous reorganizations, specifically of consulting with servicing personnel offices, in conducting its "reorganization" in April of 2004.

RESPONSE:  This statement is not a material fact in that it does not "affect the outcome of the case under governing law."  <u>Nails v. England</u>, 311 F. Supp.2d 116, 121 (D.D.C. 2004).  Specifically, the personnel offices played no role in Mr. Heist's decision to disband the HAD, which led to Plaintiff's reassignment to a non-supervisory position.

        In any event, to explain further, the cited record does not support Plaintiff's assertion here.  In his April 20, 2004 memorandum, Mr. Heist states that he consulted with the Human Resources Division to ensure the realignment could be accomplished without anyone's grade being affected.  <u>See</u> Apr. 20, 2004 (Gov. Exh. F).  Mr. Heist also testified in his deposition that "we had to involve HR and BPD to the extent of identifying position descriptions and those logistical issues that we had to resolve before we could implement this.  That was something Mike Phelps would have handled in his role . . . in carrying out the administrative responsibilities of the office."  Heist Depo. at 99:7-16 (Reply Gov. Exh. C).  Mr. Phelps stated that his standard practice was to consult with HR in carrying a reorganization.  Phelps Depo. at p. 45:13-14 (Reply Gov. Exh. D).

Q.[1]     Defendant's "reorganization" in April of 2004 was only one where that did not occur.

RESPONSE:  <u>See</u> Response to T above.


R.     Defendant's "reorganization" was proposed in a Memorandum written by Mr. Heist on

or about April 20, 2004.  Mr. Phelps claims to have had no involvement in preparing

the Memorandum and has no recollection of knowing about the reorganization before it was

approved.  Mr. Heist claims that he did.

RESPONSE:   This statement is not a material fact in that it does not "affect the outcome of the

case under governing law."  <u>Nails v. England</u>, 311 F. Supp.2d 116, 121 (D.D.C. 2004).

However, to explain further, Defendant admits Mr. Heist proposed the reorganization in his

memorandum dated April 20, 2004, and denies the remainder of the assertion.  The cites to the

record do not support the remaining assertion made.  Mr. Phelps repeatedly stated that he could

not remember whether he was consulted before or after the decision had been made but that he

was consulted at some point.  Phelps Depo.at 72:4-15; 73:1-8; 75:1-15, 79:11-22; 80:1-5.


S.     In the two years leading up to the supposed "new hiring freeze" in April of 2004, OIG

Headquarters audit divisions were never fully staffed.

RESPONSE:  Defendant denies this assertion.  Defendant admits that the Divisions were at times

understaffed.  <u>See</u> Dkt No. 37-15 (Staffing Reports) and Exhibit 2 to Phelps Decl. at ¶ 3 (Reply

Gov. Exh. B).  The documents presented by Plaintiff (Staffing Reports) show HAD was fully

_____

[1]     There is an error to Plaintiff's consecutive Statement of Material Facts.  After
paragraph "T," Plaintiff begins anew with paragraph "Q."   To avoid further confusion,
Defendant will use Plaintiff's scheme.

staffed from May 2002 until November 2002, when it was consistently 1-2 persons understaffed. See Dkt. No. 37-15. The ISAD was generally fully staffed from May 2002 to April 2004 with 18-20 auditors. The Financial Audit Division was understaffed until March 2003, and then consistently fully staffed or overstaffed by 1 auditor. Even being fully staffed the Financial Audit would require details of auditors to complete its mission. The same documents show that the Technical Oversight and Planning Division was consistently understaffed by 1 to 3 auditors. Id.


T.      Much of that time, OIG management was instructing the Office of Audit to accelerate hiring and stave off action by OMB to cut its personnel ceiling.

RESPONSE:   Defendant admits there was a push to hire from mid-2002 to July 2003. See Elion Depo.at p. 96-97, 142 152-153, 157 (Reply Gov. Exh. F). A hiring freeze was first announced in July 2003. Elion Depo. at p. 159-161). A second hiring freeze was announced in April 2004. See Gov. Exh. D.


U.      Going back to the late 1980's, the Office of Audit personnel "ceilings were raised" and "lowered... all the time."

RESPONSE:   Defendant admits that personnel ceilings were raised and lowered depending on the budget.


V.      Never on account of any hiring freeze or change in personnel ceiling was another Audit Division Director in OIG Headquarters or Regional Inspector General reassigned and

removed from management.

RESPONSE:  Defendant admits that no Audit Division Director in OIG Headquarters or

Regional Inspector General was reassigned and removed from management due to a hiring

freeze; however, management did consolidate the management of two regions (Regions 8 and

10) when the number of personnel in those regions did not justify maintaining a supervisory

GS-15 auditor (Regional Inspector General for Auditor (RIGAs)) in those regions.  They are

now managed by GS-14 supervisory auditors, who report to RIGAs in Region 7 and 9.  Heist

Decl. at ¶ 13 (Reply Gov. Exh. A).


W.     Headquarters Audits Division its [sic] staff auditors were not needed to fill critical

vacancies in two other audit Divisions, is also genuinely in dispute.

RESPONSE:   This is not a statement, but rather a legal argument.  "Legal conclusions cloaked

as facts are not sufficient to create a genuine issue of material fact."  <u>Colbert v. Chao</u>, 2001 WL

710114, * 7 (D.D.C. June 19, 2001).


X.     The workload of the Technical Oversight and Planning Division had not changed for a

number of years.

RESPONSE:  The fact that the workload had not changed does not mean that the workload is not

"tremendous" given the fact the TOP was constantly understaffed.  <u>See</u> Apr. 20. 2004

Memorandum (explaining that the "workload is tremendous and it is difficult for the current staff

to keep up in a timely manner.").

Y.     At the time of defendant's "new hiring freeze" in April of 2004, that Division was two

auditors below its authorized ceiling.

RESPONSE:  Defendant admits that the Technical Oversight and Planning Division was understaffed by two auditors in April 2004.

Z.      In the previous year and half, that Division was never staffed fully.

RESPONSE:  Defendant admits that the Technical Oversight and Planning Division was consistently understaffed even while it was increasing its responsibilities and control over the field offices between 2001 to 2004.

AA.     Headquarters Audits Division staff were not needed for the Financial Audits Division due to alleged "recent changes" in the Chief Financial Officers Act which "forced... almost a continuous financial audit process."

RESPONSE:   Defendant denies this conclusory assertion as argumentative.  Also, the recent changes were not due to the Chief Financial Officers Act, but to the due date for the FY financial audit, which Plaintiff admits was accelerated to November 15, 2004.  See Dkt. No. 37-20 (Circular A-136).  The record also shows that, even with the three  staff auditors from the HAD, the Financial Audit Division still requires details of auditors from the field.  Beard Decl. at ¶ 31 (attached to Plaintiff's Opp.)   The November 15 deadline also required the Office of Audit to begin some audit tasks earlier (id.; Heist Decl. at ¶ 3), meaning that the work was spreading out more over the year, and spiking less at the end of the fiscal year.  Heist Decl. at ¶5.

BB.     The Chief Financial Officers Act was enacted in 1990; the passage of that act

prompted HUD and other executive departments to prepare annual audited financial reports.

RESPONSE:  Defendant admits this assertion.


CC.     The alleged "recent changes" in auditing due dates were put in place by OMB in

2002.

RESPONSE:  Defendant admits this assertion.


DD.     Only a single audit, the one for FY 2004, remained to be completed when Ms.

Elion's staff was taken from her; from that point forward, the schedule would be unchanged.

RESPONSE:  Defendant denies this assertion.  The FY 2004 audit was the first audit with the

November 15 accelerated due date.  See Dkt. No. 37-20 (Circular A-136).  All financial audits

after FY 2004 are required to be completed by November 15.  Id.; Heist Decl. at ¶  3.


EE.     There was no disproportionate "ratio between managers and staff" of the

Headquarters Audits Division that warranted disbanding it: Headquarters Divisions were "never

included ... in terms of looking at" the ratio of supervisors to staff.

RESPONSE:  This statement is not a material fact in that it does not "affect the outcome of the

case under governing law."  Nails v. England, 311 F. Supp.2d 116, 121 (D.D.C. 2004).  The ratio

of supervisors to staff was not a factor in Mr. Heist's decision to disband the HAD.  See Apr. 20.

2004 (Gov. Exh. F).


FF. Even in the field, these ratios were sometimes used as a basis for adding a supervisor,

but never for removing one.

RESPONSE: <u>See</u> Response to EE.


GG.    When the supposed "new hiring freeze" was imposed, the Headquarters Audits

Division had a personnel ceiling of 9 auditors but only five were assigned there.  In the months

following the dissolution of the Headquarters Audits Division, there was work for 14

auditors in HUD OIG Headquarters that it could have performed.

RESPONSE:  Defendant admits that when the "hiring freeze" was imposed, the HAD had a

personnel ceiling of 9 auditors but only five were assigned, and  denies the remainder of the

assertion as argumentative and conclusory.

        Except for her own declaration, Plaintiff fails to point to any evidence in the record to

support the assertion that there was enough work in April 2004 to occupy 14 auditors.

Furthermore, even her own conclusory declaration fails to identify the type of work and the

volume of work in April 2004 that would occupy 14 auditors.


HH. Defendant withdrew and reduced work assignments for the Headquarters Audits

Division shortly after Ms. Elion's original EEO complaint was concluded.

RESPONSE:  This statement is not a material fact in that it does not "affect the outcome of the

case under governing law."  <u>Nails v. England</u>, 311 F. Supp.2d 116, 121 (D.D.C. 2004).


II.    In her original position as District Inspector General for Audit, Ms. Elion was

responsible for supervising the execution of internal and external audits and audit reports

concerning HUD programs and HUD-related activities within HUD Headquarters and the greater Washington, D.C., area.

RESPONSE: This statement is not a material fact in that it does not "affect the outcome of the case under governing law." <u>Nails v. England</u>, 311 F. Supp.2d 116, 121 (D.D.C. 2004).

Defendant also denies that the Plaintiff had the exclusive responsibility for audits concerning HUD programs within HUD Headquarters and the greater Washington, D.C. area. Heist Decl. at ¶ 12.

JJ.     In her subsequent position as Director of the Headquarters Audits Division, Ms. Elion managed the OIG audit division primarily responsible for internal audits and the preparation of audit reports for HUD Headquarters programs and activities.

RESPONSE: Defendant admits this assertion, but denies that Plaintiff had the exclusive responsibility for audits concerning HUD programs within HUD Headquarters. Heist Decl. at ¶ 12.

KK. Ms. Elion was also personally responsible for performing audits and issuing audit reports in more complicated and sensitive areas involving HUD officials.

RESPONSE:  This statement is not a material fact in that it does not "affect the outcome of the case under governing law." <u>Nails v. England</u>, 311 F. Supp.2d 116, 121 (D.D.C. 2004).

LL. When HUD OIG disbanded the Headquarters Audits Division, it reassigned Ms. Elion to a non-supervisory "special assistant" position under the Assistant Inspector General for

Audit.

RESPONSE:  Defendant admits this assertion.


MM. Ms. Elion's work assignments as a "special assistant" are few and far between, often menial, and not commensurate with her background and experience as a supervisory auditor who was previously engaged in the full range of OIG's audit activities.

RESPONSE:  This statement is not a material fact in that it does not "affect the outcome of the case under governing law."  Nails v. England, 311 F. Supp.2d 116, 121 (D.D.C. 2004).


NN. The Office of Audit is the larger OIG unit which included Ms. Elion's two former offices. The operating units of the Office of Audit are divided into Headquarters Divisions that are headed by Division Directors; and Regional field offices (formerly, District offices), which are headed by Regional Inspectors General for Audits. All of these office heads serve at Grade 15.

RESPONSE:  Defendant admits this assertion.


00.    All of the incumbents in these positions are accomplished auditors; all are supervisors; and all of their positions are functionally equivalent.  These supervisory auditors are responsible for managing the audit programs of HUD and there are no other managers at their level.  The program activities they manage are essentially the same, with the only meaningful distinction being that Regional Offices concentrate on field audits and operations and Headquarters Divisions focus on activities at HUD Headquarters.

17

RESPONSE:  Defendant denies that all of their positions are functionally equivalent.  The Financial Audit Division, the Information Systems Audit Division, and the Technical Oversight and Planning Divisions are unique organizations within the Office of Audit.  Defendant admits that the Headquarters Audit Division is comparable to a field office, while the above three divisions are not.  Heist Decl. at ¶ 7, 8.

PP. The chain of command for all of these supervisory auditors is the same. All answer in the first instance to the Deputy Assistant Inspector General for Audit, in this case Michael Phelps; and their second line supervisor is the Assistant Inspector General for Audit, James Heist. The Deputy Inspector General, in this case Michael Stephens, serves as third line supervisor; he is the chief operating officer for HUD OIG.

RESPONSE:  Defendant admits this.

QQ. Ms. Elion's primary assignment when she was appointed to head the Capital District audit function was to improve the performance of that office.  Her last performance appraisals as District Inspector General for Audit confirmed that she did.  According to both Assistant Inspector General Heist and Deputy Assistant Inspector General Phelps, "Ms. Elion issued five significant [audit] reports" that were "comprehensive" and "that resulted in significant changes in improving HUD's operations."

RESPONSE:  This statement is not a material fact in that it does not "affect the outcome of the case under governing law." Nails v. England, 311 F. Supp.2d 116, 121 (D.D.C. 2004).

18

RR. Despite Ms. Elion's success, in May of 2002, Mr. Heist and Mr. Phelps abolished

that District Office and reassigned Ms. Elion to the newly created Headquarters Audits Division.

RESPONSE:   This statement is not a material fact in that it does not "affect the outcome of the

case under governing law." Nails v. England, 311 F. Supp.2d 116, 121 (D.D.C. 2004).


SS. This reorganization, limitations on the scope of potential audits, reductions in the

number of assigned audits, arbitrary staff reductions, repeated acts that undermined her

managerial authority, and being personally assigned staff auditor duties were the most prominent

acts that led Ms. Elion to initiate the EEO complaints process for the first time on December 18,

2002.

RESPONSE:  This statement is not a material fact in that it does not "affect the outcome of the

case under governing law."  Nails v. England, 311 F. Supp.2d 116, 121 (D.D.C. 2004).


TT. Ms. Elion specifically identified Mr. Heist and Mr. Phelps as the management

officials responsible for discriminating against her.

RESPONSE:  Defendant admits that the complaint identified Messrs. Phelps and Heist as the

responsible officials.  The rest of the statement is immaterial to her underlying claims here

because it does not "affect the outcome of the case under governing law." Nails v. England, 311

F. Supp.2d 116, 121 (D.D.C. 2004).


UU. Without a settlement agreement, Mr. Heist and Mr. Phelps returned to the very

practices that had been the subjects of Ms. Elion's original complaint shortly after she withdrew

it.  Routine staff complaints were elevated to senior management.  Work that could have been done by Ms. Elion's division was either not performed, assigned to other offices, or assigned to Ms. Elion's staff who were then detailed to other offices.

RESPONSE:  This statement is not a material fact in that it does not "affect the outcome of the case under governing law."  Nails v. England, 311 F. Supp.2d 116, 121 (D.D.C. 2004).


VV. Defendant has admitted that Ms. Elion's complaint leveled legitimate allegations of Discrimination.

RESPONSE:  The cited record does not support this assertion and Defendant denies this assertion.  Plaintiff mischaracterizes Mr. Heist's deposition testimony, in which he indicated that he had "no reason to doubt the Plaintiff's sincerity" in bringing her first discrimination complaint.  See Heist Depo. at 76-77.  Nowhere in his deposition did Mr. Heist admit that Plaintiff's claims were legitimate.


WW.  Just before the Headquarters Audits Division was disbanded, Mr. Stephens instructed Ms. Elion to appear in his office and questioned her in an aggressive manner in an apparent attempt to obtain information adverse to Donna Hawkins, Ms. Elion's subordinate manager who herself had recently filed an EEO complaint based on race (African American) and sex.  Mr. Stephens "was quite visibly upset" when Ms. Elion denied that Ms. Hawkins was having difficulty managing her staff. Mr. Stephens raised his voice and pointed his finger at Ms. Elion, and ended the meeting abruptly.

RESPONSE: This statement is not a material fact in that it does not "affect the outcome of the

case under governing law." <u>Nails v. England</u>, 311 F. Supp.2d 116, 121 (D.D.C. 2004).

The cited record does not support Plaintiff's assertion.  In fact, when considered in full context, Mr. Phelps testified that Mr. Stephens was upset because of the possibility that OIG had "managers that are treating employees in such a way that they would resign their job as the only way out."  Phelps Depo. at 107:17-22 and 108:1-22.  Shortly before Mr. Stephens's meeting with Plaintiff about her assistant, Mr. Edward Kim (another employee under Ms. Hawkins's supervision) resigned because of the way he (Mr. Kim) "was being treated by Ms. Hawkins and Ms. Elion."  Phelps Depo. at 99:2-16 (Reply Gov. Exh. D).

XX.     Defendant involuntarily reassigned Daniel Salas, a Hispanic male, who formerly served as the Deputy Assistant Inspector General in the Office of Investigations after he filed an EEO complaint. Inspector General Kenneth Donahue himself reassigned Mr. Salas.  Deputy Inspector General Stephens was also involved in Mr. Salas' reassignment.

RESPONSE:  This statement is not a material fact in that it does not "affect the outcome of the case under governing law." <u>Nails v. England</u>, 311 F. Supp.2d 116, 121 (D.D.C. 2004).

To explain further, neither Messers. Phelps nor Heist (Plaintiff's former first and second line supervisors) played a role in Mr. Salas's reassignment.  Heist Decl. at ¶ 11.  In fact, Plaintiff even concedes that the Inspector General himself reassigned Mr. Salas.  <u>See</u> Opp. at 12. Furthermore, Mr. Salas was a Senior Executive Service ("SES") employee in the Office of Investigation.  Heist Decl. at ¶ 11.  Unlike Mr. Salas, Plaintiff's HAD was in the Office of Audit and she was a GS-15 employee at the time.  <u>Id</u>.

YY.    The thirteen OIG Divisions and Regional Offices that generated audit reports were ranked each Fiscal Year by Mr. Phelps. He measured their performance in terms of monetary benefits to HUD, cost disallowance to auditees, and timeliness of production at three previously determined audit stages. Ms. Elion's former Office was ranked third for FY 2004, the year the Headquarters Audits Division was disbanded. Defendant dissolved the Headquarters Audits Division halfway through FY 2004.

RESPONSE:  This statement is not a material fact in that it does not "affect the outcome of the case under governing law."  Nails v. England, 311 F. Supp.2d 116, 121 (D.D.C. 2004).   The ranking of each office was not a factor in Mr. Heist's decision to disband the HAD.  See Apr. 20, 2004 (Gov. Exh. F).  Furthermore, at the time of the HAD's dissolution, it was ranked tenth out of thirteen offices.  Phelps Decl. at ¶ 2 (Exh. 1) (Reply Gov. Exh. B).


ZZ. Ms. Elion's original EEO complaint in 2002 contested defendant's need to disband the Washington, D.C. District Office of audits and replace it with the Headquarters Audits Division.

RESPONSE:  This statement is not a material fact in that it does not "affect the outcome of the case under governing law."  Nails v. England, 311 F. Supp.2d 116, 121 (D.D.C. 2004).


AAA.  According to Mr. Heist, one of the principal reasons to disband the Washington, D.C. District Office of audits and replace it with the Headquarters Audits Division was to align the OIG audit offices and divisions with HUD's programmatic offices. When Mr. Heist disbanded the Headquarters Audits Division in April of 2004; it marked the first time in 33 years

when OIG's Office of Audit did not align with HUD's program and Headquarters activities.

RESPONSE:  This statement is not a material fact in that it does not "affect the outcome of the case under governing law."  <u>Nails v. England</u>, 311 F. Supp.2d 116, 121 (D.D.C. 2004).

      To explain further, the April 20th Memorandum disbanding the HAD explained that the staff within the HAD was being realigned "to best address our mission workload and our current and anticipated budget constraints."  Gov. Exh. F.  Mr. Heist explained in the Memorandum that, "We are currently under a hiring freeze so I cannot hire more staff in the Financial Audits Division or the Technical Oversight and Planning Division to address staffing needs."  <u>Id</u>.  He pointed out that it was necessary to reassign the staff within HAD to meet staffing needs.

Dated: May 8, 2007.                    Respectfully Submitted,


                                       ___/s/___Jeffrey A. Taylor_____
                                       JEFFREY A. TAYLOR, D.C. BAR # 498610
                                       United States Attorney


                                       ___/s/___Rudolph Contreras_____
                                       RUDOLPH CONTRERAS, D.C. BAR #434122
                                       Assistant United States Attorney


                                       ___/s/___John C. Truong_____
                                       JOHN C. TRUONG, D.C. BAR #465901
                                       Assistant United States Attorney
                                       555 Fourth Street, N.W.
                                       Washington, D.C.  20530
                                       (202) 307-0406

                                       Attorneys for Defendant



Of Counsel:

Maxine Sharpe
U.S. Department of Housing and Urban Development
Washington D.C.

Richard Johnson
Office of Inspector General
Washington D.C.