UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLUMBIA

- - - - - - - - - - - - - - -X

SAUNDRA G. ELION,                :

      Plaintiff         :

    v.                           :

                       :

ALPHONSO R. JACKSON,             :

      Defendant         :

- - - - - - - - - - - - - - -X

DEPOSITION OF AUSTIN GROOM

Washington, D.C.

Tuesday, April 18, 2006

Deposition of AUSTIN GROOM, called for

examination at 3:00 p.m., at the law offices of Robert

C. Seldon & Associates, P.C., 1319 F Street, N.W., Suite

305, Washington, D.C., before Gary S. Howard, a notary

public in and for the District of Columbia, when were

present on behalf of the respective parties:

APPEARANCES:

    On behalf of the Plaintiff:

      ROBERT C. SELDON, Esq.

```
 1          Law Offices of Robert C. Seldon, P.C.

 2          1319 F Street, N.W.,

 3          Suite 305

 4          Washington, D.C.

 5

 6        On behalf of the Defendant:

 7          JOHN C. TRUONG, Esq.

 8          United States Department of Justice

 9          United States Attorney's Office

10          555 4th Street, N.W.,

11          Washington, D.C.  20530

12          (202-307-0406)

13

14          MAXINE G. SHARPE, Esq.

15          HUD, Office of Inspector General

16

17      Also present:

18          SAUNDRA ELION

19

20                      C-O-N-T-E-N-T-S

21 WITNESS                      DIRECT    CROSS

22 Austin Groom                   4         51
```

1                          E-X-H-I-B-I-T-S

2 NUMBER                                   IDENTIFICATION

3 Deposition Exhibit No. 1                      31

4 Deposition Exhibit No. 2                      41

5

6   (Exhibits supplied by Mr. Seldon.)

7                      P-R-O-C-E-E-D-I-N-G-S

8 Whereupon,

9                       AUSTIN GROOM

10 was called as a witness and, having been first duly

11 sworn, was examined and testified as follows:

12                      DIRECT EXAMINATION

13         BY MR. SELDON:

14    Q     Mr. Groom, good afternoon.

15    A     Good afternoon.

16    Q     Thanks for coming. For the record, could

17 you please give us your full name and your present

18 place of residence?

19    A     The full name is Austin Boyd Groom, Jr.

20 The residence is 3504 Stonycreek Court. That's

21 Owings Mills, Maryland 21117.

22    Q     Okay.

1          MR. TRUONG: Mr. Seldon, before you go any

2 further, I just want to make an objection for the

3 record that this Plaintiff -- that calling this

4 Witness is beyond the scope of discovery here.

5          It is irrelevant to the underlying claims

6 the Plaintiff is advancing in this case. And

7 therefore, this Witness is irrelevant and so is the

8 entire testimony here today.

9          MR. SELDON:  Great. Ready to go on, Mr.

10 Groom?

11          THE WITNESS:  Yes.

12          MR. SELDON:  Okay.

13          BY MR. SELDON:

14    Q    What I'm going to do is we're going to

15 explain what we're doing here today, okay?

16          We represent the Plaintiff in this

17 action, Ms. Elion, who I think you know. Ms. Elion

18 presently has pending in the United States District

19 Court a complaint of discrimination and retaliation

20 in her employment.

21          The Defendant is, nominally, Secretary

22 Jackson, but it involves actions taken by officials

1 you like.

2          THE WITNESS:  Okay.

3          MR. SELDON:  Sure. The only rule is that

4 you can't talk to counsel about questions at those

5 breaks.

6          THE WITNESS:  Okay. Thank you.

7          BY MR. SELDON:

8     Q     Okay. Mr. Groom, you are presently

9 employed by the Office of Inspector General of the

10 Department of Housing and Urban Development.

11          Is that right?

12    A     No, that's incorrect.

13    Q     Okay.

14    A     I'm employed under the Department of

15 Housing and Urban Development. I'm now in the

16 office of fair housing and equal opportunity.

17    Q     FHEO?

18    A     FHEO.

19    Q     What position do you hold there?

20    A     I'm a management analyst.

21    Q     At what grade?

22    A     GS-15.

Page 10

1    Q    Are you a trained auditor by background?

2    A    Yes, I am.

3    Q    Do you have any professional degrees in

4 that field?

5    A    I have a number of certifications.

6    Q    Okay. It's not really the focus of this,

7 so if I could just ask you briefly, could you

8 summarize what your duties and responsibilities are

9 as a management analyst in FHEO?

10    A    I work in the office of budget admin. My

11 job is currently right now handling OIG complaints

12 that are filed through FHEO from various

13 complainants.

14        Also, I handle some budget admin.

15 functional accounting background information.

16        And then I do special projects assigned

17 by the deputy assistant secretary.

18    Q    Are you a supervisor in this job?

19    A    Not at the present.

20    Q    How long have you held this job?

21    A    I've currently been a management analyst

22 since 2002.

1    Q    I guess what I'm saying, in this

2 particular job, has it been since 2002?

3    A    Since 2002.

4    Q    And in FHEO?

5    A    In FHEO.

6    Q    And continuously in those, give or take

7 four years?

8    A    About four years.

9    Q    And continuously?

10   A    Correct.

11   Q    Okay. Prior to that time -- do you recall

12 the month that you went back to FHEO?

13   A    It was in August of 2002.

14   Q    Prior to that time, were you employed?

15   A    Yes, I was.

16   Q    Where?

17   A    In HUD, the office of the inspector

18 general.

19   Q    What capacity?

20   A    At the capacity I left, I was special

21 assistant.

22   Q    To whom?

1    A    Mike Phelps, the deputy assistant

2 inspector general for audit.

3    Q    How long had you held that job?

4    A    I was there with Mike two years.

5    Q    That would have taken you back to about

6 2000?

7    A    That's correct.

8    Q    And do you recall when in 2000, you

9 started that job?

10    A    That I don't recall.

11    Q    Okay. And were you employed before you

12 started that job?

13    A    Yes.

14    Q    In what capacity?

15    A    I was still in the HUD office of the

16 inspector general.

17    Q    Okay. As what?

18    A    I held the job as -- I think at that time

19 they called it district inspector general for

20 audit.

21    Q    Was that for the capital district?

22    A    That's correct.

Page 13

1    Q    How long did you hold that job?

2    A    I started that job in 1996. I can't

3 remember the particular month. It was March of '96.

4    Q    And so, you held that job to 2000.

5    A    Correct.

6    Q    Okay. And then from 2000 to 2002, you

7 were a special assistant to DAIGA Phelps.

8         Is that right?

9    A    That's correct.

10    Q    And then beginning in August of 2002, you

11 went to work in FHEO.

12    A    That's correct.

13    Q    Okay. Is it correct to say that when you

14 vacated the job as district inspector general for

15 audit of the capital district, it was Ms. Elion who

16 followed you as, if you know, a permanent basis in

17 that job?

18    A    Correct. They advertised the job, I

19 think, and Sandy was selected.

20    Q    Okay. And the job that you previously

21 held as special assistant to Mr. Phelps, is there

22 anyone who encumbers that job now?

Page 14

1    A    Can you repeat that again?

2    Q    Sure. Is there anyone who hold that job

3 now?  And it's special assistant to Mr. Phelps?

4         MR. TRUONG: Objection. Speculation.

5         BY MR. SELDON:

6    Q    If you know.

7    A    I can only assume, at this point in time.

8

9         Like I said, after I left the IG in 2002,

10 I never kept in total contact with people. And I

11 know that there was a number of positions --I know

12 at the time when I left the position back in 2000,

13 Sandy was then selected for the job.

14    Q    No, I'm going forward -- as special

15 assistant to Mr. Phelps.

16    A    I didn't really keep in contact with what

17 was going on.

18    Q    Okay. And you don't know now -- do you

19 know now?

20    A    No, I wouldn't know now.

21    Q    Okay. You were -- is it district

22 inspector general for the audit of the capital

Page 15

1 district?

2    A    At that time, that's what it was called.

3 There were district inspector generals. I think

4 that they're titled different now, but at that

5 time, it was.

6    Q    Okay. '96 to 2000, I take it. Right?

7    A    I think that's correct.

8    Q    How is it that you came to leave that

9 position?

10    A    The district inspector general position?

11    Q    Yes.

12    A    I was reassigned to work with Mike

13 Phelps.

14    Q    Did you solicit that reassignment?

15    A    No, I didn't.

16    Q    Was it involuntary?  Was it directed,

17 rather?

18         I'm sorry.

19    A    It was directed. It was a reassignment,

20 direct reassignment by Cathy Inkling.

21    Q    Who was who?

22    A    Who was the assistant inspector general

1 for audit. It was Mike Phelps' immediate

2 supervisor.

3     Q     You know what I forgot to put on the

4 record?

5          Your race is African-American, I take it.

6     A     It is.

7     Q     And who do you know was involved with

8 in making the decision to reassign you?

9     A     I think Mike participated in it. To what

10 level -- but, again, it was Cathy Inkling -- Pat

11 Inkling?

12    Q     Cathy Kulick.

13    A     Cathy Kulick Inkling, who actually called

14 me and actually particularly made the reassignment.

15          MR. TRUONG: Mike?  Is that Mike Phelps?

16          THE WITNESS:  Mike Phelps.

17          MR. TRUONG: Thank you.

18          BY MR. SELDON:

19    Q     And at the time before your reassignment,

20 was Mr. Phelps your supervisor in any way?

21    A     No. Most of the district inspector

22 generals for audit reported to Cathy directly.

1    Q    At the time of your reassignment, what

2 reason -- or after that, what reason or reasons

3 were given to you for reassigning you?

4    A    At that time, Cathy thought that my

5 management skills were lacking in the particular

6 position, and thought it was in the best interest

7 to move me into the headquarters unit.

8    Q    Did you believe that that was correct?

9    A    At that time, no.

10    Q    Do you believe it now?

11    A    No, at that time, no.

12    Q    Sorry?

13    A    No.

14    Q    Did you have a belief about whether

15 discrimination or retaliation was involved in that

16 decision to reassign you?

17    A    Not in Cathy's decision.

18    Q    Okay. Any other aspect of it -- Phelps'

19 role or anybody's?

20    A    No. At that time, it was just a

21 disagreement in philosophies on management.

22    Q    Okay. And then, from 2000 to '02, you

1 worked as Mr. Phelps' special assistant, I take it.

2    A    That's correct.

3    Q    What was your working relationship -- and

4 I take it he was your immediate supervisor.

5    A    He was my immediate supervisor.

6    Q    And would you have a second-level

7 supervisor?

8    A    No. It was Mike. And then the second

9 level was Jim Heist that Mike reported to.

10         He replaced Cathy Inkling.

11   Q    Okay. And before that, Mr. Heist was or

12 was not in your supervisory chain?

13   A    Not before then. We were peers.

14   Q    Okay. What were your recurrent duties and

15 responsibilities and job functions as special

16 assistant to Mr. Phelps?

17   A    If I can remember, basically, Mike

18 oversaw a lot of special projects for the various

19 regional directors.

20         And one was performance measurements.

21   Q    Okay.

22   A    And that was basically my job of

1 performance measurements.

2          And then, basically, it was special

3 projects. Any type of special projects that

4 occurred, they wanted to assign me to.

5    Q    And was that, to your view, what was

6 assigned to you, commensurate with your background

7 and experience as a GS-15?

8    A    One gave me an opportunity -- I spent

9 quite a long period of time doing recruitment.

10          MR. TRUONG: Just for clarification

11 purposes, I don't think that Mr. Groom was at GS-15

12 at that time, were you?

13          THE WITNESS:  I was a GS-13 through that

14 process.

15          MR. TRUONG: Thank you for the

16 clarification.

17          BY MR. SELDON:

18    Q    Now in August of 2002, you went to FHEO.

19    A    That's correct.

20    Q    How did that come about?

21    A    That was part of an ADR settlement with

22 the agency.

1    Q    Okay. And I think we've agreed that we're

2 not going to go into what's exchanged in the ADR.

3         So that's fine.

4         MR. TRUONG: Good idea.

5         MR. SELDON:  You do need to learn, John.

6         (Pause.)

7         Actually, I'm going to need you to

8 formally put that objection on the record.  I'm

9 just going to make the question.

10         And Mr. Groom, don't answer because this

11 is just a minuet for us.  I'm going to put the

12 question on the record and then I'm going to ask

13 you to direct the Witness not to answer so that we

14 know for sure.

15         BY MR. SELDON:

16    Q    Mr. Groom, was your case settled --

17 sorry.

18         I take it you previously had an

19 administrative complaint of discrimination against

20 HUD.

21         Is that right?

22    A    Initially.

1    Q    And I think you said that that led to

2 your reassignment to FHEO.

3    A    The reassignment to FHEO was a

4 culmination of two actions.

5    Q    Okay. What were the two actions?

6    A    One was an EEO complaint process that was

7 being pursued. And the second was an MSPB action

8 performance.

9    Q    That's what I thought. Was your removal

10 ever proposed from the federal service on

11 performance grounds?

12         MR. TRUONG: Objection,  to the extent

13 that it touches upon the ADR process pursuant to

14 Judge Kaye's instructions.

15         MR. SELDON:  Let's be clear about this,

16 John. I'm asking him whether his removal was

17 proposed.

18         You're directing the Witness not to

19 answer?

20         MR. TRUONG: Well, let's put it this way.

21 I intend to do that pursuant to Judge Kaye's --

22         MR. SELDON:  I just want to get clear

1 what you're doing.

2          MR. TRUONG: Well, hang on for a second.

3 Just let me finish my objection and then you can

4 say whatever you want to say.

5          I intend to instruct the Witness not to

6 answer pursuant to Judge Kaye's oral order of

7 yesterday, April 17th.

8          With that in mind, I would like for you

9 to rephrase the question, and if I  think it is

10 outside the scope of the issues that we talked with

11 Judge Kaye yesterday, then I'll allow the Witness

12 to answer.

13          So go ahead and rephrase your question.

14          BY MR. SELDON:

15    Q    Was your removal proposed from the

16 federal service, Mr. Groom?

17          MR. TRUONG: Go ahead and answer the

18 question.

19          THE WITNESS:  Yes.

20          BY MR. SELDON:

21    Q    When was that?

22    A    Without speculation, it's either late

1 January or February. I'm not particular. But it's

2 in that period.

3     Q      Of what?

4     A      Of 2002.

5     Q      Were you ever removed from the federal

6 service?

7     A      Yes, I was.

8     Q      Approximately when was that?

9     A      I think that was -- again, I think the

10 proposal was in January. The removal was in

11 February.

12    Q      Okay. To your knowledge, who proposed

13 your removal from the federal service?

14    A      Mike Phelps.

15    Q      Was it on performance grounds?

16    A      Correct.

17    Q      Is it correct that you took an appeal to

18 the Merit Systems Protection Board?

19    A      Correct.

20    Q      Did your appeal also include a claim of

21 discrimination or retaliation?

22    A      Not at that time.

1    Q     Did it later?

2    A     In the process, the ADR, on completion of

3 the --

4          MR. TRUONG: I just want to caution you

5 not to answer --

6          MR. SELDON:  May I make a suggestion?

7 Why don't you confer with him and see because the

8 question wasn't -- I don't know if it was exactly

9 what I was asking.

10         But I certainly don't --

11         MR. TRUONG: I understand.

12         MR. SELDON:  What we're looking for is an

13 answer, if I can say this -- and John will clarify

14 -- we're looking for an answer, not so much of what

15 the ADR agreement might have resolved.

16         What we're looking for is whether in the

17 MSPB or in the administrative process, you

18 presented a claim of discrimination or retaliation

19 over being removed.

20         MR. TRUONG: Right. Yes.  So, in other

21 words, answer your question precisely the way that

22 Mr. Seldon posed it.

1          Don't answer the question that would

2 touch upon the ADR process.

3          MR. SELDON:  Right.

4          MR. TRUONG: So when you filed your

5 complaint at the MSPB level or at the EEOC level,

6 work with those allegations.

7          MR. SELDON:  Or amended the complaint.

8          MR. TRUONG: Or amended. What were those

9 allegations?  Don't talk about the ADR process.

10          THE WITNESS:  Again, my attorney actually

11 did the filing. But my understanding of the filing,

12 in the EEO complaint -- if I

13 remember -- I think it was age, race -- there was

14 three and I can't remember the third one.

15          Age, race, and I can't remember the third

16 one. And there was three of them that they filed

17 under the EEO process.

18          Under the MSPB, we were filing against

19 the unsatisfactory performance appraisal.

20          MR. SELDON:  Okay.

21          THE WITNESS:  And we thought the facts of

22 the unsatisfactory performance appraisal led to

1 some discriminatory actions.

2          MR. SELDON:  Okay. Appreciate it.

3          BY MR. SELDON:

4    Q    Was your MSPB case litigated to a

5 decision at any point?

6    A    No, it wasn't.

7    Q    Again, I don't want to go into the ADR

8 process. But it was resolved before a decision was

9 issued by the MSPB?

10   A    That's correct.

11   Q    Okay. Was there a settlement agreement

12 entered at the MSPB -- I don't want to go into the

13 ADR process -- but a settlement agreement entered

14 into at the MSPB concerning your case?

15   A    As part of the process.

16   Q    Okay. Do you recall what was filed at the

17 MSPB?  Was it just a notice of dismissal, or was

18 there a separate settlement agreement filed there?

19   A    There was a notice of dismissal.

20   Q    That's fair enough.

21        (Pause.)

22        Who did you believe was responsible for

1 proposing your removal?

2    A    Mike Phelps, my immediate supervisor.

3    Q    What makes you say that?

4    A    His actions as a supervisor and what he

5 directed me to do.

6    Q    In what way?

7    A    Under the MSPB board, there was a

8 question about reporting levels as far as chain of

9 command of supervision in which it was an awkward

10 position I was put into.

11    Q    And when your removal was proposed, it

12 was when you were serving as special assistant to

13 Mr. Phelps?

14    A    That's correct.

15    Q    Okay. And then there was a decision made

16 to remove you. And that was made in

17 January/February of '02.

18        Is that right?  Just so we set the stage.

19    A    In January, I think the proposal was

20 made. Then it was 30 days later and they issued the

21 removal letter.

22    Q    Okay. And who was responsible for the

Page 28

1 issuance of the removal letter, to your

2 recollection?

3     A     I think it was Jim Heist. I think once he

4 made the proposal, Jim Heist actually issued a

5 final removal.

6     Q     Did you believe -- I'm not sure if you

7 testified to this or not. I'm sorry -- that

8 discrimination or retaliation figured either in the

9 removal proposal or the removal decision?

10     A     Discrimination, yes.  The retaliation, I

11 can't -- I'd be speculating.

12     Q     Okay. What makes you say discrimination?

13 And by this, I mean racial discrimination.

14     A     Racial discrimination.

15     Q     What makes you say that?

16     A     I know it was three -- race --

17           MR. TRUONG: Age.

18           THE WITNESS:  Age. I don't know what the

19 third one was.

20           (Pause.)

21           MR. SELDON:  I've got race and color

22 here, sex and age.

Page 33

1 part of your complaint or just were in the same

2 file that was given to us.

3          So what we're going to do is we're going

4 to go through some of these and figure out exactly

5 where we are.

6          This first page, 1666 of Groom Exhibit

7 1, do you recognize this document?

8    A    No, I don't.

9    Q    Okay. Now we've got the second page,

10 which is 1670.  This looks to be the cover sheet of

11 a formal complaint of discrimination filed by you.

12          Is that what it is?

13    A    That's correct.

14    Q    Okay. And then what were the subjects of

15 this complaint, in your own words?

16    A    Why it occurred?

17    Q    Yes. What do you think was going on?

18    A    At the time, again, like I said, I

19 thought that, based on Mike Phelps' decision, the

20 supervisor, it might have been related to some

21 biases and prejudices of an African-American

22 person.

1           And again, at age, at that time, 46.

2    Q     Okay. And so we look in box 16 -- first

3 of all, let's go through the date on this.

4           If we look in 17, you made the initial

5 contact with an EEO counselor on May 4th of '01.

6           Does that conform with your recollection?

7    A     That's correct.

8    Q     And then you filed this formal complaint

9 on June 20th, '01.  Is that right?

10   A     That's correct.

11   Q     And here, you named, at least at that

12 time, as the officials you believed discriminatory,

13 is Mr. Heist.

14          Right?

15   A     That's correct.

16   Q     Mr. Phelps.

17          MR. TRUONG: Box no. 10?

18          MR. SELDON:  Good.

19          BY MR. SELDON:

20   Q     Mr. Phelps, right?

21   A     That's right.

22   Q     Ms. Carroll?

Page 40

1            MR. TRUONG: Why don't you introduce it as

2 an exhibit, Mr. Seldon?

3            MR. SELDON:  I'm not really going to.

4 It's all -- I guess I will.

5            Okay. Let's make this Groom 2.

6            THE COURT REPORTER:  No.  2.

7                 (The document referred to

8                  was marked for identification

9                  as Deposition Exhibit No. 2.)

10           BY MR. SELDON:

11    Q     Do you recognize this document and what

12 appears to be your signature is on the last page?

13    A     My signature is on the page. My attorney

14 and the attorney for OIG kind of negotiated what

15 was in between the middle of it.

16            I was instructed at the end to sign it by

17 my attorney.

18    Q     And to your recollection, did this

19 resolve your administrative complaint of

20 discrimination in No. IG-0101?

21    A     It was part of the agreement.

22    Q     Did it also resolve the MSPB case?

1    A    Correct.

2    Q    Don't answer the question because I think

3 -- until Mr. Truong says it's okay.

4        What were the terms of the mediation

5 agreement?

6        MR. TRUONG: Objection, to the extent that

7 there's a confidentiality provision in the ADR

8 settlement agreement that prohibits the

9 participants, including Mr. Groom, from discussing

10 the settlement terms, and pursuant to Judge Kaye's

11 instruction yesterday during the telephone

12 conference that I have permission to instruct the

13 Witness not to answer that question.

14        So under Judge Kaye's order, Mr. Groom, I

15 am instructing you not to answer that question.

16 That's objection number one.

17        Objection number two -- well, the entire

18 deposition is irrelevant and I made that objection

19 already.

20        But more specifically, the terms of the

21 settlement have no relevance whatsoever to the

22 underlying complaints that Ms. Elion has in this

Page 42

1 case.

2          MR. SELDON:  Okay.

3          BY MR. SELDON:

4     Q     And now, I'll just go back and ask

5 you -- but again, I think it would be good if after

6 each question I put to you, you pause and give Mr.

7 Truong a chance to say it's okay to answer or not.

8          MR. TRUONG: Mr. Seldon --

9          MR. SELDON:  You can't possibly have an

10 objection to what I'm saying.

11          MR. TRUONG: I was just seeking

12 clarification.

13          Are you intending to ask a series of

14 questions involving his ADR process, despite what

15 Judge Kaye instructed the parties yesterday?

16          MR. SELDON:  Judge Kaye said to take up

17 what goes on at the deposition. And unless I ask

18 him a question and you instruct him not to answer,

19 I can't preserve what I've done, I can't preserve

20 my own --

21          MR. TRUONG: Good enough.

22          MR. SELDON:  And John, that's why I'm

1 giving you as much time as you want.

2           MR. TRUONG: I understand. So when I

3 instruct you not to answer a particular question

4 after my objection, then what you need to do is

5 say, on the advice of counsel, I decline to answer.

6           MR. SELDON:  Right. And then it's my job

7 to ask you another question, or do whatever.

8           MR. TRUONG: Right.

9           BY MR. SELDON:

10    Q    Mr. Groom, because I don't have a copy of

11 this, do you know whether there's a confidentiality

12 agreement that's part of the settlement of your

13 case, or cases?

14           MR. TRUONG: Same objection.

15           THE WITNESS:  On the advice of

16 counsel --

17           MR. SELDON:  Are you telling him not to

18 answer?

19           MR. TRUONG: That's correct.

20           MR. SELDON:  Okay. I just wanted to be

21 sure of that.

22           THE WITNESS:  On the advice of counsel, I

1 will not answer.

2          MR. SELDON:  That's fine.

3          MR. TRUONG: Just for clarification

4 purposes, the Exhibit 2 that has been introduced

5 contains a confidentiality provision.

6          To the extent that counsel wishes to

7 read that into the record, I would not object to

8 that.

9          MR. SELDON:  You're saying that's the

10 confidentiality -- I didn't understand. I didn't

11 see it numbered.

12          MR. TRUONG: Yes.

13          MR. SELDON:  So you're saying that on the

14 first page is the confidentiality provision. Okay.

15          MR. TRUONG: Yes.

16          BY MR. SELDON:

17    Q     And then, Mr. Groom, is it your

18 understanding that that first paragraph about

19 maintaining confidentiality, that that binds you as

20 a party to this agreement?

21          MR. TRUONG: Go ahead and read the

22 confidentiality provision, and then answer the

Page 45

1 question.

2         THE WITNESS:  Confidentiality must

3 be --

4         MR. TRUONG: Go ahead and read it to

5 yourself.

6         THE WITNESS:  Okay.

7         (Pause.)

8         MR. TRUONG: Do you want to re-ask the

9 question?

10         BY MR. SELDON:

11    Q    Is it your understanding that that clause

12 requires you to keep the terms of this agreement

13 confidential?

14    A    Yes.

15    Q    Okay. This agreement, I take it from what

16 you testified previously, again, we're going to go

17 slowly so that Mr. Truong -- don't jump in and

18 answer anything too fast -- that it also resolved

19 your MSPB complaint.

20         Is that right?

21         MR. TRUONG: No objection. Go ahead and

22 answer that question.

1            THE WITNESS:  Yes.

2            BY MR. SELDON:

3    Q    Your EEO complaint -- at any time, did

4 you file an EEO complaint over being removed from

5 HUD OIG?

6            MR. TRUONG: Go ahead and answer the

7 question.

8            THE WITNESS:  No, not on removal.

9            BY MR. SELDON:

10   Q    That was the subject of your

11 complaint -- I'm sorry -- your appeal to the Merit

12 Systems Protection Board.

13           Is that right?

14   A    That's correct.

15   Q    Okay. And now I'm going to ask you now to

16 go real slow because I know Mr. Truong isn't going

17 to want you to answer this, but I have to put it

18 there for the record.

19           MR. TRUONG: If you know I don't want him

20 to answer, don't ask it.

21           MR. SELDON:  No, I have to, to preserve

22 it, John.  When you get to be my age some day,

1 you'll understand.

2          BY MR. SELDON:

3    Q    What were the terms and conditions under

4 which your complaint to the Merit Systems

5 Protection Board was resolved, your appeal to the

6 MSPB was resolved?

7          MR. TRUONG: Before you answer that

8 question --

9          (Pause.)

10          Okay. Objection, to the extent that it is

11 seeking disclosure of the settlement terms of the

12 ADR, pursuant to Magistrate Judge Kaye's order

13 ruling on April 16 -- no, April 17 -- I instruct

14 Mr. Groom not to answer the question.

15          THE WITNESS:  On the advice of counsel, I

16 will not answer.

17          MR. SELDON:  Okay.

18          BY MR. SELDON:

19    Q    After the mediation settlement agreement

20 and general release -- and again, same caution,

21 giving Mr. Truong a chance to say what he needs to

22 say -- after it was entered into, was your MSPB

1 appeal dismissed by you?

2          MR. TRUONG: No objection. Go ahead.

3          THE WITNESS:  It was by my attorney.

4          BY MR. SELDON:

5    Q    On your behalf.

6    A    My behalf.

7          (Pause.)
          MR. TRUONG: Let me be clear -- no
8 objection on that particular question, not no
  objection on the entire deposition.
9          MR. SELDON:  We're going one by one.
          MR. TRUONG: Okay.
10         BY MR. SELDON:
    Q    Before your MSPB appeal, were you in fact
11 removed from the Federal Government?
    A    Yes.
12    Q    During what period of time were you
  removed?
13    A    It was effective as of March -- I'm sorry
  -- February, 2002.
14    Q    And when were you reinstated?
    A    In August of 2002.
15    Q    And for the record, you were reinstated
  right after Mr. King approved the mediation
16 settlement agreement
          Is that right? Look at the last page.
17         (Pause.)
    A    I was reinstated when May signed and I
18 reported to work.
          (Pause.)
19         MR. SELDON:  Let's us take five, and I
  would get ready for your examination because I may
20 or may not have a follow-up question, but that's
  all.
21         MR. TRUONG: Okay.
          (Recess.)
22         THE COURT REPORTER:  We're back on the
  record.

```
 1          MR. SELDON:  I don't have anything more.
            MR. TRUONG: I have just one question, Mr.
 2 Groom.
                      CROSS EXAMINATION
 3          BY MR. TRUONG:
      Q     Do you have any knowledge of Ms. Elion's
 4 allegation against HUD?
      A     No.
 5          MR. TRUONG: That's all I have.
            MR. SELDON:  Okay. Thanks for coming
 6 down, Mr. Groom.
            THE COURT REPORTER:  He'll sign. And you
 7 want a copy.
            MR. TRUONG: That's correct. The Witness
 8 will sign, will review and sign the deposition. And
   I'd like a copy, yes.
 9          THE COURT REPORTER:  And we're off.

10          (Signature not waived.)

11          (Whereupon, at 3:47 p.m., the taking of
   the deposition was concluded.)
12


13
                   --------------------------
14                      Austin Groom

15          ACKNOWLEDGEMENT OF DEPONENT

16 -----------------------------------

17 Re: Saundra G. Elion vs. Alphonso R. Jackson

18    Deposition of Austin Groom, April 18, 2006

19 -----------------------------------

20


21


22          I, Austin Groom, hereby acknowledge
```

Page 50

1 that I am the witness testifying in the above-

2 mentioned matter.

3

4 --------------------      -------------------------

5  Date                              Signature

6           Sworn to before me this

7

8 -------------------- day of-----------------------

9

10                        -----------------------

11                          Notary Public

12

13 My commission expires:

14                  ERRATA SHEET

15 Case:Saundra G. Elion v. Alphonso R. Jackson,Esq.

16 Deposition of: Austin Groom

17 Taken on: Tuesday, April 18, 2006

18 Reporter: GARY S. HOWARD

19         At the time the above-named deponent read

20 and signed the deposition, the deponent desired to

21 make the following corrections:

22 Page:    Line:    As transcribed:   Changed to:

Page 51

1  ------------------------------------------------------

2  ------------------------------------------------------

3  ------------------------------------------------------

4  ------------------------------------------------------

5  ------------------------------------------------------

6  ------------------------------------------------------

7  ------------------------------------------------------

8  ------------------------------------------------------

9  ------------------------------------------------------

10 ------------------------------------------------------

11 ------------------------------------------------------

12 -------------------------------------Dated:

13         Signed:

14

15

16

17

18

19

20

21

22

IG 01 01 – AUSTIN GROOM

You alleged that you were discriminated against because of your race (African American), age (46), color (Black) and sex (male), when the Department rated your performance as Unacceptable on the annual appraisal you received on May 1, 2001.

*RMO Phelps*



4-18-06

EXHIBIT NO. 1
GROOM
MGB REPORTING

01666

HUD EEO Complaint of Discrimination

Notice of Actions and Privacy Act Statement

| 1. Name | 2. SSN | Case No. (For HUD Use Only) |
|---|---|---|
| Austin B. Groom, Jr. | ~~████~~ | |

| 3. Mailing Address | 4. Home Phone ~~████~~ | 8. Are You Now Working for the Federal Government? |
|---|---|---|
| ~~████████~~ | 5. Work Phone (202) 708-0364 | ☒ Yes  ☐ No |

| 6. Position Title | 7. Grade & Series |
|---|---|
| Special Assistant | GS 511 15 |

| 9. Office Where You Believe Discrimination Occurred (Include Division, Office, City, State, and ZIP) | 10. Name, Title and Organizational Unit of Person(s) Who Took the Action(s) You Allege Was Discriminatory (e.g., Mary Smith, Asst Dir, Ofc of Housing) |
|---|---|
| Office of Inspector General<br>Office of Audit<br>Washington, DC    20410 | James Heist, AIGA (Appraisal Reviewer)<br>Michael Phelps, DAIGA (Appraisal Rater)<br>Theresa Carroll, ADIGA, Southwest District<br>C. Lon Keister, AIC, Southwest District |

| 11. Name and Address of Agency Where You Work. | 12. Date Notice of Right to File Complaint Received |
|---|---|
| U.S. Department of HUD<br>Office of Inspector General<br>Office of Audit, Room 8286<br>451 7th Street<br>Washington, DC    20410 | 6/6/01 |

| 13. I designate this person to be my representative. | | |
|---|---|---|
| a. Name & Title<br>Person(s) to be name at later date. | b. Address | c. Home Phone |
| | | d. Work Phone |

| 14. Type of Discrimination Alleged | | 15. Date each Alleged Act of Discrimination Took Place |
|---|---|---|
| ☒ Race (Specify): African American<br>☒ Color (Specify): Black<br>☐ Religion (Specify):<br>☐ National Origin (Specify): | ☒ Sex (Specify): Male<br>☒ Age (Specify): 46<br>☐ Handicap (Specify):<br>☐ Reprisal (Specify): | 3/22/01 End of Job Evaluation<br>5/1/01 Annual Performance Appraisal & Rating |

16. Explain the specific actions or situation that resulted in your allegation(s) that you were treated differently than other employees or applicants because of race, color, religion, national origin, sex, age, handicap, or reprisal. If your complaint involves more than one allegation of discrimination, list and number each allegation separately and furnish specific, factual information in support of each. Additional pages may be used to explain the alleged act of discrimination.

See Attabhed.

| 17. I have discussed the issues in Section 16 with an EEO counselor | 18. Name of EEO Counselor |
|---|---|
| ☒ Yes  Date of initial contact: 5/4/01<br>Date of final interview: 6/6/01 | Doris Carey |

19. Corrective Action Sought

See Attached.

RECEIVED JUN 21 20

| 20. Signature of Complainant | 21. Date of Complaint |
|---|---|
| *[signature]* Aust B Groom J | 6/20/01 |

Austin B. Groom, Jr., ▮▮▮▮▮▮▮
EEO Complaint of Discrimination in HUD
June 20, 2001
Response to Number 19:

The corrective actions that I am seeking are included below but not limited to the following:

1.    The end of assignment performance rating that Ms. Carroll prepared with input from Mr. Keister be overturned and disallowed because of their discriminatory practices and actions in generating the rating.

2.    The "Unacceptable" performance rating that Mr. Phelps issued be overturned and disallowed because of his discriminatory practices and actions in generating the rating.

3.    Remove from my Official Personnel File any information that documents the detrimental results from Mr. Heist, Mr. Phelps, Ms. Carroll, and Mr. Keister's discriminatory actions.

4.    Sensitivity and Diversity training for Mr. Heist, Mr. Phelps, Ms. Carroll, and Mr. Keister and that they demonstrate and implement the positive results from this specialized training.

5.    Direct Mr. Heist, Mr. Phelps, Ms. Carroll, and Mr. Keister to actively participate and support minority and diversity activities as a show of their sincerity in rectifying their discriminatory actions.

6.    Reinstate all leave that occurred during Mr. Heist, Mr. Phelps, Ms. Carroll, and Mr. Keister period of discrimination resulting from undue stress and anxiety created by this environment.

7.    Reimburse all attorney costs and legal fees that were incurred in preparation, during, and in completion of my EEO complaint process.

8.    Reassignment or transfer to another office outside of HUD OIG which would remove me from my hostile environment within the OIG and prevent adverse actions from OIG management specifically my immediate supervisor, Mr. Phelps.  This action should include consideration for participation in the OPM Intergovernmental Personal Act (IPA) Mobility Program.

9.    Provide me sufficient training to continue to improve and enhance my skills, knowledge, and abilities, thereby eradicating the slanderous damage on my work ethics, reputations, creditability and value to the OIG that Mr. Heists, Mr. Phelps, Ms. Carroll, and Mr. Keister have created through their discriminatory actions.



U.S. DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT
THE OFFICE OF THE SECRETARY
WASHINGTON, DC 20410-0001

Office of Departmental
Equal Employment Opportunity

AUG 23 2001

**CERTIFIED MAIL**
**RETURN RECEIPT NUMBER: 7001 0360 0000 5361 2479**

Austin B. Groom, Jr.



SUBJECT: **Notice of Acceptance** in Austin B. Groom, Jr. v. Mel Martinez, Secretary,
U. S. Department of Housing and Urban Development, Case Number IG 01 01

Dear Mr. Groom:

This refers to your Equal Employment Opportunity (EEO) discrimination complaint filed on June 21, 2001. After reviewing the complaint and the EEO Counselor's Report, I have accepted the following claim for investigation:

Whether the Department discriminated against you because of your race (black), sex (male), and age (46) when it rated your performance as Unacceptable on the annual performance appraisal that you received on May 1, 2001. You identified the following incidents to support your claim of discrimination:

- Michael Phelps, (white, male, age: 55), Deputy Assistant Inspector General for Audit, rated your performance for the period September 1, 2000 to January 31, 2001 as Unacceptable on the annual appraisal he gave you on May 1, 2001. The annual appraisal did not include the Satisfactory rating he gave you for your performance during the period April 10, 2000 to August 30, 2000, even though the annual performance period covers February 1, 2000 through January 31, 2001.

- Mr. Phelps assigned you to work on the nationwide GPRA audit under the direction of employees who hold lower graded positions than do you.

- Teresa Carroll (white, female, age: unknown), Assistant District Inspector for Audit, rated your performance on the nationwide GPRA audit as Unacceptable. Her "End of Job Evaluation" formed the sole basis for Mr. Phelps' annual appraisal. Ms. Carroll's rating was based on input from C. Lon Keister (white, male, age: 56), Auditor-In-Charge.[1]

---

[1] Mr. Keister, is a GS 13 non-supervisory, non-managerial employee.

- James Heist (white, male, age: 47), Assistant Inspector General for Audit, concurred with Mr. Phelps' rating of your performance. [2]

Your complaint contains a claim for compensatory damages. To address you claim, you must provide objective proof of the damages suffered because of the alleged discrimination. Additionally, please submit objective proof of the causal connection between the damages and the alleged unlawful discrimination. Proof can take the form of receipts and/or bills for medical care, medication and transportation to the doctor, as well as statements concerning your emotional pain and suffering, inconvenience, mental anguish, loss of enjoyment of life, injury to professional standing, injury to character or reputation, injury to credit standing, loss of health and any other non-pecuniary losses that the Department caused you due to the alleged discriminatory conduct. You may also provide statements from others; including family members, friends, health care providers, other counselors; including clergy, who can address the outward manifestations or physical consequences of your emotional distress.

Please submit the required documentation to the assigned investigator upon their contact with you.

Mr. Groom, you must notify me in writing, within fifteen (15) calendar days of your receipt of this letter, if the statement above does not correctly identify the claim. You must specify why the statement is incorrect. I will consider your response timely filed if postmarked, or delivered in person, on or before the fifteen (15) day period expires.

I have assigned your complaint to Russell D. Barger of the EEO Division for processing. Please contact him at 202.708.5921, to address any questions or concerns regarding the processing of this complaint.

If I do not hear from you regarding the accuracy of the statement identifying the claim, I will assign the claim, as stated above, for investigation.

Sincerely,

Sandra L. Hobson, Director
Equal Employment Opportunity Division

cc:  Nick B. Kehoe, GF

---

[2] Your allegation that Mr. Heist discriminated against you in his response to your administrative grievance is not actionable under the EEO statutes. Such an allegation is considered a collateral attack of the grievance process that is not within the purview of the EEO statutes.

DATE: June 4, 2001

SUBJECT: Notice of Right to File a Discrimination Complaint

FROM: <u>Doris Carey</u> , EEO Counselor

TO: <u>Austin Groom</u>
      Aggrieved Person

      Under Equal Employment Opportunity Regulations, pre-complaint processing is required before a formal complaint may be filed. This is to inform you that because the dispute you brought to the attention of the Office of Departmental Equal Employment Opportunity (ODEEO) on <u>May 4, 2001</u> has not been resolved to your satisfaction, you are now entitled to file a discrimination complaint based on race, color, religion, sex, national origin, physical and/or mental disability, age, and/or reprisal.

      If you file a complaint, it must be in writing, signed by you or your attorney, and filed, in person or by mail within fifteen (15) calendar days after receipt of this notice. The complaint must be filed with the Director of Equal Employment Opportunity (EEO) at the following address:

                    DHUD, Room 2106
                    451 7th Street, S.W.
                    Washington, D.C. 20410

      Your complaint shall be deemed timely if it is received or postmarked before the expiration of the 15-day filing period, or, in the absence of a legible postmark, if it is received by mail within five calendar days of the expiration of the filing period.

      The complaint must be specific and contain only those issues either specifically discussed with me or issues that are like or related to the issues that you discussed with me. It must also state whether you have filed a grievance under a negotiated grievance procedure or an appeal to the Merit Systems Protection Board (MSPB) on the same claims. If you have filed a grievance or an MSPB appeal, please submit a copy of your grievance or MSPB appeal with your complaint.

      You must immediately notify the Director of EEO, in writing, if you change your address and/or telephone number, or retain an attorney or any other person to represent you. You and/or your representative will receive a written notice of receipt of your discrimination complaint from the appropriate agency official.

      If you file a complaint, you must name Mel Martinez, Secretary of the Department, as defendant.

From:                                  Received by:

_Doris A. Carey 6/4/01_            _Austin B. Groom 6/6/01_
Signature of EEO Counselor/Date         Signature of Aggrieved Person/Date

                                            ODEEO 11/00



