```
    UNITED STATES DISTRICT COURT

    FOR THE DISTRICT OF COLUMBIA

- - - - - - - - - - - - - - -X

  SAUNDRA G. ELION,             :

           Plaintiff            :

       v.                       :

                                :

  ALPHONSO R. JACKSON,          :

           Defendant            :

- - - - - - - - - - - - - - -X
```

DEPOSITION OF MICHAEL PHELPS

Washington, D.C.

Wednesday, May 31, 2006

Deposition of MICHAEL PHELPS, called for examination at 1:10 p.m., at the law offices of Robert C. Seldon & Associates, P.C., 1319 F Street, N.W., Suite 305, Washington, D.C., before Gary S. Howard, a notary public in and for the District of Columbia, when were present on behalf of the respective parties:

```
 1     APPEARANCES:

 2        On behalf of the Plaintiff:

 3           ROBERT C. SELDON, Esq.

 4           Law Offices of Robert C. Seldon, P.C.

 5           1319 F Street, N.W.,

 6           Suite 305

 7           Washington, D.C.

 8

 9        On behalf of the Defendant:

10           JOHN C. TRUONG, Esq.

11           United States Department of Justice

12           United States Attorney's Office

13           555 4th Street, N.W.,

14           Washington, D.C.   20530

15           (202-307-0406)

16

17           RICHARD K. JOHNSON, Esq.

18           HUD, Office of Inspector General

19

20     Also present:

21           SAUNDRA ELION

22
```

```
 1                        C-O-N-T-E-N-T-S
 2  WITNESS                    DIRECT    CROSS    REDIRECT
 3  Michael Phelps                4      119       134
 4                        E-X-H-I-B-I-T-S
 5  NUMBER                                  IDENTIFICATION
 6  Deposition Exhibit No. 1                     18
 7  Deposition Exhibit No. 2                     71
 8  Deposition Exhibit No. 3                     79
 9
10
11    (Exhibits supplied by Mr. Seldon.)
12
13
14
15
16
17
18
19
20
21
22
```

1                    P-R-O-C-E-E-D-I-N-G-S

2  Whereupon,

3                    MICHAEL PHELPS

4  was called as a witness and, having been first duly

5  sworn, was examined and testified as follows:

6                    DIRECT EXAMINATION

7        BY MR. SELDON:

8     Q     Mr. Phelps, for the record, would you

9  please give us your full name and your present

10 place of residence?

11    A     Michael Richard Phelps, 3903 Croydon

12 Lane, Bowie, Maryland 20715.

13    Q     Okay. Mr. Phelps, I take it in the not-

14 too-distant past, you retired from the Department

15 of Housing Urban development.

16    A     Yes, sir, I did, effective January 3rd,

17 2006.

18    Q     Thanks for your precision. And what was

19 your final position there?

20    A     Deputy assistant inspector general for

21 audit.

22    Q     Okay. And we're going to pick this up in

1  Q    What about organizational structure?

2  A    Organizational structure.

3  Q    These were your customary or standard
4 operating business areas of responsibility?

5  A    Yes. I mean, you have to understand that
6 Jim and I worked close together on things. So we'd
7 talk back and forth about things.

8       Sometimes he reached decisions without
9 me. Sometimes I was involved in decisions.

10 Q    Okay.

11 A    As a general rule, before I made what I
12 considered major decisions, I would consult him.

13 Q    Again, focusing on the last three or four
14 years in your office of audit as deputy assistant
15 inspector general, was there one or more human
16 resource functions or departments that you worked
17 with to carry out your duties?

18 A    Yes, there was.

19 Q    What was it, or were they?

20 A    Within the office of inspector general,
21 we had our own human resources division.

22 Q    And did you typically work with one HR

```
 1 specialist?
 2     A     All the specialists.
 3     Q     Was Nancy Heath among them?
 4     A     Yes, she was.
 5     Q     Who else did you work with on a regular
 6 basis?
 7     A     I can't remember names.
 8     Q     That's fair enough.  Was there another
 9 division that you worked with regularly?
10     A     Yes. The bureau of public debt.
11     Q     In West Virginia?
12     A     Yes, sir.
13     Q     Was there any standard way in which what
14 duties these two organizations performed, how they
15 were divided?
16     A     My understanding of the way it was set up
17 was our HR group in the office of inspector general
18 was the policy group.
19     Q     You mean the HR division within -- oh, I
20 see.
21     A     Within OIG.
22     Q     Okay -- was the policy division.
```

1    A    Right.

2    Q    And that means?

3    A    They set the policy for the way personnel
4 operations were to be handled and carried out.

5    Q    Got it. As opposed to the bureau of
6 public debt?

7    A    Operational, carrying out those policies.

8    Q    If there was an issue of what should be
9 the OIG policy on, let's say, setting up a manual
10 for conducting a RIF, would that fall within one or
11 both of these departments' jurisdictions?

12   A    It would be pure speculation on my part.
13 I don't have the --

14   Q    Okay. Let me back up. Let's say you were
15 going to make a promotion decision, okay?  Or
16 approve one.

17        Is one of these two divisions the one
18 that you would customary consult with?

19   A    On a promotion, I would go to the bureau
20 of public debt.

21   Q    Okay. The same would be true of a
22 termination?

```
 1    A      Yes.
 2    Q      Okay. So if we call reorganizations,
 3 could be abolishing an office --
 4           MR. TRUONG:  Is that a statement or a
 5 question?
 6           MR. SELDON:  No. I'm just going to give
 7 some examples of what we could include in there.
 8           Abolishing an office. Some sort of
 9 geographical reorganization, if you catch my drift.
10
11           An office might be opened or closed, for
12 example. A reassignment of functions.  Does that
13 make sense as a possible reason for reorganization?
14    A      Could be.
15    Q      Okay. Why don't you then tell me, what
16 are the possible ways that you see a reorganization
17 coming about, or came about, when you were DAIGA?
18    A      Closing an office.
19    Q      Okay.
20    A      Opening an office.
21    Q      Okay.
22    A      Moving the location of the regional
```

 1  manager.

 2     Q      Okay.  Anything else?

 3     A      Consolidating regional offices.

 4     Q      Okay.

 5     A      Moving functions from one office to
 6  another office.

 7     Q      Okay.

 8     A      That's the best I can think of.

 9     Q      So keeping those examples in mind, I'll
10  ask you again -- does it still seem right that
11  somewhere between five or more, but less than ten,
12  times as DAIGA, you were involved in a
13  reorganization?

14     A      Probably closer to ten.

15     Q      Okay.

16     A      Maybe a little more.

17     Q      Fair enough. And your role in these
18  reorganizations would customarily be what?

19     A      It could be a very varied role, from
20  making the recommendation that it be done, to
21  implementing what I was told was being done.

22     Q      Okay. And in carrying out these ten or

Page 45

```
 1 more reorganizations, was it customary for one of
 2 the HR divisions or the other that worked with OIG
 3 to be involved?
 4      A    Yes.
 5      Q    Which one or ones?
 6      A    I'm sorry?
 7      Q    Which one or ones, or was it both?
 8      A    Both.
 9      Q    On a routine basis?
10      A    Yes.
11      Q    Standard business practice. Is that
12 right?
13      A    To the best of my knowledge. Let me say
14 it was for me.
15      Q    What about to the best of your knowledge?
16      A    To the best of my knowledge, it was.
17      Q    Okay. That's fair.
18           (Pause.)
19           Good. Making good progress.
20           (Pause.)
21           At some point in the last few years, were
22 there hiring ceilings or staffing ceilings or
```