**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

SAUNDRA G. ELION,      )
                    )
      Plaintiff,      )
                    )
     v.               )     Civ. Action No. 05-0992 (PLF)
                    )
ALPHONSO R. JACKSON,  )
  Secretary Of Housing And  )
  Urban Development,     )
                    )
      Defendant.     )
_____)

**MEMORANDUM OF POINTS AND AUTHORITIES IN**
**OPPOSITION TO DEFENDANT'S MOTION IN LIMINE**

**PRELIMINARY STATEMENT**

Thirty-five years ago, the Supreme Court devoted the entirety of its seminal Title VII decision to explaining the vital role of circumstantial evidence in proving employment discrimination and retaliation. McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973). McDonnell Douglas also acknowledged the probative value of an employer's treatment of other members of the same protected groups. Id. at 804 (1973). In case after case over the coming decades, so did Circuit Courts and District Courts. Czekalski v. Peters, 475 F.3d 360, 368 (2007); Becker v. ARCO Chem. Co., 207 F.3d 176, 194 (3rd Cir. 2000); Curtis v. Oklahoma City Pub. Schls Bd. of Educ., 147 F.3d 1200, 1217 (10th Cir. 1998); Quarantino v. Tiffany & Co., 71 F.3d 58, 63 (2nd Cir. 1995); Heyne v. Caruso, 69 F.3d 1475, 1479-81 (9th Cir. 1995); Kelber v. Joint Industry Bd. of Elec. Industry, 27 F.3d 42, 47-48 (2nd Cir. 1994); Hawkins v. Hennepin Tech Center, 900 F.2d 153, 155-56 (8th Cir. 1990); Spulak v. K Mart Corp., 894 F.2d 1150, 1156

(10th Cir. 1990); Parker v. HUD, 891 F.2d 316, 321 (D.C. Cir. 1989); Riordan v. Kempiners, 831 F.2d 690, 697-98 (7th Cir. 1987); Phillips v. Smalley Maintenance Services, Inc., 711 F.2d 1524, 1532 (11th Cir. 1983); Morris v. WMATA, 702 F.2d 1037, 1045-46 (D.C. Cir. 1982); Miller v. Poretsky, 595 F.2d 780, 784-85, 790-91 (D.C. Cir. 1978). Higby v. Billingham, 246 F.Supp.2d 10 at 15 & n.5 (D.D.C. 2003); Hariston v WMATA, 1997 WL 411946 *5 (D.D.C.) (Hogan, Ch. J). Jones v. WMATA, 946 F. Supp. 1011, 1019 (D.D.C. 1996) (Lamberth, J.), aff'd in part and vacated in part on other grounds, 205 F.3d 428 (D.C. Cir. 2000)..

Ten years after McDonnell Douglas, the Supreme Court reaffirmed the importance of circumstantial evidence in employment cases acknowledging that "[t]here will seldom be 'eyewitness testimony' as to the employer's mental processes" Aikens v. USPS, 460 U.S. 711, 716 (1983). In the meantime, the Court recognized that the methodology of proving discrimination was "never intended to be rigid, mechanized, or ritualistic." Furnco Construction Corp. v. Waters, 438 U.S. 567, 577 (1978). It found even acts of discrimination outside the statute of limitations admissible as "background evidence" of a currently actionable claim. United Air Lines, Inc. v. Evans, 431 U.S. 553, 559 (1977); accord National Railroad Ass'n v. Morgan, 536 U.S. 101, 103 (2002). The Court greatly expanded on the type and value of circumstantial evidence in this decade, when it held that an employer's lack of credibility can, with nothing more than a prima facie case, support a verdict finding discrimination. Reeves v. Sanderson Plumbing Products, Inc., 530 U.S. 133, 150-51 (2000).

Defendant's Motion In Limine is little more that an assault on the vitality of circumstantial evidence in employment cases, not to mention the rules of evidence themselves. If defendant's Motion were granted in its entirely, the only witnesses other than hostile ones who Ms. Elion could call to testify about defendant's unlawful acts would be herself. Limiting

plaintiff's evidence in this way would be contrary to the most fundamental principle of evidence in employment cases.

> A plaintiff's ability to prove discrimination indirectly, circumstantially, must not be crippled by evidentiary rulings that keep out probative evidence because of crabbed notions of relevance or excessive mistrust of juries.

Riordan v. Kempiners, 831 F.2d 690, 697-98 (7th Cir. 1987).  For these reasons, and others explained below, Defendant's Motion In Limine must be denied in its entirety.

## STATEMENT OF FACTS

The facts underlying plaintiff's claims were set forth in great detail in her Opposition to Defendant's Motion for Summary Judgment (Docket Entry No. 37).  A brief account of them follows.[1]

Saundra G. Elion formerly served as the Director of the Headquarters Audits Division of the HUD Office of Inspector General ("OIG") and as the District Inspector General for Audit for Washington, D.C.  She was the only African American woman and one of only three African Americans ever to hold positions at this level in the HUD OIG Office of Audit since its creation in 1979, until a second African American woman was appointed after the Complaint here was filed (Elion SJ Decl., Docket Entry 37, ECF #4, ¶6).  In April of 2004, Ms. Elion was stripped of her supervisory duties and reassigned involuntarily to a make-work position as a "special assistant" in a pretextual reorganization that abolished her office, 13 months after the EEO complaints process she initiated earlier concluded (Id., ¶¶12-13 & Att. 1-4, Docket Entry 37, ECF #10-13).

---

[1]     The Declarations, Attachments, and Deposition Excerpts that accompanied Plaintiff's Opposition have not be filed again.  This Opposition refers to them by ECF # within Docket Entry No. 37.

Plaintiff's predecessor in her former position as District Inspector General for Audits was Austin Groom (Groom Dep. at 11-13, Docket Entry 52 ECF #6[2]). Like plaintiff, Mr. Groom is an African American who was reassigned involuntarily to a special assistant position (Id. at 13-16). While in that position, and after filing an EEO complaint, Mr. Groom was discharged from OIG and the federal government by the same managers who took the adverse employment actions against Ms. Elion (Id. at 13-18, 26-28 & Dep. Exh. 1; Elion SJ Decl., Docket Entry 37, ECF # 4, 9-10, ¶¶5, 12; Att. 1, 2).

The purported basis for defendant's adverse actions against Ms. Elion was a "new hiring freeze" implemented in April of 2004, one that supposedly necessitated disbanding the Headquarters Audits Division and dividing Ms. Elion's staff between two other divisions (Elion SJ Decl., Docket Entry 37, ECF # 4, 11-12, ¶¶12-13 & Att. 22, 23). This action was taken despite the fact that in Fiscal Year 2004, Ms. Elion's former office was ranked third out of HUD OIG's thirteen operational Regional and Headquarters audit offices (Id., ¶¶34-36 & ECF #13 Att. 5). The standing of Ms. Elion's former Division was confirmed by a desk officer who was given the assignment from top management in the Office of Audit to rank audit Divisions and Regions and who knows that Ms. Elion's former Division ranked at the top of the that organization (Bonds SJ Aff., Docket Entry 37 ECF #6). The worst performing office, also located in Washington, D.C., was left unaffected by the "reorganization" (Elion SJ Decl., Docket Entry 37, ECF #3, ¶36). Unlike Ms. Elion, the director of that office was white and had never filed an EEO complaint (Id.).

Besides Ms. Elion, the only other Headquarters Division Director or similarly situated Regional Inspector General for Audit ever removed from management and reassigned over his

---

[2]    Materials concerning Mr. Groom accompanied Plaintiff's First Motion In Limine, Docket Entry 52.

objection was Michael Beard (Elion SJ Decl, Docket Entry 37, ECF #3, ¶30; Beard SJ Decl., ECF #4, ¶16). He, like Ms. Elion, was reassigned to a make-work special assistant position after filing an EEO complaint (Docket Entry 37, ECF #38, Heist Dep. at 67-69, 75, 141-48; Beard SJ Decl., ECF #4, ¶¶12-13). The officials responsible for this action were also the same officials who discriminated and retaliated against Ms. Elion and who discharged Mr. Groom (Beard SJ Decl., Docket Entry 37, ECF #4, ¶12; Elion SJ Decl., ECF # 3¶31).

Like Ms. Elion and Mr. Beard, Donna Hawkins, the African American Assistant Director of Ms. Elion's former Division, was also relieved of supervisory duties and reassigned involuntarily after she filed an EEO complaint (Am. Cplt./Answ., ¶37; Hawkins SJ Aff. Docket Entry 37 ECF # 5 at 1). Daniel Salas, a Hispanic male, who served as a Deputy Assistant Inspector General, was also reassigned involuntarily after filing an EEO complaint (Salas Dep. at 4-9[3]). Inspector General Kenneth Donahue reassigned Mr. Salas while Deputy Inspector General Stephens, who was also in Ms. Elion's chain-of-command, was serving as the chief operating officer for HUD OIG (Id. at 8; Jt. PT Submission, Docket No. 56, Parties' Stipulation of Fact No. 6; Stephens SJ Dep. Docket Entry 37, ECF #41, at 4, 11-14).

Truth be told, OIG's purported "new hiring freeze" did not make the Headquarters Audits Division superfluous or provide any grounds for removing Ms. Elion from supervisory ranks. In the two preceding years, OIG Headquarters audit divisions were never fully staffed up even once (Elion SJ Decl., Docket Entry 37 ECF #3, 15, ¶40 & Att. 6). That was true even though during much of that time, OIG management was exhorting the Office of Audit to accelerate its hiring, ostensibly to avoid the possibility that its personnel ceiling would be lowered (Id., ¶44 & ECF # 16-18, Att. 7-9). Moreover, the workload of the two offices that supposedly had "new" needs for

---

[3] Excerpts from Ms. Salas' deposition have been filed with this Opposition.

Ms. Elion's staff were unchanged for several years, according to the former director of one office (McLeod Dep. Docket Entry 37 ECF #39, at 5-6, 12-15, 76); and White House and OMB Memoranda, Bulletins, and Circulars, which affected the workload of the second office (Elion SJ Decl., ¶45 Docket Entry 37 ECF #3, 19-22 & Att. 10-13).  Ms. Elion's office, by contrast, would have had work for up to 14 auditors had it not been disbanded (Elion SJ Decl., Docket Entry 37 ECF #3, ¶24).

Ms. Elion's African American Assistant Director, an African American auditor in an oversight division, and her African American administrative assistant witnessed various acts of discrimination and harassment and/or the hurried and unstudied abolition of Ms. Elion's former Division and Ms. Elion's involuntary reassignment (Hawkins SJ Aff.; Campbell-Waters SJ Aff., Bonds SJ Aff., Docket Entry 37 ECF #5-7).  They were of the same type that led up to Ms. Elion's original EEO complaint in December of 2002 (Elion SJ Decl., Docket Entry 37 ECF #3, 9-11, ¶16 & Att. 1 at 1-4).  These actions resumed after the Deputy Inspector General refused to participate in ADR with counsel (Elion SJ Decl., Docket Entry 37 ECF #3, ¶¶20, 24, 27 & Att. 18 at 8).  This is the body of evidence, and more still, that defendant seeks so desperately to exclude.

**ARGUMENT**

**DEFENDANT'S MOTION IN LIMINE MUST BE DENIED IN ITS ENTIRETY**

Defendant's attempt to bolster poorly grounded arguments about relevance with repeated cries of "prejudice" and "confusion" is utterly ineffectual.

> The difficulty in that position is that the prejudice to which Rule 403 speaks is something utterly different from the capability of the evidence to debilitate the opponent's cause in an entirely legitimate manner. The prejudice that Rule 403 specifies as a factor working against the admission of relevant evidence is "unfair prejudice."

Miller v. Poretsky, supra, 595 F.2d at 795 (Robinson, J., concurring, and accepted in majority opinion, 595 F.2d at 785). Rule 403 of the Federal Rules of Evidence only speaks to the exclusion of relevant evidence when its value is "substantially outweighed" by the danger of unfair prejudice or confusion, errors on the jury's part, or waste of judicial resources. All of the evidence that defendant seeks to exclude is highly relevant, and nothing in defendant's Motion In Limine even remotely meets the standard for exclusion specified in Rule 403.

**I.**    **Testimony By Other Witnesses Also Subject**
**To Discrimination and Retaliation Is Relevant And Admissible.**

There is no denying that in addition to Ms. Elion, defendant took adverse employment actions against two senior African American members of the Office of Audit after they filed EEO complaints (Mr. Groom[4] and Ms. Hawkins[5]); a senior Regional Inspector General for Audit after he filed an EEO complaint (Mr. Beard[6]); and a Hispanic who had been one of the most senior managers in all of HUD OIG after he filed an EEO complaint (Mr. Salas[7]).  Neither is there any denying that other than Ms. Elion and Mr. Beard, her counterpart in the one of OIG's Regions, no Headquarters Division Director or Regional Inspector General for Audit was ever reassigned over his or her objection.[8]

The D.C. Circuit has expressly held that evidence "of past retaliation … for complaints" by other employees is "relevant;" if not "admitted," a jury verdict in an employer's favor must be vacated and remanded.  Morris v. WMATA, supra, 702 F.2d at 1046; accord Czekalski v. Peters, supra, 475 F.3d at 368. It reaffirmed this holding in the context of a case of discrimination; and vacated the outcome of a bench trial which failed to fully account for the fact that an employer's treatment of other women and minorities can "serve as circumstantial evidence of individualized discrimination" toward a plaintiff.  Parker v. HUD, supra, 891 F.2d at 322.  These decisions follow the rationale of the D.C. Circuit's original decision in this area, which recognized the admissibility of evidence of this nature in the context of housing discrimination.  Miller v. Poretsky, 395, 595 F.2d 780, 784-85, 790-91 (D.C. Cir. 1978).

---

[4]    Groom Dep. at 11-18, 26-28 & Dep. Exh. 1; Elion SJ Decl., Docket Entry 37, ECF # 4, 9-10, ¶¶5, 12; Att. 1, 2;
[5]    Am. Cplt./Answ, ¶37; Hawkins SJ Aff. Docket Entry 37 ECF # 5 at 1.
[6]    Elion SJ Decl, Docket Entry 37, ECF #3, ¶30; Beard SJ Decl., ECF #4, ¶16.
[7]    Salas Dep. at 4-9.
[8]    Elion SJ Decl, Docket Entry 37, ECF #3, ¶30; Beard SJ Decl., ECF #4, ¶16.

In this, the D.C. Circuit is far from alone.  <u>Becker v. ARCO Chem. Co.</u>, <u>supra</u>, 207 F.3d at 194 (3rd Cir.); <u>Curtis v. Oklahoma City Pub. Schls Bd. of Educ.</u>, <u>supra</u>, 147 F.3d at 1217 (10th Cir.); <u>Quarantino v. Tiffany & Co.</u>, <u>supra</u>, 71 F.3d at 63 (2nd Cir.); <u>Heyne v. Caruso</u>, <u>supra</u>, 69 F.3d 1475, 1479-81 (9th Cir. 1995); <u>Kelber v. Joint Industry Bd. of Elec. Industry</u>, <u>supra</u>, 27 F.3d at 47-48 (2nd Cir.); <u>Hawkins v. Hennepin Tech Center</u>, <u>supra</u>, 900 F.2d at 155-56 (8th Cir.); <u>Spulak v. K Mart Corp.</u>, <u>supra</u>, 894 F.2d at 1156 (10th Cir.); <u>Riordan v. Kempiners</u>, <u>supra</u>, 831 F.2d at 697-98 (7th Cir.); <u>Phillips v. Smalley Maintenance Services, Inc.</u>, <u>supra</u>, 711 F.2d at 1532 (11th Cir.).  District Courts in this jurisdiction have also followed suit and held that "evidence of prior discriminatory acts" toward other employees is "relevant to" an employer's "motive and intent, <u>see</u> Rule 404(b)."  <u>Jones v. WMATA</u>, <u>supra</u>, 946 F. Supp. at 1019 (Lamberth, J.) (citing and quoting <u>Morris v. WMATA</u>, <u>supra</u>, 702 F.2d at 1045); <u>accord</u>, <u>Higby v. Billingham</u>, <u>supra</u>, 246 F.Supp.2nd at 15 & n.5.[9]  The <u>Jones</u> decision also held that "the danger of unfair prejudice from such evidence does not outweigh its probative value, <i>see</i> Fed.R.Evid. 403."[10]  946 F. Supp. at 1019; <u>accord</u>, <u>Hariston v WMATA</u>, <u>supra</u>, 1997 WL 411946 *5.  "Given the difficulty of proving employment discrimination" without direct evidence and in the face of an employer's inevitable denials, "a flat rule that evidence of other discriminatory acts by or attributable to the

---

[9]    As is true here, <u>Jones</u> arose in the context of the employer's attempt to prevent four employees from testifying about its "prior discriminatory acts" toward them.  946 F. Supp. at 1019.  It was in that context that Judge Lamberth held that the probative value of evidence of this nature was relevant and admissible.  There is no difference between this case and <u>Jones</u> about the number of witnesses who plaintiff seeks to call or the content or quality of their testimony.

[10]    Rule 403, Fed. R. Evid., insofar as is relevant here, expressly limits the exclusion of relevant evidence to those circumstances when its admission is "<u>substantially outweighed</u>" by the danger of "<u>unfair</u> prejudice, confusion of the issues, or misleading the jury;" neither will it "waste . . . or" entail "needless presentation of cumulative evidence."  Rule 403,

employer can never be admitted without violating Rule 403 would be unjustified." Hunter v. Allis-Chalmers, Corp., 797 F.2d 1417, 1423 (7th Cir. 1986).[11]

In the face of this overwhelming body of precedent that supports the admissibility of testimony by other employees who have suffered discrimination and retaliation, which defendant derisively calls "me too" testimony, defendant refers to one case within this jurisdiction and four cases outside of it. The only one from this district is Coles v. Perry, 217 F.R.D. 1, 10 (D.D.C. 2005). The Coles decision was issued by the same U.S. Magistrate Judge who admitted evidence from other employees in Higby v. Billingham, supra, and had earlier recognized that such evidence is admissible when "discrimination or retaliation" is "of the same character and type" as that alleged by the plaintiff. White v. United States Catholic Conference, 1998 WL 429842, at *5 (D.D.C. May 22, 1998). He excluded testimony of this nature in Coles because it had occurred fifteen years earlier and did not concern "discrimination or retaliation of the same character and type" as the plaintiff's. 217 F.R.D at 10, n.5. These conditions are easily satisfied here.[12]

---

[11]    Defendant has also moved to exclude testimony of this nature by Janet Bonds and Latesha Campbell-Walters. Plaintiff does not plan, at least at this time, on eliciting testimony about discrimination or retaliation toward them.

[12]    Authority from outside of this jurisdiction cited by defendant is not to the contrary. Schrand v. Federal Pacific Electric. Co., excluded testimony of employees terminated by a decision-maker who "was not involved in the decision to terminate" the plaintiff. 851 F.2d 152, 156 (6th Cir. 1988). Kelly v. Boeing Petroleum Services, Inc., upheld the exclusion of "random acts and remarks concerning matters unrelated" to the type of discrimination at issue in that case. 61 F.3d 350, 357 (5th Cir. 1995). The First Circuit has long relied on Morris v. WMATA to support the admissibility of acts of discrimination toward other employees. Brown v. Trustees of Boston University, 891 F.2d 337, 350-51 (1st Cir. 1989). Its earlier decision in Kinan v. City of Brockton therefore cannot be dispositive of this issue; and in any event, merely excluded evidence of other alleged civil rights violations when the alleged perpetrator "was not mentioned" and there was no reason to believe he was found responsible for the acts that led to settlements in two earlier cases. 876 F.2d 1029, 1034 (1st Cir. 1989). Although unexplained, by all appearances, Ramos-Melendez v. Valdejully excluded evidence of claims of "employment discrimination" of unknown type and character from a case about an employee's violation of his

## II.     Plaintiff's Proposed Witnesses Have Personal Knowledge
## Of Facts Relevant to the Adjudication of this Case.

Defendant's second argument turns one of the basic evidentiary principles on head, or at least its side.  Fact witnesses are required to have "personal knowledge" of the subjects of their testimony.  Rule 602, Fed. R. Evid.  Their testimony, like all evidence, is admissible so long as it meets the basic test of relevance, i.e., that it would tend "to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence."  Rule 401, Fed. R. Evid.  Defendant somehow contends that all of Ms. Elion's favorable witnesses, other than she herself and her husband, must be barred because they "lack personal knowledge of the claims and allegations at issue in this case" (Def. Mot. at 5).  Rules 401 and 602 of the Federal Rules of Evidence require witnesses to have personal knowledge of relevant facts, not claims, and plaintiff's proposed witnesses easily meet this standard.[13]

Donna Hawkins, until she too was relieved of supervisory duties and reassigned involuntarily after filing an EEO complaint, was the African American Assistant Director of Ms. Elion's former Division (Am. Cplt./Answ., ¶37; Hawkins SJ Aff. Docket Entry 37 ECF # 5 at 1).  Ms. Hawkins was reassigned to another Division supposedly to alleviate its workload during the hiring freeze that necessitated disbanding the Headquarters Audits Division (Hawkins SJ Aff.

---

right of free speech.  960 F.2d 4 at 1, 6 (1st Cir. 1992).  These two cases cannot trump the D.C. Circuit's decisions that have long upheld the admissibility of evidence by other OIG employees who sustained the same types of discrimination and retaliation as Ms. Elion.  Czekalski v. Peters, supra, 475 F.3d at 368; Morris v. WMATA, supra, 702 F.2d at 1046; Parker v. HUD, supra, 891 F.2d at 322; Miller v. Poretsky, supra, 595 F.2d at 784-85, 790-91.

[13]     The admissibility of testimony by four of these witnesses (Beard, Groom, Salas, and Hawkins) about defendant's discrimination and retaliation against them is the subject of the preceding Section of this Opposition.

Docket Entry 37 ECF # 5 at 1). She can testify from personal knowledge whether or not her services were truly needed there.

Ms. Hawkins can also testify from her personal experience in management that senior OIG management reassigned staff away from the Division to which she and Ms. Elion were assigned, and refused to let it recruit new staff even while allowing other Divisions to do so (id., at 4-5); that senior management detailed auditors from Ms. Elion's former Division elsewhere and had them perform audits within the jurisdiction of Ms. Elion's former Division (id., at 10); that senior management apologized to her for denigrating the work product of Ms. Elion's former Division (id., at 4-5); and that Deputy Inspector General Stephens insisted that she discuss the merits of her EEO complaint without her attorney being present (Id., at 7).

Michael Beard was, until he was involuntarily reassigned as a "special assistant" and stationed in a cubicle next to Ms. Elion, one of HUD OIG's ten Regional Inspectors General for Audit (Beard Decl., Docket Entry 37, ECF # 4, ¶¶1-12). Mr. Beard knows from his personal knowledge and extensive work experience that defendant's alleged need to distribute plaintiff's staff to another Headquarters Division to participate in the audit of HUD's annual financial statement was false (Id., ¶32). He also has personal knowledge that the supposed new hiring freeze that lead to the abolition of plaintiff's former Division was "nothing new or unusual" and that no other Headquarters Division or Regional audit office was ever abolished in response to a hiring freeze (Id., ¶29). Mr. Beard has personal knowledge that defendant refused to assign an important audit to Ms. Elion's former Division at his request, which permitted defendant to justify disbanding it on account of the Division's supposed lower workload (Id., ¶33). Mr. Beard also knows that Ms. Elion's performance was superior and highly regarded throughout OIG around the country (id., ¶¶32-35); that she is similarly situated to all thirteen HUD OIG Regional

audit managers and Headquarters Division Directors and could have been reassigned into one of their positions (id., ¶¶9-10, 24); and that Ms. Elion's former Division significantly out-performed almost all other Divisions and Regions by defendant's own performance measures when it was abolished (Id., ¶¶20-24).  Mr. Beard's testimony goes right to the heart of many highly relevant facts of this case and, therefore, he cannot be excluded as a witness.

Janet Bonds is the African American female who serves as the desk officer in the Division that oversaw the work of Ms. Elion's former Division and to which one member of Ms. Elion's staff was transferred  (Bonds SJ Aff., Docket Entry 37 ECF #6 at 1-2).  Ms. Bonds has personal knowledge of the significance of the standing of Ms. Elion's former Division because she was assigned to compute rankings at the direction of senior OIG management (id., at 2 ); knows that in contrast to other reorganizations, Ms. Elion's office was abolished without advance study or consultation (id., at 7); and also knows as a desk officer in a Division responsible for oversight of all audit Divisions and Regions that the audits produced by Ms. Elion's former Division were baselessly denigrated and treated disparately from other office's audits (Id., at 9-10).  Latesha Campbell-Walters is a former subordinate of Ms. Elion's; in her current job as an assistant to senior OIG management, she has personal knowledge of admissions made by one of its members about the refusal to allow Ms. Elion to staff her former Division (Campbell-Waters SJ Aff., Docket Entry 37 ECF #7 at 3).

Stanley McLeod was the Director of one of the two Headquarters audit Divisions to which Ms. Elion's staff was reassigned, supposedly due to its need for additional auditors.  Mr. McLeod knows from having headed that Division that its workload was unchanged for years (McLeod Dep. Docket Entry 37 ECF #39, at 5-6, 12-15, 76).  Mr. McLeod, therefore, has highly relevant evidence to dispute the supposed need to disband Ms. Elion's former Division and

reassign her staff. As can be seen, all of the witnesses who plaintiff proposes to call have extensive personal knowledge of the facts at issue in this case.

### III.    Evidence Originally Derived In Other Actions Is Admissible

Daniel Salas' testimony was video-taped in another employment case against HUD OIG, with an Assistant U.S. Attorney and OIG counsel present, Malloy v. Jackson, No. 04-1117 (RCL). Mr. Salas, OIG's former Deputy Assistant Inspector General for Investigations, had testimony of great significance not only to the Malloy case, but this one as well. Defendant apparently objects to the fact that plaintiff did not depose Mr. Salas for a second time in this case and elicit identical testimony.

Plaintiff disclosed Ms. Salas as a witness in writing to defendant's counsel on March 21, 2007, and even identified his deposition as the source of his anticipated testimony (Exh. 1). That testimony is short, pointed, and very powerful, which explains why defendant is so intent on excluding it.

> Q:    Mr. Salas, let me begin by asking, did you ever have an occasion to file an administrative complaint of discrimination while you were at HUD OIG?
> A:    Are you asking me if I have ever filed an EEO complaint?
>
> Q:    While you were at HUD OIG
> A:    Yes, sir, I did.
>
> Q    Do you recall when that was, approximately?
> A:    The formal complaint, I believe, was in February of 2005.
>
> *    *    *    *
>
> Q:    After that happened, did you remain in that position as deputy assistant inspector general?
> A:    For a period of time, I did. And then I was reassigned as a special assistant to the deputy inspector general for inspections and evaluations.
>
> Q:    Was that voluntary on your part, to leave the deputy inspector general position?
> A:    No, sir, it was not. I was reassigned …
> I was reassigned by the inspector general.

Q:      Himself?

A:      Yes, sir.

(Salas Dep. at 7-9).  Defendant has stipulated that Deputy Inspector General Stephens, who

signed off on the adverse actions at issue in this case, is the chief operating officer for HUD OIG

(Jt. PT Submission, Docket No. 56, Parties' Stipulation of Fact No. 6; Docket Entry 37 ECF

#12).  There is, therefore, no real doubt that he was involved in Mr. Salas' reassignment, just as

he was in Ms. Elion's.[14]

The facts underlying Mr. Salas' involuntary reassignment were alleged in paragraph 9 of

the Amended Complaint and admitted by defendant in the corresponding paragraph 9 of its

Amended Answer.  HUD OIG appeared with its counsel at Mr. Salas' deposition (Salas Dep. at

2).  Mr. Salas resides in Texas, which makes him unavailable to plaintiff at trial.  However, since

Mr. Salas remains in defendant's employ, if it prefers, defendant is free to direct him to appear at

trial.  None of the Federal Rules of Evidence even hint that Mr. Salas' highly relevant, sworn

testimony is inadmissible simply because plaintiff did not depose him again in this case and ask

him exactly the same questions for a second time.[15]

---

[14]     If there is any issue over Stephens' involvement in Mr. Salas' reassignment, plaintiff will elicit testimony when Stephens is called as a witness in her direct case and present Mr. Salas' video-deposition afterward.

[15]     Stanley McLeod is one of plaintiff's proposed witnesses.  Mr. McLeod headed the Division to which one member of Ms. Elion's staff was assigned, and knows that his Division did not need new staff, because its workload was unchanged for years (McLeod Dep. Docket Entry 37 ECF #39, at 5-6, 12-15, 76).  Mr. McLeod was originally deposed in another case against HUD OIG, entitled Beard v. Jackson, No. 06-0756 (GK).  After it was taken, Mr. McLeod was disclosed in writing in this case on January 5, 2007 Exh. 2).  There can be no objection to Mr. McLeod's live appearance at this trial, simply because his testimony was uncovered originally in another case.  Similarly, there are no grounds for limiting the use of deposition testimony of other witnesses in this case taken in other cases to impeach their testimony, should they testify falsely at trial here.

IV.     **Ms. Elion's Testimony About The Events Which Gave Rise To Her Original EEO Complaint Are Relevant and Admissible**

Defendant's Motion in <u>Limine</u> presents two separate arguments for precluding Ms. Elion's testimony about events leading up to the abolition of her former Division, her removal from management ranks, and her involuntary reassignment. The first seeks to prevent Ms. Elion from testifying about the events that gave rise to her original EEO complaint in December of 2002 (Def. Mot. at 7-8). The second seeks to preclude Ms. Elion from testifying about the discrimination and retaliation defendant subjected her to between March of 2003, when that complaints process ended, and April 2004, when defendant took the actions that will be the focus of the upcoming trial (<u>Id</u>. at 8-9).

Plaintiff anticipates testifying relatively briefly about the events that led up to her original EEO complaint. Ms. Elion intends, however, on testifying in considerably more depth about the discrimination and retaliation she suffered after her original complaint was closed out in 2003 until her former Division was abolished. The grounds supporting the admission of this testimony are explained in greater detail in the next Section of this Opposition; they apply equally to the introduction of testimony about the events that led up to Ms. Elion's original EEO complaint.

Ms. Elion's testimony will explain her original HUD OIG administrative complaint, and summarize her reasons for filing it. She will also provide important circumstantial evidence of the motives behind HUD OIG's actions, by explaining that her original complaint targeted Assistant Inspector General for Audit James Heist and his Deputy Michael Phelps, Ms. Elion's first and second level supervisors when her former Division was abolished and she was removed from management. Ms. Elion will also testify that the discriminatory actions of Mr. Heist and Mr. Phelps that led to the filing of her original complaint were essentially no different from their

actions in the months leading up to the abolition of her former Division. Ms. Elion will also explain that the agency's refusal to engage in Alternative Dispute Resolution left her without an enforceable mechanism to prevent Mr. Heist and Mr. Phelps from continuing to discriminate against her (Elion SJ Decl., Docket Entry 37, ECF # 4, ¶¶15-24).[16]

Ms. Elion cannot be prevented from testifying about her original EEO complaint and defendant does not suggest it has any right to. Doing so is necessary to provide the jury with needed evidence about her participation in the protected EEO process, her identification of OIG management officials responsible for her treatment, and admissible "background evidence" about their earlier discrimination and retaliation toward her. United Air Lines, Inc. v. Evans, supra, 431 U.S. at 559; accord National Railroad Ass'n v. Morgan, supra, 536 U.S. at 103. Although Ms. Elion's testimony about the events leading up to her original complaint will be tailored to reflect that they are not the centerpiece of this case, she has every right to demonstrate that defendant engaged in repeated acts of discrimination and retaliation after her original EEO complaint until it took the ultimate step of abolishing her former Division. Becker v. ARCO Chem. Co., supra, 207 F.3d at 194.

---

[16]    The admissibility of Stephens' response to Ms. Elion's original discrimination complaint is the subject of Section VI, infra.

**V.    Evidence About Defendant's Acts of Discrimination and Retaliation
After Ms. Elion's Initial EEO Complaint Is Highly Probative of
<u>Defendant's Animus In Abolishing Plaintiff's Former Division</u>**

Beginning a few months after Ms. Elion withdrew her original EEO complaint in March

of 2003, defendant withdrew and reduced work assignments for the Headquarters Audits

Division until it was disbanded in April of 2004 (Phelps Dep. at 52-57; Heist Dep. at 116-22 &

Exh. 10).  Auditors from Ms. Elion's staff were detailed to work on audits in HUD Headquarters,

but under the supervision of Regional Inspectors General for Audit in field offices (Phelps Dep.

at 52-57; Elion SJ Decl., Docket Entry 37, ECF # 4, ¶24).  Just before defendant disbanded the

Headquarters Audits Division, a Regional audit office proposed that one of its audits involving

HUD Headquarters "decision makers and information" be assigned to the Headquarters Audits

Division (Beard SJ Decl., Docket Entry 37, ECF # 4, ¶33; Heist Dep. at 116-18 & Exh. 10).  Mr.

Heist never had the audit performed and he was upset that Ms. Elion's former Division had been

identified to do it (Beard Decl., Docket Entry 37, ECF # 4, ¶33; Heist Dep. at 121-22).

In light of the D.C. Circuit's precedent upholding the admissibility of testimony by other

employees about discrimination toward them, it is hard to see the logic in defendant's argument

to exclude Ms. Elion's testimony about defendant's other acts of discrimination directed at her.

In fact, defendant's continued acts undermining Ms. Elion's authority and the jurisdiction of her

former Division are highly relevant to prove that it discriminated against her when defendant

disbanded that Division and took adverse action against her.  <u>National Railroad Ass'n v. Morgan</u>,

<u>supra</u>, 536 U.S. at 103; <u>United Air Lines v. Evans</u>, <u>supra</u>, 431 U.S. at 559.

> [E]vidence of a defendant's prior discriminatory treatment of a Plaintiff … is
> relevant ... to establish whether a defendant's employment action against an
> employee was motivated by invidious discrimination.

Becker v. ARCO Chem. Co., supra, 207 F.3d at 194; accord Gore v. R.H. Macy & Co., 48 FEP

Cases 919, 920 (S.D.N.Y. 1988) ("past incidents … can be construed as evidence of a history of

discriminatory conduct leading up to" an employer's current actions); Gill v. Monroe County

Dep't of Social Services, 79 F.R.D. 316, 331 (W.D.N.Y.) (past acts of discrimination are

"admissible for the purpose of proving an ongoing pattern of discrimination")' Stroud v. Delta

Airlines, Inc., 392 F. Supp. 1184, 1189 (N.D. Ga. 1975).  Similarly, a "pattern of antagonism"

following protected EEO activity is concrete evidence of retaliation.  Robinson v. Southeastern

Pa. Transp. Auth., 982 F.2d 892, 895 (3rd Cir. 1993).  The evidence of defendant's treatment of

Ms. Elion in the year following her original protected activity until her former Division was

abolished is highly relevant, and there would be nothing "unfair" about its admission.

**VI.     Defendant's Refusal To Engage In Mediation With Ms. Elion**
**In Connection With Either of Her Two EEO Complaints Reveals**
**Its Contempt for the Discrimination Complaints Process**

EEOC regulations provide that all members of the federal service, enjoy an absolute right

to request Alternative Dispute Resolution ("ADR") in order to avoid the lengthy administrative

complaints process; HUD OIG's own operating Manual is to the same effect (Elion SJ Decl.,

Docket Entry 37, ECF # 4, 25, 26, ¶18 & Att. 16 at 4, 17 at 3).  ADR relies on a "neutral or

impartial third party" who is "trained in mediation theory and techniques" (Id., ECF # 26, Att. 17

at 3).  Ms. Elion requested ADR and, under HUD OIG practice, her request had to be honored

(Elion Decl., ¶19; Mathews Dep. at 68-69).

Ms. Elion had "the right to representation throughout the complaint process, including

during any ADR process" (Elion SJ Decl., Docket Entry 37, ECF # 4, 25, ¶18 & Att 16 at 2-3).

Deputy Inspector General Stephens was responsible for arranging ADR in Ms. Elion's case; he

refused to let her participate in ADR with counsel present in 2003 in connection with her original

EEO complaint (Heist Dep. at 44-45; Elion SJ Decl., Docket Entry 37, ECF # 4, 27 ¶20 & Att. 18 at 8).  Mr. Stephens notified Ms. Elion that he was prepared to participate personally in a conference with Ms. Elion but only if she attended without counsel (Id., ¶20).

Mr. Stephens' strong arm tactic resulted in Ms. Elion withdrawing her original complaint without a written and enforceable settlement agreement resolving her complaint, but only with Mr. Stephens' verbal assurances that OIG management would change its conduct toward her (Elion SJ Decl., Docket Entry 37, ECF # 4, 10, 26, 27, ¶22 Att. 2, 17, 19 at 7).  They proved ineffectual (Id., ¶24).  Thirteen months later, when Ms. Elion filed the EEO complaint on which this action is based, defendant again refused to engage in ADR with her (Id., ECF #34, Att. 25).

**VII.    The Ranking Of Ms. Elion's Former Office In FY 2004 Is Highly Relevant**

When it was abolished in Fiscal Year 2004, the Headquarters Audits Division was tied for third among defendant's 13 audit Divisions and Regions, according to performance criteria that defendant itself established (Elion SJ Decl., Docket Entry 37, ECF # 4, ¶¶34-36 & ECF #13 Att. 5).  The standing of Ms. Elion's former Division was confirmed by her desk officer, who knew as a result of an assignment from top level management in the Office of Audit that Ms. Elion's former Division ranked at the top of the that organization (Bonds SJ Aff., Docket Entry 37 ECF #6).  The worst performing office at that time, also located in Washington, D.C., was left unaffected by the "reorganization" (Elion SJ Decl., Docket Entry 37, ECF #3, ¶36).

The superior performance of the Headquarters Audits Division in FY 2004 while Ms. Elion was its Director is highly probative.  It shows that one of the reasons articulated by OIG as a basis for disbanding Ms. Elion's former Division, its supposed lack of production, is false. Reeves v. Sanderson Plumbing Products, Inc., 530 U.S. 133, 150-51 (2000); Aka v. Wash. Hosp. Ctr., 156 F.3d 1284, 1290 (D.C. Cir. 1998) (en banc)).  It also demonstrates that defendant

selected Ms. Elion's former Division to be disbanded and Ms. Elion herself to be relieved of managerial duties despite the fact that her Division was exceptionally productive.

Defendant objects to the introduction of evidence about that Division's objective and comparative standing, supposedly because it is "related to the fact that Plaintiff did not receive a bonus/award for 2003" (Def. Mot. at 10). This is incorrect. Defendant's own ranking of Ms. Elion former Division among its peers in FY 2004, which is actually the following year, is highly relevant because it disproves defendant's rationale for disbanding her former Davison. <u>Reeves</u>, <u>supra</u>, 530 U.S. at 150-51; <u>Aka</u>, <u>supra</u>, 156 F.3d at 1290. Even if this were not the case, the ranking of Ms. Elion's former Division would be admissible as "background evidence" of defendant's unlawful treatment of her, whether or not she independently claimed that her former Division's ranking entitled her to a monetary award. <u>E.g.</u>, <u>United Air Lines, Inc. v. Evans</u>, <u>supra</u>, 431 U.S. at 559; <u>accord</u> <u>National Railroad Ass'n v. Morgan</u>, <u>supra</u>, 536 U.S. at 103.

### VIII.    Plaintiff Does Not Plan on Testifying That Discrimination Or Retaliation Motivated Defendant To Close The Capital District Office in 2002

Ms. Elion joined HUD OIG in June of 1999, when she was appointed District Inspector General for Audit of the HUD OIG Capital District, in Washington, D.C. This was the position Ms. Elion encumbered immediately before becoming the Director of the Headquarters Audits Division (Elion SJ Decl., Docket No. 57 ECF ##, ¶7). In May of 2002, the OIG Capital District audit function was abolished and Ms. Elion was transferred to the position of Director of the OIG Headquarters Audits Division in HUD Headquarters (<u>Id</u>., ¶8). On summary judgment, Ms. Elion did not contend that the abolition of the Capital District and her reassignment to OIG Headquarters was discriminatory or retaliatory.

At trial, as on summary judgment, Ms. Elion intends to testify about her prior experience as Director of the Capital District's audit function to demonstrate her career progression, and that

she was entrusted with heading an entire audit District until defendant disbanded the Headquarters Audits Division. Ms. Elion's position heading the Capital District's audit function, like her position as Director of the Headquarters Audits Division, gave Ms. Elion extensive managerial responsibility and exposure to senior officials in HUD OIG and senior program officials in HUD (Elion SJ Decl., Docket No. 57 ECF ##, ¶9, 10 & Att. 13 at 2-7). Unless defendant adduces evidence that Ms. Elion's transfer from the Capital District in 2002 somehow disproves that it discriminated or retaliated against her in 2004 when it abolished the Headquarters Audits Division, Ms. Elion does not plan on offering evidence that closing the Capital District audit office violated Title VII.

### IX.    Mr. Elion Is Not Being Called As An Expert

Victor Elion, Ms. Elion's husband, was identified in Plaintiff's Initial Disclosures as a fact witness, not an expert (Def. Mot., Exh. A at 2 ). One look at the list of plaintiff's proposed witnesses in the Joint Pre-Trial Statement confirms that Mr. Elion is not being called as an expert (Docket Entry 56 at 15-16). He will be testifying from a lay perspective about his observations of the effects of defendant's actions on Ms. Elion. Defendant's exegeis on the requirements for expert disclosures is, to put it charitably, superfluous (Def. Mot. at 11-14).

### X.    Title VII Claims Must Be Tried to a Jury
###     Before ADEA Claims Are Tried To a Court

The Amended Complaint clearly shows that the operative facts underlying all of plaintiff's claims overlap in almost every respect, with the exception of defendant's motivation (Am. Cplt., ¶¶28-39). Counts I, II, and III of the Amended Complaint arise under Title VII, which provides for jury trials. 42 U.S.C. §1981a(c). Federal employees do not, however, have the right to jury trial for claims arising Age Discrimination in Employment Act, 29 U.S.C. §§621 et seq. Lehman v. Nakshian, 453 U.S. 156 (1981). Defendant moves for plaintiff's ADEA

claims to "be tried prior to jury selection" (Def. Mot. 14).  Leaving the issue of mechanics aside, defendant's proposal violates long-established principles of Constitutional law.

Where, as here, a complaint contains multiple causes of action arising out of a common subject matter, some of which are triable to a jury, the Seventh Amendment demands that the entire case <u>must</u> be first submitted to a jury before the court conducts a bench trial.  <u>Dairy Queen v. Wood</u>, 369 U.S. 469 (1962); <u>Beacon Theatres v. Westover</u>, 359 U.S. 500, 510-11 (1959).  All factual issues necessarily decided by the jury in rendering a verdict are then binding upon the court's subsequent adjudication of nonjury claims.  <u>Bouchet v. National Urban League</u>, 730 F.2d 799, 803 (D.C. Cir. 1984).  The mechanics of defendant's proposal to try plaintiff's ADEA in advance of jury selection is contrary to basic constitutional law.

## **CONCLUSION**

For the foregoing reasons, plaintiff respectfully submits that the Court must deny Defendant's Motion In Limine in its entirety.


Respectfully submitted,


_____//s//_____
Robert C. Seldon, Esq.
 D.C. Bar No. 245100


_____//s//_____
Molly E. Buie, Esq.
 D.C. Bar No. 483767

Robert C. Seldon & Associates, P.C.
1319 F Street, N.W., Suite 200
Washington, D.C.  20004
(202) 393-8200

Counsel for Plaintiff