## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| D. MICHAEL BEARD, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 06-00756 (GK) |
| | ) | |
| ALPHONSO R. JACKSON, | ) | |
| Secretary, U.S. Dept. of | ) | |
| Housing and | ) | |
| Urban Development, | ) | |
| | ) | |
| Defendant. | ) | |

## DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

Pursuant to Rule 56 of the Federal Rules of Civil Procedure, and LCvR 56.1, Defendant

Alphonso R. Jackson, Secretary, U.S. Department of Housing and Urban Development,

respectfully moves for summary judgment on the grounds that: (1) Plaintiff cannot establish a

prima facie case of discrimination or retaliation; and in the alternative, that (2) Defendant had

legitimate, non-discriminatory reasons for all actions it took vis-a-vis Plaintiff. In support of this

motion, Defendant respectfully refers the Court to the attached Statement of Material Facts Not

In Genuine Dispute and to the attached memorandum of points and authorities.

Because this is a dispositive motion, Defendant has not sought Plaintiff's consent. See

LCvR 7.1(m).

Respectfully submitted,

_____/s/_____
JEFFREY A. TAYLOR, DC Bar #498610
United States Attorney



_____/s/_____

RUDOLPH CONTRERAS, DC Bar #434122
Assistant United States Attorney


_____/s/_____

KAREN L. MELNIK DC BAR # 436452
Assistant United States Attorney
555 4TH Street, N.W. Rm. E-4112
Washington, D.C. 20530
(202) 307-0338

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| D. MICHAEL BEARD, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 06-00756 |
| | ) | |
| ALPHONSO R. JACKSON, | ) | |
| Secretary, U.S. Dept. of | ) | |
| Housing and | ) | |
| Urban Development, | ) | |
| | ) | |
| Defendant. | ) | |

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF
DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

Plaintiff, D. Michael Beard ("Plaintiff"), alleges that the United States Department of

Housing and Urban Development ("HUD"), Office of Inspector General ("OIG"), discriminated

against him on the basis of his age and retaliated against him for prior protected activity, in

violation of Title VII of the Civil Rights Act of 1964, as amended by the Equal Employment

Opportunity Act of 1972, 42 U.S.C. §§ 2000e et seq., and as further amended by Section 102 of

the Civil Rights Act of 1991, 42 U.S.C. 1981a, and the Age Discrimination in Employment Act

("ADEA") of 1967, 29 U.S.C. §§621 et seq.  Specifically, Plaintiff alleges discrimination and

retaliation when the Agency (1) reassigned him to HUD OIG Headquarters in January 2005; and

(2) provided an employment reference to the Department of Defense in January 2005.

As the Defendant demonstrates below, Plaintiff fails to establish a prima facie case of

discrimination based upon age, because the person who replaced Plaintiff is the same age as

Plaintiff.  Further, Plaintiff fails to establish a prima facie case of retaliation because he cannot

demonstrate a causal connection between his protected activity and the Defendant's actions.

Lastly, the Plaintiff cannot show that the reasons offered by the Defendant for reassigning

Plaintiff and for giving the employment reference were pretextual. For these reasons, Plaintiff's

claims should be dismissed.

## I.    FACTUAL BACKGROUND

Plaintiff became an employee of HUD OIG in 1988, as an Assistant Regional Inspector

General for Audit ("ARIGA") in Region IV, which is headquartered in Atlanta, Georgia. See

Exhibit 1 (Deposition of D. Michael Beard) ("Beard Dep.") at 9:8-14. In October 1992, Plaintiff

became the Regional Inspector General for Audit ("RIGA") for Region VI, which is

headquartered in Fort Worth, Texas. See id. at 9:2-5. Region VI includes Texas, Louisiana,

New Mexico, Oklahoma, and Arkansas. See Complaint at ¶ 10.

### A.    Plaintiff's Prior Protected Activities

Robert Tighe, a Special Agent employed by the Defendant in Region VI, filed an

administrative complaint of discrimination on or about 2000, claiming that he was not selected

for a promotion because of his race. See Complaint at ¶ 15.[1] On July 16, 2001, Plaintiff

provided deposition testimony in support of Mr. Tighe's administrative complaint, a case

eventually denominated Tighe v. Cuomo. See Complaint at ¶¶ 17-18. In his deposition of July

2001, Plaintiff alleged that OIG senior management was hiring minorities and females in

violation of EEO policies. See Exhibit 1 (Beard Dep.) at 13:7-16. He specifically identified

Susan Gaffney, the former Inspector General, and Kathy Kuhl-Inclan, the former Assistant

---

[1] Plaintiff states that he was one of the two selecting officials who denied Mr. Tighe the promotion, see Complaint at ¶ 16, however, Mr. Tighe's allegations were against his supervisor, Larry Chapman, the Special Agent in Charge ("SAC") of Region VI Office of Investigation. See Exhibit 1 (Deposition of D. Michael Beard) ("Beard Dep.") at 10:20 - 11:5.

2

Inspector General for Audit, as the responsible management officials. See id. at 14:1-8.

On or about June 2001, James A. Heist (DOB: 6/8/54) replaced Ms. Gaffney as the senior official at HUD OIG, becoming the Acting Deputy Inspector General for approximately two months. See Exhibit 1 (Beard Dep.) at 16:20 - 17:2; Exhibit 6 (Deposition of James Alan Heist) ("Heist Dep.") at 54:4-7; 117:2-3.  While Mr. Heist was the Acting Deputy Inspector General, he "learned that there was an EEO complaint and that [Plaintiff] gave a deposition." See Exhibit 6 (Heist Dep.) at 11-12.  Although Mr. Heist learned that Plaintiff had given a deposition in Tighe v. Cuomo, he "had no knowledge . . . one way or another" if Plaintiff's testimony was favorable or unfavorable to Mr. Tighe. See id. at 56:19 - 57:4; Exhibit 13 (Affidavit of James A. Heist) ("Heist Affidavit") at 1.  Mr. Heist was not a party in Tighe v. Cuomo, and never discussed Plaintiff's testimony with the Inspector General or senior members of his staff. See Heist Affidavit at 1.  Moreover, Mr. Heist was never "at a meeting with the Inspector General or senior members of his staff where the [Plaintiff's] deposition testimony . . . was made the subject of discussions." See id. at 2.[2]

"Sometime in 2001 [Mr. Heist] made Mr. [Michael] Phelps (DOB: 11/4/45) the first-line supervisor for all of the regional inspectors general" for Audit, including Plaintiff. See Exhibit 1 (Beard Dep.) at 22:2-24; Exhibit 2 (Deposition of Michael R. Phelps) ("Phelps Dep.") at 53:5-6; Exhibit 4 (Hierarchy Chart).  In February 2002, Mr. Phelps gave Plaintiff a reprimand "[f]or not

---

[2] Plaintiff's Complaint alleges that the "substance of Mr. Beard's testimony and the fact that it was unfavorable to HUD OIG generally and the former Inspector General in particular were the subjects of discussions between the former Inspector General and members of her senior staff." See Complaint at ¶ 22.  However, Plaintiff testified that these alleged discussions, at which he was not present, concerned "[n]ot the testimony," but an affidavit he gave in Tighe v. Cuomo in 1999. See Exhibit 1 (Beard Dep.) at 14:22-24; 15:18 - 16:3.

referring potential criminal matters to the office of investigation" in Region VI. See id. 37:20-22. Mr. Phelps also gave Plaintiff an attachment to his performance evaluation which was critical of his performance. See id. at 38:22 - 39:3; Exhibit 11 (Performance Rating attachment). At the same time, Mr. Phelps verbally told Plaintiff that he was difficult to manage. See Exhibit 1 (Beard Dep.) at 39:19-24; 41:1-8; Exhibit 19 (Informal EEO Complaint) at 3 ¶ 5. Mr. Phelps also told Plaintiff that he frequently failed to follow HUD policy and gave Plaintiff three examples. See id.

In addition, Plaintiff was counseled in March 2002 and April 2002, through an exchange of memoranda, about the negative and derogatory tone in his audits, and how the audits were not well-received by senior members of the new HUD OIG administration. See Exhibit 1 (Beard Dep.) at 45:10-17; Exhibit 19 at 4; Exhibit 20, 21, and 22. The March 28, 2002, memoranda informs Plaintiff of management's concern about Plaintiff espousing negative views of headquarters to his staff and "poisoning their views of the organization." See Exhibit 1 (Beard Dep.) at 46:13-25; Exhibit 20 at 5.

Plaintiff filed an administrative complaint of discrimination and retaliation in May 2002, complaining of a hostile work environment and requesting that the February 2002 reprimand be removed from his records. See Exhibit 1 (Beard Dep.) at 38:4-8; Complaint at ¶ 25. Plaintiff named "Assistant Inspector General for Audit James Heist, Deputy Assistant Inspector General for Audit Michael Phelps, and General Counsel Bryan Saddler," as the alleged discriminating officials. See Complaint at ¶ 26.

On December 4, 2002, a Mediation Settlement Agreement resolving Plaintiff's administrative complaint was formally approved. See Exhibit 12 (Mediation Settlement

4

Agreement). Mr. Michael P. Stephens (DOB: 12/5/47), the Deputy Inspector General, was the

management representative for the agreement. See id.; Complaint at ¶ 29; Exhibit 5 Deposition

of Michael P. Stephens ("Stephens Dep.") at 36:1-2. Mr. Stephens's motivation for signing the

agreement which provided, among other things, for the removal of Plaintiff's February 20, 2002,

reprimand, was the importance of trying "to clear the air, move on. Sometimes in the decision

process for a new manager of an organization to look at it and say, well, we could go on and on

with this, or we can make a decision to move forward . . . and that was [Mr. Stephens's]

motivation." See Exhibit 5 (Stephens Dep.) at 8:15 - 9:3. Plaintiff admits that Mr. Stephens

communicated to him at the time, that his motivation for settling the administrative complaint

was to start anew. See Exhibit 1 (Beard Dep.) at 72:18-25; 116:13-17.

Mr. Heist cannot "recall whether there was an ADR [alternative dispute resolution]

session or not." See Exhibit 6 (Heist Dep.) at 58:11-15. Moreover, Mr. Heist is unfamiliar with

the Mediation Settlement Agreement and its specific terms. See id. at 58:20 - 59:18. Similarly,

Mr. Phelps has no knowledge about any ADR session, or have any first-hand knowledge about

the Mediation Settlement Agreement. See Exhibit 2 (Phelps Dep.) at 10:6-10; 11:10-18. He

learned from either Mr. Stephens or Mr. Heist that management "wanted to try to start anew with

Mr. Beard, and they thought that if we all tried hard, we could work together and turn things

around, turn the past around, and, therefore, that's what we were going to try to do." See id. at

10:21 - 11:3.

Although Plaintiff alleges on-going discrimination and retaliation after the execution of

the 2002 Mediation Settlement Agreement, see Complaint at ¶¶ 30-33, he did not file any

administrative complaints or otherwise engage in any protected activity during 2003 or 2004.

See Exhibit 1 (Beard Dep.) at 51:19-23; 54:4-16; 72:2-7. Plaintiff did not engage again in

protected activity until January 21, 2005, when he initiated the informal administrative EEO

complaints process underlying this lawsuit. See id. at 48:51:17-18; Complaint at ¶ 52.

**B.    Plaintiff's Reassignment To Washington, D.C.**

From the time Plaintiff joined HUD OIG in 1988, until March 2002, Plaintiff enjoyed a

significant amount of autonomy to manage Region VI as he saw fit. See Exhibit 1 (Beard Dep.)

at 17:16-18. Specifically, the Inspector General ("IG") during most of this time period, Susan

Gaffney, moved "the authority to publish reports to the field, particularly external audits, and so

that the field was publishing those reports in a much more open manner or easier manner than

what had been in the past." See id. at 17:24 - 18:3. Under this decentralized management

system, Plaintiff had the power and freedom to decide what audits to bring and against whom to

bring them. See id. at 20:11-13; 25:8-11. Plaintiff preferred the decentralized system because he

believed that "[i]t's easier to motivate people when they have more input into the products they

are working with. And it's more efficient." See id. at 25:12-15.

The management style changed significantly in March 2002, when Kenneth Donahue

became the new Inspector General at HUD OIG. See Exhibit 1 (Beard Dep.) at 16:20 - 17:6;

Exhibit 2 (Deposition of Michael R. Phelps) ("Phelps Dep.") at 26:11-20. Mr. Donahue insisted

upon adherence "to the chain of command, and he announced that empowerment was over." See

Exhibit 1 (Beard Dep.) at 23:17-23. The phrase "empowerment was over" meant "[t]hat the

regional inspectors general and the special agents in charge were going to have more of their

actions approved in headquarters." See id. at 24:2-6. As part of this move towards

centralization, "a new directorate was created called Technical Oversight and Planning. And all

6

audit decisions were sent to TOP . . ." See id. at 18:23-25. Specifically, TOP was "responsible for overseeing the work of ten regional offices, reviewing drafts, reports, providing comments on those reports, those comments were provided to the . . . Assistant Inspector General for Audit Jim Heist, who passed the comments on to the" regional offices. See Exhibit 3 (Deposition of Stanley J. McLeod) ("McLeod Dep.") at 12:7-12. TOP was also "responsible for the semi-annual report to Congress, the Office of Audit plan, and Office of Audit policies and procedures." See id. at 17-19.

During the years following the change from decentralized to centralized management, Plaintiff's overall work product and attitude towards headquarters demonstrated to his supervisors that he could not adjust to the change. See Exhibit 4 (Hierarchy Chart); See Exhibit 6 (Heist Dep.) at 116:17-19. For example, with respect to Region VI's work, "there was an audit on CPD, which is Community Planning & Development, that's a division of HUD headquarters, in which a draft [audit] was presented to HUD headquarters" by Mr. Beard. See Exhibit 5 (Stephens Dep.) at 33:2-12. "[T]here was great concerns by the auditee and others that there were significant inaccuracies in that report.." See id. at 33:16-18. The concerns were so great that Mr. Donahue, the Inspector General, asked Mr. Stephens, the Deputy Inspector General, "to get involved and resolve it." See id. at 34:1-2; 36:1-2; Exhibit 4. To resolve the problems, Mr. Stephens, Mr. Heist, and Mr. Phelps, "decided collectively to bring in other auditors from other regions, and . . . did so at considerable cost and time, [it] took away from their current assignments." See Exhibit 5 (Stephens Dep.) at 34:8-15. According to Mr. Stephens, "it took [the other auditors] probably 60-90 days to resolve the issues," before "we finally were able to publish the audit." See id. at 34:16-17. Neither before the CPD audit nor since, has Mr.

7

Donahue asked Mr. Stephens to get personally involved in a draft audit. See id. at 34:3-7.

Another problem with Region VI's work product concerned draft audit reports that lacked proper criteria to support the findings. See Exhibit 6 (Deposition of James Alan Heist) ("Heist Dep.) at 90:9-11. Specifically, "[t]here were circumstances where in developing . . . audit findings, there were legal issues associated with those findings that were not developed effectively because Mr. Beard nor his staff had sought the advice of our legal counsel in vetting those issues." See id. at 90:12-17; Exhibit 7 (Affidavit of James A. Heist) ("Heist Affidavit") at 3. In one instance, after the issuance of the Jazzland report,

> [t]he program office raised an issue with respect to one of the findings, and misapplication of criteria that the audit reports asserted applied to some recipients but in fact the organization that received the funds, a guaranteed loan, was a for-profit entity, and therefore, did not meet the definition of a recipient, and as a consequence, there was no basis for recovering . . . this approximately 7 million ineligible costs.

See id. at 106:2-11.

On another occasion, Plaintiff "sent a draft audit report to Headquarters on CVR Associates, a contractor to the Housing Authority of New Orleans. He inappropriately cited his criteria for his audit finding as being OMB Circular A-87." See Exhibit 8 (Affidavit of Michael R. Phelps) ("Phelps Affidavit") at 2. Citing OMB Circular A-87 was inappropriate because it "applies to non-profits and CVR Associates is a 'for profit' company." See id. Plaintiff admits that he was responsible for the draft audits that were produced by Region VI, that he reviewed the CVR audit before it was sent to Headquarters, and that using A-87 was incorrect. See Exhibit 1 (Beard Dep.) at 68:19 - 69:13. In this kind of situation, "[w]here there were legal issues that weren't fully vetted, . . . [TOP] had to take [their] staff and go and deal with the legal

8

staff in trying to determine what was the right criteria to use." See Exhibit 3 (McLeod Dep.) at

65:12-16. This additional work for TOP had "a negative impact. [It] [t]ook additional time and

resources of our staff to deal with the issues, talk to the OGC [Office of General Counsel] staff,

talk to the regions, in trying to resolve the matter at hand." See id. at 66:13-19; Exhibit 10

(December 17, 2004, Memorandum).

    The CVR audit also demonstrates Plaintiff's failure to adhere to OIG policy with respect

to submitting a survey report. See Exhibit 8 (Phelps Affidavit) at 2.

> The Audit Operations Manual requires the submission of a survey
> report during an audit. First, you are to conduct a survey and issue
> a survey report. This is to precede the audit phase and the final
> audit report. For the CVR Associate audit, [Plaintiff] failed to
> submit a survey report. In fact the first time Headquarters became
> aware of the specific issues in the audit was when it received the
> [Plaintiff's] draft audit report. Had he provided a survey report,
> Headquarters would have been put on notice of the issues involved,
> including the inappropriate criteria that the [Plaintiff] was
> entertaining, and could have addressed such matters much earlier.

See id. 2-3. Plaintiff's supervisors expect "that a manager in the position of Regional Inspector

General for Audit would submit a survey report as required by the Audit Operations Manual."

See id. Moreover, the CVR audit demonstrates Region VI's use of inappropriate language. "It

was language that, in [management's] judgment, violated the auditing standards, not being

objective, not avoiding the use of adjectives that were of a subjective nature." See Exhibit 6

(Heist Dep.) at 99:11-15; Exhibit 18 (Heist Memorandum) at 10.

    In addition to the problems with the work product from Region VI, Plaintiff's supervisors

had an even greater concern about Plaintiff's attitude towards Headquarters and the impact it was

having on the Region VI staff. As noted above, under Susan Gaffney's philosophy of

9

decentralization, "all the regions and headquarters directors had responsibility to perform audits, issue audit reports with little or no headquarters oversight." See Exhibit 6 (Heist Dep.) at 115:15-21. However, that changed under Mr. Donahue and Mr. Heist to a "philosophy for a centralized focus with more of a degree of headquarters oversight." See id. at 116:2-5. According to Mr. Heist, Plaintiff "and his staff were resistant to that change. [Plaintiff] questioned the level of headquarters oversight, and it was in that context that we dealt or tried to get [Plaintiff] to adjust to that change." See id. at 116:9-13.

Mr. Stephens, the Deputy Inspector General, summed up the problem as follows:

> Well, the issue is that you expect your managers to understand that the direction has to come from headquarters. Mr. Donahue and I and the senior staff set the tone and the priorities and the policies, and we expect the managers in the field to implement those and to support those, and when you have region in which you feel that is working against you, and that it's fairly open and vocal about their disagreements and demeanor of [sic] headquarters, it becomes a contagious thing, and that's a concern to us, is incumbent upon us to try to evaluate what the reasons are for that, and after a significant period of time, we determined part of the major reason was because of Mr. Beard's attitude towards headquarters, and his employees felt comfortable joining in.

See Exhibit 5 (Stephens Dep.) at 32:8 - 33:1. During the three years prior to Plaintiff's transfer to Washington, D.C., Mr. Stephens visited "every region in the country, some of them two or three different times, visiting investigations and audit offices, and [his] involvement was the same, to meet with employees. And compared to those experiences, [his] overall feeling was, when [he] left Fort Worth, is that there is a climate of, let's take them on, of disgruntled, disgruntled people." See id. at 31:17 - 32:2.

Additionally, Mr. Phelps had a very similar experience when he visited Fort Worth for

10

Plaintiff's two-day staff conference in 1994. See Exhibit 2 (Phelps Dep.) at 63:6-9. "A large

part of that time issues kept coming up, that staff members - - they were derogatory, a lot of

derogatory comments about, their feelings about the way they felt about the people in TOP and

their abilities; whether they were capable, qualified, knew what they were doing. And they were

sort of demeaning to the [TOP] people." See id. at 63:10-17. Mr. Phelps summarized his

impressions of Plaintiff and the Region VI staff as follow:

> That that [sic] staff was not acting professionally, the way they
> addressed headquarters, TOP staff; the way they characterized
> those people, the way they accepted what the responsibilities of
> those people were, and that this was something that Mr. Beard
> should have been able to get a handle on with these people, and
> find a way to voice legitimate concerns without doing it in a
> demeaning, derogatory manner. And I didn't see that happening. I
> just felt this was something that he allowed to continue to go on a
> fester.

See id. at 64:2-13.

Moreover, Mr. McLeod and his TOP staff experienced the argumentative attitude

emanating from Plaintiff's region. If there was a disagreement between a region and the TOP

staff, "we would usually vet that, have discussions, telephone discussions, review the criteria, et

cetera, and most Regional Inspector Generals would accept the word of Jim Heist, who was their

boss, as far as this is the way it will go. But often in Region 6 it was not the case. Even if Jim

Heist said it was wrong, it would still be argued." See Exhibit 3 (McLeod Dep.) at 73:18 - 74:6.

For example, in a June 15, 2004, email from TOP, Mr. McLeod tells Plaintiff to remove Finding

3 from the CPD audit, and that Mr. Heist does not want any further discussion about it. See

Exhibit 14 (June 14, 2004 email); Exhibit 1 (Beard Dep.) at 62:21 - 63:4. However, on June 16,

2004, one of Plaintiff's subordinates, Laura Nixon, sent Mr. Heist an email questioning the

11

wisdom of his decision-making. See Exhibit 15 (June 16, 2004 email).

Mr. Heist also thought that Plaintiff's "attitude towards headquarters in essence adversely

affected the way . . . the [Region VI] staff interacted with headquarters." See Exhibit 6 (Heist

Dep.) at 114:10-13. In fact, in response to Ms. Nixon's email, Mr. Heist sent an email to Mr.

Phelps stating that "[w]e've got to figure out a way to impress upon Beard that, at least for his

staff's sake, he needs to make some attitude adjustments." See Exhibit 15. It became apparent

that Plaintiff set the tone that "it was acceptable, even encouraged, to question headquarters,

argue with headquarters . . ." See Exhibit 6 (Heist Dep.) at 114:13-15. Although Mr. Heist

"always encouraged voicing opinions," it was his "job to make a decision and then move on.

Oftentimes that's what wasn't happening. Instead of moving on, either [Plaintiff] or his staff

would raise issues again, argue the same points over again, and it was counterproductive." See

id. at 114:17 - 115:1.

For two years, "[f]rom 2002 through 2004," management waited for Plaintiff to adjust to

the centralized philosophy. See id. at 116:11-16. Ultimately, management concluded that

Plaintiff could not adjust. See id. at 116:17-19. Management "made a judgment that, if you

looked at the totality of what [Region VI] did, that . . . a better way to handle it was to reassign

[Plaintiff], rather than pursue a performance-based action." See id. at 113:5-9. Plaintiff "could

continue to make a contribution to the organization in the capacity of a special assistant. He

could do so without losing any grade or pay." See id. at 113:10-13. As a result, management

reached a consensus decision "some time in December 2004," to reassign Plaintiff to the position

of Special Assistant to the Deputy Assistant Inspector General for Audit, which is located in

Washington, D.C. See id. at 62:8-21; 73:12-19; Exhibit 9 (January 5, 2005 Memorandum).

In preparation for their meeting with Plaintiff to inform him of the transfer, Mr. Phelps

sent Mr. Heist an email on December 21, 2004, listing the problems which had concerned him.

See Exhibit 16 (December 21, 2004 email). Similarly, in preparation for same meeting, which

ultimately occurred on January 5, 2005, Mr. Heist "went through reasons that [management was]

reassigning Mr. Beard, discussed it with Mr. Phelps, Mr. Stephens, and it was intended to be the

points that [Mr. Heist] wanted to mention when [management] sat down with Mr. Beard and

advised him of his reassignment, these were the reasons." See Exhibit 17 (January 4, 2005

email). On January 5, 2005, Plaintiff reported to Headquarters for the meeting with management,

wherein they informed him of his reassignment to Headquarters and the reasons for that decision.

See Complaint at ¶ 34; Exhibit 6 (Heist Dep.) at 108:4 - 110:10.

The person chosen to replace Plaintiff as RIGA in Region VI was Frank Baca. See

Exhibit 6 (Heist Dep.) at 117:6-7. Mr. Heist was the selecting official. See id. at 118:6-8. Mr.

Baca, like Plaintiff, was born in 1949. See Exhibit 1 (Beard Dep.) at 79:1-3. Once Mr. Baca

became the RIGA for Region VI, the problems concerning that region's work product and

attitude towards headquarters did not continue. See Exhibit 6 (Heist Dep.) at 117:13-16; Exhibit

5 (Stephens Dep.) at 36:9-17.

### C.    Mr. Phelps's Employment Reference In January 2005

In January 2005, Plaintiff applied for the position of Deputy Assistant Inspector General

for Audit with the Office of Inspector General for the Department of Defense. See Complaint at

¶ 47. Plaintiff alleges that he was denied the position because of "an unjustified, negative

reference" provided by Mr. Michael Phelps, and that this was in retaliation for his prior protected

activities. See Complaint at ¶ 49, 51, Counts IV and V.

13

Mr. Robert Reardon from the Department of Defense, called Mr. Phelps and asked him

"to provide [his] views of the [Plaintiff] as an employee as he was considering the [Plaintiff]

for a position with his agency." See Exhibit 8 (Phelps Affidavit) at 6; Exhibit 2 (Phelps Dep.) at

18:5-11. Mr. Phelps "told Mr. Reardon a lot of positive things about the [Plaintiff]." See id.

Specifically, he told Mr. Reardon "that Mr. Beard was a bright individual; that he was well-

credentialed; that he had a staff when he was in Ft. Worth that worked well with him, that

seemed to get along well with him; he had a good rapport with his staff." See Exhibit 2 (Phelps

Dep.) at 19:2-6.

Mr. Reardon then specifically asked Mr. Phelps why Plaintiff came to Washington, D.C.

See id. at 20:1-4. Mr. Phelps told Mr. Reardon, that the agency had gone through a change in

administration, and that

> things changed as far as the way we did business. It used to be that
> the field managers were empowered to work entirely independently
> and make their own decisions and issue their own reports and do
> whatever it was they wanted to do. We now had a new Inspector
> General, and we were going in a new direction, as far as the way
> we conducted business. We were very much control-oriented
> regarding what was going on in the field and what managers were
> doing, and that Mr. Beard had trouble . . . making that transition to
> that method of operation.

See id. at 20:8-19. Mr. Phelps told Mr. Reardon that Plaintiff "could not get in step with that

new direction, which is why it was necessary to bring [Plaintiff] to Headquarters as opposed to

allowing him to continue to run a region." See Exhibit 8 (Phelps Affidavit) at 6. He also told Mr

Reardon that Plaintiff "was someone that could probably perform very well in the new

environment where he knew, going in, what was expected of him, the way it was going to be, as

opposed to the situation we had, where he was allowed to operate one way and then that got

14

changed subsequently." See Exhibit 2 (Phelps Dep.) at 25:13-19. Mr. Phelps did not state or

intend to imply to Mr. Reardon that Plaintiff had performance or conduct problems. See id. at

20:20 - 21:8.

Mr. Phelps believes that his statements to Mr. Reardon were truthful, see Exhibit 2

(Phelps Dep.) at 34:9-11, and that Plaintiff's prior EEO activity did not influence or affect the

recommendation he provided. See id. at 54:2-5.

## II.    LEGAL STANDARDS

Under Fed. R. Civ. P. 56(c), summary judgment is appropriate when the record shows

that there is no genuine issue as to any material fact and that the moving party is entitled to

judgment as a matter of law. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986);

Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986); Matsushita Elec. Indus. Co. v. Zenith Radio

Corp., 475 U.S. 574, 587 (1986).

In determining whether there exists a genuine issue of material fact, the Court must view

all facts, and reasonable inferences to be drawn from them, in a light most favorable to the non-

moving party. Anderson, 477 U.S. at 255. If the evidence favoring the non-moving party is

"merely colorable, or is not significantly probative, summary judgment may be granted." Id. at

249-50. Indeed, in order to withstand summary judgment, the non-moving party may not rest

solely upon allegations or denials. Id. at 248. The mere existence of some factual dispute is

insufficient to withstand summary judgment; there must be a genuine issue of material fact. Id.

at 247-48. There is no genuine issue of material fact if the relevant evidence of record, taken as a

whole, indicates that a reasonable factfinder could not return a verdict for the party opposing

summary judgment. Id. at 248. If the submitted evidence is of such a character that it would not

15

permit a reasonable fact finder to find in favor of the non-moving party, summary judgment is appropriate. Id. at 251.

Rule 56 does not require the moving party to negate the non-movant's claim or to show the absence of a genuine issue of material fact. Celotex, 477 U.S. at 323. Rather, when the movant files a properly-supported summary judgment motion, the burden shifts to the nonmoving party to show "specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e). The non-movant cannot manufacture genuine issues of material fact with "some metaphysical doubt as to the material facts," Matsushita Elec. Indus. Co., 475 U.S. at 586, or with "conclusory allegations," "unsubstantiated assertions,'"or by only a 'scintilla' of evidence." Little v. Liquid Air Corp., 37 F.3d 1069, 1075 (5th Cir. 1994).

Before turning to the merits, a brief word is in order concerning the scope of review in employment discrimination cases. Though Plaintiff might wish it otherwise, the employment discrimination statutes did not transform federal courts into review boards for local employment decisions. "Title VII, it bears repeating, does not authorize a federal court to become 'a super-personnel department that reexamines an entity's business decisions.'" Barbour v. Browner, 181 F.3d 1342, 1346 (D.C. Cir. 1999) (quoting Dale v. Chicago Tribune Co., 797 F.2d 458, 464 (7th Cir. 1986)). To the contrary, a court "may not 'second-guess an employer's personnel decision absent demonstrably discriminatory motive.'" Fischbach v. District of Columbia Dep't of Corrections, 86 F.3d 1180, 1183 (D.C. Cir. 1996) (quoting Milton v. Weinberger, 696 F.2d 94, 100 (D.C. Cir. 1982)).

Where, as here, a plaintiff offers no direct evidence of discrimination, employment discrimination claims are governed by the familiar framework of McDonnell Douglas Corp. v.

16

Green, 411 U.S. 792, 803-805 (1973). Under this test, Plaintiff has the initial burden of proving

by a preponderance of the evidence a prima facie case of discrimination. Texas Dep't of

Community Affairs v. Burdine, 450 U.S. 248, 252-53 (1981). If Plaintiff is able to establish a

prima facie case, then given Defendant's legitimate, nondiscriminatory reason, Plaintiff must

present evidence that the stated reason merely was a pretext for discrimination. Id. Of course, at

all times, Plaintiff retains the ultimate burden of persuasion to demonstrate that he was in fact the

victim of intentional discrimination. Burdine, 450 U.S. at 252-53. Even interpreting the facts

favorably for Plaintiff, this Court should grant Defendant's motion for summary judgment.

## III.    ARGUMENT

### A.    Plaintiff Cannot Establish A Prima Facie Case Of Age Discrimination (Count II)

The ADEA requires that "[a]ll personnel actions affecting employees or applicants for

employment who are at least 40 years of age . . . in executive agencies . . . be made free from any

discrimination based on age." 29 U.S.C. § 633a(a). Since there is no direct evidence of

discrimination, to survive summary judgment and earn the right to present his case to a jury, the

Plaintiff must resort to a burden-shifting framework similar to that enunciated in McDonnell

Douglas; Barnette v. Chertoff, 453 F.3d 513, 516 (D.C. Cir. 2006) (citing Cones v. Shalala, 199

F.3d 512, 516 (D.C. Cir. 2000); Carter v. George Washington Univ., 387 F.3d 872, 878 (D.C.

Cir. 2004)); Forman v. Small, 271 F.3d 285, 292 (D.C. Cir. 2001); May v. Shuttle, Inc., 129 F.3d

165, 172 (D.C. Cir. 1997), cert. denied, 524 U.S. 927 (1998).

To establish a prima facie case specifically under the ADEA, Plaintiff must demonstrate

that (1) he is a member of the protected class (over 40 years of age); (2) he was removed or

17

reassigned; (3) prior to being removed or reassigned, he was performing his job at a satisfactory level; and (4) he was disadvantaged in favor of a younger person, i.e., replaced by a "substantially younger" person. See O'Connor v. Consolidated Coin Caterers Corp., 517 U.S. 308, 313 (1996); Dressler v. U.S. Dep't of Housing and Urban Development, 2005 U.S. App. LEXIS 635 (D.C. Cir. 2005); Teneyck v. Omni Shoreham Hotel, 365 F.3d 1139, 1155 (D.C. Cir. 2004); May v. Shuttle, Inc., 129 F.3d 165, 172 (D.C. Cir. 1997); Dunning v. Quander, 468 F. Supp. 2d 23, n. 8 (D.D.C. 2006). As noted above, even if Plaintiff were to establish a prima facie case, then given Defendant's legitimate, nondiscriminatory reason, Plaintiff must present evidence that the stated reason merely was a pretext for discrimination. Id. Of course, at all times, Plaintiff retains the ultimate burden of persuasion to demonstrate that he was in fact the victim of intentional discrimination. Burdine, 450 U.S. at 252-53.

Plaintiff's case is fatally flawed because the person selected to replace Plaintiff as the RIGA of Region VI is the same age as Plaintiff. See Exhibit 6 (Heist Dep.) at 117:6-7; Exhibit 1 (Beard Dep.) at 79:1-3. Mr. Heist, an alleged discriminating official in this case, selected Frank Baca as Plaintiff's replacement. See Exhibit 6 (Heist Dep.) at 117:6-7; 118:6-8. Mr. Baca, like, Plaintiff, was born in 1949. See Exhibit 1 (Beard Dep.) at 79:1-3. Since the person who replaced Plaintiff was the same age as Plaintiff, he fails to show how he was disadvantaged in favor of a "substantially younger" person. See O'Connor v. Consolidated Coin Caterers Corp., 517 U.S. at 313.

This Court has said that "[a]n inference of age discrimination 'cannot be drawn from the replacement of one worker with another insignificantly younger ... The Fact that a replacement is substantially younger than the plaintiff is a far more reliable indicator of age discrimination.'"

18

See Udoh v. Trade Ctr. Mgmt. Assocs., -- F.Supp.2d - -, 2007 WL 901982, *7 (D.D.C. March

27, 2007) (quoting O'Connor v. Consolidated Coin Caterers Corp., 517 U.S. at 313) (finding no

inference of discrimination for replacement two-and-a-half years younger than plaintiff); see also

Lewis v. St. Cloud State Univ., 467 F.3d 1133, 1136-1137 (8th Cir. 2006) (plaintiff failed to

prove prima facie case where age difference was 2 ½ years); Grosjean v. First Energy Corp., 349

F.3d 332, 338-339 (6th Cir. 2006) (finding 3 years insufficient to establish prima facie case).[3]

## B.    Plaintiff Cannot Establish A Prima Facie Case Of Retaliation (Counts I, IV (Title VII) III, V (ADEA))

Title VII provides, in part, that it is unlawful for an employer to discriminate against an

employee because the employee "has opposed any practice made an unlawful employment

practice by [Title VII], or because [the employee] has made a charge, testified, assisted, or

participated in any manner in an investigation, proceeding, or hearing under [Title VII]." 42

U.S.C. § 2000e-3(a).  Title VII's anti-retaliation provision seeks to prevent an employer from

interfering (through retaliation) with an "employee's efforts to secure or advance enforcement of

the Act's basic guarantees." Burlington N. & Santa Fe Ry. Co. v. White, 126 S.Ct. 2405, 2412

(2006).

A prima facie case alleging retaliation or reprisal is established when the plaintiff

demonstrates that (1) he engaged in protected behavior; (2) the employer took an action against

---

[3] Additionally, both Mr. Stephens (born in 1947) and Mr. Phelps (born in 1945) are older than Plaintiff. See Exhibit 5 (Stephens Dep.) at 36:1-2; Exhibit 2 (Phelps Dep.) at 53:5-6. Their respective ages suggest that Plaintiff needs more than just allegations to establish a prima facie case. See Walker v. Dalton, 94 F. Supp. 2d 8, 16 (D.D.C. 2000) (finding no inference of pretext where one of the three panel members who ranked the applicants was of the same protected class as plaintiff); see also Horvath v. Thompson, 329 F. Supp. 2d 1, 5 (D.D.C.2004) (harder to establish gender discrimination when selecting official same gender as plaintiff).

19

plaintiff with material consequences such that it would dissuade a reasonable worker from making or supporting a charge of discrimination; and (3) there is a causal link between the action and the protected activity.  Rochon v. Gonzales, 438 F.3d 1211, 1219-20 (D.C. Cir. 2006); Stone-Clark v. Blackhawk, Inc., 460 F. Supp. 2d 91 (D.D.C. 2006); Edwards v. United States EPA, 456 F. Supp. 2d 72, 82 (D.D.C. 2006).  See also Burlington N. & Santa Fe Ry. Co. v. White, 126 S.Ct. at 2409; Barnette v. Chertoff,  453 F.3d 513 (D.C. Cir. 2006); Smith v. District of Columbia, 430 F.3d 450 (D.C. Cir. 2006); Carter v. George Wash. Univ., 387 F.3d 872, 878 (D.C. Cir. 2004) (McDonnell Douglas framework applies to Title VII and ADEA claims.).  In this case, Plaintiff cannot establish a prima facie case of retaliation under either Title VII or the ADEA, because there is no causal connection between his protected activity and the reassignment or Mr. Phelps's employment reference.

Defendant concedes that Plaintiff can establish the first two elements of a prima facie case of retaliation.  It is undisputed that Plaintiff provided deposition testimony on July 16, 2001, in the administrative discrimination case, Tighe v. Cuomo.  See Complaint at ¶¶ 17-18.  It is also undisputed that a Mediation Settlement Agreement between Plaintiff and Defendant was formally approved on December 4, 2002, resolving Plaintiff's administrative complaint.  See Exhibit 12.  The decision to reassign Plaintiff, which satisfies the second prong of the prima facie case, did not occur until December 2004, and was not communicated to Plaintiff until January 5, 2005.  See Exhibit 6 (Heist Dep.) at 62:8-21; 73:12-19; Exhibit 9.  Plaintiff admits that he did not file any administrative complaints or otherwise engage in any protected activity during 2003 or 2004.  See Exhibit 1 (Beard Dep.) at 51:19-23; 54:4-16; 72:2-7.

Since Plaintiff has no direct evidence to demonstrate retaliation, the Clark County case

20

controls. In Clark County, the United States Supreme Court instructed the lower courts that, in

the absence of direct evidence, a period in excess of three months is too long to establish a causal

connection between protected activity and the alleged discriminatory or retaliatory action. Clark

County School District v. Breeden, 532 U.S. 268, 273-74 (2001) (citing with approval cases

finding that temporal proximity of more than three months insufficient to demonstrate causal

connection between protected activity and adverse action). Similarly, in Mayers v. Laborers'

Health and Safety Fund of N. America, 478 F.3d 364 (D.C. Cir. 2007), the Court of Appeals

recently reaffirmed that the causation element of a prima facie case of retaliation requires

temporal proximity of less than three to four months.

    In this case, the passage of two years, from December 2002 to December 2004, is too

long a period of time to provide an inference of a causal connection between Plaintiff's protected

activity and the reassignment.[4] See Ball v. Tanoue, 133 F. Supp. 2d 84, 92 (D.D.C. 2001)

(finding that one-year time lag between protected activity and adverse employment action is too

great to establish prima facie case of retaliation); Hastie v. Henderson, 121 F. Supp.2d 72, 80

(D.D.C. 2000) (passage of nearly two years between events prevents finding of a causal

connection); Saunders v. DiMario, 1998 WL 525798 at *5 (D.D.C. 1998), aff'd,194 F.3d 175

---

[4] In addition, the management officials identified in Plaintiff's 2001 protected activity,
i.e., Susan Gaffney and Kathy Kuhl-Inclan, are not the same alleged discriminating officials
involved in this case. Plaintiff fails to produce evidence that demonstrates why Mr. Stephens,
Mr. Heist, or Mr. Phelps would logically be motivated by retaliation. See, e.g., Holcomb v.
Powell, 433 F.3d 889, 896-97 (D.C. Cir. 2006) (quoting Lathram v. Snow, 336 F.3d 1085, 1088
(D.C. Cir. 2003)) (The Court should weigh whether the plaintiff has proof that would permit a
reasonable jury to conclude that discrimination was a motivating factor for the challenged action,
looking to defendant's legitimate, non-discriminatory or non-retaliatory reasons for the
challenged decision and the evidence as a whole, in order to determine whether there is a need
for trial.).

21

(D.C. Cir 1999) ("The greater the time that elapses between the protected activity and the alleged acts of retaliation . . . the more difficult it is to demonstrate any causal connection and, absent any other evidence, where the gap is sufficiently great it is appropriate to grant judgment for the defendant as a matter of law."); Devera v. Adams, 874 F. Supp. 17, 21 (D.D.C. 1995) (eight months does not strongly suggest causal link); and Garrett v. Lujan, 799 F. Supp. 198, 202 (D.D.C. 1992) (lapse of one year too long to infer retaliation).

The foregoing argument applies equally to Mr. Phelps's employment reference in 2005. See Complaint at ¶ 47. More than two years elapsed between Plaintiff's prior protected activity, see Exhibit 9, and Mr. Phelps's conversation with Mr. Reardon. See Exhibit 8 (Phelps Affidavit) at 6; Exhibit 2 (Phelps Dep.) at 18:5-11. See Clark County School District v. Breeden, 532 U.S. at 273-74; Mayers v. Laborers' Health and Safety Fund of N. America, 478 F.3d 364 (D.C. Cir. 2007).

There is simply no evidence in the record to support a causal connection between the Plaintiff's protected activity in 2001 or 2002, and management's actions vis-a-vis Plaintiff in 2005. Indeed, senior officials were attempting to work with Plaintiff, trying to get him to adjust to the new, centralized management style. See Exhibit 6 (Heist Dep.) at 116:6-16. There is no evidence suggesting that management was concerned with or took action based upon Plaintiff's prior protected activity. Plaintiff's inaction supports this conclusion in that he did not file any administrative complaints or otherwise engage in any protected activity in 2003 or 2004. See Exhibit 1 (Beard Dep.) at 51:19-23; 54:4-16; 72:2-7. Because Plaintiff cannot show a causal connection between his protected activities and his reassignment, or Mr. Phelps's employment reference, he fails to establish a prima facie case of retaliation, and his claims should be

22

dismissed.

**C.    Plaintiff Has Not Adduced Evidence Showing That Defendant's Legitimate Non-Discriminatory Reasons For Reassigning Him Are Pretextual.**

Once the defendant has carried the burden of production, the McDonnell Douglas

framework is no longer relevant, and "the presumption raised by the prima facie case is rebutted,'

and 'drops from the case.'" St. Mary's Honor Center, 509 U.S. at 507 (quoting Burdine, 450

U.S. at 255 & n.10) (internal citations omitted). The burden then shifts back to the plaintiff to

establish that the defendant's legitimate, non-discriminatory reasons were not its true reasons but

rather were pretextual. See McDonnell Douglas, 411 U.S. at 802-04; Burdine, 450 U.S. at 252-

53. "[A] reason cannot be proved to be 'a pretext for discrimination' unless it is shown both that

the reason was false, and that discrimination was the real reason." St. Mary's Honor Center, 509

U.S. at 515 (emphasis in original). "It is not enough, in other words, to disbelieve the employer,

the factfinder must believe the plaintiff's explanation of intentional discrimination." Id. at 519.

Plaintiff bears the ultimate burden of persuasion on the issue of whether he was intentionally

discriminated against. Burdine, 450 U.S. at 253.

Even if a Court suspects that a plaintiff was victimized by an inaccurate consideration of

his qualifications, "it may not 'second-guess an employer's personnel decision absent

demonstrably discriminatory motive.'" Fischbach v. District of Columbia Dep't of Corrections,

86 F.3d 1180, 1183 (D.C. Cir. 1996) (quoting Milton v. Weinberger, 696 F.2d 94, 100 (D.C. Cir

1977)) ("It is axiomatic that under the statutory scheme of Title VII ... an employer may make an

employment decision for a good reason, a bad reason, or no reason at all so long as racial or other

discriminatory distinctions do not influence the decision."), aff'd, 595 F.2d 888 (D.C. Cir. 1979).

23

"Once the employer has articulated a nondiscriminatory reason for its actions ... the issue is not

"the correctness or desirability of [the] reasons offered ... [but] whether the employer honestly

believes in the reason it offers." Fischbach, 86 F.3d at 1183 (internal quotation marks and

citations omitted). "It is not enough for the plaintiff to show that a reason given for a job action

is not just, or fair, or sensible. He must show that the explanation given is a phony reason."

Pignato v. American Trans Air, 14 F.3d 342, 349 (7th Cir. 1994), quoted in Fischbach, 86 F.3d at

1183.

Further, "[t]o avoid summary judgment, the plaintiff [is] required to produce some

objective evidence showing defendant's proffered reasons are mere pretext." Batson v. Powell,

912 F. Supp. 565, 578 (D.D.C. 1996) (emphasis added). Nor may a plaintiff create a factual

issue of pretext merely on personal speculation of discriminatory or retaliatory intent. Greene v.

Dalton, 164 F.3d 671, 675 (D.C. Cir. 1999) ("a mere unsubstantiated allegation ... creates no

genuine issue of fact and will not withstand summary judgment.") (quoting Harding v. Gray, 9

F.3d 150, 154 (D.C. Cir. 1993)); see also Settle v. Baltimore County, 34 F. Supp.2d 969, 976 (D.

Md. 1999) (citing Felty v. Graves-Humphreys Co., 818 F.2d 1126, 1128 (4th Cir. 1987) ("[r]ecent

cases of the Supreme Court have made increasingly clear, however, the affirmative obligation of

the trial judge to prevent 'factually unsupported claims and defenses' from proceeding to trial")

(citations omitted)); Phillips v. Holladay Property Services, Inc., 937 F. Supp. 32, 35 n.2 (D.D.C.

1996), aff'd, 1997 WL 411695 (D.C. Cir. 1997) ("[A] plaintiff's denial of defendant's articulated

legitimate reason without producing substantiation for the denial is insufficient to withstand a

motion for summary judgment."). In this case, even assuming, arguendo, that Plaintiff could

prove a prima facie case, Plaintiff cannot possibly establish pretext. This fact creates an

alternative and independent ground for summary judgment in Defendant's favor.

        1.     Plaintiff's Reassignment To Washington, D.C.

      Plaintiff's reassignment resulted from his supervisors' assessment that he could not adjust

to the change from a decentralized to a centralized system of management. See Exhibit 6 (Heist

Dep.) at 116:11-19. Plaintiff readily admits that he preferred the decentralized system. See

Exhibit 1 (Beard Dep.) at 25:12-15. Under the decentralized system, Plaintiff had the power and

freedom to decide what audits to bring and against whom to bring them. See id. at 20:11-13;

25:8-11. This kind of unfettered decision-making changed significantly in March 2002, when

Kenneth Donahue became the new Inspector General at HUD OIG. See id. 16:20 - 17:6; Exhibit

2 (Phelps Dep.) 26:11-20. Plaintiff admits that under Mr. Donahue "empowerment was over,"

meaning that "the regional inspectors general and the special agents in charge were going to have

more of their actions approved in headquarters." See Exhibit 1 (Beard Dep.) at 24:2-6.

      Plaintiff's inability to get in step with the new management style is demonstrated by his

work product and his attitude towards taking direction from headquarters. For example, with

respect to Region VI's work on the CPD audit, "there was great concerns by the auditee and

others that there were significant inaccuracies in that report.." See Exhibit 5 (Stephens Dep.) at

33:2-12; 33:16-18. The concerns were so great that Mr. Donahue asked Mr. Stephens "to get

involved and resolve it." See id. at 34:1-2; 36:1-2; Exhibit 4. To resolve the problems, Mr.

Stephens, Mr. Heist, and Mr. Phelps "decided collectively to bring in other auditors from other

regions, and . . .did so at considerable cost and time . . ." See Exhibit 5 (Stephens Dep.) at 34:8-

15. According to Mr. Stephens, "it took [the other auditors] probably 60-90 days to resolve the

issues," before "we finally were able to publish the audit." See id. at 34:16-17. Neither before

the CPD audit nor since, has Mr. Donahue asked Mr. Stephens to get personally involved in a

draft audit. See id. at 34:3-7.

Another problem with Region VI's work product concerned draft audit reports that lacked

proper criteria to support the findings. See Exhibit 6 (Heist Dep.) at 90:9-11. Specifically,

"[t]here were circumstances where in developing draft audit reports, developing audit findings,

there were legal issues associated with those findings that were not developed effectively because

Mr. Beard nor his staff had sought the advice of our legal counsel in vetting those issues." See

id. at 90:12-17; Exhibit 7 (Heist Affidavit) at 3.  In one instance, after the issuance of the

Jazzland report,

> [t]he program office raised an issue with respect to one of the
> findings, and misapplication of criteria that the audit reports
> asserted applied to some recipients but in fact the organization that
> received the funds, a guaranteed loan, was a for-profit entity, and
> therefore, did not meet the definition of a recipient, and as a
> consequence, there was no basis for recovering . . . this
> approximately 7 million ineligible costs.

See id. at 106:2-11.

On another occasion, Plaintiff "sent a draft audit report to Headquarters on CVR

Associates," wherein "he inappropriately cited his criteria for his audit finding as being OMB

Circular A-87." See Exhibit 8 (Affidavit of Michael R. Phelps) ("Phelps Affidavit") at 2.  Citing

OMB Circular A-87 was inappropriate because it "applies to non-profits and CVR Associates is

a 'for profit' company." See id.  Plaintiff admits that he was responsible for the draft audits that

were produced by Region VI, that he reviewed the CVR audit before it was sent to Headquarters,

and that using A-87 was incorrect. See Exhibit 1 (Beard Dep.) at 68:19 - 69:13.  When Region

VI did not fully vet legal issues before sending a draft audit to Headquarters, it created additional

26

work for TOP, which had "a negative impact" because it "[t]ook additional time and resources of [TOP] staff to deal with the issues. See Exhibit 3 (McLeod Dep.) at 65:12-16; 66:13-19; Exhibit 10 (December 17, 2004, Memorandum).

The CVR audit is also an example of Plaintiff's failure to adhere to OIG policy with respect to submitting a survey report. See Exhibit 8 (Phelps Affidavit) at 2. The Audit Operations Manual requires the submission of a survey report during an audit. See id. For the CVR Associate audit, Plaintiff failed to submit a survey report. "In fact the first time Headquarters became aware of the specific issues in the audit was when it received the [Plaintiff's] draft audit report. Had he provided a survey report, Headquarters would have been put on notice of the issues involved, including the inappropriate criteria that the [Plaintiff] was entertaining, and could have addressed such matters much earlier." See id. at 2-3. Moreover, the CVR audit demonstrates Region VI's use of inappropriate language. "It was language that, in [management's] judgment, violated the auditing standards, [by] not . . . avoiding the use of adjectives that were of a subjective nature." See Exhibit 6 (Heist Dep.) at 99:11-15; Exhibit 18 (Heist Memorandum) at 10.

In addition to the problems with Region VI's work product, Plaintiff's supervisors were concerned about Plaintiff's attitude towards Headquarters and the impact it was having on the Region VI staff. According to Mr. Heist, Plaintiff "and his staff were resistant" to the change from a decentralized to a centralized style of management, and that Plaintiff "questioned the level of headquarters oversight . . ." See Exhibit 6 (Heist Dep.) at 116:9-13. Mr. Stephens expected his managers to understand that direction had to come from Headquarters. See Exhibit 5 (Stephens Dep.) at 32:8 - 33:1. Mr. Donahue and Mr. Stephens expected the managers in the

27

field to implement and support the tone, priorities, and policies set by senior staff. See id.

However,

> when you have region in which you feel that is working against
> you, and that it's fairly open and vocal about their disagreements
> and demeanor of [sic] headquarters, it becomes a contagious thing,
> and that's a concern to us, is incumbent upon us to try to evaluate
> what the reasons are for that, and after a significant period of time,
> we determined part of the major reason was because of Mr.
> Beard's attitude towards headquarters, and his employees felt
> comfortable joining in.

See id. During the three years prior to Plaintiff's transfer to Washington, D.C., Mr. Stephens

visited every investigative and audit office in the country, "[a]nd compared to those experiences,

[his] overall feeling was, when [he] left Fort Worth, is that there is a climate of, let's take them

on, of disgruntled, disgruntled people." See id. at 31:17 - 32:2.

　　　Mr. Phelps had a very similar experience when he visited Fort Worth for Plaintiff's two-

day staff conference in 1994. See Exhibit 2 (Phelps Dep.) at 63:6-9. "A large part of that time

issues kept coming up, . . . staff members . . . were [making] . . . a lot of derogatory comments

about . . . the people in TOP and their abilities; whether they were capable, qualified, knew what

they were doing." See id. at 63:10-17. Mr. Phelps's impression of Plaintiff and the Region VI

staff was that the staff was not acting professionally in the way they addressed Headquarters and

TOP staff. See id. Mr. Phelps believes that Plaintiff "should have been able to get a handle on

with these people, and find a way to voice legitimate concerns without doing it in a demeaning,

derogatory manner. And [he] didn't see that happening." See id. at 64:2-13.

　　　Moreover, Mr. McLeod and his TOP staff experienced the argumentative attitude

emanating from Plaintiff's region. If there was a disagreement between a region and the TOP

staff, "we would usually vet that, have discussions, telephone discussions, review the criteria, et

cetera, and most Regional Inspector Generals would accept the word of Jim Heist, who was their

boss, as far as this is the way it will go. But often in Region 6 it was not the case. Even if Jim

Heist said it was wrong, it would still be argued." See Exhibit 3 (McLeod Dep.) at 73:18 - 74:6.

For example, in a June 15, 2004, email from TOP, Mr. McLeod tells Plaintiff to remove Finding

3 from the CPD audit, and that Mr. Heist does not want any further discussion about it. See

Exhibit 14 (June 14, 2004 email); Exhibit 1 (Beard Dep.) at 62:21 - 63:4. However, on June 16,

2004, one of Plaintiff's subordinates, Laura Nixon, sent Mr. Heist an email questioning the

wisdom of his decision-making. See Exhibit 15 (June 16, 2004 email).

      Mr. Heist, too, thought that Plaintiff's "attitude towards headquarters in essence adversely

affected the way . . . the staff interacted with headquarters. See Exhibit 6 (Heist Dep.) at 114:10-

13. In fact, in response to Ms. Nixon's email, Mr. Heist sent an email to Mr. Phelps stating that

"[w]e've got to figure out a way to impress upon Beard that, at least for his staff's sake, he needs

to make some attitude adjustments." See Exhibit 15. It became apparent that Plaintiff set the

tone that "it was acceptable, even encouraged, to question headquarters, argue with headquarters

. . ." See Exhibit 6 (Heist Dep.) at 114:13-15. Although Mr. Heist "always encouraged voicing

opinions," it was his "job to make a decision and then move on. Oftentimes that's what wasn't

happening. Instead of moving on, either [Plaintiff] or his staff would raise issues again, argue the

same points over again, and it was counterproductive." See id. at 114:17 - 115:1.

      For two years, "[f]rom 2002 through 2004," management waited for Plaintiff to adjust to

the centralized philosophy. See id. at 116:11-16. Ultimately, management concluded that

Plaintiff could not adjust. See id. at 116:17-19. Management "made a judgment that, if you

29

looked at the totality of what [Region VI] did, that . . . a better way to handle it was to reassign

[Plaintiff], rather than pursue a performance-based action." See id. at 113:5-9. Plaintiff "could

continue to make a contribution to the organization in the capacity of a special assistant. He

could do so without losing any grade or pay." See id. at 113:10-13.

While Plaintiff may feel that management's decision to reassign him is totally unfair, "[i]t

is not enough for the plaintiff to show that a reason given for a job action is not just, or fair, or

sensible. He must show that the explanation given is a phony reason." Pignato v. American

Trans Air, 14 F.3d at 349, quoted in Fischbach, 86 F.3d at 1183. Plaintiff cannot demonstrate

that the reasons summarized above are phony. In sum, there is no evidence to suggest that age or

retaliation were factors in management's decision to reassign Plaintiff, and he cannot "show that

a reasonable jury could conclude from all of the evidence that this determination was made for a

discriminatory [or retaliatory] reason." Holcomb v. Powell, supra, 433 F.3d 889 (D.C. Cir.

2006).

### 2.   Mr. Phelps's Employment Reference

In January 2005, Plaintiff applied for the position of Deputy Assistant Inspector General

for Audit with the Office of Inspector General for the Department of Defense. See Complaint at

¶ 47. Plaintiff alleges that he was denied the position because of "an unjustified, negative

reference" provided by Mr. Michael Phelps, and that this was in retaliation for his prior protected

activities. See Complaint at ¶ 49, 51, Counts IV and V.

Mr. Robert Reardon from the Department of Defense called Mr. Phelps and asked him

"to provide [his] views of the [Plaintiff] as an employee as he was considering the [Plaintiff]

for a position with his agency." See Exhibit 8 (Phelps Affidavit) at 6; Exhibit 2 (Phelps Dep.) at

18:5-11. Mr. Phelps "told Mr. Reardon a lot of positive things about the [Plaintiff]." See id.
Specifically, he told Mr. Reardon "that Mr. Beard was a bright individual; that he was well-credentialed; that he had a staff when he was in Ft. Worth that worked well with him . . ." See
Exhibit 2 (Phelps Dep.) at 19:2-6.

When Mr. Reardon specifically asked Mr. Phelps why Plaintiff came to Washington,
D.C., see id. at 20:1-4, he told Mr. Reardon that the agency had gone through a change in
administration, and that the agency became "very much control-oriented regarding what was
going on in the field and what managers were doing, and that Mr. Beard had trouble . . . making
that transition to that method of operation." See id. at 20:8-19. Mr. Phelps told Mr. Reardon that
Plaintiff "could not get in step with that new direction, which is why it was necessary to bring
[Plaintiff] to Headquarters as opposed to allowing him to continue to run a region." See Exhibit
8 (Phelps Affidavit) at 6. He also told Mr Reardon that Plaintiff "was someone that could
probably perform very well in the new environment where he knew, going in, what was expected
of him, . . . as opposed to the situation . . .where he was allowed to operate one way and then that
got changed subsequently." See Exhibit 2 (Phelps Dep.) at 25:13-19.

Mr. Phelps believes that his statements to Mr. Reardon were truthful, see Exhibit 2
(Phelps Dep.) at 34:9-11, and that Plaintiff's prior EEO activity did not influence or affect the
recommendation he provided. See id. at 54:2-5. As noted above, "a reason cannot be proved to
be 'a pretext for discrimination' unless it is shown both that the reason was false, and that
[retaliation] was the real reason." St. Mary's Honor Center, 509 U.S. at 515 (emphasis in
original). Again, Plaintiff cannot "show that a reasonable jury could conclude from all of the
evidence that [the employment recommendation] was made for a [retaliatory] reason." Holcomb

31

v. Powell, supra, 433 F.3d 889 (D.C. Cir. 2006).

## IV.    CONCLUSION

Based upon the foregoing, Defendant respectfully requests that the Court grant him

judgment on all claims herein and dismiss Plaintiff's complaint with prejudice.

Respectfully submitted,

_____ /s/ _____

JEFFREY A. TAYLOR, DC Bar #498610
United States Attorney

_____ /s/ _____

RUDOLPH CONTRERAS, DC Bar #434122
Assistant United States Attorney

_____ /s/ _____

KAREN L. MELNIK, DC Bar #436452
Assistant United States Attorney
555 4th Street, N.W.
Washington, D.C. 20530
(202) 307-0338

Of Counsel:
Tiffanie Smith
U.S. Department of Housing and Urban Development
Washington D.C.

Richard Johnson
Office of Inspector General
Washington D.C.

32